# EXHIBIT 4

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
(Cite as: Slip Copy)

Page 1

C

In re Verisign, Inc., Derivative Litigation
N.D.Cal.,2007.

United States District Court,N.D. California.
In re VERISIGN, INC., DERIVATIVE LITIGA-
TION.
This Order Applies to: All Actions.
No. C 06-4165 PJH.

Sept. 14, 2007.

Betsy Carol Manifold, Francis M. Gregorek, Marisa
C. Livesay, Rachele R. Rickert, Wolf Haldenstein
Adler Freeman & Herz LLP, San Diego, CA, for
Ruthy Parnes in the Right of and for the Benefit of
"Verisign Inc.".

Edward F. Mannino, Esq., Akin Gump Strauss
Hauer & Feld LLP, Philadelphia, PA, for D. James
Bidzos.

Steve Shea Kaufhold, Akin Gump Strauss Hauer &
Feld LLP, San Francisco, CA, for D. James Bidzos,
William L. Chenevich, David J. Cowan, Dana L.
Evan, Quentin P. Gallivan, Michelle Guthrie, Diana
S. Keith, Robert J. Korzeniewski, Scott G. Kriens,
Len J. Lauer, Roger H. Moore, Edward A. Mueller,
Anil H.P. Pereira, Gregory L. Reyes, William A.
Roper, Jr., Arnold Schaeffer, Stratton D. Sclavos,
Louis A. Simpson and Richard A. Yanowitch.

**ORDER GRANTING MOTIONS TO DISMISS;
ORDER GRANTING MOTION TO COMPEL
ARBITRATION**

PHYLLIS J. HAMILTON, United States District
Judge.

*1 The motions of nominal defendant VeriSign,
Inc. ("VeriSign") and the twenty-two individual de-
fendants for an order dismissing the consolidated
amended complaint, and the motion of defendant
KPMG LLP ("KMPG") for an order compelling ar-
bitration came on for hearing before this court on
May 23, 2007. Plaintiffs appeared by their counsel
Francis M. Gregorek, Marisa C. Livesay, Stephen
R. Basser, and John L. Haurssler; VeriSign ap-
peared by its counsel Christopher H. McGrath, Bri-

an Davis, and Thomas Zaccaro; the individual de-
fendants appeared by their counsel Steven Kauf-
hold; and KPMG appeared by its counsel Dale E.
Barnes and Stephanie L. Thomases. Having read
the parties' papers and carefully considered their ar-
guments and the relevant legal authority, and good
cause appearing, the court hereby GRANTS Ver-
iSign's motion and KMPG's motion, and GRANTS
the individual defendants' motion in part and
DENIES it in part.

**BACKGROUND**

This is a shareholder derivative action brought on
behalf of nominal defendant VeriSign ("the Com-
pany") against certain former and current officers
and directors of VeriSign and against its independ-
ent auditor, asserting violations of state and federal
law, based on alleged backdating of stock option
grants.

VeriSign, which was founded in April 1995, is a
Delaware corporation with its principal place of
business in California. VeriSign provides Internet-
related digital infrastructure, including communica-
tions services and content services, as well as
products and services that protect online and net-
work interactions. VeriSign is also the authoritative
directory provider of all *.com, .net, .cc,* and *.tv* do-
main names. According to its website, VeriSign
processes as many as 18 billion Internet interac-
tions and supports more than 100 million phone
calls a day.

Named plaintiffs Ruthy Parnes and Port Authority
of Allegheny County Retirement and Disability Al-
lowance Plan for Employees Represented by Local
85 of the Amalgamated Transit Union allege that
defendants granted millions of dollars' worth of
backdated options on ten dates between October 30,
1998, and February 21, 2002, to certain high-level
VeriSign executives, in violation of the Company's
shareholder-approved stock option plans.

A stock option granted to an employee or director
of a company allows the employee or director to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

purchase company stock at a specified "exercise" or "strike" price, for a specified period of time. When an employee or director exercises an option, he or she purchases stock from the company at the exercise price, regardless of the market price of the stock on the date the option is exercised. Such stock options are generally granted in order to create incentives for employees and directors to boost profitability and the company's stock value.

If the persons responsible for the pricing and/or approval of a stock option grant retroactively base the exercise price for the option on a day when the market price was lower than the price on the day the option is actually granted, the employee or director pays less and the company gets less money for the stock when the option is exercised. Backdating option grants is not per se illegal, assuming it is permitted under the tax laws and the company's bylaws and/or shareholder-approved stock option plans. What may be unlawful is a company's failure to disclose the backdating or to report the proper compensation expense in its financial statements and other public filings.

**\*2** According to plaintiffs, VeriSign had three stock option plans in effect during the time that the allegedly backdated options were granted. The 1998 Equity Incentive Plan ("the 1998 Plan"), as amended, "provides for the granting of incentive stock options ('ISOs') to employees as administered by the Board."The 1998 Plan specifies that "the Exercise Price of an ISO will be not less than 100% of the Fair Market Value of the share on the date of the grant."CAC ¶ 66(a). The 1998 Plan is "administered by the Compensation Committee, which 'determines the persons who are to receive Awards, the number of shares subject to each Award and the terms and conditions of each such Award.'" CAC ¶ 67.

The 1998 Directors Stock Option Plan ("the 1998 Directors Plan"), as amended, "provides for the granting of non-qualified stock options ... to certain non-employee members of the VeriSign Board of Directors, as administered by the Board."The 1998 Directors Plan specifies that "[t]he exercise price of

an Option shall be the Fair Market Value ... of the shares, at the time that the Option is granted."CAC ¶ 66(b).

The 2001 Stock Incentive Plan ("2001 Plan") "provides for the granting of non-qualified stock options to officers, consultants, independent contractors and advisors of the Company as administered by the Board, or a Committee thereof."The 2001 Plan provides that "[t]he exercise price of an Option ... may not be less than the par value of the shares on the date of the grant."CAC ¶ 66(c).

In the period between late 2005 and June 2006, a series of articles appeared in major U.S. publications including *The Wall Street Journal* and *Forbes,* regarding the backdating of options granted to senior executives, directors, and employees at public companies. The articles reported the unusually high returns received on those options, and noted that a suspiciously large number of options were ostensibly granted at times when stock prices were at periodic lows, followed by sharp increases in price.

On June 26, 2006, VeriSign received a grand jury subpoena from the United States Attorney for the Northern District of California requesting documents relating to VeriSign's stock option grants and practices. The following day, VeriSign issued a press release stating that the Company intended to cooperate with the U.S. Attorney's office in connection with the subpoena. VeriSign also reported that it had received an informal inquiry from the Securities and Exchange Commission requesting documents relating to the Company's stock option grants and practices, and that it was voluntarily responding to the request and intended to cooperate fully with the SEC. VeriSign added, however, that prior to receiving either of those requests, its Board of Directors, assisted by independent legal counsel, had commenced an internal review and analysis of the Company's historical stock option grants, which internal review was continuing.

**\*3** The first complaint in the present consolidated shareholder derivative action was filed on July 5, 2006. Plaintiffs did not make a demand on Ver-

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

iSign's Board of Directors before filing suit. The Verified Consolidated Amended Shareholder Derivative Complaint ("CAC"), filed November 20, 2006, alleges nineteen causes of action, sixteen of which (first through thirteenth, and seventeenth through nineteenth) assert claims against some or all of the twenty-two individual defendants, and three of which (fourteenth through sixteenth) assert claims against VeriSign's outside auditor, KPMG.

Plaintiffs divide the twenty-two individual defendants into two groups-nine "option defendants," alleged to have received backdated options; and thirteen "director defendants," members of VeriSign's Board of Directors at various times during the period 1998 to the present. Plaintiffs assert that the director defendants, at the behest of the option defendants, improperly backdated the option grants to make it appear as though the grants had been made on dates when the market price of VeriSign stock was lower than the market price on the actual grant dates. Plaintiffs assert that options purportedly granted on three dates in 1998 (October 30, December 15, and December 18), on two dates in 2000 (August 1 and December 29), on four dates in 2001 (March 15, May 2, August 1, and September 6), and on one date in 2002 (February 21) were backdated.

Plaintiffs assert that the alleged backdating violated the terms of the Company's shareholder-approved option plans, and also resulted in option grants with lower exercise prices, which improperly increased the value of the options granted, and improperly reduced the amount the defendants had to pay the Company upon exercise of the options. They also claim that VeriSign failed to record the proper compensation expense, and now faces potential tax and accounting consequences.

The option defendants are Stratton D. Sclavos, Quentin P. Gallivan, Richard A. Yanowitch, Dana L. Evan, Arnold Schaeffer, Diana S. Keith, Robert J. Korzeniewski, Anil H.P. Pereira, and F. Terry Kremian.

Stratton D. Sclavos ("Sclavos") served as President and Chief Executive Officer ("CEO") and as a director of VeriSign from July 1995 until May 2007.FN1 In December 2001, he was named Chairman of the Board. Sclavos was allegedly also a member of VeriSign's Compensation Committee from 1999 through 2002.FN2 Plaintiffs assert that Sclavos received six backdated option grants-a grant dated October 30, 1998, for 400,000 shares at the exercise price of $7.67; a grant dated December 15, 1998, for 400,000 shares at the exercise price of $12.31; a grant dated December 29, 2000, for 100,000 shares at the exercise price of $74.19; a grant dated May 2, 2001, for 100,000 shares at the exercise price of $59.40; a grant dated August 1, 2001, for 1,225,000 shares at the exercise price of $55.94; and a grant dated February 21, 2002, for 600,000 shares at the exercise price of $22.71. Plaintiffs also allege that between May 19, 1998 and December 16, 2005, Sclavos sold approximately 2,661,473 shares of VeriSign common stock for proceeds of over $206 million.

> FN1. At the time plaintiffs filed the present action, Sclavos was still President and CEO of VeriSign.

> FN2. *See* CAC ¶ 9. The court notes, however, that VeriSign's public filings state that the Company had a three-member Compensation Committee-and Sclavos does not appear to have been one of the three members. For example, VeriSign's Form 10-K/A for fiscal year ending December 31, 1999, filed on April 27, 2000, states that the members of the Compensation Committee as of that date were Cowan, Bidzos, and Chenevich. The Definitive Proxy Statement issued April 20, 2001, with the notice of the 2001 annual meeting of VeriSign's stockholders, states that the members of the Compensation Committee as of that date were Bidzos, Chenevich, and Cowan. The Definitive Proxy Statement issued April 10, 2002, with the notice of 2002 annual meeting of VeriSign's stockholders, states that the members of the Compensation Committee

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

as of that date were Bidzos, Cowan, and Reyes.

**\*4** Quentin P. Gallivan ("Gallivan") served as VeriSign's Executive Vice-President of Worldwide Sales, from 1997 through 2005. Plaintiffs allege that Gallivan received six backdated option grants-a grant dated October 30, 1998, for 180,000 shares at the exercise price of $7.67; a grant dated August 1, 2000, for 125,000 shares at the exercise price of $151.25; a grant dated December 29, 2000, for 50,000 shares at the exercise price of $74.19; a grant dated March 15, 2001, for 35,000 shares at the exercise price of $34.00; a grant dated September 6, 2001, for 90,000 shares at the exercise price of $34.16; and a grant dated February 21, 2002, for 100,000 shares at the exercise price of $22.71. Plaintiffs assert that between May 20, 1998 and November 25, 2005, Gallivan sold approximately 720,705 shares of VeriSign common stock for proceeds of over $53 million.

Richard A. Yanowitch ("Yanowitch") served as VeriSign's Executive Vice President of Internet Services from approximately 1996 to 2001. Plaintiffs assert that Yanovitch received one backdated option grant-a grant dated October 30, 1998, for 180,000 shares at the exercise price of $7.67-and that between May 19, 1998 and August 29, 2000, Yanowitch sold 608,156 shares of VeriSign common stock for proceeds of over $67 million.

Dana L. Evan ("Evan") joined VeriSign in May 1996 and was the Executive Vice-President of Finance and Administration and the Chief Financial Officer ("CFO") until approximately July 2007.FN3 Plaintiffs allege that Evan received six backdated option grants-a grant dated October 30, 1998, for 240,000 shares at the exercise price of $7.67; a grant dated August 1, 2000, for 125,000 shares at the exercise price of $151.25; a grant dated December 29, 2000, for 25,000 shares at the exercise price of $74.19; a grant dated March 15, 2001, for 40,000 shares at the exercise price of $34.00; a grant dated September 6, 2001, for 90,000 shares at the exercise price of $34.16; and a

grant dated February 21, 2002, for 100,000 shares at the exercise price of $22.71. Plaintiffs also assert that between May 19, 1998 and February 14, 2006, Evan sold approximately 654,743 shares of VeriSign common stock for over $62 million in proceeds.

> FN3. At the time plaintiffs filed the present action, Evan was still VeriSign's CFO.

Arnold Schaeffer ("Schaeffer") joined VeriSign in January 1996 and served for some period of years as Executive Vice-President of Engineering. Plaintiffs allege that Schaeffer received one backdated option grant-a grant dated October 30, 1998, for 360,000 shares at the exercise price of $7.67-and that between May 19, 1998 and November 19, 1999, Schaeffer sold 172,529 shares of VeriSign common stock for proceeds of over $14.5 million.

Diana S. Keith ("Keith") joined VeriSign as Director of Customer Services in June 1996, and was promoted to Senior Vice-President of Customer Advocacy in August 1998. She left VeriSign in approximately 2001. Plaintiffs assert that Keith received one backdated option grant-a grant dated August 1, 2000, for 50,000 shares at the exercise price of $151.25.

**\*5** Robert J. Korzeniewski ("Korzeniewski") joined VeriSign in 2000 and is the Executive Vice-President of Corporate Development and Strategy. Plaintiffs allege that Korzeniewski received three backdated option grants-a grant dated March 15, 2001, for 35,000 shares at the exercise price of $34.44; a grant dated September 6, 2001, for 90,000 shares at the exercise price of $34.16; and a grant dated February 21, 2002, for 100,000 shares at the exercise price of $22.71. Plaintiffs also assert that between August 1, 2000 and February 14, 2006, Korzeniewski sold approximately 239,150 shares of VeriSign common stock for over $14 million in proceeds.

Anil H.P. Pereira ("Pereira") served as Executive Vice-President and General Manager of the Enterprise/Services Provider Division of VeriSign from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

1997 to 2003. Plaintiffs allege that Pereira received two backdated option grants-a grant dated March 15, 2001, for 35,000 shares at the exercise price of $34.44; and a grant dated September 6, 2001, for 50,000 shares at the exercise price of $34.16. Plaintiffs also assert that between January 31, 2001 and November 29, 2001, Pereira sold approximately 84,600 shares of VeriSign common stock for over $4.5 million in proceeds.

F. Terry Kremian ("Kremian") served as Executive Vice-President and General Manager, Finance and Administration, and CFO of VeriSign from December 2001 through 2003. Plaintiffs allege that Kremian received one backdated option grant-a grant dated February 21, 2002, for 180,000 shares at the exercise price of $22.71.

The director defendants are thirteen current or former directors of VeriSign, all of whom signed 10-Ks with allegedly false financial statements, and some of whom are alleged to have been members of the Compensation Committee, the Audit Committee, or the Nominating and Corporate Governance Committee at various times, including at the time of the backdated option grants; to have sold VeriSign stock during the relevant time period; or to have been "implicated" in options backdating at other companies. However, none of the director defendants is alleged to have received backdated VeriSign options.

The director defendants are D. James Bidzos, William Chenevich, Kevin R. Compton, David J. Cowan, Michelle Guthrie, Scott G. Kriens, Len J. Lauer, Roger H. Moore, Edward A. Mueller, Gregory L. Reyes, William A. Roper, Louis A. Simpson, and Timothy Tomlinson.[FN4]

> FN4. The CAC does not clearly indicate whether the individual director defendants were inside directors or outside directors, though it appears that most were outside directors.

D. James Bidzos ("Bidzos") served as CEO of VeriSign from April 1995 to July 1995, as Chairman of the Board from April 1995 to December 2001, as Vice Chairman of the Board from December 2001 to August 2007, and presently serves as Chairman of the Board.[FN5] He served on the Compensation Committee for an undetermined period of time.[FN6] Plaintiffs allege that between August 5, 1998 and May 22, 2001, Bidzos sold approximately 6,353,466 shares of VeriSign common stock for proceeds of over $570 million.

> FN5. At the time plaintiffs filed the present action, Bidzos was still Vice Chairman of the Board.

> FN6. In CAC ¶ 44, plaintiffs allege that Bidzos served on the Compensation Committee from 1999 through 2002. However, in CAC ¶ 93, plaintiffs indicate that Bidzos served on the Compensation Committee from 1998 through 2004.

