# EXHIBIT 12

Westlaw.

Slip Copy
Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
(Cite as: Slip Copy)

Page 1

**H** S.E.C. v. Todd
S.D.Cal.,2007.

United States District Court,S.D. California.
SECURITIES and EXCHANGE COMMISSION,
Plaintiff,
v.
John J. TODD and Robert D. Manza, Defendants.
**No. 03CV2230 BEN (WMc).**

May 30, 2007.

Karen L. Matteson, Securities and Exchange Commission, Los Angeles, CA, for Plaintiff.
Robert D. Rose, John C. Dineen, Vincent J. Brown, Sheppard Mullin Richter and Hampton, San Diego, CA, Brandon Roker, James Sanders, McDermott Will and Emery, Los Angeles, CA, for Defendants.

ORDER GRANTING IN PART DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW, DENYING DEFENDANTS' MOTIONS FOR NEW TRIAL WITHOUT PREJUDICE, AND GRANTING IN PART PLAINTIFF'S MOTION FOR ENTRY OF JUDGMENT IMPOSING RELIEF
[Dkt. Nos. 270, 286, 288, 289, 290, 291, 294, 299]
ROGER T. BENITEZ, United States District Judge.

## I. INTRODUCTION

*1 Defendants John J. Todd ("Todd") and Robert D. Manza ("Manza") (collectively, "Defendants"), move for judgment as a matter of law pursuant to Fed.R.Civ.P. 50, and for a new trial pursuant to Fed.R.Civ.P. 59. Plaintiff Securities and Exchange Commission ("SEC") moves for entry of judgment imposing relief.

## II. DISCUSSION

### A. *Rule 50* Motions

Rule 50 allows the Court to grant judgment as a matter of law either before or after the case is submitted to the jury. The rule provides:
If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). The jury's verdict must be upheld if it is supported by "substantial evidence". *Wallace v. City of San Diego,* 479 F.3d 616, 624 (9th Cir.2007)(citing *Johnson v. Paradise Valley Unified School District,* 251 F.3d 1222, 1227 (9th Cir.2001))."Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence."*Id.* In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion. *See Johnson v. Paradise Valley,* 251 F.3d at 1227-28. While the court must review the entire evidentiary record, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at 1227.The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. *Id.* Judgment as a matter of law may be granted only where, so viewed, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *McLean v. Runyon,* 222 F.3d 1150, 1153 (9th Cir.2000). The Court must apply this standard under the correct governing law, meaning there must be sufficient evidence to support the jury's conclusion for each and every element of the claims presented. *See Settlegoode v. Portland Public Schools,* 371 F.3d 503, 510 (9th Cir.2004).

*1. Section 17(a) Claim*

The SEC brought a claim against Todd under § 17(a) of the Securities Act. This claim requires that Todd made material misrepresentations, directly or indirectly, in the offer or sale of a security, with scienter (for § 17(a)(1)) or negligently (for § 17(a)(2) and (3)). In particular, the SEC brings the § 17(a) claim on the basis of a prospectus supplement filed with the Commission on September 15, 2000 which incorporated the Q2 2000 Form 10-Q by reference.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

Page 2

*2 In its Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment, the SEC stated that "there is no dispute that Todd signed a prospectus offering Gateways securities for sale", a statement which the Court unfortunately and mistakenly accepted as true when it denied Todd summary judgment on the § 17(a) claim. The evidence at trial showed that the prospectus supplement was unsigned. The SEC presented no other evidence connecting Todd to the supplement. In its Opposition to Todd's Rule 50 motion, the SEC essentially concedes this point, and instead relies on the incorporation by reference of the Q2 2000 Form 10-Q, which was signed by Todd. In doing so, the SEC relies on the portion of § 17(a) which assigns liability for "indirectly" making material misrepresentations in the offer or sale of securities, as well as a flexible construction of the federal securities laws. See SEC v. Zandford, 535 U.S. 813, 819 (2002) (finding that § 10(b) of the Securities Exchange Act should be "construed not technically and restrictively, but flexibly to effectuate its remedial purpose") (internal quotations and citations omitted).

The Court finds that even in effectuating the remedial purpose of the securities law, § 17(a) is not flexible enough to be stretched that far. The SEC asserts that "the fact that Todd did not physically file the Supplement himself is irrelevant." The Court agrees with this statement, and if the only piece of evidence missing was Todd's walk to the mailbox with the supplement, the statement would be relevant. But that is not the case. The sole connection between Todd and the prospectus supplement was the Q2 2000 10-Q which he signed and which was incorporated by reference in the supplement. There was no evidence presented at trial that Todd had even seen the prospectus supplement before, let alone been involved in its preparation, directly or indirectly. If the Court were to allow the verdict to stand on this claim, it would in essence allow potential liability in perpetuity for documents signed by an officer of a company, regardless of whether that officer has any knowledge or control over their future use.

In deciding the Rule 50 motions, it is the Court's obligation to apply the correct governing law to the evidence presented at trial. See Settlegoode v. Portland Public Schools, 371 F.3d at 510. Application of the correct governing law is perhaps the most critical duty of the Court in considering a Rule 50 motion, particularly when faced with a complex case, and the concurrent possibility of jury confusion. "The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial." Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108 (2d Cir.1997) (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036 (2d Cir.1976)).

The Court is mindful of Rule 50's requirement that a verdict be allowed to stand if there is substantial evidence to support it, even if contradictory conclusions could be drawn from that evidence. Wallace v. City of San Diego, 479 F.3d at 624. But that requirement must always be coupled with the application of the correct governing law. Of the claims at issue in this complex case, and of the many elements of those claims, whether Todd made the alleged misrepresentations in connection with the prospectus supplement was the simplest on its face. The evidence was not disputed. There was no battle of experts. And yet the jury found in favor of the SEC, in spite of a complete absence of evidence on an essential element. This raises serious concerns for the Court in regard to the jury's understanding of the law in relation to the evidence that it heard at trial.

*3 The evidence presented by the SEC at trial was insufficient as a matter of law to sustain a claim against Todd under § 17(a). The Court grants Todd's motion for judgment as a matter of law as to this claim.

*2. Section 10(b) and Rule 10b-5 Claims*

A finding of liability under Section 10(b) and Rule 10b-5 requires a legally sufficient showing of: (1) a material misrepresentation; (2) in connection with the purchase or sale of a security; (3) with scienter; (4) by use of jurisdictional means. SEC v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir.1993). The second and fourth elements were not in dispute at trial.

