# EXHIBIT A

1 | MARC J. FAGEL (State Bar No. 154425)
JUDITH L. ANDERSON (State Bar No. 124281)
2 | ELENA RO (State Bar No. 197308)

3 | Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
4 | 44 Montgomery Street, Suite 2600
San Francisco, California 94104
5 | Telephone: (415) 705-2500
Facsimile: (415) 705-2501

6

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN JOSE DIVISION

**JW**

**C  07  3798**

11

12 | SECURITIES AND EXCHANGE COMMISSION,   Case No. _____

13 | Plaintiff,

14 | v.   COMPLAINT

15 | KENNETH L. SCHROEDER,

16 | Defendant.

17

18

19 | Plaintiff Securities and Exchange Commission (the "Commission") alleges:

20 | **SUMMARY OF THE ACTION**

21 | 1.     From mid-1999 to mid-2002, and once again in 2005, defendant Kenneth L.

22 | Schroeder, the former Chief Executive Officer of KLA-Tencor Corporation ("KLA" or "the

23 | Company"), a San Jose semiconductor company, engaged in a scheme to illegally backdate stock

24 | options granted to KLA executives and employees. Schroeder used dates and prices for stock option

25 | grants chosen with hindsight and concealed this practice, causing KLA to hide millions of dollars in

26 | expenses from investors and to significantly overstate the Company's income. Schroeder continued

27 | to engage in this practice even after being specifically instructed by Company counsel that

28 | retroactively selecting grant dates without adequate disclosure was improper.

2.     Under well-settled accounting principles in effect during the relevant period, KLA did not need to record an expense for options granted to employees at the current market price ("at-the-money"), while the Company was required to record an expense in its financial statements for any options granted below the current market price ("in-the-money").  In order to provide KLA executives and employees with potentially far more lucrative "in-the-money" options, while avoiding having to inform shareholders of millions of dollars in compensation expenses, Schroeder routinely signed option grant approvals which he knew or was reckless in not knowing reflected purported grant dates and prices selected weeks after such grant dates.

3.     Schroeder approved for himself the pricing on several large awards of options that were "in-the-money" by millions of dollars.  As a result, he personally benefited from the backdating and received several million dollars in unreported compensation from the backdated options.

4.     By engaging in the acts alleged in this Complaint, Schroeder, among other things, violated the antifraud provisions of the federal securities laws, made or caused to be made materially false or misleading statements to KLA's auditors, falsified books and records, and caused KLA to falsely report its financial results.  The Commission seeks an order enjoining Schroeder from future violations of the securities laws.  In addition, the Commission seeks an order requiring Schroeder to disgorge ill-gotten gains with prejudgment interest, requiring him to pay civil monetary penalties and to repay bonuses and stock profits, barring him from serving as an officer or director of a public company, and providing other appropriate relief.

## JURISDICTION AND VENUE

5.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

6.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].  The defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national

2

1  securities exchange in connection with the acts, practices and courses of business alleged in this

2  complaint.

3        7.     Venue is proper in this District pursuant to Section 22 of the Securities Act [15 U.S.C.

4  § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Schroeder resides in the Northern

5  District of California, and acts or transactions constituting violations occurred in this district.

6             **INTRADISTRICT ASSIGNMENT**

7        8.     Assignment to the San Jose Division is appropriate pursuant to Civil Local Rules 3-

8  2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred, among

9  other places in this district, in Santa Clara County.

10                **DEFENDANT**

11        9.     Kenneth L. Schroeder, age 61, resides in Los Altos Hills, California.  Schroeder served

12  as KLA's President and Chief Operating Officer after the Company's merger on April 30, 1997 until

13  June 30, 1999, and then as KLA's Chief Executive Officer until January 1, 2006.  Schroeder also

14  served on KLA's Board of Directors and its Stock Option Committee from 1997 through 2005.

15              **RELEVANT ENTITY**

16       10.     KLA is a San Jose, California corporation that designs, manufactures and markets

17  systems for the semiconductor industry.  At all relevant times, KLA's common stock was registered

18  with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ

19  National Market under the symbol "KLAC."  At all times relevant to this action, KLA used a fiscal

20  year ending on June 30.

21             **FACTUAL ALLEGATIONS**

22  **A.**    **KLA's Stock Option Disclosures**

23       11.     During the time period KLA backdated options grants, the Company regularly used

24  employee stock options as a form of compensation to recruit, retain, and incentivize key employees.

