# EXHIBIT B

ORIGINAL

MARC J. FAGEL (State Bar No. 154425)
JUDITH L. ANDERSON (State Bar No. 124281)
ELENA RO (State Bar No. 197308)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SECURITIES AND EXCHANGE COMMISSION, | Case No. C 07 3799

Plaintiff,

v.                                                    COMPLAINT

KLA-Tencor Corporation,

Defendant.

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY OF THE ACTION**

1. From at least 1997 through mid-2002, and once again in 2005, certain executives of KLA-Tencor Corporation ("KLA" or "the Company"), a San Jose semiconductor company, concealed millions of dollars in expenses from investors, and significantly overstated the Company's income, by backdating employee stock option grants and failing to properly disclose and account for its true compensation expenses.

2. Under well-settled accounting principles in effect during the relevant period, KLA did not need to record an expense for options granted to employees at the current market price ("at-the-money"), but the Company was required to record an expense in its financial statements for any

1

SEC v. KLA-TENCOR CORP.
COMPLAINT

options granted below the current market price ("in-the-money"). In order to provide KLA executives and employees with potentially far more lucrative "in-the-money" options, without disclosing to shareholders millions of dollars in compensation expenses, KLA's Stock Option Committee routinely signed option grant approvals that reflected purported grant dates and prices selected weeks after such grant dates.

3. By using option grant dates and prices selected with hindsight, KLA materially understated the Company's expenses and overstated its income in disclosures to the Commission and the investing public, and falsely represented in certain filings that KLA had incurred no expense for option grants. The Commission seeks an order enjoining KLA from future violations of the securities laws, and providing other appropriate relief.

**JURISDICTION AND VENUE**

4. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

5. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. The defendant, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this complaint.

6. Venue is proper in this District pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Northern District of California, and the defendant may be found in this district.

**INTRADISTRICT ASSIGNMENT**

7. Assignment to the San Jose Division is appropriate pursuant to Civil Local Rules 3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred, among other places in this district, in Santa Clara County.

2

SEC v. KLA-TENCOR CORP.
COMPLAINT

**DEFENDANT**

8. KLA-Tencor Corporation is a San Jose, California, corporation that designs, manufactures and markets systems for the semiconductor industry. At all relevant times, KLA's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and traded on the NASDAQ National Market under the symbol "KLAC." At all times relevant to this action, KLA used a fiscal year ending on June 30.

**FACTUAL ALLEGATIONS**

**KLA's Stock Option Disclosures**

9. During the time KLA backdated option grants, the Company regularly used employee stock options as a form of compensation to recruit, retain, and incentivize key employees. Each option gave the grantee the right to buy KLA common stock from the Company at a set price, called the "exercise" or "strike" price, on a future date after the option vested. The option was "in-the-money" when granted if the trading price of KLA's common stock exceeded the option's exercise price. The option was "at-the-money" when granted if the trading price of KLA's common stock and the exercise price were the same.

10. From at least July 1997 and at all relevant times thereafter, KLA's primary stock option plan specifically prohibited the grant of in-the-money options. The plan required that the Board of Directors set the exercise price of the Company's stock options, and specified that the price could not be less than fair market value on the date of grant, *i.e.*, the closing trading price of KLA common stock on the date when the key terms of the option grant were known.

11. KLA publicly represented, in audited financial statements and other filings with the Commission throughout the relevant period, that its option grants were made at fair market value. In other words, KLA purported to issue options at-the-money, not in-the-money.

12. KLA's public filings affirmatively stated that the Company accounted for its employee stock option plans in accordance with provisions of the Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). Under APB 25 and the accounting rules in effect in 1997, through 2005, employers were required to record an expense on their financial statements for the in-the-money portion of any options grant. According to APB 25, that difference

3

SEC v. KLA-TENCOR CORP.
COMPLAINT

1 between the exercise price (if lower) and the quoted market price on the date of actual grant must be
2 recorded as compensation expense to be recognized over the vesting period of the option.
3 Consequently, granting in-the-money options to employees could have a significant impact on the
4 expenses and income (or loss) reported to the shareholders of a public company. APB 25 allowed
5 companies, where the key terms of an option grant were known, to grant employee stock options
6 without recording any compensation expense so long as the option exercise price was not below the
7 stock's market price on the date of the grant.

