# EXHIBIT C

MARC J. FAGEL (Cal. Bar No. 154425)
ROBERT S. LEACH (Cal. Bar No. 196191)
  leachr@sec.gov
JEREMY E. PENDREY (Cal. Bar No. 187075)
  pendreyj@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. C 07 4430 JW RS |
| Plaintiff, | |
| v. | COMPLAINT |
| JUNIPER NETWORKS, INC., | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1. From mid-1999 through mid-2003, Juniper Networks, Inc. ("Juniper" or the "Company"), a Sunnyvale, California company that sells Internet Protocol networking solutions, concealed hundreds of millions of dollars in expenses from investors, and significantly overstated the Company's income, by backdating employee stock option grants and failing to properly disclose and account for its true compensation expenses.

2. Under well-settled accounting principles in effect throughout the relevant period, Juniper was not required to record an expense in its financial statements for options granted to employees at the market price ("at-the-money"), but *was* required to record expenses for any options granted below the current market price ("in-the-money"). To help Juniper attract and retain

COMPLAINT 1

1  executives and employees with potentially far more lucrative "in-the-money" options, without
2  disclosing to shareholders hundreds of millions of dollars in compensation expenses, Juniper
3  established a scheme to grant in-the-money options while falsifying records to make it appear that the
4  options had been granted at-the-money.

5    3.    By using option grant dates and exercise prices selected with hindsight, Juniper
6  materially understated its expenses, overstated its income (or understated its losses), and falsely
7  represented in certain Commission filings that Juniper had incurred no expense for option grants.
8  The Commission seeks an order enjoining Juniper from future violations of the securities laws, and
9  providing other appropriate relief.

## JURISDICTION AND VENUE

11    4.    The Commission brings this action pursuant to Section 20(b) and 20(d) of the
12  Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and 77t(d)] and Sections 21(d) and
13  21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

14    5.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the
15  Securities Act [15 U.S.C. § 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act
16  [15 U.S.C. § 78u(d), 78u(e), and 78aa].

17    6.    Juniper, directly or indirectly, made use of the means or instrumentalities of interstate
18  commerce, or of the mails, or of the facilities of a national securities exchange in connection with the
19  transactions, acts, practices, and courses of business alleged herein.

20    7.    This Court is a proper venue for this action pursuant to Section 22 of the Securities
21  Act [15 U.S.C. § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because acts,
22  transactions, practices, and courses of business constituting the violations alleged in this Complaint
23  occurred within this district.

## INTRADISTRICT ASSIGNMENT

25    8.    Intradistrict assignment to the San Jose Division is proper pursuant to Civil Local Rule
26  3-2(c) and (d) because acts or omissions giving rise to the Commission's claims occurred, among
27  other places, in Santa Clara County, California.

COMPLAINT    2

# DEFENDANT

9. Juniper is a Delaware corporation headquartered in Sunnyvale, California that makes and sells internet-related networking products. From June 1999 through the present, Juniper's common stock has been registered under Section 12 of the Exchange Act and traded on the NASDAQ National Market. At all times relevant to this action, Juniper used a fiscal year ending on December 31.

# FACTUAL ALLEGATIONS

## Juniper's Stock Option Disclosures

10. On June 24, 1999, Juniper became a public company through an initial public offering of its stock (an "IPO"). Juniper grew rapidly following its IPO, hiring hundreds of employees through early June 2003. To support this rapid growth and to achieve its recruiting and compensation objectives, Juniper relied heavily on stock options as a recruiting and retention incentive.

11. Each option gave the grantee the right to buy Juniper common stock from the Company at set price, called the "exercise" or "strike" price, on a future date after the option vested. The option was "in-the-money" when granted if the trading price of Juniper's common stock exceeded the option's exercise price. The option was "at-the-money" when granted if the trading price of Juniper's common stock and the exercise price were the same.

12. By compensating employees with stock options, Juniper avoided paying greater salaries or other forms of compensation that would have been necessary to attract and retain employees. Juniper granted stock options to nearly all new full-time employees. Juniper also granted options to existing Juniper employees (called "ongoing" options), based on performance or other factors.

13. As a public company, Juniper filed annual reports on Forms 10-K with the Commission that included audited financial statements, certified by the companies outside auditors.

