1  MARC J. FAGEL (Cal. Bar No. 154425)
     fagelm@sec.gov
2  SUSAN F. LaMARCA (Cal. Bar No. 213251)
     lamarcas@sec.gov
3  MARK P. FICKES (Cal. Bar No. 178570)
     fickesm@sec.gov
4  JEREMY E. PENDREY (Cal. Bar No. 187075)
     pendreyj@sec.gov
5  ELENA RO (Cal. Bar No. 197308)
     roe@sec.gov
6
   Attorneys for Plaintiff
7  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2600
8  San Francisco, California  94104
   Telephone:  (415) 705-2500
9  Facsimile:  (415) 705-2501

10                    **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12                         **SAN JOSE DIVISION**

13

14  SECURITIES AND EXCHANGE COMMISSION,        Case No. C-07-4431-RMW (HRL)

15          Plaintiff,

16     vs.                                     **SECURITIES AND EXCHANGE
                                               COMMISSION'S OPPOSITION TO
17  LISA C. BERRY,                             MOTION TO DISMISS**

18          Defendant.                         Date:  February 15, 2008
                                               Time:  9:00 a.m.
19                                             Location:   Courtroom 6, 4th Floor
                                                           Hon. Ronald M. Whyte
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     ISSUES TO BE DECIDED .............................................................................. 2

III.    THE FACTS UNDERLYING THE COMMISSION'S
        ENFORCEMENT ACTION .............................................................................. 2

        A.      Berry Instigated And Directed The Backdating Scheme At
                KLA ...................................................................................................... 4

        B.      Berry Instituted And Carried Out The Backdating Scheme At
                Juniper .................................................................................................. 6

        C.      Berry Carried Out The Backdating Scheme Knowingly And
                Recklessly ............................................................................................ 7

IV.     ARGUMENT ..................................................................................................... 8

        A.      The Appropriate Legal Standards For Dismissal Of A
                Complaint ............................................................................................. 8

                1.      Federal Rule of Civil Procedure 12(b)(6) ................................. 8

                2.      Federal Rule of Civil Procedure 9(b) ........................................ 9

        B.      The Complaint Spells Out The Circumstances Of Berry's
                Fraud With Particularity ..................................................................... 10

        C.      Berry's Knowledge That Her Scheme Was Fraudulent Is Clear
                From The Complaint ........................................................................... 14

        D.      The Complaint's Allegations Fully Support Each Claimed
                Violation Of The Securities Laws ...................................................... 18

                1.      Defendant Aided And Abetted Fraud And Related
                        Violations ................................................................................. 18

                2.      Defendant Knowingly Falsified Books and Records of
                        Two Public Companies ............................................................. 19

                3.      Defendant Violated the Securities Act Antifraud
                        Provisions ................................................................................ 20

        D.      None Of The Commission's Claims For Relief Is Time-Barred ........ 21

V.      CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aaron v. SEC*,
  463 U.S. 646 (1983) .................................................................................................. 21

*Balistreri v. Pacifica Police Dept.*,
  901 F.2d 696 (9th Cir. 1988) ...................................................................................... 8

*Bell Atlantic Corp. v. Twombly*,
  127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ................................................................... 8

*Brady v. Games*,
  128 F.2d 754 (D.C. Cir. 1942) .................................................................................. 16

*Branch v. Tunnell*,
  14 F.3d 449 (9th Cir. 1994) ........................................................................................ 9

*Cahill v. Liberty Mut. Ins. Co.*,
  80 F.3d 336 (9th Cir. 1996) .............................................................................. 1, 9, 15

*Campbell v. PricewaterhouseCoopers, LLP*,
  2007 WL 841694 (E.D. Cal. Mar. 20, 2007) ........................................................... 22

*Cash v. Frederick & Co., Inc.*,
  57 F.R.D. 71 (E.D. Wisc. 1972) ............................................................................... 24

*Church of Scientology v. Flynn*,
  744 F.2d 694 (9th Cir. 1984) ...................................................................................... 8

*Conley v. Gibson*,
  355 U.S. 41 (1957) ...................................................................................................... 8

*Dayco Corp. v. Goodyear Tire & Rubber Co.*,
  523 F.2d 389 (6th Cir. 1975) .................................................................................... 25

*FEC v. Williams*,
  104 F.3d 237 (9th Cir. 1996) .............................................................................. 24, 25

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ...................................................................................... 9

*Galbraith v. County of Santa Clara*,
  307 F.3d 1119 (9th Cir. 2002) .................................................................................... 9

*Gilligan v. Jamco Dev. Corp.*,
  108 F.3d 246 (9th Cir. 1997) ...................................................................................... 9

*Hishon v. King & Spalding,*
    467 U.S. 69 (1984) ........................................................................................... 9

*Hobson v. Wilson,*
    737 F.2d 1 (D.C. Cir. 1984) ........................................................................... 25

*Holmberg v. Armbrecht,*
    327 U.S. 392 (1946) ....................................................................................... 24

*Howard v. Everex Sys., Inc.,*
    228 F.3d 1057 (9th Cir. 2000) ....................................................................... 12

*In re CNET Networks, Inc. Deriv. Litig.,* No. C-06-03817
    WHA (N.D. Cal. Apr. 11, 2007) (Alsup, J.), Slip op.,
    2007 WL 1089690 ......................................................................................... 11

*In re GlenFed, Inc. Sec. Litig.,*
    42 F.3d 1541 (9th Cir. 1994) .............................................................. 9, 14, 15

*In re UnitedHealth Group PSLRA Litig.,*
    (D. Minn. June 4, 2007), Slip op., 2007 WL 1621456 .......................... 11, 17

*In re Zoran Corp. Deriv. Litig.,*
    511 F. Supp.2d 986 (N.D. Cal. 2007) ...................................................... 12, 17

*Iolab Corp. v. Seaboard Sur. Co.,*
    15 F.3d 1500 (9th Cir. 1994) ........................................................................... 9

*Klein v. Computer Devices, Inc.,*
    591 F. Supp. 270 (S.D.N.Y. 1984) ............................................................... 16

*Moore v. Kayport,*
    885 F.2d 531 (9th Cir. 1989) ......................................................................... 13

*Neubronner v. Milken,*
    6 F.3d 666 (9th Cir. 1993) ............................................................................. 10

*Newman v. Universal Pictures,*
    813 F.2d 1519 (9th Cir. 1987) ......................................................................... 8

*Occidental Life Ins. Co. v. EEOC,*
    432 U.S. 355 (1977) ....................................................................................... 22

*Ponce v. SEC,*
    345 F.3d 722 (9th Cir. 2003) ......................................................................... 20

*Ross v. A.H. Robins Co.,*
    607 F.2d 545 (2nd Cir. 1979) ....................................................................... 16

*Seattle-First Nat'l Bank v. Carlstedt,*
  800 F.2d 1008 (10th Cir. 1986)........................................................................ 16

*SEC v. Alexander,*
  2007 WL 2816195 (Sept. 26, 2007) ............................................................... 25

*SEC v. Baxter,* No. C-05-03843 RMW (N.D. Cal. Jul. 11,
  2007) (Whyte, J.) Slip op.,
  2007 WL 2013958 at *6................................................................................ 12, 14

*SEC v. Caserta,*
  75 F. Supp.2d 79 (E.D.N.Y. 1999) ................................................................ 22

*SEC v. Dain Rauscher, Inc.,*
  254 F.3d 852 (9th Cir. 2001)......................................................................... 21

*SEC v. Fehn,*
  97 F.3d 1276 (9th Cir. 1996)............................................................. 13, 18, 19, 23

*SEC v. First California Capital Markets Group, Inc.,*
  No. C-97-02761-CRB, Slip op. at 4-5 (N.D. Cal. July 30,
  1998) ............................................................................................................ 23

*SEC v. ICN Pharmaceuticals, Inc.,*
  84 F. Supp.2d 1097 (C.D. Cal. 2000) ........................................................... 14

*SEC v. Johnson,*
  67 F.3d 484 (D.C. Cir. 1996) ........................................................................ 23

*SEC v. Jones,*
  476 F. Supp.2d 374 (S.D.N.Y. 2007).......................................................... 24

*SEC v. Koracorp Industries Inc.,*
  575 F.2d 692 (9th Cir. 1978)......................................................................... 23

*SEC v. Levin,*
  232 F.R.D. 619 (C.D. Cal. 2005) .................................................................... 8

*SEC v. Maio,*
  51 F.3d 623 (7th Cir. 1995)........................................................................... 21

*SEC v. Murphy,*
  626 F.2d 623 (9th Cir. 1980)......................................................................... 23

*SEC v. Rind,*
  991 F.2d 1486 (9th Cir. 1993)................................................................... 22, 23

*SEC v. Schiffer,*
  1998 WL 307375 (SDNY June 11, 1998).................................................... 21

*SEC v. Softpoint, Inc.*,
   958 F. Supp. 846 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348
   (2d Cir. 1998) ............................................................................................ 20

