# EXHIBIT 5

Westlaw.

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan, Southern Division.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff(s),
v.
John Paul ORR, et al., Defendant(s).
No. 04-74702:

March 6, 2006.
Cheryl Scarboro, Elinor Sosne, Lucee Kirka, Peter H. Bresnan, Reid A. Muoio, Timothy P. Peterson, William H. Kuehnle, U.S. Securities and Exchange Commission, Washington, DC, Julia C. Pidgeon, U.S. Attorney's Office, Detroit, MI, for Plaintiff.

Andrew J. Broder, Payne, Payne, Bingham Farms, MI, Lewis F. Murphy, Rebekah J. Poston, Richard E. Brodsky, Steel, Hector, Russell C. Weigel, III, Russell C. Weigel III Assoc., Miami, FL, Sean M. Walsh, Cox, Hodgman, Troy, MI, David T. McTaggart, Harry Frischer, Proskauer Rose, New York, NY, Norman C. Ankers, Honigman, Miller, Detroit, MI, for Defendants.

ORDER

ROBERTS, J.

I. INTRODUCTION

*1 This matter is before the Court on three motions: Defendant John Paul Orr's Motion to Dismiss the Complaint; Defendant David N. Bixler's Motion to Dismiss the Complaint; and, Defendant Kirkpatrick's Motion to Dismiss. Argument on the motions was heard on June 13, 2005. For the reasons stated below, the Court GRANTS Defendant Kirkpatrick's motion in part; GRANTS Defendant Bixler's motion in its entirety; and, GRANTS Defendant Orr's motion in part.

II. BACKGROUND

This action is brought by the Securities and Exchange Commission ("SEC"). The SEC alleges that a number of Kmart employees and vendors participated in schemes that led to Kmart overstating its revenues and understating its expenses. Of the eight named Defendants, only three remain: Defendants David C. Kirkpatrick ("Kirkpatrick") and David N. Bixler ("Bixler"), who were employed by vendors who contracted with Kmart Corporation ("Kmart"), and Defendant John Paul Orr ("Orr"), who was a Kmart employee. Plaintiff settled its claims against the other named Defendants and a Final Judgment entered against them on December 2, 2004. [FN1]

> FN1. The other named Defendants were Michael J. Frank, Albert M. Abbood, Darrell J. Edquist, Thomas L. Taylor, and Randall M. Stone.

Kirkpatrick, Bixler, and Orr are alleged to have acted in concert with Kmart employees (and in Orr's case, vendors) in prematurely reporting allowances earned by Kmart under vendor contracts. Specifically, on its Form 10-K [FN2] for the 2000 fiscal year [FN3] Kmart allegedly reported vendor allowances that were to be earned in the 2001 fiscal year, as earned in the 2000 fiscal year (hereinafter referred to as "pulling forward" vendor allowances). Plaintiff alleges that the actual terms of the payments were set forth in so-called "secret side agreements" which were not disclosed to Kmart's accounting department or its independent auditor, Pricewaterhouse Coopers ("PwC").

> FN2. Although the parties do not state what a Form 10-K is, it is a financial report that issuers of securities are required to file periodically with the SEC.

> FN3. In the Complaint, Plaintiff says that Kmart's fiscal year ends the last Wednesday in January. Complaint, ¶ 15. However, at oral argument, counsel for Bixler said that Kmart's 2000 fiscal year ended January 31st.

Per Plaintiff, the practice of pulling forward vendor allowances is contrary to generally accepted accounting principles ("GAAP"), and resulted in Kmart: 1) understating its cost of goods sold, and 2) overstating its earnings in the years preceding Kmart's bankruptcy filing in January 2002. Plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 2

alleges that, collectively, the named Defendants' misconduct caused Kmart's net income for the fourth quarter and fiscal year 2000 to be overstated by approximately $24 million (or 10%) when originally reported. Kmart restated its financial statements after filing for bankruptcy to correct these and other accounting errors. Individually, Plaintiff alleges that Kirkpatrick and Bixler each caused Kmart's 2000 fiscal year net income to be overstated by $3 million (or 1.2%), and that Orr caused an overstatement of $12.35 million (or 5%). Additionally, Plaintiff alleges that Orr caused Kmart's net income to be overstated by $2.5 million in the 1999 fiscal year.

In their motions to dismiss, Defendants contend that Plaintiff failed to allege facts implicating them in Kmart's alleged wrongdoing. Moreover, they contend that the collective and individual amounts that Kmart allegedly over-and understated revenues and costs in fiscal year 2000, is insignificant vis-à-vis Kmart's total sales revenues and sales costs, which were $37 billion and $29.7 billion, respectively.

A. DEFENDANT KIRKPATRICK

*2 Defendant Kirkpatrick is a former sales manager for Coca Cola Enterprises, Inc. ("Coke"). He was Coke's National Sales Director in charge of the Kmart account during all relevant times and until January 2004, when he was asked to resign. In January 2001, Albert M. Abood ("Abood"), the Divisional Vice President of non-perishable products in Kmart's food and consumables division, allegedly contacted Kirkpatrick and said that his (Abood's) division needed $5 million from Coke to help cover a divisional shortfall. Plaintiff says Kirkpatrick agreed to pay $2 million to settle accounts for the 2000 calendar year, and to advance Kmart a $3 million vendor allowance for marketing services to be performed during the 2001 calendar year. Kirkpatrick and Abood memorialized the vendor allowance agreement in a marketing contract. Under the contract, the $3 million allowance would be deemed earned by Kmart when it sold 28, 169,000 cases of Coke. But, Coke would be entitled to a refund of any unearned portion, based on the number of cases Kmart actually sold.

When it filed its financial reports for the 2000 fiscal year, Plaintiff alleges that Kmart prematurely recognized the entire $3 million allowance as a reduction of its sales costs in the fiscal year 2000, instead of the fiscal year 2001. Plaintiff says Kmart carried out its deception by concealing the Coke contract and Kmart's potential repayment obligation from its accountants. As a result, Plaintiff says Kmart's sales costs for fiscal year 2000 were understated (and its earnings were overstated) by $3 million.

Kirkpatrick is alleged to have assisted Kmart in its misrepresentation by: 1) executing two Vendor Allowance Tracking Systems ("VATS") forms containing false information, and 2) confirming them as accurate during an independent audit in February 2001. Per Plaintiff, VATS forms are relied upon by Kmart's accounting department as a summary of the basic terms of vendor allowances. Kmart bookkeepers input information from the VATS form into the company's computerized accounting system, where it is eventually posted to the general ledger.

Plaintiff alleges that the VATS forms Kirkpatrick signed off on were written as though the $3 million advance was used during 2000, and misrepresented the effective dates of the Coke contract. Specifically, VATS form 226003 stated that $2.25 million was allowed for "case display," for an "[a]greement effective from date 2/01/2000 to 12/31/2000." VATS form 226004 stated that $750,000 was allowed for "holiday display," for an "[a]greement effective from date 11/01/2000 to 12/31/2000." Def. Kirkpatrick, Exh. D.