William Chenevich ("Chenevich") has been a member of the Board of VeriSign since the Company's founding in 1995. He was a member of the Compensation Committee for some undetermined period of time.[FN7] Plaintiffs allege that between November 24, 1999 and February 10, 2004, Chenevich sold approximately 9,188 shares of VeriSign common stock for proceeds of over $400,000.

> FN7. In CAC ¶ 46, plaintiffs allege that Chenevich was a member of the Compensation Committee from 1999 through 2002. However, in CAC ¶ 93, plaintiffs indicate that Chenevich was a member of the Compensation Committee from 1998 through 2000.

**\*6** Kevin R. Compton ("Compton") served on the VeriSign Board from February 1996 until March 2005, and was a member of the Audit Committee from 1998 through 2002.

David J. Cowan ("Cowan") was a member of the VeriSign Board and served on the Compensation Committee for some undetermined period of time.[FN8] Plaintiffs allege that between October 27, 1998 and August 5, 2003, Cowan sold approximately 682,068 shares of VeriSign common stock for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
(Cite as: Slip Copy)

proceeds of over $31 million.

> FN8. In CAC ¶ 48, plaintiffs allege that Cowan was a member of the Compensation Committee from 1999 through 2002. However, in CAC ¶ 93, plaintiffs indicate that Cowan was a member of the Compensation Committee from 1998 through 2002.

Michelle Guthrie ("Guthrie") has served as a member of the VeriSign Board since December 2005, and is currently a member of the Compensation Committee.

Scott G. Kriens ("Kriens") has been a member of the VeriSign Board since January 2001. He was a member of the Compensation Committee in 2001 and 2002, and is currently a member of the Nominating and Corporate Governance Committee.

Len G. Lauer ("Lauer") was a member of the Board and the Compensation Committee from February 2004 until July 2006.

Roger H. Moore ("Moore") has served as a member of the VeriSign Board since February 2002. He served on the Compensation Committee in 2002.

Edward A. Mueller ("Mueller") joined the VeriSign Board in March 2005, was appointed to the Compensation Committee effective August 1, 2006, and was elected Chairman of the Board in May 2007. He resigned from the Board in August 2007.

Gregory L. Reyes ("Reyes") was a member of the VeriSign Board from April 2001 until July 2006. He served on the Compensation Committee for an undetermined period of time.[FN9]

> FN9. In CAC ¶ 55, plaintiffs allege that Reyes was a member of the Compensation Committee from 2002 through July 2006. However, in CAC ¶ 93, plaintiffs assert that Reyes served on the Compensation Committee beginning in 2001.

William A. Roper ("Roper") has been a member of the VeriSign Board since November 2003. He is currently President and CEO of VeriSign (having replaced Sclavos), and previously served on the Nominating and Corporate Governance Committee and on the Audit Committee. Plaintiffs allege that between August 4, 2000 and November 30, 2000, Roper sold approximately 32,050 shares of VeriSign common stock for proceeds of over $3.87 million.

Louis A. Simpson ("Simpson") has been a member of the VeriSign Board since May 2005, and currently serves as Chair of the Compensation Committee.

Timothy Tomlinson ("Tomlinson") was a member of the VeriSign Board from April 1995 through May 2002, and served as Secretary of the Company from April 1995 until October 2000. Plaintiffs allege that between August 6, 1998 and November 13, 2001, Tomlinson sold approximately 93,306 shares of VeriSign common stock for proceeds of over $10.9 million.

The option defendants and the director defendants are referred to collectively as the "individual defendants." In addition, the seven option defendants and five director defendants who sold shares of VeriSign stock at various times during the period between 1998 and 2006 are referred to as the "insider selling defendants." The insider selling defendants are Sclavos, Gallivan, Yanowitch, Evan, Schaeffer, Korzeniewski, Pereira, Bidzos, Chenevich, Cowan, Roper, and Tomlinson.

*7 The 116-page CAC pleads nineteen causes of action-thirteen state law claims asserted against some or all of the individual defendants, three state law claims asserted against KMPG, and three federal securities claims asserted against some but not all of the individual defendants. Plaintiffs allege

(1) a claim of breach of fiduciary duty and/or aiding and abetting, against all the individual defendants, alleging that they colluded in a scheme to backdate option grants and cover up their misconduct;

(2) a claim of improper accounting, against all the

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

individual defendants, in connection with alleged backdating of option grants;

(3) a claim of unjust enrichment, against the option defendants, in connection with receipt of backdated option grants and proceeds received through exercising options;

(4) a claim for rescission, against the option defendants, alleging that backdated option grants were invalid under terms of VeriSign's shareholder-approved stock option plans;

(5) a claim of constructive fraud, against all individual defendants, alleging aiding and abetting in the making of misrepresentations to VeriSign's shareholders;

(6) a claim of corporate waste, against all individual defendants, based on allegation that they were unjustly enriched at the expense of the Company;

(7) a claim of breach of contract, against the option defendants, based on their alleged breach of employment agreements with VeriSign and violation of the Company's shareholder-approved stock option plans;

(8) a claim under California Corporations Code § 25402, against the insider selling defendants, for selling VeriSign common stock while in possession of material, adverse, undisclosed information about the Company;

(9) a claim under California Corporations Code § 25403, against the director defendants, alleging that they controlled the insider selling defendants' sale of VeriSign stock;

(10) a claim of gross mismanagement, against all individual defendants, based on the allegation that they abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company;

(11) a claim for restitution, against the option defendants, based on the assertion that VeriSign has a right to recover any of the proceeds received by these defendants as a result of their exercise of the

allegedly backdated options;

(12) a claim for restitution, against defendants Sclavos, Kremian, and Evan;

(13) a claim of breach of fiduciary duty, against the director defendants, for failing to bring suit against KPMG;

(14) a claim of negligence/professional malpractice, against KPMG, based on the allegation that KPMG failed to perform audits in accordance with GAAS;

(15) a claim of breach of contract, against KPMG, based on the allegation that KPMG breached its contract with VeriSign;

(16) a claim of aiding and abetting breach of fiduciary duty, against KPMG, based on the assertion that KPMG aided and abetted VeriSign's officers and directors in breaching their fiduciary duties, in that KPMG knew about and participated in the alleged director and officer misconduct;

**\*8** (17) a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, against the director defendants and defendant Evan, based on the allegation that these defendants disseminated and approved financial statements, in the Company's Form 10-K filings for fiscal years 1998 through 2005, which did not disclose the Company's alleged option backdating practices;

(18) a claim under § 14(a) of the Securities Exchange Act and Rule 14a-9 promulgated thereunder, against defendants Sclavos, Gallivan, Yanowitch, Evan, Schaeffer, Korzeniewski, Pereira, and Kremian (all the option defendants except Keith), based on allegations that the Company's proxy statements, issued in connection with the Company's annual meetings in 1999, 2001, 2002, and 2003, falsely reported the option defendants' compensation (because of misrepresentations regarding the option grants);

(19) a claim under § 20(a) of the Securities Exchange Act, against Evan, Kremian, and the director defendants, based on the allegation that they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

were controlling persons of VeriSign, and caused VeriSign to engage in unlawful conduct.

Nominal defendant VeriSign now seeks an order dismissing the CAC pursuant to Rule 12(b)(6), arguing that plaintiffs have not sufficiently pled particularized facts demonstrating that a pre-filing demand on VeriSign's Board would have been futile.

The individual defendants seek an order dismissing the claims asserted against them pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), arguing that all claims are time-barred; that plaintiffs fail to plead the elements of an Exchange Act § 10b(5) or Rule 10b-5 claim; that plaintiffs cannot state a claim under § 14(a) of the Exchange Act or Rule 14a-9; that the § 20(a) claim must be dismissed because the § 10(b)(5) claim is defective; and that certain state law claims are derivative of other claims or fail to state a claim.

KPMG seeks an order compelling arbitration of the claims asserted against it, and an order dismissing it from this action or staying the claims asserted against it pending completion of the arbitration.

## DISCUSSION

### A. Motions to Dismiss

#### 1. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.,* 349 F.3d 1191, 1199-1200 (9th Cir.2003). Although its review is generally limited to the contents of the complaint, the Court may consider documents referenced extensively in the complaint and documents that form the basis of a plaintiff's claim. *United States v. Ritchie,* 342 F.3d 903, 908-09 (9th Cir.2003); *see also No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 925 n. 2 (9th Cir.2003).

To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2), which requires that the complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). Specific facts are unnecessary-the statement need only give the defendant " 'fair notice of what the claim is ... and the grounds upon which it rests.' "*Erickson v. Pardus,* ---U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007)).

**\*9** All allegations of material fact are taken as true. *Id.* However, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"-rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."*Bell Atlantic,* 127 S.Ct. at 1964-65 (citations and quotations omitted). A motion to dismiss should be granted if the complaint fails to proffer enough facts to state a claim for relief that is plausible on its face. *See id.* at 1966-67.

Where a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity, including an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."*Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir.2007) (citation and quotation omitted)."To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong."*Bly-Magee v. California,* 236 F.3d 1014, 1019 (9th Cir.2001) (citation and quotations omitted).

In dismissing for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleadings was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."*Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

(citations omitted); *see also Swartz,* 476 F.3d at 765;*Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir.2003).

#### 2. VeriSign's Motion

Nominal defendant VeriSign seeks an order dismissing the CAC on the ground that plaintiffs failed to make a demand on the directors prior to filing suit on July 5, 2006, and that the CAC fails to allege demand futility with particularity as required by Federal Rule of Civil Procedure 23.1. VeriSign also asserts that plaintiffs lack standing because the CAC does not specify the dates they purchased stock in VeriSign, and therefore does not establish that they satisfy the "contemporaneous ownership" requirement.

The court agrees with VeriSign and finds that the motion must be GRANTED. Plaintiffs have not alleged particularized facts establishing that a demand on VeriSign's Board would have been futile, and have not adequately alleged that they have standing to bring this action on VeriSign's behalf.

#### a. Shareholder Derivative Actions

A shareholder does not have standing to sue in an individual capacity for injury to the corporation. William Meade Fletcher, et al., 13 *Fletcher Cyclopedia of the Law of Private Corporations,* § 5939 (2007). Such an action must be brought as a derivative action-"an equitable remedy in which a shareholder asserts on behalf of a corporation a claim not belonging to the shareholder, but to the corporation."*Id.* Once the action-if filed in federal court-has been characterized as direct or derivative, the applicable procedural rules are determined by federal law. *Sax v. World Wide Press, Inc.,* 809 F.2d 610, 613 (9th Cir.1987).

**\*10** Under Federal Rule of Civil Procedure 23.1, a shareholder seeking to vindicate the interests of a corporation through a derivative suit must either first make a demand on the corporation's directors, or plead particularized facts showing why such a demand would have been futile. *See*Fed.R.Civ.P. 23.1. All plaintiffs' claims in the present action are

derivative, requiring a demand on VeriSign's Board, or a particularized showing of demand futility.

State law-not Rule 23.1-establishes the circumstances under which demand would be futile. Thus, because VeriSign is a Delaware corporation, Delaware law governs the issue of whether plaintiffs' failure to make a pre-suit demand on VeriSign's Board is excused. *See In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 989-90 (9th Cir.1999) (citing *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)).

Delaware law provides two demand-futility tests, as set forth in *Aronson v. Lewis,* 473 A.2d 805 (Del.1984), *overruled on other grounds* by *Brehm v. Eisner,* 746 A.2d 244 (Del.2000); and *Rales v. Blasband,* 634 A.2d 927 (Del.1993). When the alleged wrong is the result of a business decision by the whole board of directors, a court should employ the *Aronson* test, which evaluates whether, under the particularized facts alleged, a reasonable doubt is created 1) that the directors are disinterested and independent, or 2) that the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson,* 473 A.2d at 812.

When, however, the board members who approved the challenged act have since changed, or when the challenged act does not constitute a business decision by the board, a court should employ the *Rales* test, which determines whether the particularized factual allegations create a reasonable doubt that, as of the time the complaint was filed, a majority of the board as constituted at that time could have properly exercised its independent and disinterested business judgment in responding to a demand. *Rales,* 634 A.2d at 934. In short,
[T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389

**(Cite as: Slip Copy)**

*Id.* at 932.

In the present case, plaintiffs' demand-futility allegations must be examined under the *Rales* test. While plaintiffs allege that the members of the Board as of July 5, 2006, were not disinterested and independent, and also assert that the granting of backdated options can never be the product of a good faith exercise of business judgment-thus apparently invoking the *Aronson* test-the facts as pled show that a majority of the Board members that would have considered the demand were not involved in any decision to backdate the option grants. Thus, the second prong of the *Aronson* test is inapplicable.[FN10]

> FN10. An argument could be made that the *Aronson* test applies to the claim that the directors signed 10-Ks containing false financial statements, at least as to the 10-Ks that were signed by a majority of the current board, except that (a) it is not clear from the allegations of the CAC that the act of signing VeriSign's 10-Ks can be considered a Board "decision" or "action;" (b) the CAC alleges that backdating options cannot be a valid exercise of business judgment, but contains no such allegation regarding signing 10-Ks; and (c) as discussed below, the § 10(b) cause of action fails to state a claim.

b. Analysis

*11 As indicated above, the demand futility is analyzed under the *Rales* test based on the composition of the board at the time the lawsuit is initiated, as that is the board on which demand would be made. *See Harris v. Carter,* 582 A.2d 222, 228 (Del.Ch.1990). When the present action was commenced on July 5, 2006, VeriSign's Board consisted of eleven directors: Sclavos, Bidzos, Chenevich, Guthrie, Kriens, Lauer, Moore, Mueller, Reyes, Roper, and Simpson. To prove that demand would have been futile, plaintiffs must show that a majority of those eleven directors are not disinterested or independent.

The court finds that the motion must be GRANTED. As VeriSign notes in its reply brief, the issue raised in this motion is not the propriety or legality of backdating options, but whether plaintiffs, by pleading particularized facts in the CAC, have overcome the presumption of good faith afforded to directors. Plaintiffs have not alleged particularized facts showing that demand would have been futile because there is a reason to doubt either the disinterestedness and independence of a majority of the Board.

i. Whether the directors are disinterested

Directorial "interest" exists whenever divided loyalties are present, or where the director will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. *Rales,* 634 A.2d at 936.

Plaintiffs allege that Sclavos is interested because he received a financial benefit from the transaction in the form of backdated options; that all the directors are interested because they either "authorized, approved, ratified or ... failed to rectify" the backdated option grants, or participated in the other wrongs alleged; that the directors who served on the Compensation Committee are interested because they enabled the Company to issue backdated option grants; that directors who authorized the filing of proxy statements in support of their nomination as directors, or who signed VeriSign's 10-Ks, are interested, because the proxy statements and financial statements in the 10-Ks failed to disclose that the option grants had been backdated, and any suit to remedy the wrongs complained of could expose those directors to suit; and that the members of the Board are interested because they did not take action to recover the option defendants' "ill-gotten gains."[FN11]

> FN11. Plaintiffs also allege that demand futility is shown by the fact that while the directors may be covered under VeriSign's directors' and officers' liability insurance

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

policies against liability for breaches of fiduciary duty, such coverage would be denied if the directors were to cause the Company to sue itself or certain officers of VeriSign. CAC ¶ 185(i). VeriSign contends that such allegations are insufficient to establish that the directors are "interested." Plaintiffs appear to have conceded this point, as they do not respond to this argument in their opposition to the motion.

VeriSign notes that only one of the eleven directors-Sclavos-is alleged to have received any backdated option grants, and argues that the remaining Board members cannot be shown to have received any personal benefit from the alleged wrongdoing. In particular, VeriSign argues that six of the eleven directors could not have been involved in the alleged backdating of option grants, because five-Roper, Lauer, Mueller, Simpson, and Guthrie-did not join VeriSign's Board until well after the last backdating of options is alleged to have occurred, and a sixth-Moore-joined the Board only in February 2002, at the conclusion of the alleged backdating. Thus, VeriSign argues, this group of six directors constitutes a "disinterested" majority, fully capable of determining whether this action is in the best interests of the Company. VeriSign contends that the motion can be granted on that basis alone.

*12 VeriSign also argues that plaintiffs' boilerplate allegations that the directors "participated in" or "approved of" the purported wrongdoing are insufficient to establish that they are not disinterested; and similarly, that plaintiffs' conclusory allegations regarding service on the Compensation Committee and the Audit Committee, or regarding failure to assert claims against certain defendants, are insufficient to show an inability to evaluate a shareholder demand. VeriSign argues further that plaintiffs' claims that the directors are not disinterested because they could be sued for securities fraud or similar claims are not sufficient, as allegations that directors cannot be expected to sue themselves have repeatedly been rejected by the courts as insufficient to establish demand futility.