To satisfy the first element, the SEC must have presented substantial evidence at trial to show that Todd and Manza made misrepresentations, and those misrepresentations were material. To fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as having significantly altered the 'total mix' of information made available."*Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)*. A company is not required to disclose every financial fact. It is only required to disclose information if there is a statutory requirement to do so, or if failure to do so would render the statements it has made materially misleading. *See Oran v. Stafford, 226 F.3d 275, 285 (3d Cir.2000)*. In applying the standard under *Basic,* it is important to keep in mind the key phrase "total mix of information". This means not that a fact when viewed in isolation might have been important to an investor, but that when taken into account with all the other information available, it would have altered that "total mix". In other words, the question is not, "if a reasonable investor knew x, and only x, would that significantly affect her thinking about investing in this security?". The proper question in viewing materiality is "if a reasonable investor knew a, b, c, d, e, f, g, and now *also x,* would that significantly affect her thinking about investing in this security?". In a case such as this one, with intense focus on several transactions, it is easy to lose sight of that critical distinction set out by the Supreme Court in *Basic, 485 U.S. at 231-32*.

In addition to a material misrepresentation, the SEC must have presented substantial evidence at trial that the misrepresentation was made with scienter. Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud."*Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)*. Scienter may also be established by a showing of recklessness.*SEC v. Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir.2001)*. Reckless conduct is conduct that consists of a highly unreasonable act or omission that is an " 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* (quoting *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir.1990)* (en banc)).

### a. ACS

*4 In Q2 2000, Gateway sold a portion of its loan portfolio to Associates Commerce Solutions for $54 million. On the same date, Gateway entered into an agreement with another Associates subsidiary, ACONA, to loan ACONA $50 million in the form of a note at 6.125% interest. The SEC claims that Todd orchestrated this transaction as part of the scheme to meet revenue consensus for the second quarter, and that it should have been accounted for as a multi-element transaction, rather than as a separate sale and loan. They also claim that as part of this scheme, Todd hid the connection between the transactions from PwC.

Both the theory of liability surrounding this transaction, and the evidence presented are curious. The theory of liability is curious because it focuses primarily on the idea that this was one multi-element transaction, and Todd is liable for making material misrepresentations because he treated it as two separate transactions, and did not disclose to Gateway or PwC that it was really one. This theory, and the evidence presented, do not manage to meet the basic threshold element of a fraud claim-namely, a misrepresentation. Giving the SEC all reasonable inferences that this was in fact a multi-element transaction-its essential premise of liability in relation to the ACS transaction-the evidence that it led to a misrepresentation, let alone a material one, simply doesn't stand up to examination.

The bulk of the SEC's evidence at trial had to do with whether these transactions were related. The Court finds there was substantial evidence to support an inference that they were. But that is only the first step in finding there was substantial evidence that as a result, Gateway's financials were materially misstated. The question that must be answered is whether there was any accounting significance to recording the transactions separately instead of together, and whether Gateway's financial statements for the quarter would have looked any different. The SEC relies on its expert, Professor Arnold, for this point. Professor Arnold testified that had Gateway *not recorded any gain* on the transaction, its earnings per share ("EPS") would have been approximately one penny less. He also testified that had Gateway accounted for the transaction as one multi-element transaction, and under his interpretation of GAAP, that it would have had to defer *part of the gain* on the sale over the course of the life of the loan. What he never addressed however, was what Gateway's financials, or EPS would have looked like had it recognized what he believed to be a proper portion of the gain on this transaction in Q2 2000. Accepting his testimony, Gateway simply couldn't record *all* of the gain upfront. But he based his opinion regarding misstatement and materiality on what EPS would look like had Gateway recorded *none* of it. Based on Professor Arnold's testimony, the jury had no way of

knowing whether Gateway's Q2 2000 10-Q was materially misstated on the basis of the ACS accouting.

*5 Professor Arnold and the SEC also relied on a theory that the transaction was improperly recorded because Gateway should have recorded it using a different interest rate than the one it actually gave ACONA. Professor Arnold testified that the relevant interest rate for Gateway's accounting purposes was the internal market rate of the borrower, as opposed to the rate used in the transaction. But as with the issue of whether this was two transactions or a single multi-element transaction, the interest rate issue is a road to nowhere. Because once again, Professor Arnold never testified what the difference would actually be had Gateway recorded the transaction using the rate he believed they should have used; a rate which incidentally he testified in response to the Court's own inquiry, Gateway may have had no way of knowing.

The Court does not believe this is substantial evidence which can support a claim of a misrepresentation with respect to the ACS transaction. Even if it could, the evidence of materiality is scant. The SEC's theory, and Professor Arnold's in support, is that the supposed incorrect accounting of the ACS transaction was material because it brought a gain of a little over a penny in EPS, thereby allowing Gateway to exceed, rather than just meet, analyst consensus estimates. As discussed above, the evidence does not substantially support this claim. But even if it did, the Court must ask, why is this penny different from all other pennies? Gateway's EPS for the quarter was $ 0.37, $ 0.36 of which was earned through other transactions throughout the quarter. The idea that a transaction becomes qualitatively material because it boosts EPS by a penny, or as the SEC would have the Court think of it "*the* penny" opens a materiality minefield. Under this approach, any and all transactions that contribute to EPS are material, depending on which one the SEC chooses to focus on at a given moment. Courts have disapproved of this view of materiality, frequently viewing amounts under a certain threshold as immaterial as a matter of law. *See e .g. In re Anchor Gaming Securities Litigation,* 33 F.Supp.2d 889, 895 (D.Nev.1999) (finding EPS impact of $ 0.03 or 2.5% immaterial as a matter of law); *In re Westinghouse Securities Litigation,* 90 F .3d 696, 713 (3d Cir.1996) (finding a quantitative analysis of materiality appropriate when information may be "relevant" to investors in that it is the type of information investors care about, but the amount may be "*de minimus,*" "trivial," and "hardly conducive to informed decisionmaking") (internal quotations and citations omitted).

The final piece of the SEC's theory as to the significance of the ACS transaction is that Todd supposedly hid the relatedness of the two parts of the transaction, both contributing to the misrepresentation and showing his scienter. Drawing all reasonable inferences in favor of the SEC, the evidence is still to the contrary. Todd disclosed the full transaction to the Board, as demonstrated by the July 11, 2000 presentation which included the statement "Gateway Sold a Portion ($54M) of its Consumer Loan Portfolio as a Premium *for Cash and a Note from Associates"* (emphasis added). Similarly, in the year-end audit, PwC reviewed the transaction and noted both the dual agreements with Associates, the interest rate being offered, and reviewed the agreements "without exception". All the information was on the table in front of both the Board and the auditors. The only thing that seems to be hidden is the SEC's after-the-fact interpretation of the events and the accounting, known to nobody but them until they presented that particular theory to Mike McLaughlin, PwC's engagement partner, at his SEC deposition two years later. With respect to the ACS transaction, the Court finds that the SEC failed to present substantial evidence of a material misrepresentation, or of scienter.