25  Each option gave the grantee the right to buy KLA common stock from the Company at a set price,

26  called the "exercise" or "strike" price, on a future date after the option vested.  The option was "in-

27  the-money" when granted if the trading price of KLA's common stock exceeded the option's exercise

28

SEC v. SCHROEDER
COMPLAINT

1   price. The option was "at-the-money" when granted if the trading price of KLA's common stock and

2   the exercise price were the same.

3         12.    From at least July 1997 and at all relevant times thereafter, KLA's primary stock

4   option plan specifically prohibited the grant of in-the-money options. The plan required that the

5   Board of Directors set the exercise price of the Company's stock options, and that the price could not

6   be less than fair market value on the date of grant, *i.e.*, the closing trading price of KLA common

7   stock on the date when the key terms of the option grant were known.

8         13.    KLA also publicly represented, in audited financial statements and other filings with

9   the Commission throughout the relevant period, that its option grants were made at fair market value.

10   In other words, KLA purported to issue options at-the-money, not in-the-money.

11         14.    KLA's public filings affirmatively stated that the Company accounted for its employee

12   stock option plans in accordance with provisions of the Accounting Principles Board's Opinion No.

13   25, "Accounting for Stock Issued to Employees" ("APB 25"). Under APB 25 and the accounting

14   rules in effect in 1997, through 2005, employers were required to record an expense on their financial

15   statements for the in-the-money portion of any options grant. According to APB 25, that difference

16   must be recorded as compensation expense to be recognized over the vesting period of the option.

17   Consequently, granting in-the-money options to employees could have a significant impact on the

18   expenses and income (or loss) reported to the shareholders of a public company. APB 25 allowed

19   companies, where the key terms of an option grant were known, to grant employee stock options

20   without recording any compensation expense so long as the option exercise price was not below the

21   stock's market price on the date of the grant.

22         15.    KLA made the statements about its accounting for stock options in accordance with

23   APB 25 in the notes to its audited financial statements, including in its annual reports to shareholders,

24   filed with the Commission on Form 10-K, for its fiscal years 1998 through 2005. Also, KLA's

25   annual reports for fiscal years 2000 through 2004 stated that under the Company's stock option plans,

26   options were granted at prices not less than the fair market value of the Company's common stock on

27   the grant date, and in fiscal year 2005, were generally granted at prices not less than the fair market

28

4

1 | value of the Company's common stock on the grant date.  Schroeder reviewed and signed each Form

2 | 10-K that made these false representations for fiscal years 1998 through 2005.

3 |       16.    Schroeder further certified the Forms 10-K for fiscal years 2002, 2003, 2004 and 2005.

4 |       17.    KLA also filed proxy statements that were sent to shareholders and contained false

5 | disclosures for fiscal years 1998 through 2002.  In these proxy statements, the discussion on executive

6 | compensation falsely stated that stock options were granted at market price on the date of grant.  In

7 | addition, KLA's proxy statement for fiscal year 2001 stated that one of the material terms of certain

8 | grants to certain executives was that the exercise price of the options was the fair market value of the

9 | Company's Common Stock as of the date of grant.  Moreover, KLA's proxy statement for fiscal year

10 | 2002 stated that certain executives, including Schroeder, received a number of options in the last

11 | fiscal year which "were granted at an exercise price equal to the fair market value of the Company's

12 | Common Stock on October 2, 2001."

13 |       18.    The representations to KLA's shareholders in its annual and proxy filings about the

14 | Company's stock option program were untrue.  Schroeder knew or was reckless in not knowing those

15 | statements were untrue, because he engineered a scheme to create option grant approvals which

16 | falsely represented the date of the grant to make it appear as though KLA was not required to record

17 | an expense for its options.  In particular, to evade the consequences of granting options to employees

18 | in-the-money, Schroeder signed falsely dated options grant approvals to make it appear as though the

19 | options had been granted at the market price on an earlier date.

20 | **B.**    **Schroeder's Scheme to Backdate Options Grants**

21 |       19.    In 1997, KLA's Board of Directors delegated authority to grant stock options to non-

22 | officers to a Stock Option Committee consisting of three directors, and required that at least two

23 | members approve each grant.  Schroeder served on the Stock Option Committee from its 1997

24 | formation through 2005.

25 |       20.    The Board contemplated that the Committee would meet regularly to price options.

26 | Rather than the grants being priced at a meeting, however, the Stock Option Committee approved

27 | retrospectively-chosen option grant dates and prices and never met regularly during the time period of

28 | backdating.