8     13.    KLA made the statements about its accounting for stock options in accordance with
9 APB 25 in the notes to its audited financial statements, including in its annual reports to shareholders,
10 filed with the Commission on Form 10-K, for its fiscal years 1998 through 2005. Also, KLA's
11 annual reports for fiscal years 2000 through 2004 stated that under the Company's stock option plans,
12 options were granted at prices not less than the fair market value of the Company's common stock on
13 the grant date, and in fiscal year 2005, were generally granted at prices not less than the fair market
14 value of the Company's common stock on the grant date. KLA also filed proxy statements that were
15 sent to shareholders and contained stock option disclosures for fiscal years 1998 through 2002. In
16 these proxy statements, the discussion on executive compensation stated that stock options were
17 granted at market price on the date of grant. In addition, KLA's proxy statement for fiscal year 2001
18 stated that one of the material terms of certain grants to certain executives was that the exercise price
19 of the options was the fair market value of the Company's Common Stock as of the date of grant.
20 Moreover, KLA's proxy statement for fiscal year 2002 stated that certain executives received a
21 number of options in the last fiscal year which "were granted at an exercise price equal to the fair
22 market value of the Company's Common Stock on October 2, 2001."

### The Scheme To Backdate Options Grants

24     14.    In 1997, KLA's Board of Directors delegated authority to grant stock options to non-
25 officers to a Stock Option Committee consisting of three directors, and required that at least two
26 members approve each grant.

27     15.    The Board contemplated that the Committee would meet regularly to price options.
28 Rather than the grants being priced at a meeting, however, the Stock Option Committee approved

retrospectively-chosen option grant dates and prices, and never met regularly during the time period of backdating.

16. Beginning in July 1997 and continuing until mid-2002, certain KLA executives used an options backdating practice where the signing of grant approval paperwork was deliberately delayed so that they could look back on KLA's historical closing stock prices and choose one of the historically lowest prices as the purported grant date. On at least one occasion in 2005, a senior KLA executive backdated an additional option grant.

17. KLA backdated grants to newly hired and to recently promoted employees ("new hire" grants), as well as to current employees eligible for options at the end of the Company's annual review process (known as "peak performance" or "focal" grants), among others. These backdated grants reflected historically low prices of KLA stock for the weeks prior to the date on which the price was selected.

18. In June 1999, a KLA executive instructed the Company's Human Resources ("HR") department about procedures on how to backdate new hire grants: (1) create a list of newly hired employees; (2) wait several weeks; (3) obtain a list of KLA's daily closing stock price for the past several weeks; (4) highlight the three or four lowest prices; and (5) forward the new hire list and the highlighted stock price list to KLA's Stock Option Committee.

19. From July 1999 until mid-2002, KLA's HR department followed the procedures outlined for them for the new hire grants. HR department employees prepared the grant approval paperwork and sent it to the Stock Option Committee with a historical chart of KLA's common stock closing prices. KLA's HR department followed these procedures for several months. Thereafter, the Stock Option Committee instructed the HR department to pick one of the lowest prices before forwarding the grant approval paperwork to the Committee.

20. Month after month, KLA's Stock Option Committee approved backdated new hire option grants, knowing such approvals did not communicate the actual correct grant date. Based upon these approvals, the Stock Option Committee knew KLA would not record expenses for these in-the-money grants.

21. The Stock Option Committee also approved several peak performance or focal grants using undisclosed backdated grant dates. Each year KLA began its annual employee review process at the beginning of the summer and completed it by the end of August or beginning of September. As with the new hire grants, the Stock Option Committee would delay approving the grants, using hindsight to select a purported grant date with a lower stock price. The Stock Option Committee signed the grant approvals knowing they did not communicate the actual correct grant date. Contrary to KLA's disclosures, the Stock Option Committee knew KLA would not record expenses for these in-the-money grants.

22. From mid-1997 to mid-2002, and once again in 2005, KLA approved on 35 occasions backdated grants, which included both new hire and peak performance grants, among others.

### KLA Falsely Reported Its Financial Results

23. As a public company, KLA filed with the Commission annual reports that included audited financial statements, certified by the Company's outside auditors. KLA's failure to record a compensation expense in connection with backdated, in-the-money option grants resulted in materially overstated net income on the financial statements in its Forms 10-K as follows: 4% in 1998, 46% in 1999, 9.8% in 2000, 156% in 2001, 30% in 2002, 46% in 2003, 15% in 2004 and 4.8% in 2005, for a total of over $200 million of reported net income cumulatively from 1998 to 2005. KLA also sold securities pursuant to offering documents, including registration statements on Forms S-8 filed throughout the period of fraud, which incorporated the false financial statements.