14. Juniper publicly represented, in audited financial statements and other filings with the Commission made for or during its fiscal years 1999 through 2005, that its stock option grants were made at fair market value. In particular, Juniper stated in its annual reports to shareholders filed with the Commission on Forms 10-K for its fiscal years 1999 through 2005: "Incentive stock options are

COMPLAINT 3

granted at an exercise price of not less than the fair value per share of the common stock on the date of grant." Juniper further stated in each of those reports on Forms 10-K that, although the Company's plans allowed for the granting of so-called "nonstatutory" stock options at an exercise price of not less than 85 percent of the then-market value, "no nonstatutory stock options have been granted for less than fair market value on the date of the grant."

15. Juniper's public filings also affirmatively stated that the Company accounted for its employee stock option plans in accordance with GAAP, and particularly, that the Company followed Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25"). Under APB 25 and the accounting rules in effect during the relevant period, the Company was required to record an expense on its financial statements for the in-the-money portion of any options grant. According to APB 25, that difference between the exercise price (if lower) and the quoted market price on the date of the actual grant must be recorded as compensation expense to be recognized over the vesting period of the option. Consequently, granting in-the-money options to employees could have a significant impact on the expenses and income (or loss) reported to the shareholders of a public company.

16. APB 25 allowed a public company, where the key terms of an option grant were known, to grant employee stock options without recording any compensation expense so long as the option exercise price was not below the market price of the company's stock on the date of the grant. In each of its Forms 10-K filed with the Commission for fiscal years 1999 through 2005, Juniper represented that it had "elected to follow APB 25," and that "[b]ecause the exercise price of the Company's stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."

17. Juniper also sent to shareholders proxy statements announcing its annual meetings of shareholders for 2000 through 2003, filed with the Commission on April 13, 2000, March 28, 2001, April 11, 2002, and March 28, 2003. The proxy statements for 2000, 2001, and 2003, in describing executive compensation and particularly options granted to officers, represented that "options are granted at fair market value on the date of grant." Similarly, the 2002 proxy statement, in responding to a shareholder proposal regarding the Company's repricing (or regranting) of stock options,

COMPLAINT 4

represented that employees at Juniper who have been awarded stock options "have a right to purchase stock in the future at a price which is the fair market value on the date of the stock option grant."

### The Scheme to Backdate Option Grants

18. On July 21, 1999, Juniper's Board of Directors created a three-member Stock Option Committee ("Stock Option Committee") consisting of Juniper executives, to which it delegated authority to grant stock options to Juniper's non-executive employees. One purpose in creating the Stock Option Committee was to enable Juniper to have more flexibility in granting options. The Stock Option Committee held few, if any, actual meetings.

19. From mid-1999 to mid-2003, a Juniper executive, who has since left the Company, unilaterally determined with hindsight the date for most Juniper stock option grants. In addition, the executive routinely created backdated "minutes" for Stock Option Committee meetings that never occurred.

### Juniper Backdated New Hire Stock Option Grants

20. Beginning in the second half of 1999, the Juniper executive routinely prepared backdated stock option grants to issue options to groups of recently hired employees of Juniper. For these new hire grants, the executive collected the names of recently hired employees and had lists prepared. The executive then selected as the exercise price of the new hire grants the closing price of Juniper's stock on a date in the past, reflecting the low closing price during a particular period around the time the employees were hired. For each backdated grant from 1999 through 2003, the executive then created Stock Option Committee meeting "minutes" that falsely stated that the Stock Option Committee had met on the date of the low closing price and granted options on that date.

21. The executive signed the backdated committee "minutes" as a Stock Option Committee member. In addition, for each backdated grant the executive either presented the minutes to the other Stock Option Committee members for signature or stamped the minutes with a signature stamp the executive maintained bearing the other Stock Option Committee members' signatures.

22. Once the executive selected a backdated grant date and a corresponding exercise price, the executive informed Juniper's stock administrator, who then entered the grants into Juniper's stock

COMPLAINT 5

option tracking software using the backdated date as the grant date. Juniper did not reflect in its books an expense related to the in-the-money portion of the options.

23. For example, Juniper granted options to six new Juniper employees on the purported, but false, grant date of October 27, 1999. The six employees were hired on Monday, October 25, 1999, at which time Juniper's stock traded at $257.75. Juniper's stock price dipped to a low of $249.94 on Wednesday, October 27, then rose to $275.63 by the end of the week. The Juniper executive actually selected the grant date in mid-November 1999, when Juniper's stock was trading around $283.50, using information about Juniper's historical closing prices for its stock during the week the employees were hired.

24. Similarly, Juniper granted stock options to employees hired between October 8, 2002 through January 2, 2003, using the backdated January 2, 2003 closing price of $7.36 as the purported "fair market value" of the stock on the grant date. The Stock Option Committee never met on January 2, 2003. Instead, during mid-February, when Juniper's stock was trading around $9 per share, the executive selected that earlier January 2 date. The January 2, 2003 closing price for Juniper's stock, $7.36, used as the exercise price, was Juniper's lowest closing price of the year up to the time the executive selected the grant date.

25. Using dates selected with hindsight between mid-June 1999 through the end of May 2003, the Juniper executive backdated more than 50 grants to groups of new employees. More than $300 million in expenses associated with the in-the-money portion of those grants were not disclosed by Juniper as a consequence of the scheme.

**Juniper Backdated "Ongoing" Stock Option Grants**

26. From mid-1999 through mid-2003, Juniper also backdated performance-related grants to existing employees and officers, which Juniper called "ongoing" grants. Juniper thus backdated large grants to officers and employees that were made to create retention and performance incentives (and which at times included new hires), on approximately nine occasions.

27. For instance, Juniper granted options to a large group of existing employees and officers (and to certain new hires), which it called an "evergreen" grant, using the backdated grant date of October 4, 1999. The Stock Option Committee did not meet on October 4, 1999, and no one

COMPLAINT                                          6

determined to grant the employees and officers options that day. Instead, on November 5, 1999, when Juniper's stock price traded at $273.13, the Juniper executive created Stock Option Committee meeting minutes dated October 4, 1999, when Juniper's stock priced closed at $182.13 – the lowest price of that quarter to date. The executive subsequently caused Juniper's Board of Directors to be falsely informed that the grant had been made on October 4, 1999. More than $100 million in expenses associated with the in-the-money portion of this "evergreen" grant were not disclosed by Juniper.

28. On occasion, Juniper granted "pools" of stock options to certain business units to be awarded to employees based on the discretion of the business unit manager. On seven different occasions between 2000 and 2003, Juniper backdated "pool" grants (which also included certain grants to new hires). More than $200 million in expenses associated with the in-the-money portion of these "pool" grants were not disclosed by Juniper.

29. For example, Juniper granted options to existing employees and senior executives (as well as some new hires) in one such "pool" grant, using the backdated grant date of December 21, 2000. Juniper's stock price closed at $93.94 on December 21, 2000, which was the lowest stock price of the six months up to that date. No Stock Option Committee meeting occurred on that date. The grant was actually made in or around early January 2001, when Juniper's stock price was trading over $100 per share.

30. In the spring of 2001, Juniper's stock price had declined substantially from the levels experienced during 1999 and 2000. Consequently, many options awarded during those earlier years had strike prices well above the then-current stock price (known as "underwater" options).

31. In approximately April 2001, Juniper instituted a program to award additional options to existing employees using a formula based on the number of underwater options each employee then had, and the length of time each had been employed by Juniper. As part of the program, Juniper granted one block of this "formula" grant using as the grant date April 4, 2001, when Juniper's stock price closed at $29.19. The Juniper executive caused the grant to be backdated to April 4, selecting that date with hindsight on or about April 19, 2001, when Juniper's stock price had more than doubled to $65.58.

COMPLAINT 7

**Juniper Falsely Reported Its Financial Results**

32. As a public company, Juniper filed with the Commission annual reports on Form 10-K that included the audited financial statements, certified by the companies' outside auditors, which falsely represented Juniper's financial results. Due to Juniper's failure to record an expense for in-the-money options, Juniper's financial statements were materially misstated in each fiscal year from 1999 through 2005.

33. For example, for its fiscal year 2001, Juniper originally reported a loss of $13.4 million. However, after the company ultimately recorded a compensation expense for previously undisclosed in-the-money option grants in restated financials for this period, the Company reported an additional expense of $513.1 million, which (after adjusting for taxes) brought Juniper's loss for the year to $501.5 million.

34. Similarly, for its fiscal year 2003, Juniper originally reported net income of $39.2 million, representing the Company's first profitable year ever. As a result of Juniper's failure to record a compensation expense for backdated, in-the-money option grants, Juniper's pre-tax income was reduced by $19.3 million, which, after adjusting for taxes, reduced its net income to $30.7 million for the year, a profit reduction of 21.68%.

35. Juniper also publicly announced quarterly financial results, which were described in financial statements included in quarterly reports filed with the Commission on Forms 10-Q, that were materially false and misleading due to Juniper's failure to record compensation expenses associated with in-the-money options. Thus, Juniper's quarterly reports filed on Forms 10-Q beginning with the quarter ended September 30, 1999, and for each of the Company's first three quarters in fiscal years 2000 through 2002, and the first two quarters of fiscal year 2003, contained materially false and misleading financial statements.

36. Juniper filed with the Commission current reports on Forms 8-K on April 10, 2003, July 10, 2003 and October 9, 2003, each of which included announcements about the Company's financial results for prior quarters that were materially false and misleading due to Juniper's failure to record compensation expenses associated with undisclosed grants of in-the-money stock options.

COMPLAINT					8

37. Juniper filed with the Commission registration statements on Form S-8 on March 14, 2000, August 18, 2000, December 12, 2000, March 29, 2001, December 21, 2001, July 9, 2002, April 21, 2004, August 18, 2004, May 3, 2005, May 4, 2005, July 6, 2005 and March 7, 2006, each of which incorporated by reference false and misleading periodic reports.

38. In May 2006, the audit committee of Juniper's board of director's began to investigate the Company's historical options granting practices. As a result of the audit committee investigation, Juniper announced in March 2007 restated financial results to record expenses for options granted to employees. Juniper announced the recording of additional pre-tax, non-cash, stock-based compensation expense of $894.7 million for fiscal years 1999 through 2005 under APB 25.

## FIRST CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

39. The Commission realleges and incorporates by reference paragraphs 1 through 38 above.

40. By engaging in the conduct described above, Juniper, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

   a. Employed devices, schemes, or artifices to defraud;

   b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

41. By reason of the foregoing, Juniper has violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

COMPLAINT 9

## SECOND CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)(1)

42. The Commission realleges and incorporates by reference Paragraphs 1 through 38 above.

43. By engaging in the conduct described above, Juniper, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

44. By reason of the foregoing, Juniper violated and, unless restrained and enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

### Violations of Securities Act Sections 17(a)(2) and (3)

45. The Commission realleges and incorporates by reference Paragraphs 1 through 38 above.

46. By engaging in the conduct described above, Juniper, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a. Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b. Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

47. By reason of the foregoing, Juniper has violated and, unless restrained and enjoined, will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

## FOURTH CLAIM FOR RELIEF

**Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder**

48. The Commission realleges and incorporates by reference Paragraphs 1 through 38 above.

49. Based on the conduct alleged above, Juniper violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate periodic reports, including annual, current, and quarterly reports. Unless restrained and enjoined, Juniper will continue to violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## FIFTH CLAIM FOR RELIEF

**Violations of Exchange Act Section 13(b)(2)(A)**

50. The Commission realleges and incorporates by reference Paragraphs 1 through 38 above.

51. Based on the conduct alleged above, Juniper violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. Unless restrained and enjoined, Juniper will continue to violate Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## SIXTH CLAIM FOR RELIEF

**Violations of Exchange Act Section 13(b)(2)(B)**

52. The Commission realleges and incorporates by reference Paragraphs 1 through 38 above.

53. Based on the conduct alleged above, Juniper violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of internal accounting controls. Unless restrained and enjoined, Juniper will continue to violate 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

### SEVENTH CLAIM FOR RELIEF

**Violations of Exchange Act Section 14(a) and Rule 14a-9 thereunder**

54. The Commission realleges and incorporates by reference Paragraphs 1 through 38 above.

55. Based on the conduct alleged above, Juniper violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, that contains a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading. Unless restrained and enjoined, Juniper will continue to violate Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

**I.**

Permanently enjoin Juniper from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)], and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-9] thereunder;

COMPLAINT 12

**II.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**III.**

Grant such other relief as this Court may deem just and appropriate.

Respectfully submitted,

Dated: August 28, 2007

_____
Jeremy E. Pendrey
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

COMPLAINT                                       13