*SEC v. Svoboda*,
   409 F. Supp.2d 331 (S.D.N.Y. 2006) ..................................................... 21

*SEC v. Trabulse*,
   --- F. Supp.2d ----, 2007 WL 4293476 (N.D. Cal. 2007) ..................... 10

*In re McKesson HBOC, Inc., Securities Litig.*,
   126 F. Supp.2d 1248 (N.D. Cal. 2000) (Whyte, J) .............................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ....................................... 14, 15

*United States v. Core Laboratories, Inc.*,
   759 F.2d 480 (5th Cir. 1985) ................................................................ 24

*United States v. Jensen*,
   93 F.3d 667 (9th Cir. 1996) .................................................................. 17

*United States v. Reyes*, No. CR-06-0556 CRB (N.D. Cal.
May 30, 2007), Slip op.,
2007 WL 1574540 ............................................................................. 17, 18

*Walling v. Beverly Enters.*,
   476 F.2d 393 (9th Cir. 1973) ............................................................. 9, 16

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ............................................................... 9, 12

*Wool v. Tandem Computers, Inc.*,
   818 F.2d 1433 (9th Cir. 1987) .............................................................. 13

**STATUTES**

15 U.S.C. § 77q(a) ........................................................................................ 20

15 U.S.C. § 78m(b)(5) ............................................................................ 19, 20

15 U.S.C. § 78u(d) .......................................................................................... 2

15 U.S.C. § 77t ................................................................................................ 2

15 U.S.C. § 78t(e) ......................................................................................... 18

28 U.S.C. § 2462 .................................................................... 1, 2, 21, 22, 24

Private Securities Litigation Reform Act of 1995,
     109 Stat. 737 ............................................................................................................. 14

**RULES**

Federal Rule of Civil Procedure Rule 9(b) .............................................. 1, 9, 14, 15, 16

Federal Rule of Civil Procedure 12(b)(6) ............................................... 8, 9, 17, 21, 24

**REGULATIONS**

17 C.F.R. § 240.13b2-1 .............................................................................................. 19, 20

**TREATISES**

2 A James Wm. Moore et al.,
     *Moore Federal Practice* (2d ed. 1972) ................................................................... 16

5 Charles A. Wright & Arthur R. Miller,
     *Federal Practice and Procedure* (1990) ................................................................. 16

**OTHER AUTHORITIES**

Exchange Act Release No. 34-15570,
     1979 WL 173674 (Feb. 15, 1979)........................................................................... 20

Senate Rep. No. 101-337,
     101st Congress 2d Session (1990) ............................................................................ 3

1    **I.    INTRODUCTION**

2         In this securities law enforcement action, the Securities and Exchange Commission alleges

3    that, from 1997 through 2003, defendant Lisa C. Berry engaged in securities fraud while she served

4    as the General Counsel at two successive public companies.  Berry instituted a scheme to backdate

5    options issued to employees at both companies, including herself, so that they would receive more

6    valuable options while concealing the costs of the options from the companies' shareholders.

7         Defendant now moves to dismiss the Commission's complaint, first contending that the very

8    detailed complaint does not sufficiently plead fraud with sufficient particularity, and then arguing that

9    the "majority of conduct" is time-barred by 28 U.S.C. § 2462, the statute of limitations that applies to

10   the government's collections of fines and forfeitures.  Defendant's motion borders on frivolity and

11   invites the erroneous application of long-settled law governing motions to dismiss.

12        On a motion to dismiss, the law presumes that the facts alleged in the complaint are true, and

13   that all reasonable inferences be drawn in favor of the nonmoving party.  *Cahill v. Liberty Mut. Ins.*

14   *Co.,* 80 F.3d 336, 340 (9th Cir. 1996).  While the complaint details how Berry violated the antifraud

15   and related securities provisions by selecting, after the fact, historical dates to use as the grant dates

16   for stock options, and falsely representing that stock options committees met on those dates, in order

17   to avoid recording hundreds of millions of dollars in expenses over several years, defendant asks the

18   Court not to pay attention to those specific allegations.  Instead, defendant asks the Court to engage in

19   a review of the underlying evidence, and to credit her spin on various documents over the reasonable

20   inferences drawn in the complaint.  Defendant advocates the meticulous weighing of "inferences" to

21   be drawn from documents only by misapplying the pleading standard applicable to private securities

22   class actions; that pleading standard does not apply to Commission enforcement actions but would be

23   more than satisfied even if it did.  Because the circumstances of defendant's fraudulent scheme –

24   including the "time, place and nature" of the fraud – are abundantly clear in the complaint, Rule

25   9(b)'s particularity requirement is fully satisfied and neither further amendment of the complaint nor

26   dismissal are warranted.

27        Berry similarly errs in suggesting that the "*majority* of acts alleged in the SEC's Complaint

28   must be dismissed," purportedly because the "*majority* of the conduct underlying the allegations in

1  the complaint are [sic] precluded" by 28 U.S.C. § 2462.  Motion at 22 (emphasis added).  Indeed,

2  Berry's concession that the complaint does allege conduct that occurred less than five years prior to

3  the filing of the complaint – even if it is not, as she describes, the "majority" of conduct – utterly

4  dispenses with the issue.  Yet, even were that not the case, the statute of limitations would apply only

5  to the Commission's request for a penalty, not to the Commission's requests for: an injunction

6  against further violations of the antifraud and reporting provisions and the related provisions against

7  falsifying or failing to keep accurate books and records; disgorgement of ill-gotten gains with

8  prejudgment interest; and a prophylactic bar against defendant serving as an officer or director of a

9  public company.  These remedial measures are not subject to any statute of limitations, revealing the

10 speciousness of Berry's request to "dismiss" the complaint or its factual allegations on such grounds.

11        Berry's effort to have the Court reach well outside the complaint, to arrive at factually

12 strained and legally unjustified conclusions, is simply inappropriate on a motion to dismiss.

13 Accordingly, her motion should be rejected in its entirety.

14 **II.    ISSUES TO BE DECIDED**

15        1.   Whether the Commission's complaint, detailing the circumstances of a multi-year scheme

16 by defendant to falsify corporate records by "backdating" options grants to make them more valuable

17 to employees while hiding material expenses from shareholders, sufficiently alleges fraud and related

18 securities law violations.

19        2.   Whether, taking as true the Commission's allegations of defendant's fraudulent scheme

20 spanning from 1997 through 2003, any of the Commission's claims for remedial injunctive relief,

21 disgorgement, or the further request for a civil penalty, are time barred under 28 U.S.C. § 2462.

22 **III.   THE FACTS UNDERLYING THE COMMISSION'S ENFORCEMENT ACTION**

23        On August 28, 2007, the Commission brought this action under the federal securities laws to

24 enforce defendant's compliance with the antifraud and related provisions of the securities laws, and

25 to obtain certain remedial relief, pursuant to the Commission's statutory authority.  15 U.S.C. §§ 77t

26 & 78u(d).  As the primary agency charged with enforcement of the federal securities laws, one of the

27 Commission's basic purposes is to promote confidence in the integrity of the securities markets by

28 promptly bringing enforcement actions against securities law violators.  *See* Senate Rep. No. 101-

337, 101st Congress 2d Session (1990) (proposing Remedies Act of 1990 to provide increased deterrence to financial fraud and other illegal activity). The Commission seeks to enjoin Berry from future violations of the antifraud provisions, and provisions prohibiting falsifying corporate records, as well as from aiding and abetting public companies' filing of false periodic reports or failing to maintain accurate books and records. In addition, the Commission seeks further protection for investors through a bar against defendant's service as an officer or director of a public company, and to return defendant to the status quo ante through an order requiring her to disgorge ill-gotten gains from the unlawful conduct. Finally, the Commission also asks that Berry be ordered to pay a civil penalty. Comp. at 21-22.

The Commission's complaint alleges that beginning in approximately 1997 and continuing through 2003, while serving as the top legal officer of two successive public companies, Berry caused those companies to report materially false information about compensation and expenses to their respective shareholders, and to the Commission. First as the General Counsel of KLA-Tencor Corporation ("KLA") from mid-1997 until June 1999, and from then through January 2004, as the General Counsel of Juniper Networks, Inc. ("Juniper"), Berry was personally involved in helping to prepare the companies' publicly-announced reports (filed with the Commission) that contained the false information, and she also personally directed or executed much of the creation of false documents that made those reports so misleading. Comp., ¶¶ 1-3.

Berry devised the improper backdating scheme while serving as an officer of KLA, and then implemented similar practices at Juniper. Comp., ¶ 1. During Berry's tenure at each successive company, both KLA and Juniper used employee stock options as a form of compensation to recruit, retain, and incentivize employees, including officers such as Berry. *Id*., ¶¶ 14, 42. Each option gave the grantee the right to buy the company's common stock from the company at a set price, called the "exercise" or "strike" price, on and after a future date. *Id*., ¶ 14. An option was "in-the-money" when granted if the market price of the company's common stock exceeded the option's exercise price, and "at-the-money" when granted if the market price of the stock and the exercise price were the same. *Id.* Under accounting principles that both KLA and Juniper informed shareholders they followed at the time, each company was required to record an expense to the extent an option it

1  granted to an employee was "in-the-money," which could significantly impact the company's

2  reported income and expenses. *Id.*, ¶¶ 18, 44.

3  **A.  Berry Instigated And Directed The Backdating Scheme At KLA**

4  From mid-1997 through mid-1999 when she left KLA, Berry put in place procedures, and

5  directed the creation of false paperwork, for the repeated issuance of backdated stock option grants.

6  Using historical stock price information, the options were "backdated" to more favorable dates in the

7  past when KLA's stock price closed much lower in order to make it appear that the options had been

8  issued on those earlier dates.  The backdated options were thus more valuable, "in-the-money"

9  options when granted to employees, but appeared to have been issued "at-the-money" without the

10  necessity for the company to recognize an expense.  Comp., ¶¶ 4, 25-27, 34.

11  Berry worked with KLA's Stock Option Committee, to grant stock options to employees, and

12  she specifically oversaw the administration of the stock option grant process.  Comp., ¶¶ 22-23.

13  Using procedures Berry and the Stock Option Committee put in place, grants to employees by the

14  Stock Option Committee were deliberately delayed to allow the selection of historically low stock

15  prices with the benefit of hindsight.  *Id.*, ¶ 24.  The option grant approvals thus did not reflect the date

16  the Stock Option Committee met to approve them.  *Id.*  To achieve this end, Berry directed human

17  resources and stock administration employees at KLA to prepare the grant approval paperwork, and

18  then she directed the process for selecting the exercise price by using historical information about

19  KLA stock prices of the preceding weeks.  *Id.*, ¶ 25.  Once the grant date and price were selected, one

20  or more members of the Stock Option Committee executed the grant paperwork prepared at Berry's

21  direction, which reflected the false grant dates that had been selected using hindsight.  *Id.*  The

22  approvals were then provided to human resources and stock administration personnel who entered the

23  grant information, including the backdated exercise prices, into KLA's options tracking database

24  system.  *Id.*, ¶ 26.

25  Among the examples of such falsified grants at KLA described in the complaint are grants

26  that bear the false date of August 31, 1998.  Comp., ¶ 28.  The grants also reflect, as the options'

27  strike price, that day's closing stock price for KLA's common stock: $10.63.  Those grants include

28  grants to officers and non-officers who had been employed at KLA, as well as a new hire grant to

1    several newly hired persons.  All of these grants were actually made over a span of a couple weeks

2    during October 1998, when KLA's stock was trading between $10.75 and $13.81, and then backdated

3    to August 31, 1998.  *Id.*  The August 31 stock price of $10.63 was the lowest closing price for KLA's

4    common stock for at least three months prior to October 1998.  *Id.*  Berry herself obtained the

5    personal benefits of this backdating episode,  receiving options to purchase 22,000 shares at the lower

6    $10.63 exercise price.  *Id.*, ¶ 29.

7         As the complaint specifies, on approximately ten occasions, Berry used hindsight to choose

8    option exercise prices for new hire, peak performance/focal and other grants made to KLA employees

9    and executives, including at least one time, herself.  Comp., ¶ 32.  Each of these grants was backdated

10   to a date beginning with July 31, 1997 through June 15, 1999.  *Id.*  Moreover, these concealed,

11   backdated grants caused KLA to fraudulently report its year-end financial results in annual reports to

12   shareholders filed with the Commission on Form 10-K for fiscal years 1998 and 1999, which Berry

13   herself reviewed and discussed.  *Id.*, ¶ 37.  Her fraud further permeated KLA's public disclosures and

14   filings, causing the company to file misleading quarterly reports on Forms 10-Q for the first three

15   fiscal quarterly periods of 1997 and 1998, as well as the quarter ended March 31, 1999, each of which

16   Berry also reviewed and discussed, and helped finalize for filing with the Commission.  *Id.*, ¶ 38.

17   Berry also prepared and reviewed registration statements dated January 30, 1998, August 7, 1998 and

18   December 4, 1998, which incorporated the false financial statements, two of which she signed as the

19   chief legal officer of KLA.  *Id.*, ¶ 39.  As the chief legal officer of KLA, Berry also reviewed,

20   discussed and finalized proxy statements, filed on September 28, 1998 and October 15, 1999, each of

21   which falsely stated that one of the material terms of certain grants to certain executives was that the

22   exercise price of the option was the fair market value of the company's common stock as of the date

23   of grant.  *Id.*, ¶¶ 20-21.  Each of these false filings was made with Berry's knowledge, as alleged in

24   the complaint, and each filing was rendered materially false and misleading by Berry's own direct,

25   personal participation in falsifying (and directing others to falsify) KLA's documentation of options

26   grants through the backdating scheme.  In apparent preparation for her departure from KLA in mid-

27   1999, Berry provided "how to" instructions to other employees to carry on with the improper

28   backdating procedures, using the process she had employed during her tenure.  *Id.*, ¶¶ 3, 34.

**B.  Berry Instituted And Carried Out The Backdating Scheme At Juniper**

From mid-1999 through mid-2003, as she had done at KLA, Berry used procedures she put in place to backdate Juniper stock option grants to a date in the past when Juniper's closing stock price was lower.  Comp., ¶ 48.  Shortly after her arrival at Juniper, and based on her recommendation, Juniper created a three-member Stock Option Committee, to which it delegated authority to grant stock options to Juniper's non-executive employees.  Throughout her tenure with Juniper, Berry served as a member of the Stock Option Committee.  *Id*., ¶ 47.  Berry was responsible for overseeing Juniper's stock option granting process, including supervising Juniper's stock administrator.  *Id*., ¶ 48.  Berry routinely created backdated "minutes" for purported Stock Option Committee meetings that never occurred.  *Id*.

The complaint details several examples of such backdating by Berry while at Juniper, including the backdated grant that bore the false date of January 3, 2003.  Juniper granted stock options to employees hired between October 8, 2002 through January 2, 2003, using the backdated January 2, 2003 closing price of $7.36 as the purported "fair market value" of the stock on the supposed grant date.  Comp., ¶ 53.  Contrary to the grant documentation, the Stock Option Committee never met on January 2, 2003.  *Id*.  Instead, Berry selected that date during mid-February, when Juniper's stock was trading around $9 per share.  *Id*.  The January 2, 2003 closing price for Juniper's stock, $7.36, used as the exercise price, was the lowest closing price Juniper had experienced from the beginning of 2003 until the time Berry selected the grant date.  *Id*.

Using dates selected with hindsight between mid-June 1999 through the end of May 2003, Berry backdated more than 50 grants to groups of new employees, evading the reporting of more than $300 million in expenses associated with the in-the-money portion of those grants.  Comp., ¶ 54.  In addition, on at least nine occasions from 1999 through mid-2003, Berry backdated performance-related grants to existing employees and officers, that were made to create retention and performance incentives.  *Id*., ¶ 55.  Berry's pervasive backdating scheme at Juniper caused the company to issue materially false and misleading annual and quarterly reports (filed with the Commission on Forms 10-K and 10-Q) for each annual and quarterly fiscal period, beginning with the quarter ended September 30, 1999 through at least the second fiscal quarter of 2003.  *Id*., ¶¶ 62, 65.  Her scheme

1    similarly caused the company to issue misleading current reports on Form 10-Q, three times during

2    2003. *Id.*, ¶ 65. Moreover, Berry's fraud continued to materially affect Juniper's financial statements

3    through 2005. *Id.*, ¶ 62. As at KLA, Berry's fraudulent scheme also caused the company to make

4    further misrepresentations to shareholders in registration statements that incorporated the false

5    financials, and in proxy statements that falsely described the company's compensation practices

6    specifically through the granting of stock options. *Id.*, ¶¶ 45, 61, 67. As the chief legal officer of

7    Juniper, Berry knew well the fraudulent effects of her backdating scheme on these public filings,

8    which she routinely reviewed, discussed, helped prepare or finalize, and often signed. *Id.*, ¶¶ 61-67.

9    ### C. Berry Carried Out The Backdating Scheme Knowingly And Recklessly

10            In her role as the company's General Counsel, Berry reviewed and discussed KLA's false and

11    misleading annual and quarterly reports, both in draft and as filed with the Commission, and she

12    reviewed and signed the company's misleading registration statements. Comp., ¶¶ 37-39. Berry was

13    no stranger to the financial reports public companies were required to prepare and file accurately; she

14    had majored in accounting in college and had become the top legal officer of two public companies.

15    *Id.*, ¶ 11. Berry also knew well how the creation of false documents, and the specific lies about the

16    dates on which options were granted purportedly at the then-fair market value, caused each company

17    to misrepresent both the nature of, and the attendant expenses associated with, an important

18    component of employee and executive compensation. Indeed, while at KLA, Berry participated in

19    conference calls and communications discussing accounting rules related to stock options (*Id.*, ¶ 33),

20    and corresponded with others within and outside of the company, acknowledging her understanding

21    of the need for the company to take "a charge to its P&L" when granting options at prices lower than

22    the true fair market value, including by using historical dates (*Id.*, ¶¶ 31, 33).

23            Berry built on this experience at KLA to create the backdating program at Juniper; indeed,

24    early during her tenure with the second company, she caused Juniper's board to be falsely informed

25    that a backdated grant had actually been made on the date reflected in the grant documentation. *Id.*, ¶

26    56. The grant, to a large group of existing employees and officers, and to certain new hires, was

27    actually made on November 5, 1999 but backdated to October 4, 1999, so that the options were in-

28    the-money by approximately $90 per share. *Id.* Berry thus knew, or was reckless in not knowing,

1   that the grant documentation that she helped prepare falsely represented the date on which stock

2   options were granted at Juniper. *Id.*, ¶ 61. Berry further knew, or was reckless in not knowing, that

3   Juniper failed to properly record expenses for these in-the-money grants based on that false

4   documentation, and that as a further result Juniper's public statements that the company granted stock

5   options at the fair market value on the date of the grant and did not grant stock options for less than

6   fair market value, were materially false and misleading. *Id.* As she did at KLA, as Juniper's General

7   Counsel, Berry reviewed and discussed annual and quarterly reports that Juniper filed with the

8   Commission, and she reviewed and signed the company's registration statements. *Id.*, ¶¶ 62-67.

9          In May 2006, the audit committee of Juniper's board of director's began to investigate the

10  Company's historical options granting practices, and approximately ten months later announced

11  restated financial results to record expenses for options granted to employees, including an additional

12  approximately $880 million in stock-based compensation expense for fiscal years 1999 through 2003.

13  Comp., ¶ 68.

14  **IV.    ARGUMENT**

15         **A.    The Appropriate Legal Standards For Dismissal Of A Complaint**

16                **1.    Federal Rule of Civil Procedure 12(b)(6)**

17         Motions to dismiss are disfavored and rarely granted. *Conley v. Gibson,* 355 U.S. 41, 45-46

18  (1957), *overruled on other grounds by Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 167 L.Ed.2d

19  929 (2007). As the Court of Appeals for the Ninth Circuit has noted, "[t]he conditions that must be

20  met before a motion may be granted under Federal Rule of Civil Procedure 12(b)(6) are quite strict."

21  *Church of Scientology v. Flynn*, 744 F.2d 694, 695-96 (9th Cir. 1984). A motion to dismiss under

22  Rule 12(b)(6) tests the legal sufficiency of the causes of action set forth in the complaint; therefore, a

23  claim may not be dismissed "unless it appears beyond doubt that plaintiff can prove no set of facts in

24  support of his claim which would entitle him to relief," *Church of Scientology*, 744 F.2d at 695-96, or

25  the complaint lacks entirely "a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d

26  696, 699 (9th Cir. 1988); *see SEC v. Levin*, 232 F.R.D. 619, 622 (C.D. Cal. 2005) (citing *Newman v.*

27  *Universal Pictures*, 813 F.2d 1519, 1521-22 (9th Cir. 1987), *quoting Hishon v. King & Spalding*, 467

28

1  U.S. 69, 73 (1984)) (dismissal under Rule 12(b)(6) is appropriate "only if it is clear that no relief

2  could be granted under any set of facts that could be proved consistent with the allegations").

3      Of particular importance in ruling on the instant motion to dismiss, a district court generally

4  "may not consider any material beyond the pleadings." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.

5  1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.

6  2002). Instead, all material allegations of the complaint must be taken as true and construed in the

7  light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d at 340. In

8  addition, all reasonable inferences from the facts alleged in the complaint are drawn in the plaintiff's

9  favor. *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994). The Court does not

10  determine whether the Commission will ultimately win the case, but whether the Commission is

11  entitled to offer evidence to support the allegations in the complaint. *Gilligan v. Jamco Dev. Corp.*,

12  108 F.3d 246, 249 (9th Cir. 1997).

13      **2. Federal Rule of Civil Procedure 9(b)**

14      Rule 9(b) provides, in part, that "in all averments of fraud or mistake, the circumstances

15  constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Rule 9(b)

16  further provides: "Malice, intent, knowledge, and other condition of mind of a person may be

17  averred generally." In securities fraud actions, the plaintiff must plead with particularity the

18  circumstances constituting the fraud so that the defendant can prepare an adequate answer. *Fecht v.

19  Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547

20  (9th Cir. 1994) (en banc). This notice requirement is satisfied by allegations of the "time, place and

21  nature of the alleged fraudulent activities." *Walling v. Beverly Enters.*, 476 F.2d 393, 397 (9th Cir.

22  1973); *accord Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996); *Fecht*, 70 F.3d at 1082.

23  When a false or misleading statement is alleged, the plaintiff must set out what is false or misleading

24  about the statement, and why it is false. *In re Glen Fed*, 42 F.3d at 1548. However, nothing in Rule

25  9(b), nor in any other rule or statute that applies to a Commission enforcement action, supports

26  imposing upon the Commission any increased burden with respect to pleading the bases for

27  allegations that the defendant acted with requisite intent, or scienter, or requiring a weighing of the

28  evidence underlying the Commission's allegations.

**B.  The Complaint Spells Out The Circumstances Of Berry's Fraud With Particularity**

The Commission's complaint clearly specifies false statements Berry made or caused others to make, including misrepresentations contained in required public filings with the Commission.  It also describes Berry's deceptive conduct, stretching over several years and employed at two successive companies, of manipulating corporate documents and processes to conceal the granting of in-the-money options to employees.  Whether focusing on the deceptive scheme Berry employed, or the misrepresentations that followed, the Commission's complaint fully identifies "the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations," specifying "such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity."  *Neubronner v. Milken,* 6 F.3d 666, 671-72 (9th Cir. 1993); *see SEC v. Trabulse*, --- F. Supp.2d ----, 2007 WL 4293476, at *3 (N.D. Cal. 2007) (Alsup, J.) (denying motion to dismiss complaint for lack of particularity, finding that "examples provided by the SEC do provide times, dates, places, benefits received, and other details of the alleged fraud").

Berry apparently does not challenge the Commission's factual allegations describing her backdating scheme.  These allegations describe "what" the fraudulent scheme was, "how" Berry concocted and carried out the scheme, and "why" it was deceptive and misleading to shareholders.  By "backdating," the complaint describes Berry's creation of processes, first at KLA and then at Juniper, to select stock option grant dates with hindsight for options issued to employees and executives, including herself, and her creation of false documentation suggesting that options were granted on the selected dates.  The dates in the past were chosen because the companies' stock price was lower, so that the options would effectively be "in-the-money" when granted.  When actually granted, in-the-money options had strike (or exercise) prices lower than the then-market price of the company's stock, making the options more valuable to employees.  While the accounting rules that each company said they followed required the companies to record an expense for in-the-money options, they did not have to record an expense related to options that were at-the-money, that is, with a strike price equal to the fair market value when actually granted.  Berry employed a scheme at each company to create grant paperwork to make it appear that options were granted on an earlier date with a lower, supposedly "fair market value," thereby hiding the true "in-the-money" value of the

options when granted, and further hiding millions of dollars in expenses the companies should have

recorded.  As a district court here observed:

> Intentionally employing hindsight to adjust the grant date to an advantageously low price,
> or "backdating," is fraud. Backdating is done to avoid recognizing compensation
> expenses. Yet grantees get options that start out in-the-money which enriches them by
> that amount. This is particularly pernicious where options are granted as incentive-based
> compensation. The employee gets the incentive without doing anything to increase the
> company's value.

*In re CNET Networks, Inc. Deriv. Litig.*, No. C-06-03817 WHA (N.D. Cal. Apr. 11, 2007) (Alsup,

J.), Slip op., 2007 WL 1089690 at *9. *See In re UnitedHealth Group PSLRA Litig.*, (D. Minn. June

4, 2007), Slip op., 2007 WL 1621456 at *2 (finding "a claim has been stated," after likening the

alleged backdating scheme to the ruse in *The Sting* (Universal Pictures 1973)).

The Commission's complaint also specifies the annual reports, quarterly reports, periodic

current reports, proxy statements, and registration statements (specifically, by date), that contained

materially false statements to shareholders about how each company granted options, how each

company accounted for (or failed to account for) such options, or the nature of options granted.  For

instance, the complaint describes the "materially false and misleading" representation contained in

four proxy statements and in four annual reports filed with the Commission on Form 10-K (all

identified by date) that, "Juniper granted stock options at the fair market value on the date of the grant

and that the company did not grant stock options for less than fair market value." Comp., ¶ 61; *see

also id.*, ¶¶ 15-16 (Berry signed registration statement attaching KLA's primary stock option plan that

prohibited the grant of in-the-money options).  Similarly, the complaint identifies four year-end

financial statements (by date) included with annual reports filed by Juniper with the Commission on

Form 10-K that "were materially misstated" due to the "failure to record an expense for in-the-money

options." *Id.*, ¶ 62; *see also id.*, ¶¶ 36-37 (false year-end financial statements filed on behalf of

KLA).  The complaint goes on to provide examples of just how materially misleading those financial

statements were. *E.g.*, *id.*, ¶ 64 (failure to record compensation expenses for stock options during

fiscal year 2003 that reduced Juniper's reported profit by 21.68 percent).  It is difficult to imagine

what further detail could possibly be required to permit defendant to respond to the complaint.

1    Ignoring the allegations in the complaint detailing defendant's years-long scheme to backdate

2    options at two public companies, defendant argues that the Commission has not alleged Berry's

3    participation in the preparation of the annual reports, quarterly reports, and other publicly filed

4    documents that included the materially false representations and omissions.  Motion at 16.  However,

5    the Ninth Circuit has rejected the argument that the Court should set aside the important facts about

6    how an individual's conduct may cause a company's annual or quarterly reports and financial

7    statements to be false when determining whether the person should be liable for securities fraud.

8    *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1062 (9th Cir. 2000) (key corporate officers may not

9    "shield themselves from liability to investors simply by failing to be involved in the preparation of

10   those statements").  "'[S]ubstantial participation or intricate involvement in the preparation of

11   fraudulent statements is grounds for primary liability even though that participation might not lead to

12   the actor's actual making of the statements.' Furthermore, employees and directors who sign or

13   prepare financial disclosures can be held liable for misstatements and omissions therein." *In re Zoran*

14   *Corp. Deriv. Litig.*, 511 F. Supp.2d 986, 1011 (N.D. Cal. 2007) (citing *Howard v. Everex Sys., Inc.,*

15   228 F.3d at 1061 n.5).  Whether Berry herself actually authored the statements contained in the false

16   filings, she made those statements false through her substantial participation in the fraudulent

17   scheme.  As this Court recognized in another financial fraud matter:

18       Moreover, the Ninth Circuit has recognized that it is difficult to attribute particular
         fraudulent conduct to each defendant individually in cases where corporate fraud is
19       alleged.  *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir. 1989).
         Therefore, "[t]o overcome such difficulties in cases of corporate fraud, the allegations
20       should include the misrepresentations themselves with particularity and, where possible,
         the roles of the individual defendants in the misrepresentations." *Id.*

21

22   *SEC v. Baxter*, No. C-05-03843 RMW (N.D. Cal. Jul. 11, 2007) (Whyte, J.) Slip op., 2007 WL

23   2013958 at *6.  In addition, even if defendant merely caused another to make the false statements,

24   she is directly liable for their public dissemination.  *See, e.g., Warshaw*, 74 F.3d at 959 (reversing

25   dismissal of complaint alleging defendants' responsibility for false public statements by securities

26   analysts, since defendants were alleged to have intentionally misled the analysts in order to

27   disseminate the false information).  Defendant is also responsible for the material omissions from

28

1  those public filings about the true nature of each company's options program.  *SEC v. Fehn*, 97 F.3d

2  1276, 1290-91 (9th Cir. 1996).

3      Contrary to defendant's argument, and as discussed above, the complaint is replete with

4  allegations of Berry's important role in preparing Commission filings at both companies, describing

5  how she: "reviewed, discussed, and finalized" proxy statements at KLA, and also drafted and signed

6  such filings at Juniper (Comp., ¶¶ 21, 46); "reviewed and discussed" specified annual reports (and

7  drafts) ultimately filed on Forms 10-K at KLA, and similarly "reviewed and discussed" specified

8  annual and quarterly reports (filed on Forms 10-Q) at KLA and Juniper (*Id.*, ¶¶ 37, 38, 62, 65);

9  "reviewed and prepared," and in two out of three instances, signed, false and misleading registration

10  statements at KLA, and similarly reviewed six registration statements incorporating false and

11  misleading financials at Juniper (*Id.*, ¶¶ 39, 67); and, reviewed three current reports filed on Forms 8-

12  K announcing misleading financial information (*Id.*, ¶ 66).  Accepting these factual allegations as true,

13  as we must, and drawing the reasonable inferences from those facts, it is clear that Berry was the

14  corporate officer responsible for the preparation of the companies' public filings who also knew about

15  the stock option program and the backdating scheme.  When defendant reviewed, discussed, prepared,

16  finalized, or signed these various filings, it was her responsibility to ensure that this material

17  information was not misstated or omitted; indeed, it would be difficult to imagine how, if she were to

18  testify, Berry could explain how she could have missed these numerous false statements in those

19  documents, when she reviewed, discussed, prepared, finalized or signed them.[1]  As a consequence, the

20  misrepresentations contained in each of the annual reports, quarterly reports, current reports, financial

21  statements, registration statements and proxy statements that falsely reported that KLA, or Juniper, did

22  not grant "in-the-money" options to employees, or that the company did not incur options-related

23  expenses, were Berry's own.

24      [1]  As the parties discussed with the Court during the Case Management Conference held on

25  December 14, 2007, the Commission has been anxious to take defendant's deposition.  Berry asserted
   her Fifth Amendment privilege against self incrimination to refuse to answer questions during her

26  testimony in the Commission's investigation preceding this litigation.  Where, as here, certain matters
   are within the opposing party's knowledge, the pleading requirements of Rule § 9(b) may be relaxed.

27  *Moore v. Kayport*, 885 F.2d 531, 540 (9th Cir. 1989); *Wool v. Tandem Computers, Inc.*, 818 F.2d

28  1433, 1439 (9th Cir. 1987).

**C. Berry's Knowledge That Her Scheme Was Fraudulent Is Clear From The Complaint**

Notwithstanding the very detailed allegations of the complaint, clearly articulating the "who, what, when, where, and how" of her fraudulent scheme, misrepresentations and omissions, defendant attacks the complaint for not, in her estimation, averring *scienter* with particularity.  Motion at 8-15.  While turning a blind eye to the detailed factual allegations, defendant takes a step further, ignoring the plain dictates of Rule 9(b), which provides that "intent, knowledge, and other condition of mind of a person may be averred generally."  Defendant lifts a standard that applies only to particular private litigants, under a special statute designed to curb securities class action abuses, the Private Securities Litigation Reform Act of 1995, 109 Stat. 737 ("PSLRA").  She asks the Court to apply that inapt standard for pleading a "strong inference" of scienter to the Commission's enforcement action.  Motion at 8, 9, 13.  Defendant's suggestion is squarely contradicted by the law.  *See Baxter*, 2007 WL 2013958 at *3 (quoting Rule 9(b) and citing *In re GlenFed Securities Litig.*, 42 F.3d 1541); *SEC v. ICN Pharmaceuticals, Inc.*, 84 F. Supp.2d 1097, 1099 (C.D. Cal. 2000) ("the 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements, only apply to private securities fraud actions; they do not apply to a case, such as this, brought by the SEC").

Telling of defendant's error is her citation (Motion at 12, n.10) to the Supreme Court's decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).  In describing the genesis of the "strong inference" standard of the PSLRA, the *Tellabs* decision noted that the Court had long recognized such *private* actions as "an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission," but noted that Congress enacted the PSLRA "[a]s a check against abusive litigation by *private* parties."  *Id*. at 2504.[2]  Nothing in *Tellabs* lends any support to defendant's argument for grafting this statutorily-created standard for *private* litigants onto

_____

[2] "Designed to curb perceived abuses of the § 10(b) private action – nuisance filings, targeting deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers – the PSLRA installed both substantive and procedural controls. . . Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. at 2508 (internal citations omitted).

1   Commission enforcement cases.  As the Ninth Circuit concluded even before enactment of the

2   PSLRA, "[w]e are not permitted to add new requirements to Rule 9(b) simply because we like the

3   effects of doing so."  *In re GlenFed, Inc. Securities Litig.*, 42 F.3d  at 1546-47.[3]

4           Yet, even defendant's construction of the documents she asks the Court to interpret based on

5   her misapplication of the private pleading standard fails.  In support of her argument that the Court

6   should draw inferences other than those that might be drawn from the allegations in the complaint,

7   defendant engages in a protracted discussion about the contents of a memorandum prepared by Berry

8   as the chief legal officer for KLA.  The memorandum is cited in the complaint as an example of her

9   admitted understanding that "repricing executive stock options by using an earlier grant date with a

10  lower price would result in KLA having to take 'a charge to its P&L.'"  Comp., ¶ 33.  Defendant

11  insists that competing inferences that she spins from the document must be credited over the

12  reasonable interpretation that is cited in the complaint.[4]  Motion at 12.  Yet, the memo itself reveals

13  the absurdity of Berry's competing inferences: that she "openly shared" the stock option backdating

14  processes she used with outside counsel or outside auditors, and that the memo discusses the

15  backdating of an option by persons other than Berry.  Motion at 12.  Nowhere in the memo, from

16  Berry as the in-house counsel to an outside attorney, does Berry reveal her repeated practice of

17  selecting favorable historic dates as the purported date on which stock options were granted, and

18  representing the closing price of KLA on the selected dates as the then-fair market value of the

19  company's stock.  *See* Exhibit H to Declaration of Moji Saniefar.  Nor does the memo suggest that

20  she ever made her scheme for systematic backdating of options known to the company's outside

---

[3]  Defendant's only support for doing so in this case is her citation to four district court cases outside of the Ninth Circuit.  Motion at 8, n.7.  As described in *Tellabs*, prior to the enactment of the PSLRA, there was a divergence among the circuits as to whether there should be heightened pleading standards for scienter in securities fraud cases, with the Second Circuit applying the imposing highest, "strong inference" standard, which was rejected by the Ninth Circuit in *GlenFed*, as noted in *Tellabs*.  127 S.Ct. at 2508.

[4]  She is wrong; all reasonable inferences drawn from this document must be construed in the light most favorable to the Commission.  *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d at 340.

1    auditors.  Just as far fetched is her theory that she received *approval* for backdating in the memo she

2    wrote.[5]

3         Defendant engages in this same extended colloquy with respect to allegations regarding her

4    personal background in accounting (Motion at 10); an email in which an employee questions Berry

5    about "whether we would be able to pass the 'audit' test of not setting a date in the past in order to

6    get a better price" (Id. at 11; Comp., ¶ 31); and allegations about the systematic falsification of

7    documents at Juniper (Motion at 13).  Of course, defendant's spin on these facts strains logic and

8    simply ignores the obvious.[6]  Just as importantly, defendant's entire excuse for engaging in the

9    protracted interpretation of the documents or other evidence falls away when her invitation to

10    erroneously apply the "strong inference" standard is declined.[7]

11         Although the complaint offers numerous specifics regarding her knowledge, the defendant

12    attempts to deflect attention from these facts by declaring that the complaint "is barren of a single

---

[5]  The memo also cannot reasonably be read as "making clear that on September 30, 1998, the Stock Option Committee chose a grant date of August 31, 1998," as defendant argues.  In discussing the "repricing" of options, the memo simply states:  "The repricing date ended up being August 31, but it was not determined until September 30 that the August 31 date was the correct date."  *Id.* at KLA-SEC 000127 (the very page defendant cites).  If there is some hidden meaning buried in the words defendant used in the memo, Berry will have to testify to explain the leap she expects us to make.

[6]  In particular, defendant's attempt to minimize her background – majoring in accounting, followed by her role at both companies in overseeing the stock option granting process – rings hollow.  When Berry saw accounting disclosures she read them in the context of someone who is specifically trained in accounting.  When she participated in phone conversations regarding APB 25, or reviewed disclosures in Commission filings, her eyes did not glaze over; she got it.  Her accounting degree and extensive background in stock administration are the context in which we are asked to consider whether she knew she was committing fraud.  In this context, the back and forth in the email discussions (attached as Ex. G to Saniefar Decl.) with her subordinates prove revealing.  As one of the participants declares, the determination to backdate was Berry's (*see id.* at 3 of 3: "This is Lisa's call.").  And, she made this determination with eyes wide open and alerted to the conflict with, as another subordinate described, "the 'audit' test of not setting a date in the past in order to get a better price" (*id.* at 2 of 3).

[7]  Defendant's dive into the underlying evidence specifically defies Rule 9(b), which does not require the pleading of detailed evidence.  *Walling v. Beverly,* 476 F.2d at 397 (*quoting* 2 A James Wm. Moore et al., *Moore Federal Practice* ¶ 903, at 1930 (2d ed. 1972)); s*ee also, Seattle-First Nat'l Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir. 1986); *Brady v. Games,* 128 F.2d 754, 755 (D.C. Cir. 1942); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 n.20 (2nd Cir. 1979); *Klein v. Computer Devices, Inc.,* 591 F. Supp. 270, 279 n.25 (S.D.N.Y. 1984); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (1990).

1 direct allegation that [she] knew the relevant accounting rules or how KLA or Juniper were applying

2 them." Motion at 9. It is Berry's contention that the Commission must allege Berry's intimate

3 knowledge of the accounting rules "to satisfactorily plead scienter." Motion at 9-10. Her argument

4 misses the point. Even in *private* actions, in which plaintiffs are obligated to plead facts giving rise

5 to a "strong inference" of scienter, this Court has not required a complaint to allege familiarity with

6 an accounting provision. *See In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d at 986 (denying

7 motion to dismiss complaint against CEO and CFO who allegedly reviewed false public filings,

8 approved grants, and oversaw options granting process and thus "would have noticed if the grant

9 dates were bogus"; no reference to knowledge of accounting standard); *see also In re UnitedHealth*

10 *Group PSLRA Litig.*, 2007 WL 1621456 (denying motion to dismiss options backdating case on

11 scienter grounds; no reference to APB 25 or knowledge of accounting standard).[8] The complaint in

12 this case describes specific events in which the defendant was confronted with the application of the

13 accounting rules to expensing of stock options; defendant's direct participation in the disclosures by

14 each company to their respective shareholders; and, most particularly, defendant's repeated

15 backdating of options to evade the requirement that they be expensed. In considering a motion to

16 dismiss an indictment in another backdating fraud matter, the district court pointed out that similar

17 contentions by the defendants might amount to a defense, but one that depended on the presentation

18 of evidence at trial. "But none of these possibilities are capable of determination 'without a trial of

19 the general issue.'" *United States v. Reyes*, No. CR-06-0556 CRB (N.D. Cal. May 30, 2007), Slip

20 op., 2007 WL 1574540 at *4 (quoting Fed. R. Civ. P. 12(b), and citing, *United States v. Jensen,* 93

21 F.3d 667, 669 (9th Cir. 1996)). In that same order denying defendants' motion to dismiss, Judge

22 _____

23 [8] Numerous cases alleging false filings or fraudulent representations and omissions in financial
statements may include some evidence about the application of accounting rules or standards to the
24 preparation of financial statements. Yet, such evidence may or may not be set forth in the pleading.
For instance, in a private case this Court heard, alleging efforts to falsely inflate reported revenues by,
25 among other persons, a salesman who allegedly knew of secret "side agreements" containing
contingencies that prevented recognition of revenue under GAAP, and an in-house counsel who was
26 privy to the backdating of a contract to make it appear that it was entered into in a prior quarter, the
particularized allegations of scienter (required under the PSLRA) did not specify the salesman's or
27 lawyer's knowledge of the specific accounting rules. *See In re McKesson HBOC, Inc., Securities*
*Litig.*, 126 F. Supp.2d 1248, 1273-75 (N.D. Cal. 2000) (Whyte, J.).
28

1   Breyer also rejected the argument Berry now makes that there was "confusion surrounding APB 25"

2   that makes it "unreasonable" to hold her responsible for knowing or reckless conduct. "Whatever

3   ambiguity may exist in APB 25, it is not possible to construe the rule's language as permitting the

4   deliberate retroactive selection of a particular grant date and the intentional concealment of the date

5   on which that retroactive selection was made." *Id*. at *3.

6       **D.  The Complaint's Allegations Fully Support Each Claimed Violation Of The
           Securities Laws**

7

8       Defendant attacks the other violations of the securities laws alleged in the complaint, but takes

9   particular liberties with the facts and law supporting the allegations that Berry aided and abetted fraud

10  and reporting violations.  Defendant's arguments depend on the misconstruction of the law and her

11  convenient disregard of specific factual allegations, and must therefore be rejected.

12                  **1.  Defendant Aided And Abetted Fraud And Related Violations**

13      In the complaint, the Commission alleges that Berry is liable for aiding and abetting fraud,

14  pursuant to 15 U.S.C. § 78t(e), particularly averring that, "Berry knowingly provided substantial

15  assistance to KLA's, Juniper's and/or other persons' violations of Section 10(b) of the Exchange Act

16  . . . and Rule 10b-5."  Comp., ¶ 77.  This averment follows detailed factual allegations specifying

17  Berry's conduct by which she provided the "substantial assistance" to material misrepresentations

18  and omissions of material fact made in both KLA's and Juniper's public filings.  By alleging that

19  Berry "knowingly provided substantial assistance" to fraud violations at each company, the complaint

20  squarely meets the only description in any of the cases Berry cites of sufficient allegations of aiding

21  and abetting in a federal injunctive action.  *See Fehn*, 97 F.3d at 1281-82 (the complaint alleged

22  aiding and abetting violations, alleging "Fehn had knowingly lent 'substantial assist[ance]' to

23  Wheeler and CTI in the preparation and filing of the faulty Form 10-Q's").

24      In *Fehn*, the Ninth Circuit upheld the district court's finding of liability, and entry of a

25  permanent injunction, after a bench trial against a reporting company's outside attorney for aiding

26  and abetting fraud and reporting violations.  Because the attorney "had a hand in editing the Form 10-

27  Q" prepared by a non-attorney, and "failed to properly advise" the non-attorney and the company of

28  material omissions, the Ninth Circuit concluded that he "lent the requisite 'substantial assistance' to

1   the primary violation." *Id.* at 1293-94.  Importantly, the Ninth Circuit also held that "[t]he

2   'knowledge' element was . . . clearly established" where the defendant must have known of the

3   perpetuation of misinformation in the public filings by the company, and materially omitted

4   information, "[i]n light of the information Fehn possessed when he undertook to review and edit the

5   Form 10-Q's." *Id.* at 1295.  Here, the Commission has alleged that Berry knew of important

6   information about backdating that rendered the statements made by both companies in the Forms 10-

7   K, 10-Q, 8-K, and in proxy and registration statements materially misleading; moreover, the

8   complaint specifically alleges Berry's own hand in preparing, reviewing, finalizing, or signing such

9   documents.  These allegations readily present Berry's substantial assistance to a primary violation of

10  fraud and reporting violations, as well as her knowledge of the fraud and reporting violations and her

11  role in furthering those violations, both at KLA and Juniper.

12          Ignoring the detailed allegations of defendant's prime role in the fraud at each company, and

13  her special duty as the chief legal office to act as a gatekeeper for the accuracy of the companies'

14  representations to shareholders, defendant incongruously cites to cases where there was not sufficient

15  evidence or allegations of a defendant's awareness of a scheme to hold him liable.  Motion at 18-19.

16  The difference between the allegations in this case, and the allegations (or ultimate proof offered) in

17  each of the cases cited by defendant is clear:  here, during her tenure at two different companies the

18  defendant was the *prime mover* in the fraud that caused both companies to materially misrepresent

19  their financial condition, and other important information, to investors.  It is only by ignoring entirely

20  this first piece of the puzzle – her substantial role in the fraud – that defendant can even raise the

21  specter of the handful of inapposite cases she cites.

22          **2.  Defendant Knowingly Falsified Books and Records of Two Public Companies**

23          Section 13(b)(5) of the Exchange Act provides that "no person shall knowingly circumvent or

24  knowingly fail to implement a system of internal accounting controls or knowingly falsify any book,

25  record, or account" required to be kept under the statute.  15 U.S.C. § 78m(b)(5).  Rule 13b2-1

26  provides that "no person shall, directly or indirectly, falsify or cause to be falsified, any book, record

27  or account" required to be kept under the statute.  17 C.F.R. § 240.13b2-1.  There is no scienter

28  requirement for a violation of Rule 13b2-1.  *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 865-66

1    (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).[9]  As described in the complaint, to carry out

2    her scheme at each company, Berry relied principally on the falsification of corporate records – the

3    false dating of stock option grants.  Moreover, she concocted the backdating processes in order to get

4    around the accounting requirements for recording an expense associated with the "in-the-money"

5    grants.[10]

6                      **3.    Defendant Violated the Securities Act Antifraud Provisions**

7              The Securities Act, like the Exchange Act, prohibits acts of financial fraud such as those the

8    defendant is alleged to have engaged in.  Specifically, Section 17(a)(1) makes it unlawful "to employ

9    any device, scheme or artifice to defraud" in the offer or sale of securities, while Sections 17(a)(2)

10   and (3) further make it ulawful to "obtain money or property by means of any untrue statement of a

11   material fact or any omission to state a material fact necessary in order to make the statements made,

12   in light of the circumstances under which they were made, not misleading; or to engage in any

13   transaction, practice, or course of business which operates or would operate as a fraud or deceit upon

14   the purchaser."  15 U.S.C. § 77q(a).  As defendant acknowledges, there is no scienter requirement for

15

16   ───────────────

17   [9]  Defendant's further argument – that the rule must be read to include a scienter requirement,
     supposedly to be consistent with the statutory authority by which it was promulgated – turns a blind

18   eye to the agency's express determination in promulgating the regulation.  *See* "Promotion of the
     Reliability of Financial Information and Prevention of Concealment of Questionable or Illegal

19   Corporate Payments and Practices," Exchange Act Release No. 34-15570, 1979 WL 173674 at *9-10,
     *20-30 & *36-38 (Feb. 15, 1979) (in promulgating rules under Section 13, the Commission expressly

20   determined that violations of those regulations do not require a showing of scienter).  It also
     overlooks the fact that Section 13(b) makes conduct unlawful regardless of the intent of the violator.

21   *See Ponce v. SEC*, 345 F.3d 722, 737 n.10 (9th Cir. 2003) ("a plain reading of Section 13(b) reveals

22   that it also does not impose a scienter requirement").  In desperation, defendant even cites to, and
     attaches (as Ex. H to Saniefar Decl.), a complaint in another action as the purported support for her

23   pet theory that the scienter requirement "should be" read into the Rule, contrary precedent
     notwithstanding.  Aside from cluttering the record with 47 unrelated pages, the complaint does not

24   suggest, state, or offer any reason why a scienter requirement should be read into the Rule.

25   [10]  In a further red herring argument, defendant asserts that because the Commission did not "charge"
     either KLA or Juniper with violations of Section 13(b)(5) or Rule 13b2-1, it is "unfair and

26   anomalous" to permit these claims to stand against Berry.  While claims against other persons are
     irrelevant to Berry's liability, her argument is particular specious in since the provisions are typically

27   read to describe the conduct of individuals rather than companies; both KLA and Juniper were

28   alleged to have directly violated related provisions, Sections 13(b)(2)(A) and (B).

1  violations of the latter two provisions; negligence will suffice. *Aaron v. SEC*, 463 U.S. 646, 696

2  (1983); *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001).

3       Contrary to defendant's unfounded arguments, in circumstances such as those alleged in the

4  Commission's complaint, the somewhat different requirement under the Securities Act that the fraud

5  be "in the offer or sale" of securities, rather than "in connection with the purchase or sale of

6  securities," as required under the Exchange Act, is readily achieved.  Defendant concedes that the

7  complaint alleges such fraud "in the offer or sale" of securities at KLA, through misrepresentations

8  incorporated into three registration statements filed by KLA.  Motion at 21-22 (citing to Comp., ¶

9  39).  Employing convoluted logic about a complaint not at issue in this case (and yet attached as

10 another lengthy "exhibit"), defendant simply overlooks the Commission's allegations *in this case* that

11 six registration statements filed by Juniper between March 14, 2000 and July 9, 2002 similarly

12 incorporated materially misleading financials filed by that company.  Comp., ¶ 67.  The complaint in

13 this case further alleges that "Berry exercised certain stock options she received.  Berry further sold

14 shares in each company's stock, including shares she received based on her exercise of stock

15 options."  *Id.*, ¶ 71.  Thus, after employing a backdating scheme for several years and causing each of

16 the companies to grant her backdated options, these allegations describe how Berry herself "obtained

17 money" from her fraud.  *SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995); *SEC v. Svoboda*, 409 F. Supp.2d

18 331, 342 (S.D.N.Y. 2006); *SEC v. Schiffer*, 1998 WL 307375 at *4 & n.15 (S.D.N.Y. June 11, 1998).

19      **D.  None Of The Commission's Claims For Relief Is Time-Barred**

20      Defendant asserts that the Court should "dismiss" the "majority of acts alleged in the SEC's

21 Complaint," based on the statute of limitations that applies to the government's collection of a fine,

22 28 U.S.C. § 2462.  Defendant's nonsensical argument fails on the law, and on the facts – whether or

23 not any consideration is given to facts beyond those alleged in the complaint.  Defendant concedes, as

24 she must, that not all of the conduct alleged in the complaint occurred more than five years prior to

25 the filing of the complaint (even if there is any way to determine whether a "majority" of it did, or did

26 not).  As a matter of law, this circumstance alone disposes entirely of defendant's argument, since

27 claims may be dismissed under Rule 12(b)(6) only if, taking the factual allegations as true, *no* relief

28 may be granted.  Defendant's argument does not imply that no penalty may be imposed.  *See SEC v.*

1    *Caserta*, 75 F. Supp.2d 79, 89 (E.D.N.Y. 1999) (where relief may be predicated on conduct within

2    five-year period, statute of limitations does not bar claim); see also *Campbell v.*

3    *PricewaterhouseCoopers, LLP*, 2007 WL 841694 at *6 and n. 4 (E.D. Cal. Mar. 20, 2007).

4        Yet, even were it not the case that defendant's fraudulent scheme continued through 2003 as

5    alleged in the complaint, the statute of limitations she cites would not result in dismissal of the

6    Commission's complaint or any of the "acts alleged."  Section 2462 of Title 28 states:

7        Except as otherwise provided by Act of Congress, an action, suit or proceeding
     for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or
8        otherwise, shall not be entertained unless commenced within five years from the
     date when the claim first accrued if, within the same period, the offender or the
9        property is found within the United States in order that proper service may be
     made thereon.
10

11   The limitations period provided by 28 U.S.C. § 2462 applies, by its terms, only to claims for "any

12   civil fine, penalty, or forfeiture" and not to equitable claims for disgorgement or injunctive relief.

13   There is no implied statute of limitations applicable to SEC actions seeking equitable remedies such

14   as an injunction or disgorgement.  *SEC v. Rind*, 991 F.2d 1486, 1488-92 (9th Cir. 1993).  As the

15   Ninth Circuit found in *Rind,* "Congress granted the Commission broad power to enforce the

16   substantive provisions of the securities laws but refrained from imposing an explicit time limit on

17   Commission enforcement actions.  Congress clearly devoted its time and attention to limitations

18   issues.  The fact that it did not enact an express statute of limitations for lawsuits instituted by the

19   Commission, therefore, must be interpreted as deliberate."  991 F.2d at 1490.  The Court explained

20   that "[w]hen the Commission sues to enforce the securities laws, it vindicates public rights and

21   furthers the public interest."  *Id*. at 1491.  And, from this fact the Court reasoned that, "[i]mposing a

22   state or any other statute of limitations on Commission civil enforcement actions would also conflict

23   with the underlying policies of the securities laws; this conclusion strongly negates any inference that

24   Congress intended a limitations period to apply."  *Id*. at 1492 (citing *Occidental Life Ins. Co. v.*

25   *EEOC*, 432 U.S. 355, 367 (1977)).

26       Defendant argues, without finding support in the law, that the Court should ignore the

27   equitable and remedial nature of the Commission's enforcement action by simply labeling the

28   complaint "punitive."  According to defendant, once the "punitive" label is plastered to all the relief

1   sought by the Commission (based on purported, but never identified, "strong circumstantial

2   evidence") it is an easy task to simply declare that "conduct occurring 4-10 years ago" should be

3   ignored.  Defendant's principle support for her theory of a "punitive" case, *SEC v. Johnson*, 67 F.3d

4   484 (D.C. Cir. 1996), is inapposite.  *Johnson* involved an appeal from the imposition of two

5   sanctions, a censure and a six-month suspension as a broker, after an administrative hearing regarding

6   respondent's failure in one instance to supervise another person, as alleged in "an indictment-like

7   document."  *Id*. at 489.  The court of appeals found that the sanctions were "not based on any general

8   finding of Johnson's unfitness as a supervisor, nor any showing of the risk she posed to the public."

9   *Id*.[11]

10          Here, in contrast, the Commission pled the basis for, and will establish, "the reasonable

11   likelihood of future violations" by Berry, in obtaining the requested injunctive relief.  *See, e.g., Fehn*,

12   97 F.3d at 1295-96 (setting out five-factor test for determining reasonable likelihood of future

13   violations, including: degree of scienter involved; isolated or recurrent nature of the infraction;

14   defendant's recognition of the wrongfulness of conduct; likelihood, based on occupation, that future

15   violations might occur; and sincerity of assurances against future violations) (quoting *SEC v. Murphy*,

16   626 F.2d 623, 655 (9th Cir. 1980)); *SEC v. Koracorp Industries Inc.*, 575 F.2d 692, 697-98 (9th Cir.

17   1978).[12]  The Commission will also establish how ordering defendant to disgorge her ill-gotten gains

18   will return her to the status quo ante.  *See, e.g., Rind*, 991 F.2d at 1491 ("The Commission seeks

19   disgorgement in order to deprive the wrongdoer of his or her unlawful profits").  Defendant asks the

20

21   [11]   Berry's argument is also at odds with a decision in this district rejecting attempts to blur the
22   distinction between the injunctive remedies and disgorgement the Commission seeks and the request
     for a civil penalty.  *See SEC v. First California Capital Markets Group, Inc.*, No. C-97-02761-CRB,
23   Slip op. at 4-5 (N.D. Cal. July 30, 1998) (*See* Appendix of Authority Not Published in Official
     Reporters, Ex. A) (holding that under *Rind*, Commission equitable claims are not subject to statute of
24   limitations even where penalties are sought and barred by limitations).

25   [12]   The *Fehn* matter contrasts with defendant's unsupported contention that she is being "punished"
26   because "an injunction or officer and director bar would subject Ms. Berry to disbarment proceedings
     in two states where she currently holds a license to practice law."  Motion at 24.  Like Berry, Fehn
27   was a lawyer at the time of his misconduct, and he was enjoined.  According to public information
     from the State Bar of California, Fehn is currently an active member of the bar, in Los Angeles.  (*See*
28   http://members.calbar.ca.gov/search/member_detail.aspx?x=43341.)

1    Court to discredit the Commission's allegations and to essentially weigh the propriety of granting

2    each of the forms of equitable relief requested, and to therefore ignore the Ninth Circuit's tests for

3    determining when injunctive and other relief is necessary.

4          Even if defendant's arguments about the application of 28 U.S.C. § 2462 had any merit,

5    which they do not, the result she asks the Court to reach is simply nonsensical.  Defendant requests

6    that the Court "dismiss" allegations from the complaint.  Motion at 22.  However, Rule 12(b)(6)

7    permits for dismissal only of  "a claim for relief."  Where a plaintiff's allegations support any claim,

8    those allegations are not independently subject to removal from the complaint.  *Cash v. Frederick &*

9    *Co., Inc.*, 57 F.R.D. 71, 78-79 (E.D. Wisc. 1972).  The Commission has alleged that defendant

10   engaged in a fraudulent scheme over several years through her tenure with Juniper, ending in 2003,

11   which continued to affect the financial statements of Juniper well into 2006.  It makes no sense, at

12   this stage, to pick among the evidence to delineate what will be relevant.

13         Finally, defendant's arguments about the application of the statute of limitations are

14   premature and inappropriate on a motion to dismiss.  Her statute of limitations arguments are

15   admittedly highly dependent on interpretations of the facts underlying this case and cannot be

16   resolved in her favor without disregarding or discounting the Commission's allegations.  Moreover, if

17   defendant were to pursue a defense based on the application of a statute of limitations, the

18   Commission would be entitled to present legal and factual counter-arguments, including the tolling of

19   the statute pursuant to the doctrine of equitable tolling.  "Where a plaintiff has been injured by fraud

20   and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the

21   statute does not run until the fraud is discovered."  *FEC v. Williams*, 104 F.3d 237, 240 (9th Cir.

22   1996) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)).  The doctrine of equitable tolling

23   applies to every federal statute of limitations, including Section 2462.  *Id.; United States v. Core*

24   *Laboratories, Inc.*, 759 F.2d 480, 484 (5th Cir. 1985).  The self-concealing conduct underlying the

25   fraud claims against Berry also establishes the equitable tolling of the statute, as her backdating

26   scheme effectively hid for years the true expenses incurred by both companies in granting stock

27   options to employees.  *See SEC v. Jones*, 476 F. Supp.2d 374, 382 (S.D.N.Y. 2007) ("for a fraud to

28   be self-concealing, the defendant must have engaged in 'some misleading, deceptive or otherwise

1  contrived action or scheme, in the course of committing the wrong, that [was] designed to mask the

2  cause of action,'" citing *Hobson v. Wilson*, 737 F.2d 1, 34 (D.C. Cir. 1984)).[13]  Since the chief

3  questions to be considered in applying this doctrine involve the Commission's diligence in learning

4  of the fraud and whether there could be any unfair prejudice to defendant from tolling the statute,

5  courts have recognized that the most prudent course would suggest discovery on the factual issues

6  underlying the fraud claims as well as the claims of equitable tolling.  *See SEC v. Alexander*, 2007

7  WL 2816195, at *15 (E.D.N.Y. Sept. 26, 2007) (slip op) (determining on motion to strike affirmative

8  defenses that applicability of equitable tolling of fraud claims in options backdating case too difficult

9  to analyze at that time).

10  **V.    CONCLUSION**

11       For the above reasons, the defendant's motion to dismiss should be denied.

12  DATED:   January 11, 2008              Respectfully Submitted,

13

14                                        /s/  Susan F. LaMarca
                                          Susan F. LaMarca
15                                        Attorneys for Plaintiff
                                          SECURITIES AND EXCHANGE COMMISSION
16

17

18

19

20

21

22

23

24

25

---

26  [13]   To establish equitable tolling of the statute of limitations the Commission would show:  (1)
    wrongful concealment of defendant's actions; (2) failure to discover the operative facts that are the
27  basis of the action within the limitations period; and (3) the Commission's due diligence.  *Williams*,
    104 F.3d at 240; *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975).
28