To ensure proper accounting, Plaintiff alleges that the VATS forms should have reflected the true purpose of, and effective dates for, the $3 million allowance. Per Plaintiff, Abood and Kirkpatrick knew or were reckless in not knowing that the VATS forms misrepresented the true terms of the advance. Plaintiff says the true terms were disclosed in the parties' contract and a subsequent letter written by Kirkpatrick. In a letter dated March 28, 2001, Kirkpatrick referred to the $3 million allowance as the "2001 Direct Marketing Fund" and indicated that it would, per the recipient's request, [FN4] be settled against the two VATS forms signed by Kirkpatrick. However, Plaintiff alleges that neither the contract nor the letter was provided to Kmart's accounting department or PwC.

> FN4. The recipient was Jim Kenny, whose position with Kmart is not known. The letter was also carbon copied to four other individuals who were only identified by name.

*3 Kirkpatrick asserts that the VATS forms that he signed were not inaccurate because Kmart did perform case display and holiday display activity

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 3

during the dates listed and, according to him, the amounts allowed reflect a fair value for those activities. Even though the allowance was not given for services performed during the dates listed on the VATS forms, Kirkpatrick essentially argues that it was within Kmart's discretion to account for the allowance as it wished so long as it fulfilled its sales obligation by the end of 2001, which he says it did. Moreover, Kirkpatrick states that the VATS forms themselves show that it was never the parties' practice to insert the dates of underlying agreements in the field requesting "effective dates." Rather, Kirkpatrick says the "effective dates" section merely referred to the dates of the activity Kmart chose to fund with the allowance. In any event, Kirkpatrick asserts that Plaintiff has not alleged any facts which suggest that he knew of or participated in Kmart's alleged concealment of the Coke contract or Kmart's repayment obligations under the contract.

B. DEFENDANT BIXLER

During the relevant time, Defendant Bixler was a National Sales Director for Pepsi-Cola Company ("Pepsi"). He was in charge of Pepsi's beverage account with Kmart. In 1997, Kmart and Pepsi entered into a multi-year agreement, under which Pepsi paid Kmart allowances for sales and promotional activities. Towards the end of Kmart's 2000 fiscal year, Abood allegedly began to pressure Bixler for additional allowances that were not included in the contract. Plaintiff alleges that Abood threatened to give an additional 10 million cases of Kmart business to Pepsi's competitor--Coke--if Bixler did not agree.

In January 2001, Plaintiff says Bixler "agreed to 'advance' or 'prepay' $3 million worth of allowances to be earned by Kmart during calendar year 2001 under the Pepsi Contract." Complaint at ¶ 79. Bixler memorialized the agreement in a letter signed by both him and Abood and dated January 11, 2001. In the letter, Bixler referred to the allowance as a pre-payment for the "Feature Ad budget" for 2001:
> The attached VATS Agreement # 219971 ($3,000,000) is to be applied to 2001 SVA Feature Ad Support.
> The Feature Ad budget for 2001 will reflect a $3,000,000 pre-payment in January for 2001.

Def. Bixler, Exh. 1(b). Bixler also signed VATS form 219971, which stated that the $3 million payment was for an "[a]greement effective from date 1/1/01 to 1/31/01." Def. Bixler, Exh. 1(c). And, in the "special comments" section of the form, he noted "Incremental R.O.P. Support--Feature Ad Payment."

*Id.*

Plaintiff alleges that the VATS form executed by Bixler misrepresented the effective date of Pepsi's allowance agreement with Kmart and falsely stated that the allowance related to "Incremental R.O.P. Support," which is a special type of advertising activity that Plaintiff says was not covered by the Pepsi contract. Plaintiff contends that Bixler knew or was reckless in not knowing that the VATS form misrepresented the true terms of the allowance. It was Bixler's "side" letter, says Plaintiff, that included the true terms of the allowance. However, Plaintiff alleges that the letter was not provided to Kmart's accounting department or PwC. Bixler disputes Plaintiff's assertion and states that, in its complaint, Plaintiff acknowledges that he sent both the letter and the VATS form to Kmart, [FN5] but does not allege that he was responsible for the two being separated.

> FN5. The Complaint does not explicitly indicate where the letter and VATS were sent, or that they were sent together.

*4 During its audit of Kmart's 2000 financial statements, PwC contacted Bixler and requested that he provide written confirmation of the VATS form he executed. However, per Plaintiff, Bixler told one or more auditors that he was reluctant to execute a written confirmation. The Complaint does not indicate whether Bixler gave an explanation for his reluctance. Therefore, a meeting was arranged. Plaintiff alleges that Bixler met with an auditor from PwC and "convinced" the auditor that Kmart earned the $3 million allowance during the 2000 fiscal year. Plaintiff states in its complaint that the auditor subsequently documented the conversation with Bixler in his work papers.

Bixler asserts that Plaintiff's allegation regarding the PwC audit falls short because it is cursory and does not provide the content of his supposed statements. Furthermore, Bixler contends that the auditor's notes, which are referenced in Plaintiff's complaint, confirm that he accurately stated the terms of the allowance agreement. Neither party provides a copy of the auditor's notes. However, Bixler's attorney, Harry Frisher, states in an affidavit that he saw a copy of them during a visit to Plaintiff's office and caused them to be transcribed verbatim. Frisher Decl. at ¶ 5. Per Frisher, the auditor wrote with regard to the allowance that Bixler "confirmed verbally that these amounts were accurate/valid allowances that were earned by K-mart during 2001." *Id.* Therefore, contrary to Plaintiff's allegations, Bixler asserts that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 4

the auditor's notes do not suggest that he made a false, inaccurate or misleading statement regarding when the allowance was earned.

Bixler also contends that Plaintiff failed to allege that the vendor advance was improper or unusual, or that he was involved in Kmart's reporting decision. Bixler asserts that the date of his letter is within the effective dates on the VATS form. In any event, he asserts that the effective dates section of the form is ambiguous. Plaintiff disputes Bixler's contention that the form was unclear about the meaning of the term "effective date," because the back side of the form explains that "effective date" means the date the agreement "starts and ends." Pl. Exh. F.

Lastly, Bixler asserts that Plaintiff failed to allege: 1) that he had knowledge that the VATS form would be used by Kmart as the basis for recording the transaction, or 2) the significance of the "effective date" and other statements on the form to Kmart's accounting department.

C. DEFENDANT ORR

Defendant Orr is a former Kmart merchandiser. From October 1999 until he was terminated on February 15, 2001, Orr was Divisional Vice President of Kmart's photo division. Orr's responsibility was to decide which film and camera products and services to offer in the retail stores and how to display them. Plaintiff alleges that several vendor allowances, including one for $2.5 million for the 1999 fiscal year and several totaling $12.35 million for the 2000 fiscal year, were pulled forward at Orr's direction.

i. $7 Million Kodak Advance

*5 Per Plaintiff, Orr met regularly with (unidentified) staff members. During those meetings he allegedly discussed pulling forward vendor allowances and reviewed schedules prepared by staff members which listed pull forward opportunities. Plaintiff alleges that Kmart's photo division projected a margin shortfall near the end of the 2000 fiscal year. Therefore, Plaintiff says that on January 31, 2001 (the last day of the 2000 fiscal year), one of Orr's subordinates asked an Eastman Kodak ("Kodak") salesman, Darrel Edquist, to advance $7 million worth of allowances to be earned throughout the 2001 calendar year. Edquist allegedly agreed and confirmed it in a memo, to an unidentified individual, whom Plaintiff alleges "made clear" that the money was an advance of allowances to be earned in 2001 (hereinafter "the Edquist memo"). Edquist also signed VATS form 222946. Plaintiff alleges this form falsely listed the effective dates of the $7 million allowance as "01/01/01 to 01/31/01." Plaintiff says the false form was subsequently given to PwC in response to a request for confirmation of the allowance.

Orr contends that Plaintiff's allegations do not implicate him in any wrongdoing. Orr points out that the Edquist memo was dated February 19, 2001, four days after he (Orr) was terminated. Moreover, he points out that there are no allegations that he: 1) told his staff to pull forward the Kodak advance or knew that the participants intended to do so; 2) reviewed or approved the VATS form; 3) submitted or directed others to submit false information to Kmart's accounting department; 4) communicated or otherwise conspired with Kodak to defraud Kmart; 5) received the Edquist memo or communicated with Edquist about its contents; 6) acted unreasonably in recording transactions; 7) had the motive or opportunity to violate or aid and abet a violation of federal securities laws; or 8) knew, or was reckless in not knowing, the impact on Kmart's financial statements or that the Kodak advance violated Kmart policy.

ii. $3.25 Million Kodak Advance

Plaintiff alleges that another $3.25 million advance was included in an allowance schedule that Orr reviewed and discussed with his staff towards the end of 2000 fiscal year. Per Plaintiff, all of the allowances on the schedule related to promotional and marketing activities for the 2001 calendar year and beyond. However, in order to pull the allowances forward, Plaintiff alleges that Orr directed his subordinates to execute a series of eight VATS forms totaling $3.25 million. [FN6] Plaintiff says all of the VATS forms misrepresented the effective dates of the allowances in fiscal year 2000. Edquist allegedly co-signed two of the largest of the VATS forms, totaling $2.5 million, and set out the true terms in a memo written on January 31, 2001. Plaintiff says this "made clear" that the money was an advance of allowances to be earned by Kmart during the 2001 calendar year. Edquist allegedly sent the memo to Orr and his subordinates in February 2001, but it was not provided to Kmart's accounting department or independent auditors.

> FN6. VATS numbers: 222920; 222921; 222922; 222924; 222935; 222936; 222947; and, 222985.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-04431-RMW    Document 28-6    Filed 02/01/2008    Page 6 of 16

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 5

*6 Orr argues that Plaintiff again failed to allege that he received the memo or that he discussed its contents with Edquist or anyone else. Orr further contends that Plaintiff's allegations suffer the same deficiencies as those concerning the $7 million advance.

iii. $2.5 Million Kodak Advance

At the end of the 1999 fiscal year (ending January 26, 2000), Plaintiff alleges that Kmart's photo division projected a profit shortfall. To address the expected shortfall, Plaintiff alleges that Orr asked Edquist for additional allowances to help the photo division make its numbers. When Edquist resisted, Orr allegedly threatened to sell the exclusive right to display product at the front of Kmart stores to a Kodak competitor, Fuji. Edquist allegedly relented and agreed to pay $2.5 million to secure Kodak's right to display product at the front of Kmart stores during the 2000 calendar year. Plaintiff alleges that Edquist further agreed to "paper" the transaction to enable Kmart to "take the money into income" immediately. Complaint, ¶ 39.

Per Plaintiff, Orr directed his subordinate to sign VATS form 197017 with Edquist. Plaintiff says the VATS form listed the effective dates of the allowance as "2/1/99 to 1/25/00," and stated that the allowance related to an "Annual Rolling Rack Program for 1999." Plaintiff says this information was false because the allowance actually related to activity scheduled for the 2000 calendar year. And, according to Plaintiff, Edquist stated in his own notes that Orr requested that Kodak complete the effective date and special comment sections on the VATS form so that it would appear that the payment was for work performed in 1999. As a consequence, Plaintiff alleges that Kmart's cost of goods sold was understated by $2.5 million in the 1999 fiscal year.

Orr argues that "pull forward" allegations for the 1999 fiscal year are not relevant, because Plaintiff's complaint centers on Kmart's alleged misrepresentations in its Form 10-K for the 2000 fiscal year. Orr also says the alleged misconduct relative to the 1999 fiscal year is not actionable because: 1) Plaintiff did not allege that Kmart's Form 10-K for the 1999 fiscal year was deficient in any way; 2) the alleged deficiency is immaterial relative to Kmart's reported net income for the 1999 fiscal year, which was $403 million; and 3) the allegations regarding the 1999 fiscal year predate the notice that was given in June 2000 (via the accounting memorandum discussed below) regarding Kmart's accounting policies, and Plaintiff did not allege that Orr received the notice.

iv. $2.1 Million Fuji Advance

Per Plaintiff, in January 2001, Fuji agreed to pay a $2.1 million allowance to secure placement of its product at favorable locations within Kmart stores during the 2001 calendar year. Plaintiff alleges that the $2.1 million allowance was subsequently pulled forward with "Orr's knowledge and assistance," [FN7] via VATS form 222915. Plaintiff says this form misrepresented the effective date of the agreement as "01/31/01 to 01/31/01." [FN8] Plaintiff alleges that the Fuji allowance was on a list of pull forwards Orr reviewed and discussed with his staff.

> FN7. Complaint, ¶ 56.
>
> FN8. The Court presumes that the effective date listed in the Complaint is not a typographical error since Plaintiff listed the same date range in its brief.

*7 Orr argues that Plaintiff does not allege any supporting facts to substantiate its assertion that he knew and assisted in the alleged misrepresentation, except its claim that the true terms of the agreement with Fuji were included in a letter sent to Orr and one of his subordinates. Because no specific information is given regarding the contents of the letter and its date, Orr contends that reference to the letter is insufficient. Orr further contends that Plaintiff's allegations regarding the Fuji advance suffer from the same deficiencies as allegations regarding the Kodak advances.

v. Accounting Memorandum

Plaintiff alleges that Kmart's accounting policies and procedures regarding vendor allowances were set forth in a memorandum dated June 26, 2000, which was "communicated" to Kmart officers and employees, including Orr. The memo stated in relevant part that "[a]llowances may only be recorded in the period for which they are earned[,]" and that income must be matched to the period in which the expense is incurred. Complaint, ¶ 31. Orr says that Plaintiff's reliance upon this document to establish that he knowingly participated in the alleged fraud is misplaced because: 1) he was only listed as a carbon copy recipient; 2) the memo directed the accounting department to review it with merchandising personnel, but there is no allegation that Orr actually received, read or understood its application to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-04431-RMW   Document 28-6   Filed 02/01/2008   Page 7 of 16

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 6

Kmart's accounting policies; and 3) there is no allegation that Orr was responsible for determining how and when Kmart recognized revenue.

In sum, Orr asserts that Plaintiff failed to allege facts to establish that he participated in the alleged fraudulent conduct or that he was aware of it. Further, he contends that there are no allegations that he was familiar with Kmart's accounting practices or responsibilities or that he was in a position to affect those practices or responsibilities.

D. MANAGEMENT LETTER

In addition to the individual allegations against Kirkpatrick, Bixler and Orr, Plaintiff alleges that a letter entitled, "Management's Responsibility for Financial Statement," ("management letter"), which included the Form 10-K for the 2000 fiscal year, was also affected by their alleged allowance misrepresentations. Kmart's Chief Operating Officer and Chief Financial Officer signed the management letter and purported to assure investors about the quality of Kmart's financial statements. However, Plaintiff alleges that Kirkpatrick, Bixler and Orr's misconduct rendered the letter false because it stated that Kmart's financial statements were prepared in accordance with GAAP, and that Kmart maintained comprehensive systems of internal controls designed to provide reasonable assurance that assets are safeguarded and transactions are executed in accordance with established procedures. Neither statement was true, says Plaintiff, because Kirkpatrick, Bixler and Orr caused allowance transactions to be recognized in a manner contrary to GAAP, and they helped circumvent Kmart's internal controls over allowances in a manner contrary to Kmart's policies and procedures.

*8 Based on the above allegations, Plaintiff asserts several claims against Defendants. Each Defendant is alleged to have violated: 1) or aided and abetted a violation of Section 10(b) the Securities Exchange Act of 1934 ("Exchange Act") [FN9] and Rule 10b-5, [FN10] promulgated thereunder (Count I); 2) the books and records provision of Rule 13b2-1 [FN11] of the Exchange Act (Count II); 3) Section 13(b)(5) [FN12] of the Exchange Act (Count III); and 4) or aided and abetted a violation of the reporting provisions of the Exchange Act--Section 13(a), [FN13] Rule 12b-20, [FN14] Rule 13a-1, [FN15] and Section 20(e) [FN16] (Count V). Additionally, Orr is alleged to have violated, and Kirkpatrick and Bixler are alleged to have aided and abetted, a violation of Rule 13b2-2 [FN17] (Count IV). Defendants move to dismiss all claims.

FN9. 15 U.S.C. § 78j(b).

FN10. 17 C.F.R. § 240.10b-5.

FN11. 17 C.F.R. § 240.13b2-1.

FN12. 15 U.S.C. § 78m(b)(5).

FN13. 15 U.S.C. § 78m(a).

FN14. 17 C.F.R. § 240.12b-20.

FN15. 17 C.F.R. § 240.13a-1.

FN16. 15 U.S.C. § 78t(e).

FN17. 17 C.F.R. § 240.13b2-2.

III. ANALYSIS

Defendants move to dismiss Plaintiff's complaint pursuant to FRCP 9(b) and 12(b)(6). When reviewing a Rule 12(b)(6) motion, the trial court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." Gazette v. City of Pontiac, 41 F.3d 1061, 1064 (6th Cir.1994); see also Miller v. Currie, 50 F.3d 373, 377 (6th Cir.1995). Because a Rule 12(b)(6) motion rests upon the pleadings rather than the evidence, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence or evaluate the credibility of the witnesses." Miller, 50 F.3d at 377. The court should deny a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Gazette, 41 F.3d at 1064; see also Miller, 50 F.3d at 377; Vemco, Inc. v. Camardella, 23 F.3d 129, 132 (6th Cir.1994). While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. In re DeLorean Motor Co., 991 F.2d 1236, 1240 (6th Cir.1993). Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. DeLorean, 991 F.2d at 1240.

Notwithstanding the liberal standard required under FRCP 12(b)(6), when fraud is alleged FRCP 9(b) requires that the allegations "be stated with particularity." The particularity requirement of Rule 9(b) serves three purposes:
  1) it ensures that allegations are specific enough to

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
**(Cite as: 2006 WL 542986 (E.D.Mich.))**

Page 7

inform a defendant of the act of which the plaintiff complains, and to enable him to prepare an effective response and defense; 2) it eliminates those complaints filed as a pretext for the discovery of unknown wrongs--a 9(b) claimant must know what his claim is when he files; and 3) it seeks to protect defendant from unfounded charges of wrongdoing which injure their reputations and goodwill.
Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 361-362 (6th Cir.2001)(quoting Vennittilli v. Primerica, Inc., 943 F.Supp. 793, 798 (E.D.Mich.1996)). Consequently, "[c]onclusory allegations that a defendant's conduct was fraudulent are insufficient." In re Air Crash Disaster at Detroit Metro. Airport v. Northwest Airlines, Inc., 737 F.Supp. 406, 407 (E.D.Mich.1989); Bovee, 272 F.3d at 361. "Instead, the complaint must describe the conduct that allegedly constitutes the fraud with some specificity." Id. "Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud." Bovee, 272 F.3d at 361.

*9 With these standards in mind, the Court considers each claim.

A. SECTION 10(b) AND RULE 10b-5 (ANTIFRAUD) VIOLATIONS

In Count I, each Defendant is alleged to have either directly violated Section 10(b) and Rule 10b-5, or aided and abetted Kmart's violation. In order to state a claim for violation of Section 10(b) [FN18] and Rule 10b-5, [FN19] a plaintiff must allege: 1) a misrepresentation or omission, 2) of a material fact, 3) made with scienter, 4) justifiably relied on by plaintiff, and 5) proximately causing injury to plaintiff. In re Comshare, Inc. Securities Litigation, 183 F.3d 542, 548 (6th Cir.1999); In re Federal-Mogul Corp. Securities Litigation, 166 F.Supp.2d 559, 562 (E.D.Mich.2001).

> FN18. Section 10(b), 15 U.S.C. § 78j(b) provides that it is unlawful:
> To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

> FN19. Rule 10b-5, 17 C.F.R. § 240.10b-5 states that:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

"At the pleading stage, a plaintiff satisfies the materiality requirement ... by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utility Co., 228 F.3d 154, 161 (2nd Cir.2000). See also Basic Inc. v. Levinson, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1987); Helwig v. Vencor, Inc., 251 F.3d 540, 563 (6th Cir.2001). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)(footnote omitted). See also Basic, 485 U.S. at 231-232 (adopting TSC standard); Helwig, 251 F.3d at 563.

"Scienter" is defined as a "mental state embracing intent to deceive, manipulate or defraud." In re Comshare, 183 F.3d at 548 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)) (quotation marks omitted). Scienter may be established through a showing of recklessness, which is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." Id at 550 (citation and quotation marks omitted). And, "[w]hile the danger need not be known, it must at least be so obvious that any reasonable [person] would have known of it." Id (citation and quotation marks omitted).

Therefore, a plaintiff can meet its burden on the scienter element by pleading facts showing a "strong inference" of recklessness. Bovee, 272 F.3d at 362.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-04431-RMW   Document 28-6   Filed 02/01/2008   Page 9 of 16

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 8

The Sixth Circuit in *Helwig* stated that a strong inference is shown when there is "little room for doubt as to the misconduct." 251 F.3d at 553. The *Helwig* Court explained that, for pleading purposes, "[i]nferences must be reasonable and strong--but not irrefutable[,] because "the task of weighing contrary accounts is reserved for the fact finder." *Id.* But, the plaintiff is only entitled to "the most plausible of competing inferences." *Id.* Neither mere negligence nor motive and opportunity alone is sufficient. *Bovee*, 272 F.3d at 549-550.

i. DIRECT VIOLATION

a. Defendants Kirkpatrick and Bixler

*10 Defendants Kirkpatrick and Bixler argue that the allegations against them, even if presumed true, do not establish a direct violation of antifraud laws. The Court agrees.

Both Kirkpatrick and Bixler were representatives of third-party vendors who allegedly indirectly contributed to Kmart's filing with the SEC in which Kmart overstated its revenues for the 2000 fiscal year and understated its expenses. However, Plaintiff cites no authority for finding a direct violation when the alleged acts are as far removed as were Kirkpatrick and Bixler's. The fraud allegedly committed was Kmart's issuance of its Form 10-K for the 2000 fiscal year, which Plaintiff says misled investors regarding Kmart's actual revenues and expenses. There are no allegations, however, that either Kirkpatrick or Bixler were directly involved in the preparation or issuance of the Form 10-K. Rather, they are only alleged to have signed off on documents--the VATS forms--which ultimately were incorporated in the figures that went into the Form 10-K filed by Kmart.

Plaintiff contends that, although Kirkpatrick and Bixler's participation was indirect, their acts were responsible for "creating" a misrepresentation regarding Kmart's revenues and expenses. None of the cases cited in support by Plaintiff, however, involves third parties as peripheral as Kirkpatrick and Bixler. For instance, in *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324 (N.D.Ga.1998), defendant was the auditor and business consultant for the subject company. Though it was an outside organization, defendant did not operate at arms length. Defendant was in-house and actively participated in management of the company as a consultant. The *Carley* Court found that although defendant was a secondary party, it could be held primarily liable for an alleged Section 10(b) and Rule 10b-5 violation because it reviewed and approved certain public financial statements before they were issued and it specifically directed the inclusion of certain false or inaccurate information into those statements. The Court stated that defendants' alleged conduct was "[m]ore than mere participation, complicity, or assistance." 27 F.Supp.2d at 1334. "Plaintiffs essentially alleged that the Defendant was the author of the alleged misstatement." *Id* at 1334-1335.

A secondary party was similarly more than peripherally involved in *SEC v. Quattrone*, LR-18534, 2004 SEC Lexis 25 (Jan. 27, 2004), an administrative proceeding cited by Plaintiff as an example of direct violations brought against vendors. Pl. Exh. D. In *Quattrone*, ten people, including officers of the subject company and several of its vendors, were alleged to have directly violated Section 10(b) and Rule 10b-5 and aided and abetted violations. The vendors allegedly executed false audit confirmations that resulted in the company overstating its revenues over several years. However, the vendors were also party to a much larger scheme. The vendors and the company allegedly orchestrated a number of so-called "round-trip" transactions, whereby they circulated money between the company, a third-party customer, and a vendor in a manner that gave the false impression that the money exchanged was part of legitimate transactions, when in fact no goods were sold:

*11 In most instances, the customer and vendor in each circle shared a common owner. False paperwork, including purchase orders, invoices, and bills of lading, was created purporting to represent sales of various cheese products from Suprema to the customer, then from the customer to the vendor, and finally from the vendor back to Suprema. On each leg of the circle--Suprema to the customer, customer to the vendor, and vendor back to Suprema--checks were circulated in purported payment for the transactions. Typically, the checks from Suprema to each vendor involved in the fraud were greater than the corresponding checks from the related customer back to Suprema. This difference in the checks represented a kick-back or "commission" paid to the common owners for their participation in the fraudulent scheme. Funds for the checks, including commissions, were drawn on Suprema's line of credit, which increased as Suprema's accounts receivable grew. With rare exception, no goods were actually sold, purchased, or exchanged in these transactions.

*Quattrone*, 2004 SEC Lexis 25, *3-4. The "round-trip" scheme, along with two other fraudulent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-04431-RMW   Document 28-6   Filed 02/01/2008   Page 10 of 16

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 9

schemes executed by the company, resulted in material misstatements in the company's filings with the SEC over four years. Notably, however, the vendors settled the claims brought against them. So, it was never actually determined that the SEC's direct 10(b) and Rule 10b-5 claims were viable.

In any event, there are no allegations that either Kirkpatrick or Bixler was involved in the preparation or issuance of Kmart's 10-K filing to the extent that the secondary parties in *Carley* and *Quattrone* were involved in their respective schemes. The Court has found no other authority and concludes that Plaintiff failed to state a direct violation under 10(b) and Rule 10b-5 against Kirkpatrick and Bixler.

b. Defendant Orr

Although Defendant Orr was a Kmart employee who was more directly involved with Kmart, there is no basis to hold him more culpable than Kirkpatrick and Bixler. Orr was the Divisional Vice President of Kmart's photo division during the relevant time. However, there are no allegations with respect to any of the allowances that he allegedly pulled forward that he was directly involved in the preparation or issuance of the Form 10-K for the 1999 or 2000 fiscal years. Like Kirkpatrick and Bixler, he is only alleged to have executed, or directed others to execute, VATS forms that were incorporated into Kmart's Form 10-K. No 10(b) or 10b-5 violation is stated against him.

ii. AIDING AND ABETTING [FN20]

> FN20. Private causes of action for aiding and abetting under Section 10(b) and Rule 10b-5 are not permitted. See *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). However, because the SEC is not considered a private party, it is entitled to bring an aiding and abetting claim. 15 U.S.C. § 78t(e).

Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had a general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir.1974). To determine whether an alleged aider and abettor had a "general awareness" that his activity was improper, the Court must consider the surrounding circumstances and expectations of the parties. *SEC v. Washington County Utility District*, 676 F.2d 218, 226 (6th Cir.1982). "[T]he defendant must have knowledge of the wrongful character of the activity, not merely knowledge of the activity which led to the wrong." *Vidosh v. Holsapple*, 1987 WL 273164, *17 (E.D.Mich.1987).

*12 The Court finds that Plaintiff adequately alleged that the primary violation was committed by Kmart. Defendants contend, however, that the primary violation fails because the amounts attributed to them are immaterial as a matter of law when compared to Kmart's total sales revenues and costs. The Court is not persuaded that it is appropriate to make such a finding at this stage of the proceedings. Dismissal as a matter of law on the ground that a misstatement or omission is immaterial is not appropriate "unless [the statements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. See *Helwig*, 251 F.3d at 563.

Notwithstanding the arguably negligible amounts alleged against Defendants (individually and collectively), [FN21] there is no basis for the Court to find, as a matter of law, that no reasonable Kmart investor would have found that the alleged manipulation of revenues and costs by Defendants "significantly altered the 'total mix' of information available" about Kmart. *TSC Industries*, 426 U.S. at 449. It is settled that "there is no numerical benchmark for materiality." *SEC v. Kahn*, 2002 WL 1163723, *7 (N.D.Ill.2002). Indeed, the *Helwig* Court succinctly points out that "[m]ateriality is about marketplace effects, not just mathematics." *Helwig*, 251 F.3d at 563 (citations omitted). Therefore, to state a claim for aiding and abetting against Defendants in this case, Plaintiff only needs to plead sufficient facts to support a finding that they had a general awareness that their acts were part of overall activity that was improper, and that they knowingly provided substantial assistance in the violation.

> FN21. The Court makes no finding regarding whether it is appropriate for Plaintiff to aggregate the amounts alleged against Defendants.

a. Defendant Kirkpatrick

Accepting Plaintiff's allegations against Kirkpatrick as true and construing all reasonable inferences in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 10

Plaintiff's favor, Plaintiff sufficiently pled an aiding and abetting claim. Plaintiff alleges that Abood advised Kirkpatrick during a meeting and through a subsequent e-mail that he needed $5 million to cover a profit shortfall for the 2000 fiscal year. Shortly thereafter, Kirkpatrick allegedly agreed to pay $2 million that was owed by Coke for the 2000 fiscal year, and to prepay an additional $3 million vendor allowance that would be earned during the 2001 fiscal year. However, Kirkpatrick executed two VATS forms totaling $3 million which, on their face, created the impression that the $3 million was tendered for an agreement that was performed during the 2000 fiscal year, because each listed effective dates during the 2000 fiscal year. Kirkpatrick is alleged to have later falsely confirmed the accuracy of the terms appearing on the face of the VATS forms with Kmart's auditors.

Reasonable jurors could infer from Kirkpatrick's alleged communications with Abood that he knew that Abood intended to report the $3 million advance as though it were earned in 2000. By signing off on the VATS forms, which were inaccurate on their face, and subsequently confirming their validity to Kmart's auditors, reasonable jurors could also find that Kirkpatrick acted knowingly and that his actions substantially assisted the overall scheme.

*13 Kirkpatrick alleges that the parties' course of dealing was such that the "effective dates" section on the VATS form was not used to reference the dates of the underlying agreement, but instead the dates of the activity Kmart chose to fund with the allowance. Kirkpatrick's assertion, however, raises a question of fact which is not properly considered on a motion to dismiss.

Defendant Kirkpatrick's motion to dismiss this claim will be denied.

b. Defendant Bixler

The facts pled against Defendant Bixler do not support Plaintiff's claim that Bixler had a general awareness that his alleged actions were part of an improper scheme or that he knowingly provided substantial assistance in the same. Unlike the allegations against Kirkpatrick, there are no direct allegations, or facts from which one could infer, that Bixler was aware of the purpose of Abood's demand for an increase in allowances. Plaintiff only alleges that Abood made his demand near the end of the 2000 fiscal year. Even when considered in conjunction with the remaining allegations, there is no basis to infer that the timing did or should have alerted Bixler to Abood's intentions.

Further, one cannot reasonably infer from the documents subsequently executed by Bixler that he was aware of Abood's intentions or that he knowingly provided substantial assistance. The effective dates listed on the VATS form--January 1, 2001 through January 31, 2001--are not inconsistent with Bixler's agreement with Abood. Per Plaintiff, Bixler agreed to give an immediate advance on allowances to be earned during the 2001 calendar year. Consistent with that agreement, Bixler indicated in the January 11, 2001 letter that the advance would be denoted by Pepsi as a pre-payment on the "Feature Ad" budget. [FN22] He also referenced the advance on the VATS form as a "Incremental R.O.P. Support-Feature Ad Payment." Although the VATS Bixler executed does not spell out the terms under which the allowance was given, it is not false on its face or inconsistent with the agreement made. [FN23]

> FN22. Plaintiff asserted during oral argument that Bixler's letter was not prepared in the ordinary course of business. However, Plaintiff did not make this allegation in the Complaint and it cannot reasonably be inferred.
>
> FN23. Note that, the Court "may consider the full text of the SEC filings, prospectus, analysts' reports and statements "integral to the complaint," even if not attached, without converting the motion into one for summary judgment under Fed.R.Civ.P. 56." Bovee, 272 F.3d at 360-361.

Plaintiff's claim that Bixler lied to the PwC auditor is also insufficient to establish his general awareness or knowing substantial assistance, because it is not pled with the requisite particularity. Plaintiff merely states that Bixler "*convinced* the PwC auditor during their face-to-face meeting that Kmart earned the $3 million allowance during the [fiscal year] 2000," and that the auditor documented the conversation in his "work papers." Complaint, ¶ ¶ 86, 88 (emphasis added). However, Plaintiff offers no facts to support its claim that Bixler "convinced" the auditor; that is, there are no allegations regarding what Bixler allegedly said or what the auditor indicated in his notes. Such conclusory allegations of fraud are insufficient under FRCP 9(b). *In re Air Crash Disaster*, 737 F.Supp. at 407; *Bovee*, 272 F.3d at 361.

The fact that Plaintiff did not give the auditor a copy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-04431-RMW    Document 28-6    Filed 02/01/2008    Page 12 of 16

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 11

of the January 11 letter also does not give rise to a reasonable inference that Bixler knew he was participating in accounting fraud. Plaintiff does not allege that Bixler knew or should have known that the auditor was not aware of the letter. And, as stated, Plaintiff does not indicate what Bixler said during the meeting. If he disclosed the material terms of the agreement, the fact that he did not also give the auditor a copy of the letter memorializing it would be immaterial for purposes of determining whether Bixler was complicit in accounting fraud.

*14 Plaintiff's aiding and abetting claim against Bixler fails.

c. Defendant Orr

Plaintiff adequately pleads aiding and abetting on two of the four pull forward transactions that Defendant Orr allegedly orchestrated. Orr is alleged to have pulled forward: 1) a $2.5 million vendor allowance from Kodak for the 1999 fiscal year; 2) a $7 million allowance from Kodak for the 2000 fiscal year; 3) a $3.25 million allowance from Kodak for the 2000 fiscal year; and 4) a $2.1 million allowance from Fuji for the 2000 fiscal year.

1. $7 Million and $2.1 Million Allowances

Plaintiff failed to state a claim against Orr for the $7 million and $2.1 million allowances. None of the allegations regarding the $7 million allowance implicates Orr. Plaintiff alleges that one of Orr's subordinates asked Kodak representative Darrel Edquist to advance $7 million worth of allowances to be earned during the 2001 calendar year. Per Plaintiff, Edquist then signed a VATS form that misrepresented the effective dates of the allowance, set forth the true terms of the agreement in a memo that "made clear" that the money was an advance of allowances to be earned throughout the 2001 calendar year, and confirmed the false VATS form with Kmart's auditor. Edquist allegedly sent a copy of his memo to one of Orr's subordinates, which Plaintiff says was never given to Kmart's accounting department or auditor.

There is a glaring absence of any allegation that Orr participated directly or that he directed the chain of events. Plaintiff does not even allege facts which indicate whether Orr was aware of the alleged actions of his subordinate and Edquist. The only allegation regarding Orr and the $7 million allowance is Plaintiff's assertion that the allowance was one of many pull forward opportunities listed on a schedule prepared by Orr's staff, which he reviewed during regular staff meetings. This assertion does not give rise to an inference of fraud by Orr and falls far short of the particularity requirement under FRCP 9(b).

Plaintiff's allegations regarding the $2.1 million Fuji advance similarly fail. The allegations are vague regarding what transpired and who was involved. Plaintiff alleges that the allowance was pulled forward "with Orr's knowledge and assistance." Complaint, ¶ 56. However, Plaintiff does not state how he knew about the pull forward or what actions he took which constitute assistance. Further, with regard to the VATS form that was allegedly falsified, Plaintiff simply says that "the parties" executed the form, without identifying the alleged parties. Complaint, ¶ 57. It is not alleged, and there is no basis for the Court to presume, that Orr was one of those parties. Moreover, Plaintiff only offers the conclusory allegation that the VATS form misrepresented the effective date of the agreement. Plaintiff does not plead supporting facts indicating what the effective date really was or that the funds were not, indeed, earned on the date indicated. In the same vein, Plaintiff alleges that the "true terms" of the agreement with Fuji were set forth in a letter sent to Orr and one of his subordinates. However, Plaintiff does not state what the true terms of the agreement were, when the letter was sent, or by whom.

*15 These allegations do not meet the threshold requirements of either FRCP 12(b)(6) or 9(b). And, contrary to Plaintiff's assertion during oral argument, Plaintiff's general allegation that all of the pull forwards attributed to Orr were "[a]t Orr's direction" is also insufficient to meet the particularity requirements of FRCP 9(b), particularly where (as here) the specific allegations do not bear out the claim. Complaint, ¶ 34.

2. $2.5 Million Allowance

Unlike the $7 million and $2.1 million advances discussed above, Plaintiff explicitly alleges direct involvement and intentional misrepresentations by Orr in the alleged pull forward of $2.5 million from Kodak into the 1999 fiscal year. Orr allegedly directed Edquist to falsify the VATS forms so that it would appear that the funds were earned during the 1999 fiscal year, and that the funds were applied to programs conducted in 1999. Complaint, ¶¶ 40-41.

These allegations, the truth of which must be presumed, sufficiently allege that Orr had a general awareness of the impropriety of his actions, that he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 12

proceeded knowingly, and that the actions constituted substantial assistance in the overall scheme to defraud investors regarding Kmart's actual revenues and expenses in the 1999 fiscal year. Orr contends that Plaintiff's allegations are insufficient because Plaintiff does not allege that the Form 10-K for the 1999 fiscal year was deficient. Plaintiff does allege, however, that Orr's actions caused the Kmart's cost of goods sold to be understated in the 1999 fiscal year. Complaint, ¶ 42.

3. $3.25 Million in Kodak Allowances

Plaintiff alleges that Orr directed subordinates to execute eight VATS forms totaling $3.25 million in vendor allowances from Kodak, for the purpose of pulling the allowances forward. Complaint, ¶ 53. Plaintiff further alleges that each of the VATS forms misrepresented the effective dates of the allowances as falling within Kmart's 2000 fiscal year. *Id.*

The Court finds that these allegations adequately plead that Orr deliberately directed subordinates to execute VATS form so that it would appear that promotional and marketing allowances were received before they actually were. Orr correctly points out that Plaintiff did not expressly allege that he directed his subordinates to misrepresent the dates on the forms, only that he directed them to execute the forms. However, it is alleged that Orr directed them to execute the VATS forms for the purpose of pulling forward allowances. By definition, a pull forward could only occur if the dates were falsified. Consequently, the Court finds that reasonable jurors could infer that Orr did effectively direct his subordinates to misrepresent the dates on the VATS forms.

As with the $2.5 million allowance, Plaintiff sufficiently alleged that Orr had a general awareness of the impropriety of his actions, that he proceeded knowingly, and that the actions constituted substantial assistance in the overall scheme to defraud investors regarding Kmart's actual revenues and expenses in the 2000 fiscal year. Defendant's motion to dismiss Plaintiff's aiding and abetting claim with regard to the $2.5 and $3.25 million allowances is denied.

B. RULE 13b2-1 AND SECTION 13(b)(5) (BOOKS AND RECORDS) VIOLATIONS

*16 In Counts II and III, Plaintiff alleges that Defendants directly violated Rule 13b2-1 and Section 13(b)(5) by causing the falsification of Kmart's books and records, and by knowingly circumventing Kmart's internal accounting controls.

Section 13(b)(2)(A) requires that issuers of securities subject to the Exchange Act's reporting provisions "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 75m(b)(2)(A). Consistent with that requirement, Rule 13b2-1 prohibits one from falsifying any corporate book, record or account subject to the provisions of the Exchange Act:

> No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.

17 C.F.R. § 240.13b2-1. Similarly, Section 13(b)(5) of the Securities Exchange Act, 15 U.S.C. § 78m(b)(5), provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" that one is required to prepare under the Exchange Act.

Unlike Section 10(b) and Rule 10b-5 claims, no showing of scienter is required to establish a violation of Rule 13b2-1. *SEC v. McNulty,* 137 F.3d 732, 740-741 (2nd Cir.1998); *SEC v. Lowy,* 2003 U.S. Dist. Lexis 8918, *68-69 (E.D.N.Y.2003). Plaintiff must, however, show that the defendant acted unreasonably. *Lowy,* 2003 U.S. Dist. Lexis 8918, at *69.

i. Defendants Kirkpatrick and Orr

Plaintiff sufficiently pled these claims against Defendants Kirkpatrick and Orr. Plaintiff alleges that Kirkpatrick falsified two VATS forms, which were incorporated into Kmart's Form 10-K filing for the 2000 fiscal year, and that he falsely confirmed the forms as accurate when Kmart's auditor's inquired. Plaintiff, likewise, alleges with regard to the $2.5 million and $3.25 million allowances, that Orr directed subordinates to falsify VATS forms. These false VATS forms allegedly caused Kmart to understate its cost of goods sold for the 1999 (Orr only) and 2000 (Orr and Kirkpatrick) fiscal years.

These allegations are sufficient to support a claim that Kirkpatrick and Orr knowingly caused Kmart's books and records to be falsified, and that they knowingly circumvented Kmart's internal accounting controls. Defendants' motion to dismiss these claims is denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 13

ii. Defendant Bixler

Both claims fail against Defendant Bixler. As discussed more fully above, Plaintiff failed to plead facts supporting its contention that Bixler falsified documents or caused any documents to be falsified, or that he knowingly circumvented Kmart's internal accounting controls.

C. RULE 13b2-2 VIOLATION

Rule 13b2-2 prohibits officers and directors from making false or misleading statements to an accountant or omitting material facts relative to the preparation of financial statements and states in relevant part:

*17 (a) No director or officer of an issuer shall, directly or indirectly:
(1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or
(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:
(i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or
(ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.
(b)(1) No officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that issuer that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading.
(2) For purposes of paragraphs (b)(1) and (c)(2) of this section, actions that, "if successful, could result in rendering the issuer's financial statements materially misleading" include, but are not limited to, actions taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor:
(i) To issue or reissue a report on an issuer's financial statements that is not warranted in the circumstances (due to material violations of generally accepted accounting principles, generally accepted auditing standards, or other professional or regulatory standards);
(ii) Not to perform audit, review or other procedures required by generally accepted auditing standards or other professional standards....
17 C.F.R. § 240.13b2-2.

i. Defendants Kirkpatrick and Bixler

Plaintiff acknowledges that Rule 13b2-2 can only be directly violated by officers and directors of the subject corporation. However, it contends that Defendants Kirkpatrick and Bixler aided and abetted Kmart employee Abood's violation of the Rule. As a vice president in Kmart's food and consumables division, which Plaintiff characterizes as a major business division within Kmart, Plaintiff contends that Abood was an officer within the meaning of the Exchange Act. Defendants do not dispute Plaintiff's characterization of Abood's position. However, they contend that Plaintiff failed to state a claim of aiding and abetting against them under Rule 13b2-2.

With regard to Kirkpatrick, Plaintiff alleges that: 1) Abood violated Rule 13b2-2 by signing a false VATS form that was provided to PwC during its audit; 2) Kirkpatrick co-signed the false VATS form, which he knew or was reckless in not knowing was false; and 3) Kirkpatrick falsely confirmed the VATS form as accurate when PwC inquired during its audit. Plaintiff contends that these allegations are sufficient to state a claim of aiding and abetting. The Court agrees. Plaintiff indisputably alleged a primary violation by Abood. [FN24] See Complaint, ¶ 70, 76. And, the allegations that the VATS forms listed effective dates that Kirkpatrick knew to be false and that Kirkpatrick confirmed the false information in the forms when PwC inquired, are sufficient to support Plaintiff's contention that Kirkpatrick had a general awareness that his actions were part of an overall scheme by Abood that was improper, that he acted knowingly, and that his actions substantially assisted Abood's scheme.

> FN24. For the reasons stated, the Court finds that Plaintiff adequately pled facts establishing the requisite materiality of the falsity.

*18 Plaintiff contends that it has adequately alleged that Bixler also aided and abetted a violation of Rule 13b2-2 by Abood because it alleges that Bixler co-signed a false VATS form, misrepresented the terms of the allowance to a PwC auditor, and failed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-04431-RMW    Document 28-6    Filed 02/01/2008    Page 15 of 16

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 14

provide the auditor with a copy of the letter he wrote which included the terms of his agreement with Abood. Plaintiff's claim fails, however, because Plaintiff has not alleged facts to support its claim that the VATS form Bixler executed was false or that he misrepresented the terms of the allowance during his meeting with PwC auditors. Further, there are no allegations that indicate that Bixler was aware that Kmart's auditor did not already have a copy of the letter, which was co-signed by Kmart employee Abood, or that Bixler played any part in concealing the letter from PwC.

ii. Defendant Orr

Because Orr was a vice president in Kmart's photo division, Plaintiff contends that he was an officer within the meaning of the Exchange Act. Therefore, Plaintiff alleges that Orr directly violated Rule 13b2-2 by "causing the falsification" of the VATS form for the $7 million vendor allowance advance from Kodak that was, in turn, provided to PwC during the 2000 fiscal year audit. Plaintiff's claim fails, however, because Plaintiff does not adequately allege that Orr directly or indirectly falsified the $7 million VATS form or that he submitted it to PwC. As discussed above, Plaintiff only alleges that Edquist and one of Orr's subordinates falsified the form, and that Edquist confirmed its allegedly false terms when PwC inquired. There are no allegations that Orr directed his subordinate or Edquist's actions, or that he was even aware of them.

D. SECTION 13(a) and RULES 12b-20 and 13a-1 (REPORTING) VIOLATIONS

Section 13(a) [FN25] of the Exchange Act, 15 U.S.C. § 78m(a) and SEC Rules 12b-20, [FN26] 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1, [FN27] promulgated thereunder, require issuers of registered securities to file various reports relative to those securities and to supplement them as necessary to ensure that they are not misleading. Plaintiff alleges that each Defendant aided and abetted Kmart's violation of these reporting provisions. Plaintiff asserts that Kmart committed the primary violation by filing a Form 10-K that contained materially false and misleading financial statements.

FN25. Section 13(a) states in relevant part:
Every issuer of a security registered pursuant to section 78l of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security--
(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.
(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

FN26. Rule 12b-20 states:
Every issuer having securities registered ... shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

FN27. Rule 13a-1 states:
Every issuer having securities registered ... shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

i. Defendants Kirkpatrick and Orr

Plaintiff has adequately stated a claim for violation of the reporting provisions by Kirkpatrick (for the $3 million allowance) and Orr (for the $2.5 and 3.25 million allowances) for the reasons stated with regard to Plaintiff's claim that they aided and abetted Kmart's violation of Section 10(b) and Rule 10b-5. Both are alleged to have knowingly executed or caused to be executed VATS forms that misrepresented the date that funds received for vendor allowances were earned.

ii. Defendant Bixler

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 542986 (E.D.Mich.)
(Cite as: 2006 WL 542986 (E.D.Mich.))

Page 15

As with the other claims against Bixler, this reporting provision claim against Bixler fails as well because Plaintiff failed to plead facts showing that Bixler made any misrepresentations on the VATS form.

VI. CONCLUSION

*19 For the reasons stated, Defendants' respective motions are decided as follows:
A. Defendant Kirkpatrick
The Court:
1. GRANTS Kirkpatrick's motion to dismiss Plaintiff's claim of a direct violation of Section 10(b) and Rule 10b-5 in Count I, but DENIES his motion on the claim of aiding and abetting violation of those provisions.
2. DENIES Kirkpatrick's motion to dismiss Count II (violation of Rule 13b2- 1);
3. DENIES Kirkpatrick's motion to dismiss Count III (violation of Section 13(b)(5));
4. DENIES Kirkpatrick's motion to Dismiss Count IV (violation of Rule 13b2- 2); and
5. DENIES Kirkpatrick's motion to Dismiss Count V (violation of Section 13(a), Rule 12b-20, Rule 13a-1, and Section 20(e)).
B. Defendant Bixler
The Court GRANTS Defendant Bixler's motion in its entirety.
C. Defendant Orr
The Court:
1. GRANTS Orr's motion to dismiss Plaintiff's claim of a direct violation of Section 10(b) and Rule 10b-5 in Count I; GRANTS the motion on the claim of aiding and abetting violation of those provisions with regard to the $7 million and $2.1 million allowances, and; DENIES the motion on the claim of aiding and abetting violation of those provisions with regard to the $2.5 and $3.25 million allowances.
2. GRANTS Orr's motion to dismiss Count II (violation of Rule 13b2-1) with regard to the $7 million and $2.1 million allowances, but DENIES Orr's motion on the remaining allowances ($2.5 and $3.25 million);
3. GRANTS Orr's motion to dismiss Count III (violation of Section 13(b)(5)) with regard to the $7 million and $2.1 million allowances, but DENIES Orr's motion on the remaining allowances ($2.5 and $3.25 million);
4. GRANTS Orr's motion to Dismiss Count IV (violation of Rule 13b2-2); and
5. GRANTS Orr's motion to Dismiss Count V (violation of Section 13(a), Rule 12b-20, Rule 13a-1, and Section 20(e)) with regard to the $7 million and $2.1 million allowances, but DENIES Orr's motion on the remaining allowances ($2.5 and $3.25 million).

IT IS SO ORDERED.

Slip Copy, 2006 WL 542986 (E.D.Mich.)

Motions, Pleadings and Filings (Back to top)

• 2004 WL 3122324 (Trial Pleading) Complaint (Dec. 02, 2004)

• 2:04cv74702 (Docket) (Dec. 02, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.