*Receipt of personal financial benefit*

Plaintiffs allege that Sclavos is "interested" because he received a personal financial benefit in the form of backdated option grants, CAC ¶ 185(a); and contend that the directors who are "insider sellers"-Sclavos, Bidzos, Chenevich, and Roper-are "interested" because they benefitted financially from selling VeriSign stock while in the possession of insider knowledge concerning the purported backdating scheme.

A director's interest may be shown by demonstrating "a potential personal benefit or detriment to the director as a result of the decision."*Beam ex rel Martha Stewart Omnimedia, Inc.,* 845 A.2d 1040, 1049 (Del.2004). The personal benefit must arise "from the challenged transaction." *Rales,* 634 A.2d at 933. Directors who receive backdated stock options receive a personal benefit that is not shared by the shareholders. *See In re Zoran Corp. Derivative Litig.,* --- F.Supp.2d ----, 2007 WL 1650948, at *8 (N.D.Cal., June 5, 2007); *In re CNET Networks, Inc. Shareholder Derivative Litig.,* 483 F.Supp.2d 947, 958 (N.D.Cal.2007). If a plaintiff can plead with particularity that a director knowingly received backdated grants, that director will be considered interested. *In re Zoran,* 2007 WL 1650948, at *8. Accordingly, based on the allegation that Sclavos received backdated option grants between 1998 and 2002, the court finds that plaintiffs have arguably established that Sclavos was "interested" and incapable of fairly evaluating a demand made on the Board.

Corporate insiders sell company stock as a matter of course, and there is no per se rule that makes a director "interested" based solely on generalized allegations that he or she sold company stock while in possession of material, non-public information. *See Guttman v. Huang,* 823 A.2d 492, 502 (Del.Ch.2003).

[Such a rule] would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

pled *particularized facts* regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.

**\*13** *Id.* (emphasis added).

Here, plaintiffs allege that Sclavos sold VeriSign stock on various dates between 1998 and 2005, CAC ¶ 178; that Bidzos sold stock on various dates between 1998 and 2001, CAC ¶ 169; that Chenevich sold stock on various dates between 1999 and 2004, CAC ¶ 170; and that Roper sold stock on various dates in 2000, CAC ¶ 176. Apart from the listing of sales of specific numbers of shares of VeriSign stock on specific dates, the CAC's only allegations regarding insider selling are the conclusory assertions that "by reason of their high executive and/or directorial positions within VeriSign," all the insider defendants "had access to highly material information regarding the Company, including the information set forth [in the CAC] regarding the true adverse facts of VeriSign's option backdating, improper accounting, and false financial statements," CAC ¶ 222; and that all the insider selling defendants sold Company stock "while in the possession of materially adverse non-public information regarding the Company," CAC ¶ 167.

With the possible exception of Sclavos, these allegations of insider selling are insufficiently particularized to establish that the directors are incapable of objectively considering a demand. For example, plaintiffs plead no facts as to Bidzos, Chenevich, or Roper individually, establishing that they had knowledge of options backdating at VeriSign. Nor, as to any of these four directors, do plaintiffs plead particularized facts showing that they had any knowledge of any irregularities in the Company's financial statements. Moreover, as to Roper, the facts pled in the CAC establish that he was not even present at VeriSign as an employee or a director when he sold shares of Company stock in 2000 (or

when the alleged backdating occurred).

*Potential liability for civil or criminal securities fraud*

Plaintiffs allege that all the directors "authorized, approved, [or] ratified" the backdating of stock option grants, and have been named as defendants in this lawsuit, CAC ¶ 185(b); that the members of the Compensation Committee "and the Board by its approval of" the Committee's recommendations, "enabled" or "permitted" the Company to backdate options granted to the option defendants, thereby breaching their fiduciary duties to the Company; and that the backdating of options was unlawful, CAC ¶ 185(c), (d). Plaintiffs also assert that all the directors authorized the filing of proxy statements in support of their election as directors, which failed to disclose that the option defendants' options had been backdated; and "authorized the disclosures relating to shareholder approved option plans which misrepresented that the options carry the stock price of the day of the award," CAC ¶ 185(f); and signed the Company's annual Form 10-Ks for fiscal years 1998 through 2005, which included financial statements that failed to account for the backdated stock options, CAC ¶ 185(g). Plaintiffs claim that all the members of the Board are "hopelessly conflicted" because any suit by the Board to remedy the wrongs complained of in the present action would expose the members of the Board to suits for proxy violations and securities fraud. CAC ¶ 185(f), (g).

**\*14** The argument that demand should be excused because the directors would otherwise have to sue themselves, thereby placing the conduct of the litigation in hostile hands and preventing its effective prosecution, has been made to, and dismissed by, numerous courts. *See, e.g., Aronson,* 473 A.2d at 818. It is true that the basic test of demand futility evolved because "[w]here the board's actions cause the shareholder complaint, 'a question is rightfully raised over whether the board will pursue these claims with 100% allegiance to the corporation, since doing so may require that the board sue *itself* on behalf of the corporation.' " *Ryan v. Gifford,*

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

918 A.2d 341, 352 (Del.Ch.2007) (quoting *Sanders v. Wang,* 1999 WL 1044880, at *4 (Del.Ch., Nov.8, 1999)). However, a plaintiff may not "bootstrap allegations of futility" by pleading that "the directors participated in the challenged transaction or that they would be reluctant to sue themselves." *Blasband v. Rales,* 971 F.2d 1034, 1049 (3rd Cir.1992).

"Unless facts are alleged with particularity to overcome the presumptions of independence and a proper exercise of business judgment, in which case the directors could not be expected to sue themselves, a bare claim of this sort raises no legally cognizable issue under Delaware corporate law."*Aronson,* 473 A.2d at 818. Thus, the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge the disinterestedness of directors. *Ryan,* 918 A.2d at 355.

A plaintiff can overcome the presumption of director disinterestedness only with particularized facts indicating that the director's actions were "so egregious that a substantial likelihood of directorial liability exists."*In re Silicon Graphics,* 183 F.3d at 990 (quoting *Aronson,* 473 A.2d at 805). A showing that the potential for liability rises to a "substantial likelihood" requires particularized factual allegations "detailing the precise roles that these directors played at the company, the information that would have come to their attention in these roles, and any indication as to why they would have perceived the [wrongdoing]."*Guttman,* 823 A.2d at 503. Here, however, plaintiffs fail to plead particularized facts raising a reasonable doubt that a majority of the Board face a substantial likelihood of liability.

For example, plaintiffs' generalized allegations that the director defendants breached fiduciary duties are insufficient to demonstrate that any director engaged in conduct that resulted in a substantial risk of personal liability.*In re Silicon Graphics,* 183 F.3d at 990. In addition, as explained below in the discussion of the substantive claims, the cause of action alleging false or misleading proxy solicitations is time-barred, and plaintiffs fail to plead

fraud with particularity in any of their substantive causes of action. Having failed to state a claim for proxy violations or securities fraud, plaintiffs cannot use those causes of action as a basis for alleging demand futility.

**\*15** As for the stock option grants, plaintiffs make only the conclusory assertion that all the directors "authorized, approved, [or] ratified" the backdating. It is true that "[a] director who approves the backdating of options faces at the very *least* a substantial likelihood of liability," and that "[b]ackdating options qualifies as one of those 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment.' " *Ryan,* 918 A.2d at 355-56 (quoting *Aronson,* 473 A.2d at 815). However, the CAC alleges no particularized facts supporting such a claim, and provides no explanation as to which of the directors are alleged to have "authorized" the backdated grants, which are alleged to have "approved" the backdated grants, or which are alleged to have "ratified" the backdated grants-or what form such authorization or approval or ratification supposedly took.

In this case, as noted by VeriSign, six of the eleven directors could not have been involved in authorizing or approving the backdating because any decision to issue backdated grants took place before the commencement of their tenure on the Board.FN12Moreover, "[i]t is no answer to say that demand is necessarily futile because ... the directors ... approved the underlying transaction."*Brehm,* 746 A.2d at 257 n. 34. As for "ratifying" backdated grants, that could mean any number of things-"post hoc approval, willingness to participate in a coverup, or knowing that the grants were backdated, or any number of transgressions."*In re CNET,* 483 F.Supp.2d at 963.

> FN12. It is true that Moore joined the Board some time in February 2002, and the latest backdating allegedly occurred with regard to options purportedly granted on February 21, 2002. However, plaintiffs allege no facts indicating that Moore parti-

cipated in any scheme to backdate options, and concede in their opposition to VeriSign's motion that Moore is "not implicated in [the] list of interested directors."Pltfs' Opp. at 16 n. 17.

Plaintiffs suggest that under *Ryan,* a mere allegation that a company granted backdated options is sufficient to excuse demand. However, the facts in *Ryan* are distinguishable from the facts in the present case. In that case, six directors sat on the board, but the three-member compensation committee, not the entire board, approved the backdated options. The court nevertheless found that the decision to grant backdated options could be imputed to the entire board, because one-half of the current board members (the three committee members) had approved each challenged transaction. Thus, the court applied the *Aronson* test, and found that the allegations of "knowing and intentional violations of the stock option plans" raised a reason to doubt that the challenged transactions could result from a valid exercise of business judgment. *Ryan,* 918 A.2d at 354. In addition, the court found that demand would be futile under the *Rales* test, because the three directors who served on the compensation committee and approved the backdating faced "at the very least a substantial likelihood of liability."*Id.* at 355.

Here, by contrast, the CAC contains no particularized allegations stating which director or directors approved which grant, or when such grant was approved and how it was backdated-and no allegations showing how or why a particular director would know that the options were backdated. Moreover, while it is not clear from the CAC whether the Board approved the option grants, it appears that a majority of the current members of the Board were not directors at the time of the alleged backdating.

### Service on Board committees
*16 Plaintiffs allege that the Board's Compensation Committee, Audit Committee, and Nominating and Corporate Governance Committee "set the policies which permitted the backdating of options to oc-

cur."CAC ¶ 90. Among other things, plaintiffs assert that the Compensation Committee was responsible for setting salaries and other compensation of the executive officers, and administering the stock option and other employee equity and bonus plans, CAC ¶ 92, and that the Compensation Committee "granted" the stock options to the option defendants, CAC ¶ 117. They assert further that the Audit Committee was obligated to exercise oversight over the Company's financial reporting and controls, CAC ¶ 95; and that the Nominating and Corporate Governance Committee was charged with considering the performance and qualifications of each potential Board nominee, and with annually reviewing the performance of the Board, CAC ¶ 101.

Of the Board as constituted as of July 5, 2006, plaintiffs assert that Sclavos, Bidzos, Chenevich, Reyes, Lauer, and Simpson were members of the Compensation Committee at various times, CAC ¶¶ 9, 44, 46, 52, 55, 58, 93; that Chenevich, Kriens, Muller, and Roper were members of the Audit Committee at various times, CAC ¶¶ 46, 51, 54, 56, 96; and that Bidzos and Kriens were members of the Nominating and Corporate Governance Committee at various times, CAC ¶¶ 51, 100. Plaintiffs assert that the Board "should have been aware" that VeriSign used different measurement dates when computing compensation costs for certain stock option grants; and claim that under the charters and policies of these three Committees, the directors had an obligation to investigate the difference in measurement dates and recorded dates of option grants. CAC ¶ 102.

These allegations are wholly insufficient to support a claim of demand futility. First, as previously discussed, the CAC is not consistent in alleging the dates of service of various directors on the Compensation Committee. That is a minor point, however, except insofar as it reflects the CAC's lack of organizational integrity. More significant is the fact that of the eight directors alleged to have served on one or more of the three Committees, four-Lauer, Mueller, Roper, and Simpson-joined the Board after the end of the alleged backdating. Thus, their membership in the various Committees

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

does not create a reasonable doubt that those four directors are disinterested.

In addition, plaintiffs plead only conclusory allegations regarding Committee service. "Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that the directors were conflicted."*In re CNET,* 483 F.Supp.2d at 963. Here, the CAC alleges no facts explaining the role, if any, that each director played in the alleged wrongdoing, in terms of his service on one or more of the Committees.

Most notably, the court was unable to locate any reference in the CAC to a connection between the activities of the Nominating and Corporate Governance Committee and the members thereof, and the alleged wrongdoing. It also appears that plaintiffs have attempted to blur the distinction between the Compensation Committee (responsibility for administering and approving option grants) and the Audit Committee (different responsibilities, but no role in option awards). The CAC also provides no basis for inferring that the members of the Audit Committee had any knowledge of the alleged backdating, or any knowledge of deficiencies in the Company's public filings.

*Failure to take action*

**\*17** Plaintiffs allege that a demand on the Board would have been futile because the directors "through abdication of duty, permitted the wrongs alleged herein to have occurred," CAC ¶ 185(h); because the directors have not "recommended that any defendant be relieved of his or her duties as director," CAC ¶ 185(j); and because the directors "did not require that the [o]ption [d]efendants immediately disgorge all of their ill-gotten gains from their improper manipulation of their stock option grants, did not require them to return all unexecuted stock options to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, ... [and] did not take any other action, including commencing legal proceedings, to protect the interests of the Company,"

CAC ¶ 185(k).

Such boilerplate allegations that the directors are not independent because they failed to act or assert claims against certain defendants are not sufficient to establish demand futility, for two reasons. First, plaintiffs make this argument with regard to the entire Board, and not as to the individual directors. Thus, it cannot be used to support an assertion that a particular director was "interested" or conflicted.

Second, as VeriSign notes in its moving papers, such allegations essentially constitute an attempt to plead a claim of "failure of oversight." [FN13] When pled as a separate cause of action, such a claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."*In re Caremark Int'l, Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch.1996). Such a claim requires a showing, for example, that a company's board of directors or a board committee met only sporadically or devoted patently inadequate time to its work, or that the board or a committee had clear notice of wrongdoing and simply chose to ignore that evidence. *See Guttman,* 823 A.2d at 505-07.

> FN13. In their opposition to VeriSign's motion, plaintiffs assert that the "failure to exercise oversight" allegations establish a "substantial likelihood of personal liability"-though that is clearly not how it is pled in the CAC.

Here, the CAC pleads no particularized facts showing how or when any of the directors knew of the alleged option backdating practices in question, or that they intentionally backdated any option grants. Moreover, plaintiffs' assertion that the Board has taken no action is contradicted by VeriSign's announcements, in June 2006 and after, that it was conducting an internal review of the options grants, with the assistance of independent legal counsel.

ii. Whether the directors are independent

Directorial "independence" exists when a director's decision is based on "the corporate merits of the subject before the board" rather than on

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

"extraneous considerations or influences." *Aronson,* 473 A.2d at 816. When lack of independence is charged, the plaintiff must allege particularized facts showing either that the board is dominated by an officer or director who is the proponent of the challenged transaction, or that the board is so under his influence that its discretion is "sterilize[d]." *Rales,* 634 A.2d at 936. If a director is considered "controlled" by another, interested, director, he or she is lacking in the independence necessary to consider the challenged transaction objectively.

**\*18** A controlled director is one who is dominated by another party, whether through close personal or familial relationship or through force of will. A director may also be considered "controlled" if he or she is beholden to the allegedly controlling entity, as when the entity has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively.

*Telxon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002) (citation omitted).

Plaintiffs argue that because Sclavos is President and CEO of the Company, he cannot be considered to be acting independently, considering his considerable financial stake in maintaining his current offices and position. Plaintiffs also allege in the CAC that the members of the Board are personally and professionally entangled with certain of the other defendants, or are implicated in stock option backdating at other companies, and are therefore lacking in the independence necessary to consider or take necessary and proper action on the Company's behalf.

VeriSign argues that none of these allegations is sufficient to establish lack of independence. VeriSign asserts that plaintiffs have pleaded no particularized facts demonstrating that any single director has or had control over any other director, and submits that the vague allegations of "friendship" or

business relationships are not sufficient to excuse demand. VeriSign also notes that many of the allegations do not even claim any sort of relationship between the directors mentioned, but rather simply indicate that they had some sort of overlapping tenure at a particular company.

VeriSign contends that the fact that several directors also sit together on the boards of other companies does not itself establish lack of independence. Similarly, VeriSign contends that boilerplate allegations that directors are not independent because they have served as directors or employees at other companies where option backdating issues purportedly have arisen are insufficient. VeriSign notes that plaintiffs provide no specifics whatsoever regarding those defendants' alleged "implication" in other options backdating, and make no connection between events at other companies and events at VeriSign.

### *Sclavos' position as President and CEO*

Plaintiffs argue in their opposition to VeriSign's motion that Sclavos' position as President and CEO of VeriSign, and the fact that he receives substantial financial compensation from his position, are sufficient to raise a reasonable doubt regarding his independence from other board members. Plaintiffs claim that Sclavos cannot be considered to be acting independently, considering his substantial financial stake in maintaining his current offices and position.

**\*19** Because plaintiffs did not include these assertions in their demand futility allegations, the court need not consider them here. The court simply notes that demand futility cannot be pled merely on the basis of allegations that directors were paid for their service, and acted or would act to preserve their positions. *Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by* Brehm, 746 A.2d 244. Some Delaware courts have held that where a director's position in the corporation provides him his principal employment and salary, it might be reasonable to infer that a director's ability to impartially consider a demand is comprom-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ised. *See, e.g., In re Limited, Inc.,* 2002 WL 537692, at *5 (Del.Ch., March 27, 2002) (where a director also serves as a high-ranking executive, with a substantial compensation package, "[i]t is reasonable to infer that compensation of this magnitude is material.... [A]s a general matter, compensation from one's principal employment is 'typically of great consequence' to the employee' "). Here, however, the CAC alleges no particularized facts establishing that Sclavos lacks independence based on his executive compensation.

*Personal relationships*

Plaintiffs allege, based on a report in the *San Jose Mercury News,* that Reyes and Sclavos are personally involved with each other because they are friends. CAC ¶ 191(b). Plaintiffs also claim that Reyes, Sclavos, and Compton have been part owners of the San Jose Sharks (professional ice hockey team) during the same or overlapping time periods since 2002. CAC ¶ 191(j).

When a complaint alleges lack of independence based on a relationship between directors, the court must review the complaint to see whether it states with particularity facts indicating that the director's independence may reasonably be doubted-either because of "financial ties, familial affinity, a particularly close or intimate personal or business affiliation, or because of evidence that in the past the relationship caused the director to act non-independently vis à vis an interested director."*Beam,* 845 A.2d at 1051.

However, mere allegations that directors move in the same social circles, or a characterization that they are friends, is not sufficient to negate a director's independence for demand excusal purposes. *Id.* at 1051-52;*see also Litt v. Wycoff,* 2003 WL 1794724, at *4 (Del.Ch., March 28, 2003) (allegation of mere personal friendship with interested director is insufficient to raise reasonable doubt as to second director's independence); *Benerofe v. Cha,* 1998 WL 83081, at *3 (Del.Ch., Feb.20, 1998) (conclusory allegation of long-standing friendship is not enough to raise a reasonable doubt about director's ability to exercise his judgment independently of his friend).

[F]or presuit demand purposes, friendship must be accompanied by substantially more in the nature of serious allegations that would lead to a reasonable doubt as to a director's independence.... To create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that because of the nature of the relationship or additional circumstances other than the interested director's stock ownership or voting power, the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director.

***20** *Beam,* 845 A.2d at 1052.

Here, the CAC alleges only that Sclavos, a presumably interested director, and Reyes, an outside director, are friends; and that Sclavos, Reyes, and Compton, another outside director, have at some unknown point been part owners of a sports franchise. The CAC pleads no facts showing that Sclavos controlled Reyes or Compton, or explaining how or why Reyes and Compton would be unable to reach a decision independent of Sclavos or each other.

*Business/employment connections*

Plaintiffs also assert that several of the directors are connected through business or employment relationships. They allege that Kriens has been Chairman and CEO of Juniper Networks, Inc., since 1996, and Sclavos has been a board member at Juniper since 2000, CAC ¶ 191(a); that Sclavos and Schaeffer both served as Vice Presidents at Tagilent, Inc., during the period 1993-1995, CAC ¶ 191(c); that Sclavos served as a board member at Keynote Systems from April 1999 to December 2003, and Cowan has served as a board member at Keynote since March 1998, CAC ¶ 191(d); that Korzeniewski served as CFO of Network Solutions, Inc., from 1996 to 2000, when it was acquired by VeriSign, and Sclavos served as a board member during the same or overlapping time periods, CAC ¶ 191(e); that Evan and Compton have both served

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
(Cite as: Slip Copy)

as board members at Logictier, Inc., and did so during the same or overlapping time periods, CAC ¶ 191(f); that Schaeffer and Evan both hold positions at Apple Computer and were employed by Apple during the same or overlapping time periods, CAC ¶ 191(g); that Korzeniewski, Roper, and Simpson all held executive positions at Science Applications International Corporation during the same or overlapping time periods, CAC ¶ 191(h); and that Kremian and Moore both held senior positions with Illuminet Holdings, Inc., and were employed by Illuminet during the same or overlapping time periods, CAC ¶ 191(i).

An allegation that an interested director and other directors move in the same business circles is not enough to negate a director's independence for pre-suit demand purposes. *Beam*, 845 A.2d at 1051-52. Nor is the naked assertion of a previous business relationship sufficient to overcome the presumption of a director's independence. *Orman v. Cullman*, 794 A.2d 5, 27 (Del.Ch.2002). Such allegations, without more, fail to raise a reasonable doubt that the director could not exercise his or her independent business judgment in approving the transaction, and therefore lack the specific factual predicate necessary to survive a motion to dismiss. *Id.*

In their opposition to the motion, plaintiffs argue that a "history of personally beneficial affiliation" or a clear pattern of mutual advantage between an interested director and other directors serving on the board demonstrates lack of independence, and claim that they have pleaded facts in the CAC demonstrating such beneficial affiliation or mutual advantage by alleging the various business connections of some of the defendants. In support of their argument, plaintiffs cite *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del.Ch.2003); *Biondi v. Scrushy*, 820 A.2d 1148 (Del.Ch.2003); and *Kahn v. Tremont Corp.*, 1994 WL 162613 (Del.Ch., Apr.21, 1994). A look at the facts of these three cases provides an indication of the level of financial and business interconnection that the Delaware courts view as creating doubts about a director's independence.

*21 In *Oracle*, the company's Special Litigation Committee ("SLC")[FN14] moved to terminate the derivative action pending against certain Oracle directors and officers for insider trading, so that the SLC could pursue the claims on behalf of Oracle. The court found that the SLC could not be considered "independent" because the two SLC members-both of whom were professors at Stanford University-were being asked to investigate fellow Oracle directors who also had important ties to Stanford.

> FN14. The court in *Biondi* noted that one of the purposes for forming a special litigation committee "is to promote confidence in the integrity of corporate decision making by vesting the company's power to respond to accusations of serious misconduct by high officials in an impartial group of independent directors."*Biondi*, 820 A.2d at 1156.

Specifically, among the directors who were accused by the derivative plaintiffs of insider trading were (1) another Stanford professor, who taught one of the SLC members when he was a Ph.D. candidate and who served as a senior fellow and a steering committee member alongside that SLC member at the Stanford Institute for Economic Policy Research ("SIEPR"); (2) a Stanford alumnus who had directed millions of dollars of contributions to Stanford during recent years, served as Chair of SIEPR's Advisory Board and had a conference center named for him at SIEPR's facility, and had contributed nearly $600,000 to SIEPR and Stanford Law School, both parts of Stanford with which one of the SLC members was closely affiliated; and (3) Oracle's CEO, who had made millions of dollars in donations to Stanford through a personal foundation and large donations indirectly through Oracle, and who was considering making donations of his $100 million house and $170 million for a scholarship program at Stanford as late as August 2001, at around the same time period the SLC members were added to the Oracle board. The court found that taken together, those and other facts were sufficient to create a reasonable doubt about the imparti-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ality of the SLC. *In re Oracle*, 824 A.2d at 920-21.

*Biondi* also involved a two-member SLC, appointed to investigate claims of insider selling against several directors of HealthSouth Corporation, including HealthSouth's Chairman and CEO, Richard M. Scrushy ("Scrushy"). Derivative suits had been filed alleging that HealthSouth's directors had sold large blocks of stock while in possession of the non-public knowledge that the Medicare reimbursement rate was about to be lowered, which would materially lower HealthSouth's earnings. The SLC sought a stay of the derivative actions so that it could pursue its own investigation.

The court found that the two members of the SLC-Larry Striplin ("Striplin") and Jon Hanson ("Hanson")-had compromising ties to Scrushy, including the fact that both Striplin and Hanson served with Scrushy on the board of the National Football Foundation and College Hall of Fame, Inc., of which Hanson had been the Chairman since 1994. One of that organization's key awards was named for HealthSouth, indicating to the court that the company, under Scrushy's managerial leadership, had been quite generous with a cause important to Hanson. In addition, the court noted that Striplin and Scrushy were both large contributors to college sports programs in Alabama, and that a stadium at a college in Alabama had been named "Scrushy-Striplin Field."

*22 The court noted further that the same day that the SLC was created with what the court termed "questionable membership," HealthSouth hired the law firm of Fulbright and Jaworski to investigate the securities trading issues that were at the heart of the pending derivative lawsuit-the issues supposedly being entrusted to the SLC. Six days later, HealthSouth put out a press release quoting Scrushy's successor as CEO as making a statement purporting to exonerate Scrushy from the charges of insider selling-the charge that the SLC had just been formed to investigate. Approximately a week later, HealthSouth announced the election of Robert P. May ("May") as an independent director, who soon became Chairman of the SLC upon Striplin's

resignation. When he resigned, Striplin issued a strong statement supporting Scrushy.

A month later, HealthSouth issued a press release announcing that Scrushy had been "cleared by outside investigation" (referring to a report issued by Fulbright and Jaworski) of advance knowledge of non-public material facts prior to the stock transactions. SLC Chairman May was quoted in the press release as stating that this outside review by Fulbright and Jaworski "puts to rest any question whether Mr. Scrushy had any inkling or knowledge of the Medicare reimbursement rule change or its impact" prior to his stock transactions. Based on all these facts, the court concluded that the SLC could not meet its burden of showing its independence, and denied the request for a stay. *Biondi,* 820 A.2d at 1156-58, 1165.

In *Kahn,* Tremont Corporation, which was under the control of its Chairman, Harold C. Simmons ("H.C.Simmons"), purchased 15% of the common stock of NL Industries, Inc. ("NL Industries"-also under H.C. Simmons' control) from Valhi, Inc. ("Valhi"-also under H.C. Simmons' control), for $96 million. Prior to the challenged transaction, Valhi owned 62% of NL Industries' stock, and 44% of Tremont's stock. Contran Corporation ("Contran") owned 90% of Valhi's stock. Contran's outstanding stock was owned by a trust for the benefit of H.C. Simmons' children, of which he was the sole trustee. Simmons was Chairman of Contran, Valhi, and NL Industries, and CEO of Contran and Valhi.

The NL Industries stock was unregistered, and could therefore not be resold in a public distribution. The plaintiff in the subsequent shareholder derivative action alleged that Tremont had no legitimate business interest in spending $96 million, and that the transaction was conceived by Valhi solely for its benefit and that of H.C. Simmons, and that the purchase swiftly resulted in a large loss for Tremont. The plaintiff asserted that pre-suit demand was futile because H.C. Simmons controlled a majority of the directors on the board and could not possibly show that the purchase would have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
(Cite as: Slip Copy)

been pursued by an independent board of directors of the company.

The defendants moved to dismiss for failure to make a pre-suit demand, arguing that the Tremont board of directors was independent and disinterested, that a committee of independent directors had negotiated the transaction under attack, that the board as a whole was not under the control of H.C. Simmons, and that pre-suit demand was not excused under *Aronson.* The court found that the plaintiff had pleaded facts sufficient to create a reasonable doubt as to the board's disinterest and independence.

*23 The court noted that two directors were officers of NL Industries in addition to being officers and directors of Tremont, and therefore owed their salaries from both companies to Valhi and to H.C. Simmons as controlling shareholder. Thus, the court concluded, any unwillingness to cooperate by approving a transaction sponsored by Valhi might be thought to jeopardize more than simply their positions as directors of Tremont. In addition, H.C. Simmons and two other directors were officers or directors of Valhi or Contran. The court concluded that the plaintiff had met his burden of creating a reasonable doubt that a majority of Tremont's directors were interested in seeing the NL Industries stock purchase go through, and would not have entertained litigation over the matter. *Kahn,* 1994 WL 162613, at *2-5.

In contrast to the particularized facts alleged in *Oracle, Biondi,* and *Kahn,* plaintiffs in the present case plead no facts showing interlocking financial obligations, no facts demonstrating that any director is dominated by an officer or director who is a proponent of the challenged transaction, and no facts establishing that any director is so "beholden" to a controlling director or majority shareholder-whether for financial, professional, or any other reason-that his or her discretion would be "sterilized." *See Rales,* 634 A.2d at 936.

Indeed, the CAC does not even identify a controlling or dominating person or persons, but simply asserts that the "members of the Board are conflicted and entangled with certain of the other [d]efendants," and are therefore unable to fairly consider a demand from the shareholders. However, the alleged "entanglement" consists of nothing more than simultaneous employment at a company other than VeriSign, or simultaneous service on another company's board of directors. Plaintiffs plead no facts establishing, for example, that the mere fact that directors Roper and Simpson were formerly employed at SAIC during a portion of the time period that option defendant Korzeniewski was employed at SAIC means that Roper and Simpson could not impartially consider a demand from VeriSign shareholders regarding the alleged backdated options.

Moreover, the CAC's mishmash of allegations regarding the purported "entanglement" of the directors obscures the fact that half the defendants identified in ¶ 191 as having concurrently served on the boards of other companies, or as having been employed by other companies during the same time period, are not even the directors plaintiffs claim are lacking in independence. Two of those defendants-Cowan and Compton-are not current directors. Three-Schaeffer, Korzeniewski, and Evan-are not directors, but rather executives alleged to have received backdated options. The only defendants mentioned who are "current" VeriSign directors for purposes of the demand-futility analysis are Sclavos, Kriens, Roper, Simpson, and Moore. The allegations in the CAC provide no substantial reason to question those directors' impartiality and objectivity, based on their employment or board service at companies other than VeriSign.

*Backdating at other companies*

*24 Finally, plaintiffs allege that three directors-Kriens, Reyes, and Lauer-have each been "implicated" in options backdating at other companies during the time each was serving as the CEO of that company; and that three-Kriens, Sclavos, and Moore-have been directors at companies that have been "implicated" in options backdating.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
(Cite as: Slip Copy)

Page 21

Specifically, plaintiffs allege that Kriens has been implicated in backdating at Juniper, where he has been Chairman and CEO since October 1996, CAC ¶ 191(a); that Kriens is a director of Equinix, Inc., a company "implicated" in the granting of backdated options, CAC ¶ 191(l); that Sclavos has since 2001 been a board member of Intuit, a company "implicated" in the granting of backdated options, CAC ¶ 191(k); that Moore has since 2000 been a director at Western Digital Corporation, a company that has admitted backdating stock options and which is currently restating its financial results, and which also utilized KMPG as its auditor, CAC ¶ 191(m); that Reyes has been charged with civil and criminal securities fraud for the backdating of options while he was CEO of Brocade Communications, Inc.,[FN15] and that KMPG was also Brocade's auditor from 2002 to 2006, CAC ¶ 191(n); and that Lauer has been "implicated" in options backdating at Sprint Nextel Corporation, where he was CEO until August 22, 2006, and that KMPG was Sprint's auditor in 2004 and 2005, CAC ¶ 191(o).

> FN15. After plaintiffs filed the present action, Reyes was convicted by a federal jury of securities fraud, in connection with options backdating at Brocade.

With the exception of the allegations concerning Reyes, plaintiffs plead no particularized facts showing how these directors are alleged to be "implicated" in options backdating at other companies. Moreover, it is not clear that a correlation exists between a given director's "implication" in options backdating at a company other than VeriSign, and the proposition that the director is incapable of independently considering a demand by VeriSign's shareholders free from "extraneous considerations or influences." *Aronson,* 473 A.2d at 816.

Plaintiffs simply suggest that an agreement by a VeriSign director to sue the individual defendants on the Company's behalf might be considered an "admission" that the same conduct by that director at another company was unlawful. That proposition is highly speculative, surely does not qualify as a

particularized fact, and seems irrelevant to the question whether a director on the VeriSign Board is capable of acting independently of other directors or majority shareholders at VeriSign. The court remains at a loss as to how the two concepts are connected.

### c. Standing

VeriSign argues that plaintiffs lack standing to bring this derivative suit, as they have not adequately alleged ownership of VeriSign stock. Under Rule 23.1, a plaintiff must allege that he/she/it "was a shareholder or member at the time of the transaction of which the plaintiff complains." Fed.R.Civ.P. 23.1. A derivative plaintiff has no standing to challenge option transactions that occurred prior to the time that plaintiff owned company stock. *See In re Computer Sciences Corp. Derivative Litigation,* --- F.R.D. ----, 2007 WL 2274951, at *10 (C.D.Cal., July 24, 2007); *see also Desimone v. Barrows,* 924 A.2d 908, 924-27 (Del.Ch.2007) (under Delaware law, "continuing wrong" doctrine does not afford shareholder standing to challenge earlier wrongs that pre-date his/her stock ownership).

**\*25** In the CAC, plaintiffs allege that they "have owned VeriSign stock during the Relevant Period" (defined as January 1, 1998, to the present) "and continue to own the Company's common stock." The court finds, however, that plaintiff have not adequately pled their status as shareholders at all time relevant to the transactions challenged in the CAC. Accordingly, plaintiffs must unambiguously indicate in any amended complaint the dates they purchased VeriSign stock, and whether they have continuously owned VeriSign stock from the time of purchase up to the present.

### 3. Individual Defendants' Motion

The individual defendants seek an order dismissing all claims asserted against them. Among other things, they contend that the CAC does not allege any basis for awarding damages or injunctive relief against the individual defendants under federal securities laws; that the element of reliance, required

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

to support plaintiff's fraud theory under both their federal and state law claims, is absent and cannot be alleged in good faith; and that plaintiffs were on notice of the facts underlying their state law claims more than four years before they sued, rendering all those claims time-barred.

Although the CAC must be dismissed as stated above, for failure to allege demand futility and failure to allege standing to bring a derivative action on VeriSign's behalf, the court also rules separately on the individual defendants' motion, so that any amended complaint can also address the pleading deficiencies in the substantive causes of action. The court finds that the individual defendants' motion must be GRANTED in part and DENIED in part.

### a. Federal Claims

Defendants argue that the claims brought under the 1934 Securities Exchange Act should be dismissed for failure to state a claim. They contend that the seventeenth cause of action, for violation of § 10(b) and Rule 10b-5, should be dismissed for failure to plead fraud with particularity; that the eighteenth cause of action for violation of § 14(a) and Rule 14a-9 should be dismissed because plaintiffs do not identify any damages causally connected to the proxy solicitations at issue; and that the nineteenth cause of action for § 20(a) control person liability should be dismissed because plaintiffs fail to plead a primary violation under the Exchange Act. Defendants also assert that each of these causes of action should be dismissed because the claims are untimely.

Motions to dismiss Exchange Act claims are governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), enacted by Congress to remedy perceived abuses in securities class action litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ---- U.S. ----, ----, 127 S.Ct. 2499, 2504, 168 L.Ed.2d 179 (2007). Among other changes, the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter."*Id.* (citing 15 U.S.C. § 78u-4(b)(1), (2);

*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

### i. § 10(b) claim

**\*26** Plaintiffs allege that the director defendants and Evan made false or misleading statements in VeriSign's Form 10-K annual reports, filed with the SEC for fiscal years 2000 through 2005,[FN16] by representing that the 10-Ks complied with GAAP in reporting stock option grants in the financial statements, CAC ¶¶ 119-123; by concealing in the SEC filings that the stock options were priced at less than the fair market price of the stock on the date of the grant, CAC ¶ 147; and by disseminating financial statements that improperly recorded and accounted for allegedly backdated option grants, thereby understating compensation expenses and overstating net income, CAC ¶¶ 148-149.

> FN16. VeriSign's Form 10-K for fiscal year 2000, filed on March 28, 2001, was signed by Sclavos, Evan, Bidzos, Chenevich, Compton, Cowan, Kriens, and Tomlinson. The Form 10-K for fiscal year 2001, filed on March 19, 2002, was signed by Sclavos, Evan, Bidzos, Chenevich, Compton, Cowan, Kriens, Moore, Reyes, and Tomlinson. The Form 10-K for fiscal year 2002, filed on March 31, 2003, was signed by Sclavos, Evan, Bidzos, Chenevich, Compton, Cowan, Kriens, Moore, and Reyes. The Form 10-K for fiscal year 2003, filed on March 15, 2004, was signed by Sclavos, Evan, Bidzos, Chenevich, Compton, Kriens, Lauer, Moore, Reyes, and Roper. The Form 10-K for fiscal year 2004, filed on March 16, 2005, was signed by Sclavos, Evan, Bidzos, Chenevich, Compton, Kriens, Lauer, Moore, Reyes, and Roper. The Form 10-K for fiscal year 2005, filed on March 13, 2006, was signed by Sclavos, Evan, Bidzos Chenevich, Guthrie, Kriens, Lauer, Moore, Mueller, Reyes, Roper, and Simpson.

In the seventeenth cause of action, plaintiffs assert

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389

Page 23

**(Cite as: Slip Copy)**

that the director defendants and defendant Evan "knew or recklessly disregarded the fact that the Company's financial statements were misleading," and that these misrepresentations artificially inflated the value of VeriSign's stock by understating the compensation received by the option defendants. CAC ¶ 264. They also claim that at the same time that the price of VeriSign's stock was inflated due to improperly-accounted for stock options, defendants were "causing VeriSign to repurchase its own stock at those inflated prices starting in 2001," thereby violating § 10(b) and Rule 10b-5, and that VeriSign was injured because it purchased its own stock at those inflated prices on the open market. CAC ¶¶ 265-266.

The basis of plaintiffs' § 10(b) claim thus appears to be that Evan and the director defendants misrepresented to the market that the stock options were being granted at fair market value as of the date of the grant; that the value of VeriSign's stock was inflated because of those misrepresentations; and that VeriSign then purchased its own stock on the open market at that inflated price and was damaged thereby.

Defendants argue that the seventeenth cause of action should be dismissed for failure to state a claim. Under § 10(b), it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."15 U.S.C. § 78j(b).

SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for any person to use interstate commerce
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of

business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege (1) a material omission or misrepresentation, or the use of a manipulative or deceptive device or contrivance, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation (a causal connection between the misrepresentation or deceptive device and the loss).*See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

**\*27** Defendants contend that the CAC fails to state a claim under § 10(b) because plaintiffs do not adequately plead the elements of the claim, and because the claim is time-barred. In opposition, plaintiffs assert that the CAC specifically alleges that defendants committed a variety of manipulative and deceptive acts, including backdating option grants and issuing false financial statements and proxy statements; that defendants' scheme was in furtherance of their scheme to defraud the Company; and that defendants engaged in their fraudulent scheme knowingly or recklessly. They also assert that the claim is timely. The court finds that the motion must be GRANTED.

*Falsity*

Under the PSLRA-whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"-the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, "state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1); *see also In re Silicon Graphics,* 183 F.3d at 984-85 (plaintiffs must provide, in great de-

tail, all the relevant facts forming the basis of allegations made on information and belief).

In this case, defendants assert, plaintiffs' allegation that the individual defendants falsely backdated option grants is based on information and belief, as plaintiffs do not allege that they have personal knowledge of any such backdating. Defendants contend that the only basis plaintiffs plead for this belief is the allegedly "striking" difference between the buy-in price on the nominal grant dates and the share price one month after. Defendants also argue that plaintiffs' claims are deficient because the CAC fails to specify which of the individual defendants allegedly made the false and misleading statements.

The basis of plaintiffs' allegations of falsity appears to be that in signing the Form 10-Ks, Evan and the director defendants misrepresented to VeriSign that the information in the financial statements was accurate, which representation necessarily included an assurance that the stock options were being granted at fair market value as of the date of the grant. In the CAC, plaintiffs assert that based on information released concerning the federal investigation of VeriSign's option grants, and also based on VeriSign's announcement that it would be late filing its Form 10-Q for the quarter ending June 30, 2006, "[t]he question of whether or not VeriSign will issue a restatement [of financial statements] is only a matter of when, not if."CAC ¶¶ 113-114.

On November 21, 2006, the day that plaintiffs filed the CAC, VeriSign announced that it had determined the need to restate its historical financial statements for the years and interim periods from 2001 to 2005 and for the first quarter of 2006 to record additional non-cash, stock-based compensation expense related to past stock option grants. VeriSign stated that it had identified certain grants with incorrect measurement dates, without required documentation, or with initial grant dates and prices that were subsequently modified.

*28 While it is true that the allegations of backdating are not pled with particularity-with regard to, *e.g.,* who was responsible for or authorized back-

dating, who knew about it, when the options were granted, and what the price of the options should have been-the misrepresentation alleged in the § 10(b) claim is directed instead toward the contents of the financial statements in VeriSign's 10-Ks. In view of VeriSign's announcement of the anticipated restatement of its financial statements to account for backdated options, the court finds that plaintiffs need not allege additional facts to support their claim that defendants issued false or misleading financial statements.

*Scienter*

The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). In the Ninth Circuit, "stat[ing] facts [with] particularity" is interpreted as a requirement that plaintiffs "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."*In re Silicon Graphics,* 183 F.3d at 974;*see also In re Read-Rite Corp. Sec. Litig.,* 335 F.3d 843, 846 (9th Cir.2003) (plaintiff must allege specific contemporaneous statements or conditions, known to defendant, that demonstrate intentional or deliberately reckless false or misleading nature of statements when made).

In determining whether plaintiffs' scienter allegations reach the level of a "strong inference," the district court "must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."*Gompper v. VISX, Inc.,* 298 F.3d 893, 896-97 (9th Cir.2002) (also noting the "inevitable tension ... between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA"). In other words, the court must consider "not only inferences urged by the plaintiff, ... but also the competing inferences rationally drawn from the facts alleged."*Tellabs,* 127 S.Ct. at 2504. To qualify as "strong," an inference of scienter "must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing in-

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
(Cite as: Slip Copy)

ference of nonfraudulent intent."*Id.*

Defendants assert that the CAC does not meet the PSLRA's stringent standard for pleading scienter, because plaintiffs rely on boilerplate assertions rather than particularized allegations, and because they cite to no sources of information or any contemporaneous documents that support their claims. Specifically, defendants argue, plaintiffs plead no facts indicating how the director defendants and Evan were supposed to have known of the alleged backdating or of the accounting impact of such alleged actions. Defendants contend that it is not enough for plaintiffs to allege, as they have, that defendants "must have known" or "could have known" of fraud based on their job titles or job duties, in light of the PSLRA's requirement that plaintiffs plead specific facts, not boilerplate.

**\*29** In opposition, plaintiffs argue that the CAC adequately pleads scienter by alleging, among other things, that dozens of VeriSign stock option grants were backdated, that such backdating violated the express provisions of the Company's shareholder-approved stock option plans, that the backdating occurred over an extended time period, and that each time the price of VeriSign's stock rose significantly after the alleged grant. Plaintiffs claim that these facts alone support a strong inference that those who received backdated options, as well as those who granted, reviewed, or approved them, did so either knowingly or recklessly.

Plaintiffs assert that the CAC alleges how each of the individual defendants participated in the backdating scheme either with knowledge or reckless disregard for their wrongful actions; and also alleges that the director defendants, at the behest of the option defendants, actually backdated the option grants. Plaintiffs also claim that the CAC specifically alleges the role of the Compensation Committee in the backdating scheme, as well as the role of the Audit Committee; and that the CAC alleges that the defendant-insiders sold over $1 billion of VeriSign stock while in the possession of knowledge about the backdated stock option grants. Plaintiffs insist that defendants "cannot seriously dispute"

that these defendants had full knowledge of the backdating, or that such backdating violated the shareholder-approved plans that were described as requiring option grants at or above the current market prices of VeriSign stock in the proxy statements that all the director defendants signed.

The court finds that the CAC fails to allege, with respect to each defendant, facts giving rise to a strong inference that each such defendant acted with deliberate recklessness or engaged in conscious misconduct. While it is true that the CAC pleads numerous "facts," those facts are little more than generalities-that dozens of options were backdated, that such alleged backdating violated the applicable option plans, that the alleged backdating occurred on multiple occasions, and that the VeriSign stock price rose after the alleged grants.

It is not true, as plaintiffs claim, that the CAC alleges how *each* individual defendant participated in the alleged "backdating scheme." For example, the CAC alleges no facts giving rise to a strong inference that the director defendants who joined VeriSign's Board after the alleged backdating-Guthrie, Lauer, Moore, Mueller, Roper, and Simpson-participated in a backdating scheme. As for Evan and the remaining director defendants-Bidzos, Chenevich, Cowan, Kriens, Reyes, Tomlinson, and Compton-their participation during the time of the option grants is pled without factual particularity.

Plaintiffs simply allege that Evan and all the director defendants "disseminated or approved financial statements that did not disclose the backdating practices that were occurring at VeriSign and the resulting effect of those practices on the Company's financial results," and that they "knew or recklessly disregarded the fact that the Company's financial statements were misleading."CAC ¶ 264. Plaintiffs also assert that the members of the Compensation Committee and the Board "by its approval of their recommendations," enabled or permitted the Company to backdate stock options granted to the option defendants. CAC ¶ 185(c).

**\*30** These allegations do not satisfy the pleading

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

requirements of the PSLRA because plaintiffs neither specify the roles that Evan and each of the director defendants played in the alleged backdating scheme or in the alleged scheme to issue false financial reports, nor allege facts giving rise to a strong inference of scienter as to *each* defendant. *See In re Atmel Corp. Derivative Litig.,* 2007 WL 2070299, at *6 (N.D.Cal., July 16, 2007). It is not sufficient under the PSLRA to allege scienter against defendants as a group. *See* 15 U.S.C. § 78u-4(b)(2) (plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

The assertions of scienter are entirely conclusory, and the CAC contains no specific allegations of contemporaneous reports or data supporting the assertions of scienter-not a single fact showing what each defendant knew, when he/she knew it, or how he/she acquired that knowledge. This lack of factual specificity is particularly striking because none of the director defendants is alleged to have received any of the backdated options.

The mere fact of a particular defendant's position within VeriSign is insufficient, without more, to impose liability. *See, e.g., In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1087 (9th Cir.2002)."[A] complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their 'hands-on' positions and involvement in the day-to-day management of the company."*In re Peerless Systems Corp. Sec. Litig.,* 182 F.Supp.2d 982, 993 (S.D.Cal.2002). Nor is the boilerplate allegation that "[t]he director defendants and Evan knew or recklessly disregarded the fact that the Company's financial statements were misleading," CAC ¶ 264, sufficient to state a claim.

Moreover, plaintiffs' arguments of "motive and opportunity," relating to sales of stock, are not considered adequate in the Ninth Circuit. *See In re Silicon Graphics,* 183 F.3d at 974. Plaintiffs contend that courts have held that an inference of scienter can be raised by stock sales significantly smaller than the stock sales at issue here. However, the cases on which they rely-*Fecht v. Price Co.,* 70

F.3d 1078, 1084 (9th Cir.1995), and *Rubenstein v. Collins,* 20 F.3d 160, 169 (5th Cir.1994)-both predate the effective date of the PSLRA, and are therefore not controlling. The Ninth Circuit has noted that insiders often sell stock for a variety of reasons having nothing to do with fraud, and has concluded that even large stock sales, without more, cannot give rise to a strong inference of scienter. *See, e.g., In re Vantive,* 283 F.3d at 1093;*Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir.2001).

Finally, the mere fact that a corporation restates its financial statements does not give rise to a strong inference that any individual defendant acted with intent to defraud. *See DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002) (publication of inaccurate accounting figures, or failure to follow GAAP, standing alone, is insufficient to establish scienter).

*Loss causation*

**\*31** Defendants contend that plaintiffs' theory that VeriSign was damaged by "inflated stock prices" does not satisfy the economic loss element of a § 10(b) claim. In *Dura,* the Supreme Court ruled that purchasing a stock at an inflated price does not constitute a loss, because the purchaser then owns a stock that is priced at the inflated prices. *Dura,* 544 U.S. at 342. The Court concluded that the complaint was properly dismissed where the sole allegation of economic loss was the claim that the plaintiff had purchased at an inflated price. *Id.* at 346-47.

Here, the CAC alleges loss under § 10(b) based solely on VeriSign's "repurchase of its own stock on the open market at inflated prices starting in 2001."CAC ¶ 265. Defendants note that plaintiffs have not alleged that VeriSign lost money on the repurchased shares, or that the Company's stock price declined following a disclosure of backdating. Indeed, defendants argue, plaintiffs do not allege any "disclosure" of backdating at all, and the only basis they allege for their belief that the option grants were backdated is the "striking" difference between the buy-in price on the nominal grant dates

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

and the share price approximately one month later. Thus, defendants contend, plaintiffs have failed to allege economic loss.

In opposition, plaintiffs contend that the CAC adequately pleads economic loss and loss causation, by alleging that VeriSign's stock price dropped after disclosure of the simultaneous resignations of defendants Reyes and Lauer from VeriSign's Board.FN17Plaintiffs argue that it is this price drop that satisfies the requirements for pleading loss causation and economic loss.

> FN17. VeriSign made the announcement in a Form 8-K filed on August 2, 2006. The resignations were effective July 31, 2006.

In order to plead loss causation, a plaintiff need only allege that the loss resulted from a stock price drop caused by revelation of the "relevant truth"-that is, true facts about the Company's financial condition or performance that defendants had concealed. *Dura.* 544 U.S. at 342-46. Plaintiffs assert, however, that it is not necessary that there be a true "corrective disclosure," but rather that the market could learn about the possible fraud through a number of sources spread out through a period of time, during an investigation or because of resignations. Plaintiffs claim that the allegations of market knowledge through the resignation of key directors, followed by a drop in the price of the stock, are sufficient to adequately allege economic loss.

The court finds that the CAC fails to plead facts showing economic loss or loss causation. Indeed, as defendants have pointed out, it is questionable whether plaintiffs will ever be able to allege loss causation, because VeriSign's stock price went up, not down, after the June 27, 2006, announcement of the grand jury subpoena, the inquiry from the SEC, and the announcement of the internal review of stock option practices by VeriSign's board of directors. Similarly, the stock price went up, not down, after VeriSign's November 21 and 22, 2006, announcements of the preliminary results of the directors' review of the stock option grants, and its statement of its intent to restate its 2001-2005 fin-

ancial statements to record $250 million in non-cash, stock-based compensation expense.

**\*32** The announcement of the resignations of Reyes and Lauer is meaningless for purposes of showing loss causation, as the announcement was made more than five weeks after the announcement of the grand jury subpoena and the SEC investigation. That initial disclosure on June 27, 2006, constituted "disclosure to the market," and plaintiffs cannot claim that the market was unaware of these facts until Reyes and Lauer resigned weeks later. Moreover, plaintiffs do not explain the connection-if any-between the resignations and the alleged fraudulent backdating of options. In particular, there is no indication in the CAC that VeriSign announced that Reyes and Lauer had resigned because they were involved in options backdating at VeriSign.

*Reliance*

Defendants argue that plaintiffs cannot plead reliance under their theory of the § 10(b) claim, because the individuals who were allegedly responsible for VeriSign's repurchase of its shares-the director defendants and Evan-are the same individuals who were responsible for VeriSign's allegedly false financial statements, and who "knew or recklessly disregarded the fact that the Company's financial statements were misleading."

Reliance cannot be established when the individual allegedly acting on a misrepresentation "already possesses information sufficient to call the representations into question."*Atari Corp. v. Ernst & Whinney,* 981 F.2d 1025, 1030 (9th Cir.1992). Defendants assert that plaintiffs' theory that VeriSign relied on the allegedly misleading financial statements when it repurchased the shares is untenable, in view of plaintiff's allegation that the individuals making the repurchase decisions already knew-and indeed were responsible for-the issuance of misleading financial statements.

In opposition, plaintiffs contend that the complaint adequately pleads reliance. They argue that defendants' argument-that the individual defendants'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
(Cite as: Slip Copy)

knowledge of the impropriety of the buy-backs is attributable to the Company-is without merit. They contend that if it were true, a corporation could never sue its fiduciaries for fraud, because officers and directors could always argue that their knowledge of wrongdoing must somehow be attributed to the corporation.

Plaintiffs argue that the individual defendants took ultra vires actions contrary to the authorization provided by the Company's stock option plans, and adverse to the interests of the Company, and assert that under such circumstances, the individual defendants' knowledge cannot be imputed to the Company. They contend that taking defendants' argument to its logical end would allow corporate officers to mislead their corporation and then escape derivative liability to the corporation precisely because they misled the corporation.

The court finds that plaintiffs fail to plead facts showing reliance. As with loss causation, it may prove impossible for plaintiffs to adequately plead reliance under the facts of the case. Plaintiffs allege that "VeriSign would not have purchased VeriSign common stock at the prices it paid, had the market previously been award [sic] that the market price of VeriSign's stock was artificially and falsely inflated by defendants' misleading statments."CAC ¶ 266. However, the CAC does not identify a single VeriSign officer or director who relied on the supposedly false or misleading financial statements in deciding to undertake the stock repurchase on VeriSign's behalf.[FN18]

> FN18. The CAC does not even plead facts indicating when the alleged "repurchase" of stock "on the open market" occurred.

*33 Plaintiffs might be able to plead reliance if they were to allege that the corporate decision-maker for the repurchase of shares had no knowledge of the alleged fraud. Here, however, plaintiffs allege that all the senior management and board members not only knew about the alleged backdating but also caused it, and that all the director defendants and Evan intentionally caused VeriSign to release financial statements that omitted to disclose the alleged backdating.

*Timeliness*

In addition to pointing to the pleading deficiencies, defendants contend that the § 10(b) claim must be dismissed as untimely. They assert that plaintiffs were on notice of the facts upon which they base their claim of backdating no later than one month after each grant date, and more than two years before they filed the complaint.

The limitations period for a § 10(b) claim is "the earlier of (1) 2 years after the discovery of the facts constituting the violation, or (2) 5 years after such violation."28 U.S.C. § 1658(b).[FN19] The Ninth Circuit has not yet addressed whether "discovery of the facts constituting the violation" requires a plaintiff's discovery of a misrepresentation, or simply that the plaintiff was put on inquiry notice of the misrepresentation. *See Berry v. Valence Tech., Inc.,* 175 F.3d 699, 703-04 (9th Cir.1999); *accord, Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 951 (9th Cir.2005).

> FN19. This provision is properly considered a statute of repose.*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson.* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (construing the former statute, which imposed a one- and three-year limitation). A statute of limitations differs from a statute of repose because the former "bars plaintiff[s] from bringing an already accrued claim after a specified period of time," whereas the latter "terminates a right of action after a specific time, even if the injury has not yet occurred."*Fields v. Legacy Health System,* 413 F.3d 943, 952 (9th Cir.2005) (citation omitted). The statute of repose applicable to claims under the Exchange Act is not subject to equitable tolling. *Lampf.* 501 U.S. at 363.

The Ninth Circuit has indicated, however, that if it were to adopt an "inquiry notice" standard, it would

be in the following formation-whether a plaintiff, in the exercise of reasonable diligence, should have uncovered the facts underlying the fraud. *Berry.* 175 F.3d at 704. In any event, defendants assert that in this case, the "inquiry notice" and the "actual discovery" standards will lead to the same result.

Defendants contend that plaintiffs were on notice of the facts on which they base their claims of back-dating no later than one month after each grant date-meaning that they were aware of the alleged misrepresentations no later than March 31, 2003. They claim that because this difference was public and obvious at the time, plaintiffs had both actual and inquiry notice of the facts underlying their backdating allegations no later than one month fol-lowing the last nominal grant date-which was March 2002. Thus, defendants contend, the two-year statute of limitations began to run on the filing date of the first financial statement filed after March 2002, which was March 31, 2003. As this was more than two years before the first complaint was filed in this consolidated action, defendants contend that the § 10(b) claim is time-barred.

In opposition, plaintiffs argue that the § 10(b) claim is timely. They claim that regardless of whether in-quiry notice or actual notice is the standard, they could not have discovered, and did not discover, defendants' unlawful practices before 2006. They assert that the first indication of any possible wrongdoing with respect to VeriSign's stock option grants came on June 27, 2006, when VeriSign an-nounced the federal investigation. They contend that there is no way they could have been put on notice of defendants' wrongful acts before the U.S. Department of Justice or the SEC was aware of it.

**\*34** The court finds that the claim is only partially time-barred. Plaintiffs have adequately established that they were not placed on notice of the alleged violations prior to the announcement of the grand jury subpoena and SEC investigation. However, in the event that plaintiffs are able to state a claim un-der § 10(b), based on alleged misrepresentations in VeriSign's financial statements in the Company's 10-Ks for fiscal years 2000 through 2005, the claim

alleging misrepresentations in the Form 10-K for fiscal year 2000, which was filed on March 28, 2001, would be time-barred because the Form 10-K was filed more than five years before the present action was filed on July 5, 2006.

<div align="center">ii. § 14(a) claim</div>

Plaintiffs allege that proxy solicitations issued from March 31, 1999, to April 16, 2003, for the election of VeriSign's directors, contained false or mislead-ing information, including the allegedly false nom-inal grant dates. CAC ¶¶ 153-155. In the eighteenth cause of action, plaintiffs assert that the proxy statements violated § 14(a) and Rule 14a-9 because they omitted material facts, including that the indi-vidual defendants were knowingly causing Ver-iSign to engage in an option backdating scheme. CAC ¶ 269. Plaintiffs request damages and injunct-ive relief in the form of voiding the elections for which the proxy solicitations were issued.

Defendants argue that the § 14(a) claim should be dismissed because plaintiffs cannot obtain relief un-der that provision. Section 14(a) prohibits the soli-citation of proxy votes "in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."15 U.S.C. § 78n(a). SEC Rule 14a-9 prohibits solicitations "containing any statement which ... is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."*Mills v. Electric Auto-Lite Co..* 396 U.S. 375, 383, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

To state a claim under Rule 14a-9 and Section 14(a), a plaintiff must allege a false or misleading statement or omission of material fact; that the mis-statement or omission was made with the requisite level of culpability; and that it was an essential link in the accomplishment of the transaction.*De-saigoudar v. Meyercord,* 223 F.3d 1020, 1022 (9th Cir.2000); *see also In re Atmel.* 2007 WL 2070299, at \*8. Under the PSLRA, a § 14(a) claim must be pled with particularity. The required state of mind

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

for a § 14 claim is negligence, however, not knowledge or deliberate recklessness. *See In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000). Thus, plaintiffs must plead particularized facts that give rise to a strong inference of negligence. *Id.*

Defendants argue that the allegations in the CAC do not support a claim that the proxy solicitations caused any damages, because the request for injunctive relief is moot, and because the claim is time-barred.

**\*35** First, defendants contend that the CAC does not state what damages VeriSign suffered as a result of the allegedly misleading proxy statements. They argue further that there can be no damages, as the election of particular slates of directors could not have caused any damage to VeriSign. They note that a plaintiff in a proxy solicitation case must plead and prove a "transactional nexus" or a "transactional causation." *See Gaines v. Haughton,* 645 F.2d 761, 776 (9th Cir.1981), *overruled in part on other grounds by In re McLinn,* 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). Thus, they argue, under § 14(a), plaintiffs can seek only damages that resulted directly from the transaction at issue in the proxy solicitation-here, the election of the directors.

Defendants contend that plaintiffs cannot meet the "transactional causation" requirement by requesting damages based on the alleged backdating or on VeriSign's repurchase of its shares following the alleged backdating, because those transactions were not subject to shareholder approval, via the challenged proxy statements or otherwise. Defendants also assert that plaintiffs cannot satisfy the "transactional causation" requirement by alleging that the proxy solicitations damaged VeriSign by causing the election of directors who subsequently took actions harmful to the Company, because the mere fact that omissions in proxy materials, by permitting directors to win election, indirectly lead to financial loss through mismanagement does not create a sufficient nexus with the alleged monetary loss.

Second, defendants contend that plaintiffs' request for injunctive relief is moot because all the challenged elections authorized directorial terms that are now expired. The CAC challenges proxy solicitations filed on five dates-March 31, 1999; April 22, 1999; April 12, 2001; April 3, 2002; and April 16, 2003. Each of those directorial elections authorized a three-year term for the directors elected, the most recent of which expired in April 2006. Thus, defendants argue, it is too late to void any of those elections, which fact moots plaintiffs' request for injunctive relief.

Third, defendants assert that the § 14(a) claim is untimely, because the last filed proxy statement on which plaintiffs base their claims was filed on April 16, 2003, which is more than three years before the date the present action was filed. Here, the last-filed proxy statement upon which plaintiffs base their claims was filed on April 16, 2003, which is more than three years before the July 5, 2006, filing date for plaintiffs' complaint.

The court finds that the motion must be GRANTED because the § 14(a) claim is time-barred. The limitations period for a § 14(a) claim is "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation."*Westinghouse Elec. Corp. by Levit v. Franklin,* 993 F.2d 349, 353 (3d Cir.1993). Plaintiffs allege false and misleading statements in proxy statements filed on March 31, 1999; April 22, 1999; April 12, 2001; April 3, 2002, and April 16, 2003. The complaint in the present action was filed on July 5, 2006, which was more than three years after the proxy statements were filed. Thus, the claim under § 14(a) and Rule 14a-9 is barred by § 14(a)'s three-year statute of repose.

**\*36** In their opposition, plaintiffs argue that where, as here, a § 14(a) claim is brought on the basis of fraud, the statute of limitations in 28 U.S.C. § 1658 supplements the one-year-after-discovery or three-years-after-occurrence statute of limitations that would otherwise apply to a § 14(a) claim.

Plaintiffs also assert that under federal law, the

Slip Copy                                                                                                   Page 31
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

five-year statute of limitations (under 28 U.S.C. § 1658) begins when the last alleged misrepresentation was made by defendants. Here, they submit, the last alleged misrepresentation in a proxy statement was made on April 16, 2003. Thus, plaintiffs argue, the five-year period did not begin to run until after April 16, 2003, at the earliest.

A Section 14(a) claim is not a claim that "sounds in fraud" under the Sarbanes-Oxley Act of 2002, so its statute of limitations was not extended by 28 U.S.C. § 1658(b)(2). Thus, the statute of limitations is one year from the discovery of the occurrences giving rise to the claim, but no later than three years from the date of the violation. *In re Zoran,* 2007 WL 1650948, at *24; *see also In re Exxon Mobile Corp. Sec. Litig.,* 387 F.Supp.2d 407, 423-24 (D.N.J.2005); *In re King Pharms., Inc.* 2004 WL 5043539, at *7 (E.D.Tenn., Aug.11, 2004); *Virginia M. Damon Trust v. North Country Fin. Corp.,* 325 F.Supp.2d 817, 823-24 (W.D.Mich.2004); *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 196-97 (S.D.N.Y.2003).

The court also finds that the § 14(a) claim fails to state a claim for two additional reasons. First, as argued by defendants, plaintiffs fail to allege any injury suffered as a result of the allegedly misleading proxy statements-that is, they allege no direct injury suffered by VeriSign as a corporation as a direct result of the transaction that was at immediate issue in the proxy (election of directors). Damages are recoverable under § 14(a) "only when the votes for a specific corporate transaction requiring shareholder authorization ... are obtained by a false proxy statement, and that transaction was the direct cause of pecuniary injury for which recovery is sought."*Gen'l Elec. Co. by Levit v. Cathcart,* 980 F.2d 927, 932 (3rd Cir.1992).

Second, plaintiffs fail to plead the required state of mind with particularity as to each defendant, as required by the PSLRA. The required state of mind for a § 14(a) claim is negligence. Here, plaintiffs plead no particularized facts "giving rise to a strong inference" that each defendant acted with the required state of mind. *See* 15 U.S.C. § 78u-4(b)(2).

ii. § 20(a) claim

Defendants argue that the § 20(a) claim for "controlling person" liability must be dismissed because plaintiffs have not adequately alleged a primary violation. Plaintiffs argue, however, that they have alleged a primary violation, and that the § 20(a) claim can therefore proceed.

Under § 20(a), joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predicated on a primary violation under the 1934 Act. *Heliotrope Gen'l, Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir.1999). A claim that individual defendants are "controlling persons" of a company must allege (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator. *America West,* 320 F.3d at 945; *see also Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000).

**\*37** Plaintiffs allege the § 20(a) claim against Evan, Kremian, and the director defendants. They assert that Evan and Kremian-former CFOs of VeriSign-and the director defendants-"by virtue of their positions with VeriSign and their specific acts"-were controlling persons of VeriSign and exercised their power and influence "to cause VeriSign to engage in the illegal conduct and practices complained of" in the CAC. CAC ¶ 275.

The court finds that the motion must be GRANTED, for two reasons. First, plaintiffs have not adequately stated a claim of a primary violation, and the § 20(a) claim therefore cannot proceed. *See, e.g., Paracor Fin., Inc. v. Gen'l Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996).

Second, plaintiffs do not allege that Evan, Kremian, or the director defendants controlled a primary violator. The derivative claims are asserted on behalf of VeriSign. Plaintiffs do not allege claims against VeriSign as a primary violator, and indeed, it is logically impossible for a corporation on whose behalf a derivative action is brought to also be a primary violator. Yet, in the § 20(a) claim,

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

plaintiffs assert that the alleged controlling persons exercised their power and influence over VeriSign. CAC ¶ 275. Thus, the § 20(a) cause of a action fails to state a claim.

### b. State Law Claims

Defendants seek an order dismissing the first through thirteenth causes of action, alleging breach of fiduciary duty, accounting, unjust enrichment, rescission, constructive fraud, corporate waste, breach of contract, insider trading under California law, gross mismanagement, and restitution. Defendants contend that plaintiffs were on notice of the facts underlying all their state law claims more than four years before they sued, and that all those claims are therefore time-barred and should be dismissed on that basis.

Plaintiffs argue, however, that the statute of limitations is subject to the "discovery rule," that it should be equitably tolled, and that it should be tolled based on the doctrine of fraudulent concealment.

### i. What law applies

Before resolving this dispute, the court must determine which law applies to the state law claims. Plaintiffs in this case invoke federal question jurisdiction under 28 U.S.C. § 1331, supplemental jurisdiction under 28 U.S.C. § 1367(a), and diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Defendants assert that federal choice-of-law rules apply because plaintiffs allege federal question jurisdiction.

A federal court sitting in diversity applies the substantive law of the state in which it sits, and applies federal procedural rules. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (district court exercising diversity jurisdiction must follow substantive law, including choice-of-law rules, of forum state). Statutes of limitations are considered substantive for purposes of *Erie*. *See Guaranty Trust Co. of New York v.*

*York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

**\*38** In an action involving state law claims, federal courts also follow *Klaxon* and apply the law of the forum state, even where the plaintiff also asserts claims under federal law. *MRO Comm'ns, Inc. v. American Tel. & Tel. Co.*, 197 F.3d 1276, 1282 (9th Cir.1999); *see also Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir.2000) (federal court exercising supplemental jurisdiction over state law claims is bound to apply law of forum state to same extent as if it were exercising its diversity jurisdiction).

Under the "internal affairs" doctrine, the law of the state of incorporation governs liabilities of officers or directors to the corporation and its shareholders. *Shaffer v. Heitner*, 433 U.S. 186, 215 n. 44, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *see also CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983); Rest. (Second) of Conflict of Laws § 309 and comment (a). Internal corporate affairs involve those matters that are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders. *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *see* Rest. (Second) of Conflict of Laws § 313, comment (a). Under this doctrine, courts look to a corporation's state of incorporation as the source of substantive law governing claims regarding that corporation's internal affairs. *Kamen*, 500 U.S. at 108-09.

In general, courts in California follow the internal affairs doctrine. *See* Cal. Corp.Code § 2116 (directors of foreign corporation transacting intrastate business are liable to corporation for making of unauthorized dividends, purchase of shares or distribution of assets of false certificates, reports or public notices or other violation of official duty according to applicable laws of state of incorporation); [FN20] *see also Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir.1998); *Davis & Cox v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

*Summa Corp.,* 751 F.2d 1507, 1527 (9th Cir.1985). Thus, Delaware law, the law of the state of VeriSign's incorporation, applies to all causes of action that implicate the Company's internal affairs, including the claims for breach of fiduciary duty, accounting, unjust enrichment, rescission, constructive fraud, corporate waste, breach of contract, gross mismanagement, and restitution.

> FN20. California makes an exception to the internal affairs doctrine where shares of the foreign corporation are not listed or traded on a national exchange, and where more than one-half of the outstanding voting shares are held by California residents. Cal. Corp.Code § 2115.

Delaware applies a three-year statute of limitations to claims of tort, contract, and breach of fiduciary duty. 10 Del. Ch. § 8106. The three-year limitation period is also applied to equitable claims by analogy. *See Smith v. McGee,* 2006 WL 3000363, at *3 (Del.Ch., Oct.16, 2006); *see also Ryan,* 918 A.2d at 359. "The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has been a harmful act by a defendant. This is true even if the plaintiff is unaware of the cause of action or the harm."*In re Tyson Foods, Inc. Consol. Shareholder Litig.,* 919 A.2d 563, 584 (Del.Ch.2007).

#### ii. Whether the first through thirteenth causes of action are time-barred

**\*39** Under Delaware law, a plaintiff may toll the limitations period by specifically alleging that the facts were "so hidden that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint."*Smith,* 2006 WL 3000363, at *3;*see also In re Tyson,* 919 A.2d at 584-85. If the plaintiff sufficiently meets his burden of showing that the statute was tolled, relief extends only until plaintiff is on inquiry notice.*Ryan,* 918 A.2d at 359. Tolling ends when plaintiff discovers, or in the exercise of reasonable diligence should have discovered, his injury. *Id.*[FN21]

> FN21. A similar rule applies in California.

Under California law, a limitations period begins to run when a cause of action accrues, which is normally "at the time when the cause of action is complete with all its elements."*Fox v. Ethicon Endo-Surgery, Inc.,* 35 Cal.4th 797, 806, 27 Cal.Rptr.3d 661, 110 P.3d 914 (2005). A plaintiff whose claim is time-barred on its face has the burden of showing that he or she should be able to invoke the "discovery rule." *Id.* at 808, 27 Cal.Rptr.3d 661, 110 P.3d 914. Under this rule, a cause of action does not accrue "until the plaintiff discovers, or has reason to discover, the cause of action."*Id.* at 807, 27 Cal.Rptr.3d 661, 110 P.3d 914. A plaintiff has reason to discover a cause of action when he or she has reason to suspect a factual basis for wrongdoing that has caused him or her harm. *Id.* The discovery rule "only delays accrual until a plaintiff has, or should have, inquiry notice of the cause of action."*Id.* To invoke the discovery rule, the plaintiff must specifically plead facts showing the time and manner of discovery, and the inability to have made earlier discovery despite reasonable diligence. *Id.* at 808, 27 Cal.Rptr.3d 661, 110 P.3d 914.

The statute of limitations may also be tolled when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth. *In re Tyson,* 919 A.2d at 585. Under this doctrine, a plaintiff is required to allege an act of "actual artifice" by the defendant that either "prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."*Id.*

Finally, where a plaintiff has reasonably relied on the competence and good faith of a fiduciary, the doctrine of equitable tolling stops the statute from running. *Id.* No evidence of actual concealment is necessary in such a case, but the statute is tolled only until the investor "knew or had reason to know of the facts constituting the wrong."*Id.* (citation omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

Under any of these theories, a plaintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice. "Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled."*Id.*

Plaintiffs argue that the statute of limitations should be tolled because the first public indication of any potential improprieties concerning the granting of stock options at VeriSign came on June 27, 2006, when the Company announced that it had received a grand jury subpoena and a request from the SEC for documents relating to its stock option grants and practices.

Plaintiffs also assert that the allegations in the CAC satisfy the requirements of the doctrine of fraudulent concealment, because defendants are alleged to have caused VeriSign to falsely represent that the exercise price of the stock option grants was the fair market value of VeriSign's stock, measured by the publicly traded price as of the date of the grant. They argue further that defendants' roles as fiduciaries justify tolling the statute of limitations through the doctrine of equitable tolling because plaintiffs were entitled to rely on the competence and good faith of those protecting their interests.

In response, defendants contend that plaintiffs cannot claim that they were not on notice of the backdated option grants until VeriSign's June 27, 2006, announcement, and then also base their allegations of options backdating entirely on the alleged "striking" pattern of option grants and VeriSign stock prices. Defendants claim that numerous academics, journalists, stock analysts, and federal prosecutors had reason to analyze and inquire regarding stock option practices long before June 27, 2006, based on the same sort of "striking" pattern that plaintiffs allege. Defendants also assert that plaintiffs fail to allege any facts beyond the "striking" pattern referenced in the CAC that were *not* publicly available before they filed the first

complaint in this case in July 2006.

**\*40** Defendants contend that the issue for the court on this motion to dismiss is whether the "striking" pattern of stock option grants and stock price movements serve to put plaintiffs on inquiry notice of the potential claims they attempt to plead against the individual defendants. Defendants assert that if this question is answered in the affirmative, then "fraudulent concealment" does not apply because plaintiffs were already on notice that the option grants were fraudulent, and plaintiffs' claims are time-barred.

The court finds that the claims are not time-barred. As with the federal claims, plaintiffs have adequately established that they were not placed on inquiry notice of the alleged violations prior to the announcement of the grand jury subpoena and the SEC investigation.

 ii. Whether the third, fourth, fifth and seventh, eighth, ninth, eleventh, and twelfth causes of action state a claim

Defendants contend that the claims of unjust enrichment, rescission, constructive fraud, breach of contract, insider trading under California law, and restitution fail to state a claim.

*Unjust enrichment*

Defendants assert that the third cause of action for unjust enrichment should be dismissed because a contract already governs the parties' relationship, and because the claim is untimely. They note that the CAC specifically pleads in the eighth cause of action that the option defendants' employment contracts govern their compensation, and that the option defendants have breached those contracts. Thus, defendants argue, the claim for unjust enrichment should be dismissed.

In opposition, plaintiffs argue that the unjust enrichment claim is not precluded by the existence of a contract. They submit that as officers and directors of the Company, defendants had fiduciary duties independent from their contractual obligations.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

Thus, plaintiffs assert, the unjust enrichment claim survives independent of any contractual claim or obligation. They also contend that because the CAC alleges that the option defendants' contracts are subject to rescission based on allegations of fraud, the unjust enrichment claim is not precluded because of the existence of any contract.

Under Delaware law, a claim for unjust enrichment has five elements-(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. *See Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del.Ch.1999)."[N]o action for unjust enrichment lies where a contract governs the parties' relationship to each other."*McKesson HBOC, Inc. v. N.Y. State Common Retirement Fund, Inc.,* 339 F.3d 1087, 1091 (9th Cir.2003) (applying Delaware law).

The court finds that the motion must be DENIED. To the extent that plaintiffs are ultimately able to prevail under a breach of contract theory, they will be precluded from also recovering under a claim of unjust enrichment. However, for pleading purposes, plaintiffs are entitled to assert claims in the alternative and to plead inconsistent causes of action. *See* Fed. R. Civ. Pro. 8(e) (2); *Oki America, Inc. v. Microtech Int'l, Inc.,* 872 F.2d 312, 314 (9th Cir.1989); *In re Wal-Mart Wage and Hour Employment Practices Litig.,* 490 F.Supp.2d 1091, 1117 (D.Nev.2007).

**\*41** *McKesson,* on which defendants rely, is distinguishable. In that case, plaintiff McKesson sued its own shareholders for unjust enrichment arising from a merger between McKesson and HBO & Company ("HBOC"). McKesson alleged that the former HBOC shareholders were the beneficiaries of a windfall triggered by alleged accounting improprieties by HBOC. The court first noted that no action for unjust enrichment lies where a contract governs the parties' relationship, but also found that in the case before it, an unjust enrichment claim was theoretically possible, as there was no controlling contract between the parties. The court

held, however, that the plaintiff could not maintain an action for unjust enrichment (an equitable claim), in part because of the availability of potential legal claims against "targets for recovery" other than the former HBOC shareholders, *McKesson,* 339 F.3d at 1093, and in part because a restitutionary award would have been unjust under the circumstances presented by the case, *id.* at 1095-96.

While *McKesson* accurately states the rule that no action for unjust enrichment is possible where a contract governs the parties' relationship, that rule did not control the outcome of the case, as there was no contract between the parties. Thus *McKesson* does not support defendants' position here, which appears to be that a plaintiff cannot plead breach of contract and also plead unjust enrichment in the alternative.

*Rescission and constructive fraud*

Defendants contend that the fourth cause of action for rescission and the fifth cause of action for constructive fraud fail to state a claim. Plaintiffs seek rescission of the option grants on the grounds that they were procured by "fraud, deceit and abuse of control."CAC ¶ 208. In order to obtain rescission on those grounds, plaintiffs must show either actual or constructive fraud. Both actual and constructive fraud require reliance on an alleged misrepresentation by the defrauded party. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 901 A.2d 106, 115 (Del.2006).

Here, defendants contend that plaintiffs cannot show reliance. The individuals who are alleged to have awarded the grants to the option defendants were the members of the Compensation Committee, but plaintiffs repeatedly assert in the CAC that the members of that committee were complicit in the purported backdating scheme. Thus, defendants argue, plaintiffs cannot show that the individuals awarding the grants could have relied on any misrepresentation made by the option defendants. In addition, defendants contend that plaintiffs have not pled with any particularity the misrepresentations used to fraudulently procure the option grants, as required by Rule 9(b). Defendants contend that in

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

light of these two deficiencies, the fourth cause of action fails to state a claim for rescission.

In opposition, plaintiffs argue that rescission is appropriate based on defendants' misconduct, as well as their abuse of control, and the illegal nature of the grants which made the granting of backdated stock options invalid, ultra vires acts, since such grants were not authorized or made in accordance with the terms of the Company's shareholder-approved stock option plans. Thus, plaintiffs assert, the claim for rescission is properly pled even without an allegation of a fraudulent basis for the claim.

**\*42** Plaintiffs also contend that a claim for constructive fraud is not really a claim of fraud, and therefore is not required to be pled under Rule 9(b). Nevertheless, they also submit that a fair reading of the CAC shows that the claim for constructive fraud meets the requirements of Rule 9(b), which requires only that the circumstances constituting the fraud be stated with particularity, but allows state of mind to be "averred generally."

Plaintiffs point to the allegations that the Company, with the knowledge, approval, and participation of each of the individual defendants, disseminated false financial statements in Form 10-K filings. Plaintiffs also assert that the CAC lists specific fraudulently filed proxy statements, and specific false statements contained within and omitted from the proxies; and that the CAC alleges that the option defendants fraudulently caused the Company, through its Board of Directors, to issue backdated stock option grants that were in direct violation of shareholder-approved stock option plans. Plaintiffs argue that as such, the CAC states a claim for rescission.

In reply, defendants reiterate that the rescission claim fails because plaintiffs have not adequately alleged the elements of either actual or constructive fraud. In response to plaintiffs' assertion that they do not need to plead actual or constructive fraud in order to state a claim for rescission, but may simply rely on allegations that the option grants were "invalid," defendants argue that plaintiffs never explain how the stock options were "invalid" in any way beyond their initial allegations.

The court finds that the motion must be GRANTED. Plaintiffs' cause of action for rescission amounts to a claim for relief based on constructive fraud. Constructive fraud "arises on a breach of duty by one in a confidential or fiduciary relationship to another that induces justifiable reliance by the other to his or her prejudice."37 Am.Jur. Fraud and Deceit § 8 (2001), *quoted in Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211,1236 n. 70 (Del.Ch.2001), *judgment reversed on other grounds,*817 A.2d 149 (Del.Supr.2002).
Fraud is either actual or constructive. Constructive fraud is a breach of legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. It is a term applied to a great variety of transactions which equity regards as wrongful, to which it attributes the same or similar effects which follow from actual fraud, and for which it gives the same relief as that granted in cases of actual fraud. While called constructive fraud, it is nevertheless fraud.

*Schmeusser v. Schmeusser,* 559 A.2d 1294, 1297 (Del.1989) (citation and quotation omitted); *see also Wal-Mart Stores,* 901 A.2d at 114-16.

In federal court, claims of fraud must be pled with particularity.Fed.R.Civ.P. 9(b). Here, plaintiffs have not alleged constructive fraud with particularity, in part, because they have not alleged the elements as to each specific defendant, but only generally, and have not pled reliance. Indeed, it is not clear that plaintiffs' claim of constructive fraud is distinguishable in any way from their claim of breach of fiduciary duty. In the first cause of action for breach of fiduciary duty, plaintiffs allege that the individual defendants breached their fiduciary duty by engaging in a scheme to grant backdated stock options to themselves and/or other officers and directors of the Company, and to cover up their misconduct. In the fifth cause of action for con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

structive fraud, plaintiffs allege that the individual defendants owed a duty of candor and full disclosure regarding the true state of VeriSign's business and assets, and that they made misrepresentations and failed to disclose the true facts regarding their stewardship of VeriSign.

**\*43** In addition, plaintiffs have not alleged facts supporting the claim that the options were backdated. In particular, they have not clearly explained exactly who approved the options and when they were approved; have not stated whether and to what extent the members of the Compensation Committee (as opposed to the whole Board) had the authority to grant options; have not indicated whether other options were granted during the period between 1998 and 2002 that were not backdated; and have not alleged the actual grant dates of the allegedly backdated options or the appropriate price of the options.

*Breach of contract*

Defendants contend that the seventh cause of action for breach of contract fails to state a claim. In this claim, plaintiffs allege that the option defendants breached their employment contracts by entering into the purported backdating scheme. Defendants contend that this cause of action does not state a claim because plaintiffs do not specify any terms of those employment contracts, or specify the terms that were allegedly breached, and do not state whether the agreements were written or oral. Defendants argue that a breach of contract claim must plead the terms of the alleged contract.

In opposition, plaintiffs assert that the CAC adequately pleads a claim for breach of contract, because it specifies the terms of the Company's stock option plans and "related agreements" and the breaches thereto. For example, plaintiffs note, the CAC states that during the relevant period, the Company had three stock option plans, and that each provided that the exercise prices of options could not be less than 100% of fair market value on the date of the grant (defined as the stock's closing price on that date); and that the CAC alleges that

improper backdating violated the terms of the plans. Plaintiffs assert that given the specific language about the stock option plans in the CAC, which they claim are the "contracts" at issue in this cause of action, and the specificity with which the CAC asserts that those contracts were violated, the cause of action for breach of contract states a claim.

The court finds that the motion must be GRANTED. The elements of a claim of breach of contract include 1) the existence of a contract, 2) the breach of an obligation imposed by the contract, and 3) resulting damages to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 612 (Del.2003). In this case, plaintiffs fail to allege the essential elements of the individual defendants' employment contracts with VeriSign, or how those contracts were breached. As for plaintiffs' argument that the contracts at issue were the option contracts, there is no indication in the CAC that the individual defendants are parties to the stock option plans. Moreover, while the plans may be relevant, plaintiffs do not allege that the plans form the basis of the employment relationship between VeriSign and any of the individual defendants.

*Insider trading claims under California law*

**\*44** Defendants argue that the eighth and ninth causes of action for violation of California Corporations Code §§ 25402 and 25403 should be dismissed because those laws do not apply to VeriSign and because the claims are untimely.

In the eighth cause of action, plaintiffs allege that the insider selling defendants sold shares of VeriSign stock at the same time that they had access to "highly material information regarding the Company, including the information set forth [in the CAC] regarding the true adverse facts of VeriSign's option backdating, improper accounting, and false financial statements," which was not generally available to the public and the securities markets, and that the sales of stock were therefore made in violation of Corporations Code § 25402. CAC ¶¶ 222-224.

In the ninth cause of action, plaintiffs allege that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

the director defendants (five of whom were also insider selling defendants) were aware of the insider selling defendants' knowledge of the material, adverse, non-public information," and that the director defendants, "through their positions, possessed control and influence over the [i]nsider [d]efendants' sale of VeriSign common stock."CAC ¶¶ 227-228.

Defendants contend that because the §§ 25402 and 25403 claims deal with "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders," they fall within the ambit of the internal affairs doctrine. *See Edgar,* 457 U.S. at 465. Defendants assert that because VeriSign is a Delaware corporation, Delaware law governs plaintiffs' claims, making §§ 25402 and 25403 inapplicable to this case. Thus, they argue, the eighth and ninth causes of action fail to state a claim.

In opposition, plaintiffs note that the California Court of Appeal has upheld the application of California Corporations Code § 25402 to officers and directors of a Delaware corporation. In *Friese v. Superior Court,* 134 Cal.App.4th 693, 701-03, 36 Cal.Rptr.3d 558 (2005), *cert. denied, Moore v. Friese,* --- U.S. ----, 127 S.Ct. 138, 166 L.Ed.2d 37 (2006), the court discussed the scope of California's security regulation and held that California's securities laws apply to foreign corporations. *Friese* specifically rejected the argument that the internal affairs doctrine acts to limit § 25403 of the California Corporations Code to domestic companies.*Id.* at 708-10,36 Cal.Rptr.3d 558.

Defendants argue, however, that this court need not follow the decision of a California state court on this matter, as this case is in federal court based on plaintiffs' invocation of federal question jurisdiction. Thus, defendants assert, the federal internal affairs doctrine dictates that any claims relating to the internal affairs of VeriSign are subject to Delaware law, not California law.

As explained above, federal choice of law rules do not apply in this case, as plaintiffs invoke diversity

jurisdiction, in addition to supplemental jurisdiction over the state law claims. Based on the ruling by the California Court of Appeal in *Friese,* the court finds that the claims brought under §§ 25402 and 25403 are not barred by application of California's internal affairs doctrine. The court does find, however, that the § 25402 claim is partially time-barred, and that it also fails to allege fraud with particularity. Because the § 25402 claim fails, the § 25403 claim also fails.

**\*45** A § 25402 claim must be brought "before the expiration of five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire."Cal. Corp.Code § 25506(b). The five-year bar is a strict limit that may not be tolled. *See In re Atmel,* 2007 WL 2070299, at *11 (citing *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1308 (9th Cir.1982). The complaint in this action was filed on July 5, 2006. Thus, the claim is time-barred to the extent that it alleges sales prior to July 5, 2001.

Accordingly, the § 25402 claim asserted against Yanowitch, Schaeffer, Bidzos, and Roper-which alleges insider sales occurring only prior to July 5, 2001, but none after that date-is dismissed as untimely. The § 25402 claim asserted against Sclavos, Gallivan, Evan, Korzeniewski, Pereira, Chenevich, Cowan, Roper, and Tomlinson is dismissed to the extent that it alleges sales prior to July 5, 2001.

In addition, any amended complaint should plead the § 25402 claim with particularity, as insider trading under California law is a fraudulent practice. *Bowden v. Robinson,* 67 Cal.App.3d 705, 711, 136 Cal.Rptr. 871 (1977). The CAC alleges only that the insider selling defendants "had access to highly material information" regarding VeriSign, including information regarding the "true adverse facts" of the options backdating, the improper accounting, and the false financial statements, and that they sold stock while in possession of that information. However, plaintiffs do not explain which "true adverse facts" each of the selling defendants knew, when each knew those facts, how they acquired the

knowledge, or which sales were made when de-
fendants were in possession of which inside inform-
ation.

*Claims for restitution*

Defendants contend that the eleventh and twelfth
causes of action for restitution should be dismissed
because they are derivative of the unjust enrichment
claim. Restitution is a remedy for unjust enrich-
ment. Thus, a claim for restitution is derivative of
an unjust enrichment claim. *See Schock v. Nash,*
732 A.2d 217, 232 (Del.1999). Defendants contend
that the eleventh and twelfth claims for restitution
therefore fail for the same reason as the unjust en-
richment claim.

In opposition, plaintiffs argue that they are entitled
to plead in the alternative, and claim that both the
unjust enrichment claim and the restitution claims
are properly pled. They also assert that their claims
for restitution are not premised solely on their un-
just enrichment claims, which are limited to the re-
ceipt of backdated options. They assert that they
also claim restitution against Sclavos, Kremian, and
Evan, based on improper bonuses and other equity-
based compensation those defendants received
partly because of VeriSign's inflated earnings state-
ments. Plaintiffs contend that defendants have
failed to address that claim for restitution.

**\*46** The court finds that the motion must be
GRANTED. While it is true that plaintiffs are en-
titled to plead in the alternative, Fed.R.Civ.P.
8(e)(2), the claim for restitution as pled seeks an
equitable remedy for the equitable claim of unjust
enrichment. Plaintiffs' arguments notwithstanding,
the CAC does not allege restitution based on the re-
ceipt of improper bonuses and other compensation
received by Sclavos, Kremian, and Evan, but
simply alleges that the option defendants received
benefits by virtue of the exercise of backdated op-
tions.

B. KPMG's Motion to Compel Arbitration

1. Legal Standard

The Federal Arbitration Act ("FAA") provides that
written agreements to arbitrate disputes arising out
of transactions involving interstate commerce "shall
be valid, irrevocable, and enforceable, save upon
such grounds as exist at law or in equity for the re-
vocation of any contract."9 U.S.C. § 2. The FAA
"creates a body of federal substantive law of arbit-
rability, enforceable in both state and federal courts
and pre-empting any state laws or policies to the
contrary."*Moses H. Cone Mem. Hosp. v. Mercury
Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74
L.Ed.2d 765 (1983).

Any party bound to an arbitration agreement that
falls within the scope of the FAA may bring a mo-
tion in federal district court to compel arbitration
and stay the proceeding pending resolution of the
arbitration. 9 U.S.C. §§ 3, 4. The FAA eliminates
district court discretion and requires the court to
compel arbitration of issues covered by the arbitra-
tion agreement. *Dean Witter Reynolds, Inc. v. Byrd,*
470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158
(1985).

The role of the federal courts in these circum-
stances is limited to determining whether the arbit-
ration clause at issue is valid and enforceable under
§ 2 of the FAA. *Chiron Corp. v. Ortho Diagnostic
Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir.2000).
However, despite the "liberal federal policy favor-
ing arbitration agreements,"*Green Tree Fin.
Corp.-Alabama v. Randolph,* 531 U.S. 79, 81, 121
S.Ct. 513, 148 L.Ed.2d 373 (2000), state law is not
entirely displaced from federal arbitration analysis.
Under § 2, "state law, whether of legislative or ju-
dicial origin, is applicable if that law arose to gov-
ern issues concerning the validity, revocability, and
enforceability of contracts generally."*Perry v.
Thomas,* 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 96
L.Ed.2d 426 (1987).

Thus, generally applicable contract defenses, such
as fraud, duress, or unconscionability may be ap-
plied to invalidate arbitration agreements without
contravening § 2. *Doctor's Assocs., Inc. v. Cas-
arotto,* 517 U.S. 681, 686, 116 S.Ct. 1652, 134
L.Ed.2d 902 (1996). In making this determination,

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

federal courts may not address the validity or en-
forceability of the contract as a whole. *Prima Paint
Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395,
401, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *see
also Ticknor v. Choice Hotels Int'l, Inc.,* 265 F.3d
931, 936-37 (9th Cir.2001).

### 2. KPMG's Motion

KPMG audited VeriSign's financial statements for
the company's fiscal years 1998 through 2005.
Plaintiffs allege that KPMG failed to perform its
services with due care, and they assert derivative
claims against KPMG for negligence and profes-
sional malpractice, breach of contract, and aiding
and abetting breach of fiduciary duty.

**\*47** A separate "engagement letter" governed the
provision of services by KPMG for each of Ver-
iSign's fiscal years. The engagement letter that was
executed in March 2005 ("the agreement") provides
that "[a]ny dispute or claim arising out of or relat-
ing to the engagement letter between the parties,
the services provided thereunder, or any other ser-
vices provided by or on behalf of KPMG" must be
submitted to mediation and, if not resolved within a
period of time or if one party requests, must be sub-
mitted to arbitration. The agreement also provides
that any issue concerning the extent to which a dis-
pute is subject to arbitration, or "any dispute gov-
erning the applicability, interpretation, or enforce-
ability of these [ADR] procedures, including any
contention that all or part of these procedures are
invalid or unenforceable," shall be governed by the
Federal Arbitration Act and resolved by the arbit-
rators.

KPMG asserts that under this agreement, the FAA
governs the dispute, and the claims asserted against
KPMG by plaintiffs in this action-the thirteenth,
fourteenth, fifteenth, and sixteenth causes of action-
must be referred to arbitration. KPMG argues that
the claims asserted against it should be dismissed or
stayed pending arbitration.

KPMG contends further that the FAA would apply
even without the explicit provision in the agreement
because VeriSign's stock trades on a national ex-

change, and KPMG was engaged to audit financial
statements that VeriSign was required to file in or-
der to maintain its listing on that exchange. Since
the FAA applies in connection with all contracts
"affecting commerce," 9 U.S.C. § 2, KPMG con-
tends that this case requires application of the FAA.

KPMG also argues that the agreement between Ver-
iSign and KPMG binds the derivative plaintiffs and
covers all their claims against KPMG. KPMG as-
serts that the derivative plaintiffs have no greater
rights than VeriSign itself has, and that because the
derivative plaintiffs are pursuing VeriSign's claims,
they are bound by VeriSign's agreement to mediate
or arbitrate those claims. KPMG contends that be-
cause the agreement covers all claims arising out of
services KPMG performed before, during, and after
the agreement, it covers the derivative plaintiffs'
claims.

In opposition, plaintiffs assert that because
plaintiffs' claims against KMPG are based on
events that pre-dated the March 2005 agreement,
the arbitration provision in that agreement does not
apply. They contend that because the 2005 agree-
ment was the first one that contained an arbitration
provision, no agreement to arbitrate existed from
1998 to 2005. They assert that arbitration cannot be
compelled for disputes that arose during periods
when no effective contract requiring arbitration was
in place.

Plaintiffs also note that the language in the March
2005 agreement is in the present tense, and argue
that the March 2005 agreement does not subsume
previous agreements or otherwise extend by its
terms to prior services KPMG provided to Ver-
iSign, and that the agreement does not contain any
provisions indicating that it governs or amends pri-
or agreements.

**\*48** Plaintiffs contend that the Company was re-
quired to enter into a new engagement letter with an
auditor to perform VeriSign's audit for the coming
year, and that the shareholders had to approve the
engagement of that auditor. They argue that once
the shareholders approved engagement letters that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

did not contain arbitration provisions, it would be inconsistent with this process (requiring shareholder approval of auditor) to allow KPMG to change the terms of the agreement to require arbitration.

Plaintiffs assert that there is no statement in the March 2005 agreement indicating that the new engagement letter's arbitration provision covered past services provided by KMPG to VeriSign, and that because arbitration provisions cannot be considered retroactive unless the agreement contains an express provision to that effect, the March 2005 agreement between VeriSign and KMPG cannot be held to operate retroactively.

The court finds that the motion must be GRANTED. The FAA governs the issue of arbitrability here because the agreement expressly so provides and because the agreement involves interstate commerce. The agreement covers all the derivative plaintiffs' claims because it encompasses any dispute arising out of the agreement, KPMG's services thereunder, and "any other services provided by or on behalf of KPMG."

The court is not persuaded by plaintiffs' argument that the arbitration provision does not apply to their claims because all the events underlying the claims occurred before the parties executed the agreement. The arbitration provision is extremely broad, and covers not just services provided under the agreement, but also "any other services provided by KPMG," and disputes and claims involving "any entity for whose benefit the services in question are or were provided."

The cases cited by plaintiffs are inapposite, as they involve agreements providing for arbitration only of claims arising under the agreements themselves. *See, e.g., Wachovia Bank, N.A. v. Schmidt,* 445 F.3d 762, 767 (4th Cir.2006); *Security Watch, Inc. v. Sentinel Sys., Inc.,* 176 F.3d 369, 372 (6th Cir.1999). Here, however, the arbitration agreement is not limited to claims arising under the agreement itself. In addition, as KPMG points out, some courts have allowed arbitration agreements to apply retroactively to transactions that occurred prior to the

execution of the agreement. *See In re Universal Service Fund Tel. Billing Practices Litig.,* 300 F.Supp.2d 1107, 1124 (D.Kan.2003); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. King,* 804 F.Supp. 1512, 1514 (M.D.Fla.1992).

Doubts or ambiguities must be resolved in favor of and not against arbitration. *Moses H. Cone Mem'l Hosp v. Mercury Const. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Moreover, under the terms of the agreement, any doubts about arbitrability must be resolved by the arbitrators. Thus, at a minimum, the arbitrators, not the court, must decide the question of arbitrability.

## CONCLUSION

**\*49** In accordance with the foregoing, VeriSign's motion to dismiss the complaint for failure to allege demand futility is GRANTED, and KMPG's motion to compel arbitration is GRANTED. In addition, the individual defendants' motion to dismiss the first through twelfth and the seventeenth through nineteenth causes of action for failure to state a claim is GRANTED in part and DENIED in part.

The complaint is dismissed with leave to amend, although the court is doubtful that plaintiffs will be able, in any amended complaint, to plead sufficient particularized facts to establish demand futility. As for the individual claims, the eighteenth cause of action is dismissed with prejudice, and the fourth, fifth, seventh, eighth, ninth, eleventh, seventeenth, and nineteenth causes of action are dismissed with leave to amend.

In addition, while the court is cognizant both of Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief,"*Bell Atlantic,* 127 S.Ct. at 1959 (2007) (citation omitted), and of the pleading requirements of Rule 23.1 and the PSLRA, the court finds the 117-page CAC to be, in the words of the Delaware Supreme Court, a truly "prolix complaint larded with conclusory language,"*Brehm,* 746 A.2d at 254.

The court suggests that plaintiffs avoid reproducing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec. L. Rep. P 94,389
**(Cite as: Slip Copy)**

either the mass or the generalized, boilerplate alleg- ations of the CAC in any amended complaint; and that the sixth cause of action for corporate waste be eliminated as duplicative of the second cause of ac- tion for unjust enrichment; that the fifth cause of action for constructive fraud be eliminated as du- plicative of the first cause of action for breach of fi- duciary duty if plaintiffs are unable to plead con- structive fraud with particularity; and that the ac- counting, rescission, and restitution claims be in- cluded as remedies, not as separate causes of ac- tion.

Any amended complaint shall be filed no later than October 17, 2007.

**IT IS SO ORDERED.**

N.D.Cal.,2007.
In re Verisign, Inc., Derivative Litigation
Slip Copy, 2007 WL 2705221 (N.D.Cal.), Fed. Sec.
L. Rep. P 94,389

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.