*b. higher risk lending*

*6 Beginning in Q2 2000, Gateway began to offer financing to consumers with weaker credit. Gateway used a tier system to categorize different levels of creditworthiness, Tier I being the strongest. Tier V and above represented the consumers who would be considered higher-risk based on FICO scores or other traditional credit standards. Todd viewed Tier V and above as an untapped market for Gateway and initiated a program in which Gateway would sell higher-margin computers to those customers. As part of this initiative, Gateway did not allow consumers to customize their computer, but rather sold them a model that it had produced but that it couldn't sell to its primary market. Before initiating this program, Gateway intended to take a full write off of the cost of that inventory.[FN1] By selling the computers and providing financing, Gateway hoped to realize some eventual return. Gateway's banking arm informed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Todd that it lacked sufficient information on Tier V and above to predict what the rate of default could be, but believed that it could be up to 50%.

> FN1. The Court notes that at this late date in these proceedings, counsel for the SEC seems to believe that Gateway literally gave money to higher-risk buyers, rather than extend credit and create an account receivable complete with loan loss reserve. (April 26, 2007 Hearing Transcript at p. 134-137).

The SEC does not challenge Gateway's accounting for these loans, but rather contends that the disclosure was insufficient. Under Regulations S-K, 17 C.F.R. § 229.303, and Regulation S-X, 17 C.F.R. § 210.10-01, a company is required to disclose any known trends or uncertainties that will have a material impact on sales, revenue or income. The SEC asserts that the increase in higher tier lending was just such a trend, and the failure to disclose it as such constitutes a material omission. It is undisputed that Gateway's Q2 2000 10-Q did not contain a specific disclosure of the lending. It is also undisputed that the Q3 2000 10-Q and the 2000 10-K did contain disclosures regarding the lending, but the SEC challenges the adequacy of those disclosures.

Both the SEC and its expert, Professor Arnold premise liability under § 10(b) and Rule 10b-5 in relation to the higher-risk loans on the alleged violation of these regulations, particularly S-K, Rule 303. But the case law is clear that "the 'demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5. Such a duty to disclose must be separately shown." *Oran v. Stafford*, 226 F.3d at 288 (quoting *Alfus v. Pyramid Tech. Corp.*, 164 F.Supp. 598, 608 (N.D.Cal.1991)). This conclusion is based in large part on the SEC's own interpretation of S-K, Rule 303 ("SK-303"), which imposes a far broader materiality standard than the standard imposed by the Supreme Court under *Basic*. *See Oran v. Stafford*, 226 F.3d at 288 (citing Exchange Act Release No. 34-26831, 54 Fed.Reg. 22427, 22430 n. 27). Therefore, regardless of whether the increase in higher tier lending constitutes a known trend under SK-303, the SEC still must show that the omission would have "significantly altered the total mix of information." *Id.* See also *In re Verifone Securities Litigation*, 11 F.3d 865, 870 (9th Cir.1993) (SEC regulation S-K and Exchange Rules can not be imported as a surrogate for a straight materiality analysis under § 10(b) and Rule 10b-5); *In re Campbell Soup Company Securities Litigation*, 145 F.Supp.2d 574, 590-591 (D.N.J.2001) (violation of regulation SK-303 does not necessarily violate § 10(b)).

*7 With regard to the Q2 2000 10-Q, the Court finds there is an initial issue as to whether the SEC presented substantial evidence at trial that the higher tier lending qualified as a known trend under SK-303. Todd initiated the program in that quarter as a strategy to increase revenue. The SEC focused extensively on the fact that this was a strategic initiative. But a strategic initiative is not the same thing as a "known trend" under SK-303. *In re Canandaigua Securities Litigation* is instructive on this issue. 944 F.Supp. 1202, 1210-1212 (S.D.N.Y.1996). In that case, the plaintiffs alleged that Canandaigua violated SK-303 by failing to disclose as a "trend or uncertainty" its new strategy of pricing its new products below market level. After an extensive analysis of the policies behind Regulation S-K, the court found that "the emphasis on financial condition and operational results suggests that information concerning management decisions such as pricing plans properly fall outside of S-K 303 disclosure." Further, "there is a significant difference between events and trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans." *Id.* at 1210-1211. The court also noted that in highly competitive consumer-based industries, it made little sense to impose an obligation to disclose to competitors (which is the effect of public disclosure) sensitive pricing and marketing decisions. "S-K 303's mandate to disclose material 'trends and uncertainties' does not contemplate furnishing competitors with an analytical blueprint of a company's business strategy". *Id.* at 1211.

The plaintiffs in *Canandaigua* argued that the marketing strategy should have been disclosed under SK-303 because "a material effect on the registrant's financial condition or results of operations" was "reasonably likely to occur". *Id.* at 1212. In support of that argument, they used the same approach that the SEC uses here, namely they pointed to the risks of the strategy, and the potential for serious losses if it did not work. The court found that this is true of practically every business decision, and to impose this theory of disclosure on SK-303 would not only

be absurd in a competitive market, but would effectively "bury shareholders in an avalanche of trivial information."*Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)). This Court must agree with that analysis. The SEC presented extensive testimony on the risk of the strategy of higher tier lending. It is undisputed that those in charge of Gateway's banking arm did not think it was a good idea. But that is the nature of a business decision or strategy-it involves risk. The essence of the SEC's theory and the evidence it presented is that this particular strategy involved too much risk. But "too risky" is not the standard for disclosure either under SK-303 or § 10(b) and Rule 10b-5. "Too risky" is the essence of fraud by hindsight. Had the strategy been successful, the Court has no doubt we would not be hearing about it now. The Court finds that the SEC failed to present substantial evidence of a material omission with regard to higher tier lending in Q2 2000.

**\*8** As is the case with the ACS transaction discussed above, even if the Court found there had been substantial evidence of a material omission, the SEC failed to present substantial evidence of Todd's scienter with regard to this failure to disclose in the second quarter. Scienter requires a showing that Todd acted with intent to deceive, or else acted recklessly, such that his actions were highly unreasonable and an extreme departure from the standards of ordinary care. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990) (en banc). With regard to the Q2 2000 10-Q, the SEC presented no evidence that Todd knew or should have known that disclosure was required (presuming that it was). Mike McLaughlin testified that he did not believe disclosure of the loans was required in the Q2 2000 10-Q. If the auditor did not believe disclosure was necessary after conducting the interim review, it is hard to understand how Todd, who was not a CPA, could have been expected to think that it was. This is not recklessness, it is not even negligence.

While the issues with regard to the Q3 2000 10-Q and the 2000 10-K are somewhat different, the outcome is the same. Gateway included disclosures of the lending in the Q3 2000 10-Q, and more extensive disclosures in the 10-K. In the Q3 2000 10-Q, it broke out as a line item caption the amount of financed receivables, and included a note on finance receivables in the Management Discussion & Analysis ("MD & A"). Professor Arnold testified that in his opinion, the disclosure in the 10-Q should have been more extensive. He also testified that the receivables should have been broken out by tier in order to comply with S-X and S-K. This is once again Monday morning quarterbacking. A registrant is not required to be clairvoyant in predicting what disclosures an expert will require of it years after the fact. It is only required to disclose information as required by statute, regulation, or GAAP and to make the financial statements not materially misleading. Arnold takes issue with the disclosures as "boilerplate", but the Court is unaware of any requirement for original wording or a creative turn of phrase. Boilerplate language becomes boilerplate because it is generally considered sufficient to convey the necessary information. Professor Arnold's testimony was the sole evidence presented by the SEC in support of the claim that the disclosures in the Q3 2000 10-Q were insufficient and therefore constitute a material omission. The Court finds this does not qualify as substantial evidence.

Further, once again there is a total failure to show scienter. With regard to Todd, in support of his scienter, the SEC relies in part on an email in which he inquired of Manza whether they had to make the disclosures in the Q3 2000 10-Q if they were going to securitize the portfolio. The SEC finds this objectionable because Todd did not "embrace disclosure". (SEC Opp. to Todd's Motion for JMOL at p. 20). This choice of language by the SEC is telling with regard to its approach to this case-compliance with the law as written is not sufficient-corporate officers must go beyond and "embrace" it (whatever that may mean), or else be accused of fraud. The law does not require cheerful compliance, or excessive compliance, or even willing compliance, only compliance. And in the face of a failure to comply, that failure must have been either intentional, or reckless such that it was an extreme departure from the standards of ordinary care. The evidence with respect to the disclosures in the Q3 2000 10-Q is not open to differing interpretations on this point. Manza informed Todd that he believed they would have to disclose the financing receivables in the 10-K, and possibly in the Q3 10-Q. Todd inquired as to whether it was really required. Manza explored the issue with his staff, and determined that it was. He also brought it to McLaughlin's attention, and discussed with him what the appropriate disclosures would be for the 10-Q. PwC provided its suggestion, Gateway opted for a more abbreviated disclosure, and PwC found it unobjectionable. These facts are undisputed. McLaughlin further testified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that had he believed the disclosure was insufficient, he would have objected and brought it to the attention first of management, then of the Audit Committee. While the company did not adopt the disclosure recommended by the auditor, the auditor found the one it did make to be adequate. Once again, the only requirement is compliance with the law. Todd and Manza were not obligated to adopt PwC's recommendation in full in order to comply with the law so long as the disclosure they adopted was adequate. Their auditor told them it was. As a matter of law, there can be no scienter under these facts. This is not an extreme departure from the standards of ordinary care, this is compliance with those standards.

*9 The disclosures in the 10-K were far more extensive, appearing in several places throughout the document and specifically noting the increase in reserves in response to the increase in the company's participation in higher risk financing categories. There was no evidence to support an inference that anyone advised Todd or Manza that these additional disclosures were insufficient. PwC did not object, nor was there evidence that Todd or Manza should have known in any other way that these disclosures were supposedly inadequate. The Court finds that there is not substantial evidence to support a finding of liability with regard to the higher tier lending.

*c. Lockheed*

Lockheed Martin was Gateway's third party IT services provider. This outsourcing relationship began in 1999. Gateway owned the computers and servers that Lockheed used to provide IT services. In the third quarter 2000, Gateway sold that equipment to Lockheed for approximately $47 million, and booked it as revenue. Approximately one third of the equipment was Gateway branded, while the remainder consisted of non-Gateway branded items, such as Sun and IBM servers. The SEC asserts the recognition of revenue was improper under GAAP because it should have been recorded as a fixed asset sale and that it was materially misleading to record it as revenue.[FN2]

> FN2. The SEC clarifies its position with regard to Lockheed in its Opposition to Manza's Motion for JMOL in that it does not contend the sale itself was improper or lacked economic substance, only that it should not have been recorded as revenue.

(Mem. in Opp. to Manza's Motion for JMOL at p. 15, n. 13).

First, the Court must address whether substantial evidence was presented at trial which would support a finding that the transaction led to a material misrepresentation. As the SEC now concedes, the transaction itself is not inherently problematic-Gateway had several issues in its outsourcing relationship with Lockheed that it could cure by selling Lockheed the equipment. Lockheed would also benefit by owning the equipment by becoming more entrenched with Gateway and being able to charge more for its services. But this does not affect the issue of the propriety under GAAP of recording the sale as revenue.

Unlike the two transactions discussed above, the bulk of the evidence regarding the Lockheed transaction revolved around differing interpretations of GAAP. GAAP encompasses "a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement.' " *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020-21 (5th Cir.1996) (quoting *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir.1988)); *see also In re Cirrus Logic Sec. Litig.*, 946 F.Supp. 1446, 1457 (N.D.Cal.1996) ("it should be noted that GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management."); *In re GlenFed. Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (recognizing that "flexible accounting concepts do not always (or perhaps ever) yield a single correct figure.").

*10 The SEC takes the position that a sale of fixed assets cannot be recorded as revenue. It is still unclear to the Court what GAAP provision it relies on for this position. The SEC's expert, Professor Arnold, testified conclusively that GAAP is in writing. He also testified that he had not found a provision of GAAP that says that a sale of fixed assets cannot be booked as revenue. After spending approximately 1,130 hours on this engagement for the SEC, at a cost of $450,000, Professor Arnold could not identify any provisions or provision of GAAP which would support the SEC's position with respect to the Lockheed accounting. Rather, he testified that he didn't have to, because it was

"interpretation".

Defendants presented evidence that the transaction could have been recorded correctly under GAAP, relying on Statement of Financial Accounting Concept # 6, which defines revenues as "inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."Under defendants' interpretation of Concept 6, it would have been proper to record the income from the Lockheed transaction as revenue because it was from Gateway's ongoing major or central operations-selling computer equipment. Defendants' expert provided a useful illustration of this interpretation by way of a furniture company. A furniture company's major and central operation is furniture sales. Therefore, if a customer walked into a showroom and wanted to buy a desk that was not on the showroom floor, but rather being used as a "fixed asset", i.e. by the sales staff, that desk would be reclassified to inventory and the sale would generate revenue. With regard to revenue recognition, it wouldn't matter that the desk was not classified as inventory at that moment, because the sale was still in the nature of the company's major and central operations. On the other hand, if the company sold the computer sitting on top of the desk, it would not generate revenue because the company's major and central operation is the sale of furniture. Under this reading of Concept 6, Gateway could reclassify the computer equipment it sold to Lockheed into inventory (which it did), and record revenue on it because Gateway's major and central operation is the sale of computers. It could not, however, have recorded revenue on the desks the computers sat on, had those also been sold. Nowhere in GAAP is there any further written explanation of what constitutes a "major and central operation" for purposes of revenue recognition.

GAAP allows for a range of reasonable treatments leaving the choice among alternatives to management. _Lovelace v. Software Spectrum Inc., 78 F.3d at 1020-21_. The SEC asks this Court to ignore not only this principle, but the lack of any basis in GAAP for its stance that the sale of fixed assets cannot be recorded as revenue. The Court finds that Professor Arnold's unfounded "interpretation" of GAAP does not qualify as substantial evidence that Defendants' choice of accounting for the Lockheed transaction was unreasonable. The SEC has therefore failed to present substantial evidence that the Lockheed transaction led to a material misstatement.

*11 Even if it had, substantial evidence was also lacking to support a finding of scienter on the part of either Todd or Manza with respect to Lockheed. As noted above, the SEC now concedes the transaction itself is not problematic. GAAP violations, without more, are not sufficient to show scienter. See _In Re Software Toolworks, Inc., 50 F.3d 615, 627 (9th Cir.1994)_. With respect to Manza, the SEC relies heavily on his testimony that he would not have initially booked the entire amount as revenue, as well as the similar initial impressions of several of his accounting staff. The evidence was undisputed that both Manza and his staff gained comfort with the accounting on the basis of analogizing it to the non-Gateway branded items sold from the Country Stores, including display items, as well as consideration of Concept 6. For this to be evidence of scienter, the Court would have to apply a rule of law that absurdly holds that changing one's mind as a result of research and discussion is "an extreme departure from the standards of ordinary care". Such a holding does not square with either case law or logic.

To support its allegations of scienter, the SEC also relies on a theory that the accounting was hidden from PwC. But as was the case with ACS, giving all reasonable inferences to the SEC, the evidence does not support such a finding. The evidence is undisputed that Manza brought the Lockheed transaction to McLaughlin's attention. He did so at a meeting with McLaughlin, and at least one or two other people. McLaughlin testified that the purpose of the meeting was to discuss significant and unusual transactions, which it was understood, PwC would then review. He further testified that Manza followed up with him and asked if PwC had looked at the Lockheed transaction, asking to the effect of whether he was alright with it, and he responded that he was. The SEC further quibbles with Manza's communication with PwC on the issue by claiming that it was not enough to bring the transaction to their attention as unusual and significant, but he needed to specifically tell them to check the revenue recognition. The Court is left to wonder whether Manza was also supposed to conduct the Q3 2000 quarterly review for PwC-there is a certain point at which a business professional must be able to trust that when he asks his auditor to review something, the auditor does his job and looks at the whole transaction. Making that assumption falls within the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

standards of ordinary care for the Controller of a large company. The fact that the transaction was "unusual" does nothing to change that, as it was brought to McLaughlin's attention at a meeting the purpose of which was to discuss unusual transactions.

Additional evidence further belies the theory that PwC was unaware of the revenue aspect of the transaction. In its quarterly review, PwC noted the Lockheed sale in one of its workpapers, noted that it was recorded in the "trade receivables" account, and passed on reclassifying the amount because it was de minimis. As McLaughlin testified, the "trade receivables" account was a revenue account. Gateway had only ever used it as a revenue account. In other words, PwC saw the sale recorded in an account reserved for revenue, and passed further review. To the extent that PwC was "unaware" of the accounting for the Lockheed transaction, it was not because of Manza. The Court finds the SEC failed to produce substantial evidence as required under Rule 50 to show Manza acted with scienter with respect to the Lockheed transaction.

*12 The SEC's evidence of scienter for Todd relies primarily on his own testimony that he wanted to book the revenue from Lockheed, that he added it to his "gap-closure list", and that he pushed back against Manza's initial impression that revenue could not be booked on the non-Gateway branded equipment. As stated above, discussion back and forth among professionals, as well as reconsideration of initial impressions is not sufficient to show scienter. Additionally, the desire of a corporate officer to generate revenue and meet analyst expectations is not an extreme departure from the standards of ordinary care. The SEC introduced no evidence to the contrary. Nor is it a reasonable inference that keeping track of the company's performance is evidence of intent to defraud. As it does with Manza, the SEC takes issue with Todd for not being more specific in his conversations with McLaughlin. In support of this, it references Todd's testimony that he asked McLaughlin if he was "comfortable" with the "revenue" on Lockheed, to which McLaughlin responded "yes." This actually supports the opposite inference from that the SEC wishes the Court to draw. The analysis above with respect to Manza's communications to PwC applies equally to Todd. The Court finds there was not substantial evidence to support a finding Todd acted with scienter with respect to Lockheed.

### d. VenServ

Gateway sold approximately $20 million of computers to Venserv in September 2000. Venserv was a reseller who bought the computers to sell to higher credit risk customers. Gateway had relationships with several other resellers, including Rentway, Insight and Advanced Micro. Venserv went on to later purchase an additional $30-50 million in Gateway computers over the course of the two companies' business relationship. As part of this $20 million sale to Venserv, Gateway entered into a Reseller Agreement and a Referral Agreement. The Reseller Agreement was relatively standard and Gateway utilized it, or a very similar agreement, with its other reseller partners.

Unlike the other transactions at issue in this case, the parties agree that revenue was improperly recognized on the VenServ transaction in Q3 2000. The SEC initially argued that revenue was improperly recognized because the sale did not meet the criteria for a bill-and-hold transaction. But in its Opposition to Manza's Motion for JMOL, it steps away from that position, and in fact refers to it as "irrelevant". (SEC Mem. in Opp. to Manza's Motion for JMOL at p. 10). Instead, it now takes a position consistent with the evidence presented at trial, that the reason the revenue should not have been recognized in the third quarter is that the earnings process was not complete. The Referral Agreement provided that Gateway would refer customers to VenServ who had gone through more traditional financing routes (including through Gateway itself) and were unsuccessful in financing a computer. The $20 million in sales to VenServ was to a large degree contingent upon these referrals. All the witnesses were in accord that this contingency should have prevented Gateway from recognizing the revenue in the third quarter because the earnings process was not yet completed, and the referral obligation constituted a substantial continuing obligation to VenServ. The content of the Referral Agreement came to PwC's attention in Q4 2000 during the fourth quarter review/year end audit. At that time, Manza agreed with PwC that the contingency in the Referral Agreement meant the revenue should be reversed, and it was restated prior to the release of the 10-K.

*13 The sole issue with respect to VenServ is therefore scienter. A GAAP violation, without more, is not sufficient to support a finding of scienter. See In Re Software Toolworks, Inc., 50 F.3d at 627. With

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

Page 10

respect to Manza, the SEC relies on several "red flags" that it believes should have led Manza to conclude the revenue should not be booked. The first of these is an email which blind carbon copied Manza and laid out possible terms of the VenServ agreement, which if carried through, the SEC theorizes would have made revenue recognition inappropriate. But it is undisputed those were not in fact the final terms of the agreement. Second is the fact that after the computers were sold by VenServ, they were sent to Gateway for the warranty to be registered. This practice was investigated internally at Gateway with respect to another reseller, Rentway, and deemed not to have an impact on completion of the earnings process. Shortly after this investigation concluded, Manza exchanged emails with his plant controllers, the focus of which was to be sure the sales "were being handled in accordance with GAAP".

Third was the discovery by Manza that Gateway was "leasing" at least one employee to VenServ. The employee or employees were Gateway employees who would have otherwise been laid off, but instead were leased to VenServ, which did not have its own sales staff. The SEC did not introduce any basis for believing that this would impact the completion of the earnings process or represented a significant continuing obligation on Gateway's part with respect to the computers. The final "red flag" the SEC relies on is that the inventory being kept in a warehouse for VenServ was invaded by warehouse staff and shipped to RentWay customers. The evidence was undisputed that when Manza discovered this fact, he immediately brought it to Todd's attention, and Todd disciplined those employees because it was VenServ's inventory. The final two pieces of information the SEC points to-the warehousing fees paid by Gateway and the extended payment terms-cannot be considered with regard to Manza's scienter, because by the SEC's own evidence, they came to his attention after the Q3 2000 10-Q had been filed.

As the parties agree, the "dramatic" reason (to quote Professor Arnold) the revenue from the VenServ transaction had to be reversed was the contingent nature of the sale based on Gateway's obligation under the Referral Agreement to refer sufficient customers to VenServ.

Even Professor Arnold agreed it would have been a close call whether the revenue recognition was proper given some of the other factors without the contingency in the Referral Agreement. McLaughlin also testified that the accounting was ambiguous, such that one accountant's view of the transaction could be different from another's. He further testified that he believed a lack of communication within Gateway led to Manza being unaware of the Referral Agreement until he followed up on a PwC inquiry in late December 2000 or early January 2001. The SEC presented no evidence that would support an inference that Manza knew of the terms of the Referral Agreement prior to that time. The evidence the SEC relied on showed only that given what Manza knew at the time (which is how revenue recognition is determined), the accounting was ambiguous. This is not substantial evidence of intent to defraud or recklessness. To allow this to stand for an "extreme departure from the standards of ordinary care" would be to dilute those words to an untenable degree. The Court finds the SEC failed to produce substantial evidence to conclude Manza acted with scienter with respect to the VenServ transaction.

*14 With respect to Todd, the evidence the SEC relies on is illusory. There is a dispute as to whether he signed the Referral Agreement, or just the Reseller Agreement. Even if he actually signed both, the SEC introduced no evidence that he was aware of the accounting implications of the Referral Agreement. Further, when he was informed that employees had improperly invaded the VenServ inventory to fill Rentway's order, the evidence was undisputed that he was angry and disciplined the employees. The SEC posits that he could have been upset because this error of the employee "threatened to expose the fraudulent revenue scheme". (SEC Mem. in Opp. to Todd's Motion for JMOL at p. 27). Under Rule 50, the SEC is entitled to all reasonable inferences; it is not entitled to wholly unsupported innuendo. The Court finds the SEC failed to introduce substantial evidence to find that Todd acted with scienter with respect to the VenServ transaction.

For the reasons discussed above, the Court grants both Todd and Manza's Motions for Judgment as a Matter of Law with respect to the claims under § 10(b) and Rule 10b-5.

*3. Section 13 Claims*

In addition to the claims for securities fraud, the SEC brought claims against both defendants for (1) aiding and abetting violations of § 13(a) of the Securities Exchange Act (the "reporting provisions"); (2) aiding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and abetting violations of § 13(b)(2)(A) of the Securities Exchange Act and Rule 13b2-1 thereunder (the "books and records provisions"); and (3) violations of Rule 13b2-2 (false statements to auditors).

In order to find aider and abettor liability for section 13 violations, the SEC must show that: "(1) [Gateway] violated the relevant securities laws; (2) [Defendants] had knowledge of the primary violation and of his or her own role in furthering it; and (3) [Defendants] provided substantial assistance in the primary violation."_Ponce v. Securities and Exchange Commission, 345 F .3d 722, 737 (9th Cir.2003)_. As discussed above, there was substantial evidence to support a finding that Gateway's Q3 2000 10-Q was materially misstated on the basis of the VenServ transaction. Scienter is not required to find aiding and abetting liability under § 13(a) and Rules 12b-20 and 13a-13. _Id. at 737 n. 3;see also SEC v. McNulty, 137 F.3d 732, 736 (2d Cir.1998)_ (scienter not an element of claims under §§ 13(a) and 13(b)); _SEC v. Savoy Industries, Inc. 587 F.2d 1149, 1167 (D.C.Cir.1978)_ (reporting provisions of § 13 not intended to be antifraud provisions, and therefore do not require scienter). Both Todd and Manza knowingly entered into the VenServ transaction, and assisted in the preparation of the misstated Q3 2000 10-Q. The Court therefore finds a reasonable jury could have found them liable for aiding and abetting violations of the reporting provisions.

Similarly, there was substantial evidence that Gateway committed books and records violations on the basis of the incorrect accounting for the Venserv transaction. For the same reasons as described above with respect to aiding and abetting § 13(a) violations, there was substantial evidence which would allow a reasonable jury to conclude both Defendants aided and abetted the § 13(b)(2)(A) violations. Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or caused to be falsified, any book, record, or account" that a company is required to keep under the books and records provisions of the Securities Exchange Act. There is no scienter requirement under this rule, rather liability is premised on standards of "reasonableness"._SEC v. Softpoint, Inc., 958 F.Supp. 846, 865-866 (S.D.N.Y.1997)_. Because the rule includes "indirectly causing to be falsified", and has no scienter requirement, on the basis of the VenServ transaction, a reasonable jury could have found that both Defendants violated Rule 13b2-1.

*15 The final claim the SEC brought was for violations of Rule 13b2-2, which states in relevant part:
(a) No director or officer of an issuer shall, directly or indirectly:
(1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or
(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:
(i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or
(ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2. The SEC bases this claim on both defendants signing the Q3 2000 Management Representation Letter to PwC, in particular the statement in that letter that the financial statements were made in accordance with GAAP.

The Court has yet to find a case where a claim of Rule 13b2-2 violations was sustained without knowledge of the falsity of the statements at issue. _See e.g. SEC v. Cohen, No. 4:05CV371-DJS, 2007 WL 1192438 at *19 (E.D. Mo. April 19, 2007)_ (finding knowledge of falsity of statements required to find liability under Rule 13b2-2); _McConville v. SEC, 465 F.3d 780, 789 (7th Cir.2006)_ (finding substantial evidence supported 13b2-2 violation when 10b-5 violations had been proven, and substantial evidence supported finding knowledge of the falsity of the statements); _SEC v. Sandifur, No. C05-1631C, 2006 WL 538210 at *9 (W.D.Wash. March 2, 2006)_ (finding 13b2-2 violation sufficiently alleged when defendant knowingly concealed information auditor would find critical to approve deal, and primary section 10(b) violation had been sufficiently alleged); _SEC v. Dauplaise, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175 at *3, 8 (M.D.Fla. Feb. 22, 2006)_ (finding 13b2-2 violation sufficiently alleged when CEO knew of default on note and receivership and failed to disclose to accountants, and primary section 10(b) violation had been alleged); _SEC v. Orr, No. 04-74702, 2006 WL 542986 at *16-18 (E.D.Mich. March 6, 2006)_ (considering defendants' knowledge, or recklessness in not knowing statements made to auditors were false); _SEC v. Autocorp Equities, Inc.,_

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                  Page 12
Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343
**(Cite as: Slip Copy)**

No. 2:98-CV-00562 PGC, 2004 WL 1771608 at *6 (D.Utah Aug. 4, 2004) (finding 13b2-2 liability only appropriate upon showing that defendant later learned previous statements to auditors were false and failed to correct them).

In order to impose liability under Rule 13b2-2, Defendants therefore would have had to know when they signed the management representation letter that the Q3 2000 10-Q was not prepared in accordance with GAAP. For the reasons discussed above with respect to scienter under the § 10(b) and 10b-5 violations, the SEC failed to introduce substantial evidence to support a finding that Defendants knew their statements in the management representation letter were false.

*16 The Court therefore grants both Todd and Manza's Motions for Judgment as a Matter of Law with respect to the claim under Rule 13b2-2, and denies both Motions with respect to the claims for aiding and abetting violations of §§ 13(a) and 13(b)(2)(A), and violations of Rule 13b2-1.

B. *Rule 59* Motions for New Trial

The Court finds to the extent it has granted the Motions for Judgment as a Matter of Law, it need not reach the Motions for New Trial. With respect to the claims for which the Court denies the Motions for Judgment as a Matter of Law, the Court's judgment is no different when applying the standard under Rule 59. Under Rule 59, a court may grant a new trial when the jury's verdict is against the clear weight of the evidence. Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir.1987)."If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial."*Id.* at 1371-72 (internal citations ommitted). Having weighed the evidence, and assessed the witnesses' credibility as is allowed under Rule 59, for the reasons set forward with respect to the Rule 50 Motions, the Court cannot say that the verdict is "contrary to the clear weight of the evidence" with regard to the claims for aiding and abetting violations of § 13(a), § 13(b)(2)(A) and violations of Rule 13b2-1. See Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir.1990).

For the reasons stated above, the Motions for New Trial are denied without prejudice as to the § 17(a), § 10(b) and Rule 10b-5, and Rule 13b2-2 claims, and denied with prejudice as to the remaining claims.

C. SEC's Motion for Relief

Based on the jury verdicts, the SEC moves for the following relief against both defendants: (1) a permanent injunction prohibiting future violations of the securities laws; (2) a permanent officer and director bar; (3) disgorgement; and (4) civil penalties. The Court determines both equitable relief and the amount of any civil penalty. See Tull v. United States, 481 U.S. 412, 427 (1987) (finding that while jury trial was required to determine liability in case with both legal and equitable claims, court should determine the amount of civil penalty, if any),

1. Permanent Injunction

The SEC seeks to permanently enjoin both defendants from future violations of the securities laws. In order to obtain a permanent injunction, the burden falls on the SEC to show a reasonable likelihood of future violations. SEC v. Murphy, 626 F.2d 633, 655 (9th Cir.1980). In predicting the likelihood of future violations, the Court must assess the totality of the circumstances.*Id.* As part of that assessment, the Court may consider several factors, including the existence of past violations; the degree of scienter involved; the isolated or recurring nature of the infraction; the defendant's recognition of the wrongful nature of the conduct; the likelihood because of defendant's professional occupation that future violations might occur; and the sincerity of defendant's assurances against future violations. *Id.* The primary purpose of injunctive relief is to deter future violations, not to punish the violators. SEC v. Koracorp Industries, Inc., 575 F.2d 692, 697 (9th Cir.1978).

*17 There is no evidence of past violations on the part of either defendant. To the extent that the violations at issue in this case qualify as the past violations the Court is to consider, those now consist of aiding and abetting violations of the reporting provisions and the books and records provisions, both non-fraud violations committed without scienter. While the SEC points to *SEC v. Murphy* as a case in which an injunction issued for violations that are not scienter-based, the court in that case made a finding that defendant acted at least recklessly, which is the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

standard for scienter in this Circuit. 626 F.2d at 655. The Court is also to consider the degree of scienter involved, a factor which here militates against the issuance of an injunction. Defendants acted without scienter. The misstatements that occurred as a result of the accounting for the Venserv transactions involved neither intent nor an extreme departure from the standards of ordinary care. Defendants erred, and at the end of the day made accounting choices which were later deemed incorrect. This is not the level of scienter for which an injunction, permanent or otherwise, is appropriate. The remaining factors do not change the totality of the circumstances with regard to a likelihood of future violations. The infractions were isolated. The Defendants have not "recognized the wrongfulness of their conduct" in the sense that they argue that they did not in fact commit a fraud. This is a wholly appropriate position during the pendency of Rule 50 and Rule 59 motions, and as discussed above, the Court believes it to be a justified one. Having listened to the testimony of both Defendants at trial, the testimony of those who worked with them, and reviewing the various submissions in support and in opposition to this motion, the Court finds the defendants are not likely to engage in future violations of the securities laws. The request for a permanent injunction is therefore denied.

*2. Officer and Director Bar*

The SEC seeks a permanent bar on both Defendants acting as officers or directors of any public company. The Court is only authorized to issue such a bar in response to a violation of § 17(a)(1) or § 10(b) (the antifraud provisions).15 U.S.C. § 77t(e); 15 U.S.C. § 78u(d)(2). Defendants have not committed violations of the antifraud provisions. The Court therefore may not issue such a bar. Even if it was authorized to do so, the Court finds that the factors it may consider do not support such relief. Those factors include: (1) the egregiousness of the underlying violation; (2) the defendant's "repeat offender" status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that the misconduct will recur.SEC v. First Pacific Bancorp, 142 F.3d 1186, 1193 (9th Cir.1998).

It is helpful to view the facts of *First Pacific Bancorp* for an example of when an officer and director bar is appropriate. *Id* . In that case, after fraudulently diverting $500,000 from one offering, the defendant knowingly used his own money to close an offering that had failed to meet the minimum requirement. He was held jointly and severally liable with the corporate defendants because he was chairman of the board, CEO and majority shareholder. Further, his actions resulted in putting off the inevitable failure of a bank, the failure of which the court found him responsible for. During that time, he paid himself hundreds of thousands of dollars in salary, commissions, consulting, management and legal fees. FDIC and California bank examiners found he was paying himself excessive compensation in the amount of two to three times what a CEO of a comparable institution would receive, and was using it to cover his heavy personal debt and excessive standard of living. *Id.* at 1191-1192.These are the types of facts that demonstrate "egregiousness" of an underlying violation. While there may be less egregious facts than those of *First Pacific Bancorp* that would still qualify for an officer and director bar, the SEC has not made a showing that either Todd or Manza's conduct qualifies. The request for a permanent officer and director bar is therefore denied.

*3. Disgorgement*

**\*18** The SEC seeks disgorgement from both defendants of their "ill-gotten gains" consisting of their salaries, bonuses, and in Todd's case, severance package when he left Gateway. From Todd, the SEC seeks $1,726,250 consisting of $206,250 in salary for the second and third quarters of 2000 plus a cash severance of $1,520,000. From Manza the SEC seeks $85,150 consisting of $58,750 in salary for the third quarter and $26,400 in bonus for that quarter. In addition, the SEC requests pre-judgment interest in the amount of $593,541.83 from Todd and $40,388.87 from Manza.

Disgorgement is intended to force a defendant to surrender his unjust enrichment. SEC v. Rind, 991 F.2d 1486, 1493 (9th Cir.1993). It is not a punitive remedy. The SEC therefore must be able to show unjust enrichment, and that the disgorgement it requests is a reasonable approximation of a defendant's ill-gotten gains. SEC v. JT Wallenbrock & Associates, 440 F.3d 1109, 1113-1114 (9th Cir.2006). The SEC falls short on both counts. First, it fails to show unjust enrichment. Defendants did not profit from the reporting and books and records violations. They did not cash in stock options, nor

otherwise exploit this supposed scheme. Second, it lacks the requisite nexus between the supposed ill-gotten gains and the requested disgorgement. The SEC's position that Defendants should give up their salaries for the time at issue is untenable-it is basically a statement that because of several business decisions or errors, nothing else they did during that period matters. This is punitive. The SEC also failed to show unjust enrichment with respect to Manza's bonus for the third quarter. The Management Incentive Program ("MIP"), Gateway's bonus structure that applied to Manza, was supposed to be the great smoking gun-the motivation behind the scheme to increase revenues. But the undisputed evidence at trial showed that the MIP was actually a series of gradations of bonus based on performance of the company. It was not an all or nothing proposition, nor was it based solely on meeting analyst consensus. If Gateway missed analyst consensus, Manza still got a bonus, albeit a slightly smaller one. Specifically, it would have been $6000 less, not the $26,400 the SEC asks for in disgorgement. Finally, the SEC fails to show any nexus between Todd's severance package and the violations. There was no evidence at trial that Todd was fired because of the violations at issue here, nor that he received the severance package because of them. The Court finds that disgorgement is not an appropriate remedy for the violations in this case.

*4. Civil Penalties*

The SEC seeks civil monetary penalties in the amount of $220,000 from Todd and $110,000 from Manza. The civil penalty provision of the Exchange Act provides for three "tiers" of penalty, to be imposed in an amount "determined by the court in light of the facts and circumstances."15 U.S.C. § 78u(d)(3)(B)(i). The SEC seeks third tier penalties, which are appropriate when "the violation ... involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."15 U.S.C. § 78u(d)(3)(B)(iii). There has been no evidence presented of losses or a significant risk of loss to anybody due to the violations at issue. Nor did the violations involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement", which by itself would qualify for a second tier penalty. 15 U.S.C. § 78u(d)(3)(B)(ii).

*19 The Court finds that in light of the facts and circumstances, first tier civil monetary penalties are appropriate. Both defendants were found liable for aiding and abetting violations of § 13(a), § 13(b)(2)(a), and violating Rule 13b2-1 with respect to the VenServ transaction. In light of all the facts and circumstances, the Court assesses a civil penalty against Manza of $10,500, consisting of $3,500 per violation, and $16,500 against Todd, consisting of $5,500 per violation. Todd was the CFO, and ultimately responsible for Gateway's financial statements. The Court believes a higher penalty is therefore appropriate.

## IV. CONCLUSION

For the reasons stated above, the Court:
1. GRANTS Defendant Todd's Motion for Judgment as a Matter of Law as to the § 17(a) claims; the § 10(b) and Rule 10b-5 claims; and the Rule 13b2-2 claims;
2. GRANTS Defendant Manza's Motion for Judgment as a Matter of Law as to the § 10(b) and Rule 10b-5 claims; and the Rule 13b2-2 claims;
3. DENIES both Defendants' Motions for Judgment as a Matter of Law as to the remaining claims;
4. GRANTS Plaintiff SEC's Motion for Relief as to civil penalties in the amount of $10,500 against Manza and $16,500 against Todd;
5. DENIES Plaintiff SEC's Motion for Relief as to permanent injunction, officer and director bar and disgorgement; and
6. DENIES both Defendants' Motions for New Trial as to the § 17(a) claims; the § 10(b) and Rule 10b-5 claims; and the Rule 13b2-2 claims without prejudice, and as to the remaining claims with prejudice.

IT IS SO ORDERED.

S.D.Cal.,2007.
S.E.C. v. Todd
Slip Copy, 2007 WL 1574756 (S.D.Cal.), Fed. Sec. L. Rep. P 94,343

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.