SEC v. SCHROEDER
COMPLAINT

21.     Beginning in July 1997 and continuing until mid-2002, certain KLA executives used an options backdating practice where the signing of grant approval paperwork was deliberately delayed so that they could look back on KLA's historical closing stock prices and choose one of the historically lowest prices as the purported grant date.

22.     KLA backdated grants to newly hired and to recently promoted employees ("new hire" grants), as well as to current employees eligible for options at the end of the Company's annual review process (known as "peak performance" or "focal" grants), among others. These backdated grants reflected historically low prices of KLA stock for the weeks prior to the date on which the price was selected.

23.     In June 1999, a KLA executive instructed the Company's Human Resources ("HR") department about procedures on how to backdate new hire grants: (1) create a list of newly hired employees; (2) wait several weeks; (3) obtain a list of KLA's daily closing stock price for the past several weeks; (4) highlight the three or four lowest prices; and (5) forward the new hire list and the highlighted stock price list to KLA's Stock Option Committee.

24.     From July 1999 until mid-2002, KLA's HR department followed the procedures outlined for them for the new hire grants. HR department employees prepared the grant approval paperwork and sent it to the Stock Option Committee with a historical chart of KLA's common stock closing prices. KLA's HR department followed these procedures for several months. Thereafter, the Stock Option Committee instructed the HR department to pick one of the lowest prices before forwarding the grant approval paperwork to the Committee.

25.     Month after month, Schroeder routinely signed backdated new hire option grant approvals without ever ensuring that the grants were accounted for appropriately. Schroeder knew or was reckless in not knowing that these approvals did not communicate the actual correct grant date. Based upon these approvals, Schroeder knew or was reckless in not knowing that KLA would not record expenses for these in-the-money grants. See Appendix A.

26.     Schroeder knew or was reckless in not knowing that only the Stock Option Committee members had authority to set the date and price of option grants to new hires and the rank-and-file.

6

1   He also understood that by signing the grant approvals, he was authorizing the grants at the purported

2   date and price contained in the approvals.

3         27.     Schroeder also approved several peak performance or focal grants using undisclosed

4   backdated grant dates to existing executives and employees. See Appendix A. Each year KLA began

5   its annual employee review process at the beginning of the summer and completed it by the end of

6   August or beginning of September. As with the new hire grants, Schroeder would delay approving

7   the grants, using hindsight to select a purported grant date with a lower stock price. When Schroeder

8   signed the grant approvals, he knew or was reckless in not knowing that they did not communicate

9   the actual correct grant date. Contrary to KLA's representations, Schroeder knew or was reckless in

10  not knowing KLA would not record expenses for these in-the-money grants.

11        28.     From mid-1997 to mid-2002, and once again in 2005, KLA approved on 35 occasions

12  backdated grants, which included both new hire and peak performance grants, among others.

13  **C.    In a March 2001 Memorandum, Schroeder Receives Legal Advice that He Cannot
          Retroactively Set Stock Prices**

14

15        29.     Schroeder understood the accounting implications of awarding an in-the-money

16  options grant. Soon after he became CEO in July 1999, Schroeder received communications that

17  made him aware of the basic accounting rules for stock options. For example, in September 1999,

18  Schroeder received an email reflecting outside counsel's opinion that certain options granted with an

19  exercise price equal to the fair market value on the date of grant would not result in a compensation

20  expense. During the period of the fraud, Schroeder kept abreast of proposed requirements that all

21  employee stock options (rather than just in-the-money options) be expensed by companies, as well as

22  pronouncements and deliberations by the Financial Accounting Standards Board on stock option

23  accounting.

24        30.     Schroeder therefore knew or was reckless in not knowing that KLA would have to

25  record an accounting expense for any options that were granted below fair market value on the date of

26  the grant. He also knew or was reckless in not knowing the requirements for the determination of a

27  grant date, *i.e.*, when the key terms of the option grant were known.

28

7

SEC v. SCHROEDER<br/>COMPLAINT

31.     In March 2001, KLA's then-General Counsel communicated to Schroeder that selecting grant prices with hindsight required the Company to take a compensation charge, and that doing so without disclosing the fact could run afoul of the law.  On or around March 19, 2001, the GC sent a "Stock Options Pricing" Memorandum to Schroeder.  The first sentence in the Summary section stated: "the date at which the price of option grants is determined must be the fair market value of the underlying shares as of the date upon which options are granted."

32.     The Memorandum further described the accounting rules for stock options and stated: "[a]ny attempt to set a price before such a grant is made raises substantial risks under securities and tax laws [and] accounting rules and gives rise to disclosure obligations."  The Memorandum stated that "the Board and its committees are limited in their ability to grant options at a retroactive price without exposing the company to risk of an accounting charge."

33.     In a March 22, 2001 email back to the General Counsel, Schroeder acknowledged reading the memorandum and responded:  "The Compensation Committee has given the Stock Option Committee (Gary, Ken and I) power to set the price of stock options . . . Please don't take away some of my best tools for attracting and retaining people.  We need those people to win the battle.  Help me, don't just tell me how to follow a strict interpretation of rules.  I need a 'war time counselor,' not someone who can recite page and verse."

**D.     Schroeder Continued Approving Backdated Options Grants Despite Having Read the March 2001 Memorandum**

34.     Although Schroeder understood the accounting implications of awarding in-the-money grants before March 2001, and although he received a further warning in March 2001 that backdating options grants without proper disclosure and accounting ran afoul of securities laws, Schroeder nonetheless continued backdating options grants.  After March 2001, Schroeder had the Stock Option Committee approve eight additional new hire grants and two additional peak performance grants, all of which were backdated.  See Appendix A.

35.     For example, KLA awarded several grants to employees purportedly on October 2, 2001 at an exercise price of $29.31, including peak performance grants to officers and non-officers and a new hire/promotion grant.  The $29.31 stock price on October 2, 2001 was the lowest closing

1  price for KLA's common stock for the second half of 2001.  In reality, the grant was not made until

2  on or around October 24, 2001, when KLA's stock was trading at $40.86.

3          36.    Schroeder signed the backdated grant approval, which resulted in Schroeder himself

4  receiving options granted in-the-money at the low price.  He approved for himself options to purchase

5  341,100 shares under this grant, which were "in-the-money" by $5,437,134.  Schroeder was by far the

6  largest option recipient under this grant.

7          37.    In response to the Sarbanes-Oxley Act of 2002, KLA adopted in mid-2002 new

8  procedures for approving options grants, which included pre-scheduled meetings.  As a consequence,

9  backdating became more difficult.  Nevertheless, Schroeder backdated an additional grant in 2005.

10 On January 26, 2005, an HR department employee sent an email to Schroeder providing closing stock

11 prices for three previous days in order to price a new hire grant.  The email asked Schroeder to

12 confirm using the January 24 price, which was the lowest of the three, and lower than the price on

13 January 26.  Schroeder emailed back "OK for the price on 1/24."  Schroeder's actions directly

14 conflicted with KLA's then procedures for pre-scheduling Stock Option Committee meetings and

15 pricing options on the actual date of the grant.

16 **E.    Schroeder's Backdating Scheme Causes KLA to Falsely Report Financial Results**

17         38.    As a public company, KLA filed with the Commission annual reports that included

18 audited financial statements, certified by the Company's outside auditors.  KLA's failure to record a

19 compensation expense in connection with the backdated, in-the-money option grants resulted in

20 materially overstated net income on the financial statements in its Forms 10-K as follows: 4% in

21 1998, 46% in 1999, 9.8% in 2000, 156% in 2001, 30% in 2002, 46% in 2003, 15% in 2004 and 4.8%

22 in 2005, for a total of over $200 million of reported net income cumulatively from 1998 to 2005.

23 KLA also sold securities pursuant to offering documents, including registration statements on Forms

24 S-8 filed throughout the period of fraud, which incorporated the false financial statements.

25 Throughout these periods from 1998 to 2005, Schroeder reviewed KLA's financial statements prior to

26 filing them with the Commission.

27         39.    Beginning with the quarterly period ended September 30, 2002 through the quarterly

28 period ended March 31, 2005, Schroeder certified all quarterly financial statements filed for each of

KLA's first three quarters. These Forms 10-Q contained materially false and/or misleading financial statements because of KLA's failure to record compensation expenses associated with in-the-money options. Schroeder signed certifications stating, among other things, that he had reviewed the Forms 10-Q for these periods and he was not aware of any material misstatements of fact or omissions in those filings.

40.     In addition, KLA's Forms 8-K filed on April 23, 2003, July 24, 2003, October 22, 2003, January 22, 2004, April 21, 2004, July 29, 2004, October 21, 2004, January 20, 2005, April 28, 2005, July 28, 2005 and October 27, 2005, each of which announced the Company's financial results for the prior quarter, contained materially false and/or misleading financial information because of KLA's failure to record compensation expenses associated with undisclosed grants of in-the-money stock options. Additionally, KLA's Form 8-K filed on March 21, 2001 announced projected third quarter financial results which were materially false and/or misleading. KLA recorded false and misleading information in its books and records, and the representations to KLA's shareholders in its annual, quarterly and current reports about the Company's stock option program, and its financial results, were untrue.

41.     KLA's proxy statements (which were sent to its shareholders) for fiscal years 1998 through 2002 also made materially false representations about executive compensation. Among other things, in describing executive compensation, the proxy statements each falsely stated that stock options were granted to certain executives at market price on the date of grant. In addition, KLA's proxy statement for fiscal year 2001 stated that one of the material terms of certain grants to certain executives was that the exercise price of the options was the fair market value of the Company's Common Stock as of the date of grant. Moreover, KLA's proxy statement for fiscal year 2002 stated that certain executives, including Schroeder, received a number of options in the last fiscal year which "were granted at an exercise price equal to the fair market value of the Company's Common Stock on October 2, 2001." This statement was false, and further failed to disclose the fact that the options granted to Schroeder were in-the-money by approximately $5 million.

42.     KLA provided documentation, which failed to disclose the true grant dates for options to employees and officers, to the Company's external auditors in connection with audits of KLA's

financial statements.  Relying on the false documentation supplied to them, the auditors concurred with KLA's assessment that no compensation expense should be recorded for the options granted to employees.  Schroeder knew or was reckless in not knowing that KLA provided false grant approval information to its auditors.

43.    In addition, Schroeder signed management representation letters with reference dates of July 27, 1999, September 27, 1999, May 12, 2000, July 24, 2000, September 25, 2000, September 27, 2000, November 9, 2000, November 14, 2000, February 14, 2001, May 11, 2001, July 31, 2001, November 14, 2001, December 19, 2001, February 13, 2002, May 13, 2002, July 31, 2002, September 9, 2002, September 20, 2002, September 27, 2002, November 13, 2002, February 13, 2003, May 14, 2003, July 23, 2003, September 12, 2003, November 6, 2003, February 5, 2004, March 5, 2004, August 18, 2004, November 2, 2004, December 22, 2004, February 3, 2005, April 29, 2005, September 1, 2005 and November 18, 2005 to the auditors during the time period of the fraud falsely asserting that KLA's financial statements were prepared consistently with GAAP.

44.    Schroeder caused to be signed and filed with the Commission a false Form 4, which was supposed to disclose to the public annual changes in his beneficial ownership of KLA securities. This Form 4, dated December 7, 2001, reported false grant dates for his option grants.

45.    In May 2006, the Special Committee of KLA's Board of Directors began to investigate the Company's historical options granting practices.  As a result of the Special Committee investigation, KLA announced in February 2007 restated financial results to record expenses for options grants to employees.  KLA announced the recording of additional pre-tax, non-cash, stock-based compensation expenses of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25, and (b) $28 million for the period from July 1, 2005 through December 31, 2006 under SFAS No. 123(R).

**F.    Schroeder Was Motivated by Personal Gain and Competitive Advantage to Backdate Options**

46.    Schroeder knew that he and other officers of KLA similarly received options backdated as of the same dates as the backdated employee options.  He thus was motivated to

1 continue the scheme, in part, to enrich himself and his fellow officers. In addition, he knew providing

2 in-the-money options to employees helped him in "attracting and retaining people."

3   47.  Pursuant to the backdated grants, Schroeder received options that were in-the-money

4 by millions of dollars. On at least two occasions, Schroeder received large options grants which were

5 dated as of the same dates on which he had granted other employees backdated options. Those grants

6 to Schroeder were backdated as of April 4, 2001 and October 2, 2001. Schroeder was also unjustly

7 enriched, through, among other things, the exercise of additional stock options, the sale of KLA stock

8 at prices fraudulently inflated as a result of KLA's false financial statements and the receipt of

9 bonuses.

**FIRST CLAIM FOR RELIEF**
*(Violations of Section 10(b) of the*
*Exchange Act and Rule 10b-5 Thereunder by Schroeder)*

12   48.  The Commission realleges and incorporates by this reference Paragraphs 1 through 47,

13 above.

14   49.  By engaging in the conduct described above, Schroeder, directly or indirectly, in

15 connection with the purchase or sale of securities, by the use of means or instrumentalities of

16 interstate commerce, or the mails, with scienter:

17   (a)  employed devices, schemes, or artifices to defraud;

18   (b)  made untrue statements of material facts or omitted to state material facts

19      necessary in order to make the statements made, in the light of the

20      circumstances under which they were made, not misleading; and

21   (c)  engaged in acts, practices, or courses of business which operated or would

22      operate as a fraud or deceit upon other persons, including purchasers and

23      sellers of securities.

24   50.  By reason of the foregoing, Schroeder has violated, and unless restrained and enjoined,

25 will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

26 C.F.R. § 240.10b-5] thereunder.

27

28

12

## SECOND CLAIM FOR RELIEF
*(Aiding and Abetting Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 Thereunder by Schroeder)*

51.     The Commission realleges and incorporates by this reference Paragraphs 1 through 47, above.

52.     By engaging in the conduct described above, Schroeder, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a)     employed devices, schemes, or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

53.     Schroeder knowingly provided substantial assistance to another person's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], and therefore is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

54.     Unless restrained and enjoined, Schroeder will continue to violate and aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF

*(Violations of Section 17(a)(1) of the Securities Act by Schroeder)*

55.     The Commission realleges and incorporates by this reference Paragraphs 1 through 47, above.

56.     By engaging in the conduct described above, Schroeder, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in

SEC v. SCHROEDER
COMPLAINT

1  interstate commerce or by use of the mails with scienter employed devices, schemes, or artifices to

2  defraud.

3      57.    By reason of the foregoing, Schroeder violated, and unless restrained and enjoined,

4  will continue to commit violations of, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

5                              **FOURTH CLAIM FOR RELIEF**

6              *(Violations of Sections 17(a)(2) and (3) of the Securities Act by Schroeder)*

7      58.    The Commission realleges and incorporates by this reference Paragraphs 1 through 47,

8  above.

9      59.    By engaging in the conduct described above, Schroeder, directly or indirectly, in the

10  offer or sale of securities, by use of the means or instruments of transportation or communication in

11  interstate commerce or by use of the mails:

12          (a)    obtained money or property by means of untrue statements of material fact

13                 or by omitting to state a material fact necessary in order to make the

14                 statements made, in light of the circumstances under which they were

15                 made, not misleading; and

16          (b)    engaged in transactions, practices, or courses of business which operated

17                 or would operate as a fraud or deceit upon the purchasers.

18      60.    By reason of the foregoing, Schroeder has violated, and unless restrained and enjoined,

19  will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and

20  (3)].

21                              **FIFTH CLAIM FOR RELIEF**

22          *(False Statements and Omissions to Accountants and Auditors—*
        *Violation of Rule 13b2-2 by Schroeder)*

23      61.    The Commission realleges and incorporates by this reference Paragraphs 1 through 47,

24  above.

25      62.    By engaging in the acts and conduct alleged above, Schroeder, directly or indirectly,

26  made or caused to be made a materially false or misleading statements or omitted to state or caused

27  another person to omit to state, material facts necessary in order to make statements made, in light of

28  the circumstances under which such statements were made, not misleading to an accountant in

                                        14                          SEC v. SCHROEDER
                                                                    COMPLAINT

1  connection with an audit or examination of the financial statements of KLA required to be made or

2  the preparation or filing of reports required to be filed by KLA with the Commission.

3      63.    By reason of the foregoing, Schroeder has violated and, unless restrained and enjoined,

4  will continue to violate Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

5                              **SIXTH CLAIM FOR RELIEF**
                      *(False Periodic Reports—Aiding and Abetting Violations*
6                     *of Section 13(a) of the Exchange Act and Rules 12b-20,*
                           *13a-1, 13a-11 and 13a-13 Thereunder by Schroeder)*
7

8      64.    The Commission realleges and incorporates by this reference Paragraphs 1 through 47,

9  above.

10     65.    Based on the conduct alleged above, KLA violated Section 13(a) of the Exchange Act

11  [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20,

12  240.13a-1, 240.13a-11 and 240.13a-13] thereunder, which obligate issuers of securities registered

13  pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate

14  annual and quarterly reports.

15     66.    By engaging in the conduct alleged above, Schroeder knowingly provided substantial

16  assistance to KLA's filing of materially false and misleading reports with the Commission.

17     67.    By reason of the foregoing, Schroeder aided and abetted violations by KLA of Section

18  13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17

19  C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.  Unless restrained and

20  enjoined, Schroeder will continue to aid and abet such violations.

21                           **SEVENTH CLAIM FOR RELIEF**
                      *(Inaccurate Books and Records—Aiding and Abetting Violations of*
22                        *Section 13(b)(2)(A) of the Exchange Act by Schroeder)*

23     68.    The Commission realleges and incorporates by this reference Paragraphs 1 through 47,

24  above.

25     69.    Based on the conduct alleged above, KLA violated Section 13(b)(2)(A) of the

26  Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to

27  Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records and accounts

28

SEC v. SCHROEDER
COMPLAINT

1 | which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets

2 | of the issuer.

3 |       70.    By engaging in the conduct alleged above, Schroeder knowingly provided substantial

4 | assistance to KLA's failure to make and keep books, records and accounts which, in reasonable

5 | detail, accurately and fairly reflect its transactions and dispositions of its assets.

6 |       71.    By reason of the foregoing, Schroeder has aided and abetted violations by KLA of

7 | Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  Unless restrained and

8 | enjoined, Schroeder will continue to aid and abet such violations.

9 | **EIGHTH CLAIM FOR RELIEF**
*(Inadequate Internal Accounting Controls—Aiding and Abetting*

10 | *Violations of Section 13(b)(2)(B) of the Exchange Act by Schroeder)*

11 |       72.    The Commission realleges and incorporates by this reference Paragraphs 1 through 47,

12 | above.

13 |       73.    Based on the conduct alleged above, KLA violated Section 13(b)(2)(B) of the

14 | Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to

15 | Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of

16 | internal accounting controls.

17 |       74.    By engaging in the conduct alleged above, Schroeder knowingly provided substantial

18 | assistance to KLA's failure to devise and maintain a sufficient system of internal accounting controls.

19 |       75.    By reason of the foregoing, KLA has aided and abetted violations by KLA of Section

20 | 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].  Unless restrained and enjoined,

21 | Schroeder will continue to aid and abet such violations.

22 | **NINTH CLAIM FOR RELIEF**
*(Falsifying Books and Records or Circumventing Internal Accounting*

23 | *Controls—Violation of Section 13(b)(5) of the Exchange Act by Schroeder)*

24 |       76.    The Commission realleges and incorporates by this reference Paragraphs 1 through 47,

25 | above.

26 |       77.    By the conduct alleged above, Schroeder violated Section 13(b)(5) of the Exchange

27 | Act [15 U.S.C. § 78m(b)(5)] which prohibits anyone from knowingly circumventing a system of

28 | internal accounting, or knowingly falsifying certain books, records, and accounts.

SEC v. SCHROEDER
COMPLAINT

78. Unless restrained and enjoined, Schroeder will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

**TENTH CLAIM FOR RELIEF**
*(Falsifying Books and Records—Violation of*
*Rule 13b2-1 of the Exchange Act by Schroeder)*

79. The Commission realleges and incorporates by this reference Paragraphs 1 through 47, above.

80. By engaging in the conduct described above, Schroeder falsified or caused to be falsified KLA's books, records and accounts in violation of Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

81. Schroeder has violated and, unless restrained and enjoined, will continue to violate, Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

**ELEVENTH CLAIM FOR RELIEF**
*(False Proxy Statements—Aiding and Abetting Violations*
*of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder by Schroeder)*

82. The Commission realleges and incorporates by this reference Paragraphs 1 through 47, above.

83. Based on the conduct alleged above, KLA violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, that contain a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

84. By engaging in the conduct alleged above, Schroeder knowingly provided substantial assistance to KLA's false or misleading proxy statements.

85. By reason of the foregoing, Schroeder has aided and abetted violations by KLA of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder. Unless restrained and enjoined, Schroeder will continue to aid and abet such violations.

17

## TWELFTH CLAIM FOR RELIEF
*(Beneficial Ownership Reporting—Violations of Section 16(a)*
*of the Exchange Act and Rule 16a-3 Thereunder by Schroeder)*

86.   The Commission realleges and incorporates by this reference Paragraphs 1 through 47, above.

87.   Based on the conduct alleged above, Schroeder violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder, which require officers, directors and beneficial owners of more than ten percent of any class of equity security registered pursuant to Exchange Act Section 12 [15 U.S.C § 78l] to file periodic reports disclosing any change of beneficial ownership of those securities.

88.   Schroeder has violated and, unless restrained and enjoined, will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder.

## THIRTEENTH CLAIM FOR RELIEF
*(Violations of Rule 13a-14 of the Exchange Act by Schroeder)*

89.   The Commission realleges and incorporates by this reference Paragraphs 1 through 47, above.

90.   Schroeder signed, as KLA's principal executive officer, false certifications pursuant to Rule 13a-14 of the Exchange Act that were included in KLA's 2002, 2003, 2004 and 2005 annual reports filed on Forms 10-K, as well as its quarterly reports filed on Forms 10-Q for the quarters ended September 30, 2002 through March 31, 2005. For the first three certifications, Schroeder falsely stated, among other things, that the quarterly reports fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that information contained therein fairly presented in all material respects the financial condition and results of operations of KLA. From the quarter ended September 30, 2003 on, Schroeder falsely stated in the certifications, among other things, that: (a) each report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (b) each financial statement, and other financial information included in each report, fairly presented in all material respects the financial condition, results of operations and

18

1 cash flows of KLA as of, and for, the period presented in the report; and (c) Schroeder had disclosed

2 to KLA's auditor and audit committee all significant deficiencies and material weaknesses in the

3 design or operation of internal control over financial reporting and any fraud, whether or not material,

4 that involved management or other employees who had a significant role in KLA's internal control

5 over financial reporting.

6       91.     By reason of the foregoing, Schroeder has violated, and unless restrained and enjoined

7 will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

8 **PRAYER FOR RELIEF**

9       WHEREFORE, the Commission respectfully requests that this Court:

10 I.

11       Permanently enjoin Schroeder from directly or indirectly violating Section 17(a) of the

12 Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(b)(5), and 16(a) of the Exchange Act [15

13 U.S.C. §§ 78j(b), 78m(b)(5), and 78p(a)], and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, and 16a-3

14 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2, and 240.16a-3], and from

15 aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the

16 Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), and 78n(a)] and Rules

17 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1,

18 240.13a-11, 240.13a-13, and 240.14a-9] thereunder;

19 II.

20       Prohibit Schroeder, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)],

21 from serving as an officer or director of any entity having a class of securities registered with the

22 Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file

23 reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

24 III.

25       Order Schroeder to disgorge any wrongfully obtained benefits, including prejudgment interest;

26 IV.

27       Order Schroeder to pay civil penalties pursuant to Section 20(d) of the Securities Act [15

28 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

SEC v. SCHROEDER
COMPLAINT

## V.

Order Schroeder to repay bonuses and stock profits, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243.

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:       July 25, 2007                    Respectfully Submitted,

Elena Ro
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

SEC v. SCHROEDER
COMPLAINT

## APPENDIX A

### Backdated KLA Options Grants From July 1999 To January 2005
### Signed by Kenneth L. Schroeder

| Purported Grant Date | Exercise Price | Compensation Charge Included in Restatement | Type of Grant |
|---|---|---|---|
| 7/26/99 | $31.34 | $460,299 | New Hire; Promotion; Other |
| 8/20/99 | $31.47 | $1,141,626 | New Hire; Promotion; Other |
| 11/30/99 | $42.28 | $922,054 | New Hire; Promotion; Other |
| 12/16/99 | $46.44 | $2,457,338 | New Hire; Promotion; Other |
| 1/28/00 | $56.31 | $746,641 | New Hire; Promotion; Other |
| 2/18/00 | $68.00 | $952,429 | New Hire; Promotion; Other |
| 4/14/00 | $57.63 | $6,421,313 | New Hire; Promotion; Retention; Other |
| 5/25/00 | $44.13 | $2,929,703 | New Hire; Promotion; Retention; Other |
| 7/05/00 | $50.06 | $1,638,875 | New Hire; Promotion; Other |
| 8/13/00 | $44.69 | $86,991,587 | Peak Performance/Focal; New Hire; Promotion; Retention; Other |
| 10/17/00 | $28.06 | $2,668,599 | New Hire; Promotion; Retention; Other |
| 11/10/00 | $26.25 | $16,939,483 | Peak Performance/Focal; New Hire; Promotion; Retention; Other |
| 12/22/00 | $31.81 | $5,275,005 | New Hire; Promotion; Retention; Other |
| 2/09/01 | $35.88 | $1,585,718 | New Hire; Promotion; Retention; Other |
| 4/04/01 | $32.75 | $49,554,744 | Peak Performance/Focal; New Hire; Promotion; Retention; Other |
| 5/30/01 | $29.58 | $2,250,190 | New Hire; Promotion; Retention; Other |
| 7/10/01 | $46.67 | $6,665,136 | New Hire; Promotion; Other |
| 10/02/01 | $29.31 | $135,445,909 | Peak Performance/Focal; New Hire; Promotion; Retention; Other |
| 11/20/01 | $45.84 | $624,993 | New Hire; Promotion; Retention; Other |
| 1/18/02 | $49.92 | $448,206 | New Hire; Promotion; Retention; Other |
| 2/28/02 | $57.91 | $595,752 | New Hire; Promotion; Other |
| 1/24/05 | $43.99 | $1,063,382 | New Hire; Promotion; Retention; Other |