24. KLA's Forms 10-Q for each of its first three quarters in fiscal years 1998 through 2005 contained materially false and/or misleading financial statements because of KLA's failure to record compensation expenses associated with in-the-money options.

25. In addition, KLA's Forms 8-K filed on April 23, 2003, July 24, 2003, October 22, 2003, January 22, 2004, April 21, 2004, July 29, 2004, October 21, 2004, January 20, 2005, April 28, 2005, July 28, 2005 and October 27, 2005, each of which announced the Company's financial results for the prior quarter, contained materially false and/or misleading financial information because of KLA's failure to record compensation expenses associated with undisclosed grants of in-the-money stock options. Additionally, KLA's Form 8-K filed on March 21, 2001 announced projected third

1  quarter financial results which were materially false and/or misleading. KLA recorded false and
2  misleading information in its books and records, and the representations to KLA's shareholders in its
3  annual, quarterly and current reports about the Company's stock option program, and its financial
4  results, were untrue.

5      26.    KLA's proxy statements (which were sent to its shareholders) for fiscal years 1998
6  through 2002 also made materially false representations about executive compensation. Among other
7  things, in describing executive compensation, the proxy statements each falsely stated that stock
8  options were granted to certain executives at market price on the date of grant. In addition, KLA's
9  proxy statement for fiscal year 2001 stated that one of the material terms of certain grants to certain
10 executives was that the exercise price of the options was the fair market value of the Company's
11 Common Stock as of the date of grant. Moreover, KLA's proxy statement for fiscal year 2002 stated
12 that certain executives received a number of options in the last fiscal year which "were granted at an
13 exercise price equal to the fair market value of the Company's Common Stock on October 2, 2001."
14 Such disclosures were false because they failed to state that KLA granted in-the-money options that
15 were not accounted for appropriately in the Company's financial statements.

16     27.    KLA provided documentation, which failed to disclose the true grant dates for options
17 to employees and officers, to the Company's external auditor in connection with audits of KLA's
18 financial statements. Relying on the false documentation supplied to them, the auditors concurred
19 with KLA's assessment that no compensation expense should be recorded for the options granted to
20 employees.

21     28.    In May 2006, the Special Committee of KLA's Board of Directors began to investigate
22 the Company's historical options granting practices. As a result of the Special Committee
23 investigation, KLA announced in February 2007 restated financial results to record expenses for
24 options grants to employees. KLA announced the recording of additional pre-tax, non-cash, stock-
25 based compensation expenses of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under
26 APB Opinion No. 25, and (b) $28 million for the period from July 1, 2005 through December 31,
27 2006 under SFAS No. 123(R).
28

## FIRST CLAIM FOR RELIEF
*(False Periodic Reports—Violations*
*of Section 13(a) of the Exchange Act and Rules 12b-20,*
*13a-1, 13a-11 and 13a-13 Thereunder by KLA)*

29. The Commission realleges and incorporates by this reference Paragraphs 1 through 28, above.

30. Based on the conduct alleged above, KLA violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate annual, quarterly and current reports that, among other things, do not contain untrue statements of material fact or omit to state material information necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

## SECOND CLAIM FOR RELIEF
*(Inaccurate Books and Records—Violations of*
*Section 13(b)(2)(A) of the Exchange Act by KLA)*

31. The Commission realleges and incorporates by this reference Paragraphs 1 through 28, above.

32. Based on the conduct alleged above, KLA violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

## THIRD CLAIM FOR RELIEF
*(Inadequate Internal Accounting Controls—Violations of*
*Section 13(b)(2)(B) of the Exchange Act by KLA)*

33. The Commission realleges and incorporates by this reference Paragraphs 1 through 28, above.

34. Based on the conduct alleged above, KLA violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to

Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of internal accounting controls.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Issue an order permanently restraining and enjoining Defendant and its agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with them, from violating Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder;

II.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

III.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:   July 25, 2007                Respectfully Submitted,

_Elena Ro_
Elena Ro
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION