1

2

3

4                                                    **E-FILED on _____5/7/2008_____**

5

6

7

8

9

10                    IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                           SAN JOSE DIVISION

13

14

15  SECURITIES AND EXCHANGE                 No. C-07-04431 RMW
    COMMISSION,
16                                          ORDER GRANTING IN PART AND
                   Plaintiff,               DENYING IN PART MS. BERRY'S MOTION
17                                          TO DISMISS
             v.
18                                          **[Re Docket No. 14]**
    LISA C. BERRY,
19
                   Defendant.
20

21
            Defendant Lisa C. Berry ("Berry") moves to dismiss the complaint filed by the plaintiff, the
22
    Securities and Exchange Commission ("SEC").  The SEC opposes the motion.  The court has read
23
    the moving and responding papers and considered arguments of counsel.  For the reasons set forth
24
    below, the court grants in part and denies in part Ms. Berry's motion to dismiss.  The SEC is granted
25
    30 days leave to amend the complaint.
26
                               **I.  BACKGROUND**
27
            Lisa C. Berry is a lawyer with a masters of law in taxation.  Compl. ¶ 11.  From September
28
    1996 through June 1999, she served as Vice Present and General Counsel of KLA-Tencor

1  Corporation ("KLA"). *Id.* She left KLA to become the General Counsel of Juniper Networks, Inc.

2  ("Juniper") in June 1999 (and also became Vice President and Secretary in July), where she served

3  until January 2004. *Id.*

4      Both KLA and Juniper have recently admitted to backdating stock options. Compl. ¶ 68.[1]

5  The SEC believes Ms. Berry "devised" the backdating practice at KLA, and then took the practice to

6  Juniper. *Id.* ¶ 1. The SEC alleges that Ms. Berry was one of the architects of backdating and a

7  vector by which the practice spread throughout the Valley.

8      **A.    Ms. Berry's Tenure at KLA**

9          **1.    KLA's Backdating**

10     KLA used stock options to "recruit, retain, and incentivize key employees." Compl. ¶ 14.

11  KLA's primary stock option plan prohibited the corporation from granting in-the-money[2] stock

12  options to its employees. *Id.* ¶ 15. The plan required the board of directors to set the exercise price.

13  *Id.*¶ 15. The board delegated this responsibility to a Stock Option Committee consisting of three

14  directors. *Id.* ¶ 22. At least two of the members had to approve each stock option grant. *Id.* ¶ 22.

15  The SEC alleges that Ms. Berry was familiar with these requirements because she signed and filed a

16  Form S-8 registration statement attaching the stock option plan on August 7, 1998. *Id.* ¶ 16.

17     The SEC alleges that Ms. Berry worked with the Stock Option Committee during her two

18  years at KLA and that she "oversaw the administration of the stock option grant process." *Id.* ¶ 23.

19  She allegedly "put in place" procedures to enable the committee to award in-the-money option

20  grants, namely, by deliberately delaying the award of option grants to employees to "allow the

21  selection of historically low stock prices with the benefit of hindsight." *Id.* ¶ 24. Ms. Berry

22

23          [1]    The SEC's complaint actually omits any allegation regarding the amount of
    backdating at KLA. Nonetheless, the court may take judicial notice of SEC filings. *E.g.*, *In re*
24  *CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953-54 (N.D. Cal. 2007); *In re Copper Mountain Sec.
    Litig.*, 311 F. Supp. 2d 857, 865 (N.D. Cal. 2004); *In re Calpine Sec. Litig.*, 288 F. Supp. 2d 1054,
25  1076 (N.D. Cal.2003). In its 10-K for 2006, KLA admitted to widespread backdating requiring a
    restatement of its financial reporting. *See generally* KLA-Tencor, Inc., Annual Report (Form 10-K)
26  (Jan. 26, 2007).

27          [2]    An "in-the-money" stock option is an option with an exercise price less than the
    stock's actual price. Theoretically, one could exercise an "in-the-money" stock option when it is
28  granted and realize the difference between the option's exercise (or strike) price and the stock's
    market value (provided one could exercise the option immediately).

accomplished this by directing Human Resources to prepare the grant approval paperwork and directing the selection of the backdated exercise price. *Id.* ¶ 25. The paperwork for the backdated stock option grants was then executed by Stock Option Committee members (as required by the stock option plan). *Id.* From there, the grant approvals were provided to HR to enter the grants into KLA's options tracking database system. *Id.* ¶ 26. Using this procedure, Ms. Berry allegedly directed the grant of backdated options to new employees ("new hire" grants) and current employees ("peak performance" grants). *Id.* ¶ 27.

This process is detailed in the instructions Ms. Berry allegedly gave to KLA's HR department before she left and went to work for Juniper. *Id.* ¶ 34. Ms. Berry allegedly taught the HR department to (1) make a list of newly hired employees; (2) wait several weeks; (3) prepare a list of KLA's daily closing stock prices for that period; (4) highlight the three or four lowest closing prices; and (5) forward both the list of employees and highlighted list of stock prices to the Stock Option Committee. *Id.* Using this procedure developed by Ms. Berry, the SEC alleges that KLA's backdating continued after she left.

The SEC alleges two illustrations of the practice. KLA awarded stock grants to several new hires, current employees, and officers bearing a purported grant date of August 31, 1998, when the stock's closing price was $10.63. *Id.* ¶ 28. However, these grants were actually made in October of 1998 when the stock was trading between $10.75 and $13.81. *Id.* The August grant date was the stock's lowest price for at least three months prior to October 1998. *Id.* The rewarded employees apparently included Ms. Berry; she allegedly received options to purchase 22,000 shares. *Id.* ¶ 29. The second illustration comes just two months later, when KLA's stock had continued to climb. The SEC alleges that KLA made a one-time, one hundred-share grant to thousands of KLA employees bearing a grant date of October 19, 1998, when the stock closed at $27.6250. *Id.* ¶ 30. The selection of the actual grant date, however, allegedly occurred in December, when the stock price was over $40. *Id.* In total, the SEC alleges that Ms. Berry used hindsight to backdate stock option grants approximately ten times during her tenure at KLA. *Id.* ¶ 32.

**2.    Ms. Berry's Knowledge Regarding the KLA Backdating**

1    The SEC notes that Ms. Berry majored in accounting in college, Compl. ¶ 11, and points to

2    two instances that allegedly demonstrate Ms. Berry's knowledge of the impropriety of KLA's stock

3    option granting practices.  The SEC does so by selectively quoting passages from two internal KLA

4    documents in its complaint.  *See id.* ¶¶ 31, 33.  Ms. Berry requests that the court take judicial notice

5    of both documents in their entirety and has submitted them for judicial notice; the SEC does not

6    oppose this request.

7    The first document is a low-quality copy of an email exchange that shows Ms. Berry's

8    circulation of a memo regarding options grants in early December of 1998.  *See* Docket No. 15, 07-

9    04431-RMW, Saniefar Decl., Ex. A (N.D. Cal. Nov. 19, 2007).  Leslie Wilson responded to the

10   email circulating the memo, voicing concerns about using October 19, 1998 as a date for the options

11   grants.  She wrote:

12       The October 19th date is in conflict with what was communicated in Ken's first
         memo i.e. "The date and price of the stock option grant will be determined at a
13       meeting of the Stock Option Committee that will take place between **November
         5, 1998** and December 31, 1998."  If we can choose the October 19th date, then
14       maybe there should be some communication around this.  This is Lisa's call.

15   *Id.* (emphasis in original).  Ms. Berry responded to this email three hours later:

16       I think we can use the October 19 date because that was the date it was discussed
         at the board meeting - the approval date was up to the stock option committee.
17       November 5 came up because that was the date of the all employee meeting.  I
         don't think anyone is going to argue since the price was lower on October 19.
18
19   *Id.* Joy Nyberg responded to this email the next afternoon.

20       The first [issue] is whether we would be able to pass the 'audit' test of not setting a
         date in the past in order to get a better price.  Since the date and price were not
21       announced at the All Employee Meeting on November 5th and a memo went out
         from Ken Levy to all employees stating that the decision would be made at a
22       meeting between November 5 and December 31, it looks like we are picking the
         October 19th date for the price.  If I am reading your response correctly it sounds
23       like from a legal standpoint you think we could pass the audit test if challenged.
         Please confirm.

24   *Id.* At this point, the document's quality deteriorates.[3]  Ms. Berry's response to the email asking for

25   her confirmation on the legality of the option grant reads "My responses are in red."  *Id.*  A portion

26   inserted below Nyberg's email appears to contain faded text (likely red text, printed grey and

27

28       [3]    It should be noted that the document's Bates stamp ("MLB/KLA-SEC 00052520")
     indicates that it was produced by KLA to the SEC, then presumably produced to Ms. Berry from the
     SEC's files.

ORDER GRANTING IN PART AND DENYING IN PART MS. BERRY'S MOTION TO DISMISS— C-07-04431 RMW
TSF                                                    4

successively faded by reproduction).  This was most likely Ms. Berry's answer; however, it is

impossible to determine how Ms. Berry responded to this query on the state of the current record.

The second document referenced by the SEC and provided by Ms. Berry is a copy of a memo

intended for Larry W. Sonsini at Wilson Sonsini Goodrich & Rosati and cc'ed to Judith Mayer

O'Brien.  The document's fax cover sheet indicates it is Judith's copy.  *See id.*, Ex. B.  The document

is also marked "Attorney-Client Privilege" and "Attorney Work Product" and Bates stamped "KLA-

SEC."

The memo purports to be a summary of the past two board meetings to inform Mr. Sonsini of

developments at KLA because KLA's outside directors had requested Mr. Sonsini's attendance at an

upcoming meeting.  The first section, and the section cited by the SEC, discuss KLA's recent

repricing of some employees' options at the board's August meeting.[4]  In October, excluded

executives appear to have demanded a similar deal.  In describing what happened to Mr. Sonsini,

Ms. Berry wrote:

> In order to address the potential accounting problems, the Board agreed that the
> officers would have to return the required paperwork by the October 23 which
> would be the date of repricing.  As fate would have it, the stock price rose from
> $27.83 to $33.94 between October 19 and October 23.  There was significant
> complaining by certain officers about the repricing date being October 23 rather
> than October 19.  As a result, Ken Levy presented to each of the Board members
> a compromise that would not cost the company *a charge to its P&L* (if we were to
> have used the October 19 date, the charge would have been approximately $3.5
> million).  The Board subsequently approved the following arrangement - the
> previously granted "in-lieu" options would be granted as previously approved and
> the repricing of options would be at a less than one for one arrangement such that
> the total options before and after repricing would be the same.

*Id.* (emphasis added to passage by the SEC).

### 3.    Ms. Berry's Alleged Misstatements at KLA

The SEC alleges that various KLA filings were fraudulent because of misstatements

regarding KLA's options practices.  Compl. ¶¶ 20-21, 36-40.  In summary form, the SEC alleges that

Ms. Berry should be held liable for the following public statements:

---

[4]    While stock options become tremendously valuable when a company's stock rises,
they become virtually worthless when a stock's value declines.  Such "underwater" options no longer
incentivize the employees who had staked their fortunes on the company's success.  In such
situations, companies often exchanged "underwater" options for new options in the hope of
motivating employees.

| Type of Filing | Dates | Ms. Berry's Alleged Role |
|---|---|---|
| Form 10-K | Sept. 28, 1998<br>Oct. 15, 1999 | Ms. Berry "reviewed, discussed, and finalized" KLA's annual reports. Compl. ¶¶ 21, 37. |
| Proxy statements | Sept. 28, 1998<br>Oct. 15, 1999 | Ms. Berry "reviewed, discussed, and finalized" KLA's proxy statements. Compl. ¶¶ 20, 21. She also signed them. *Id.* ¶ 61. |
| Form 10-Q | 1997 through March 31, 1999 | Ms. Berry "reviewed, discussed, and finalized" KLA's quarterly reports. Compl. ¶ 38. |
| Form S-8 | Jan. 30, 1998<br>Aug. 7, 1998 | Ms. Berry "reviewed and prepared" Form S-8 offering documents and signed them. These filings incorporated the false financial statements discussed above. Compl. ¶ 39. |

**B.      Ms. Berry's Tenure at Juniper**

Ms. Berry became Juniper's general counsel on June 18, 1999. Compl. ¶ 41. When she applied for the job, Ms. Berry allegedly claimed that she had "experience in stock administration and the review of financial statements." *Id.*

**1.      Juniper's Backdating**

Juniper went public six days after Ms. Berry began working as general counsel. *Id.* ¶ 42. Juniper hired hundreds of employees following its IPO, and routinely used stock options to recruit, compensate, and retain its new employees. *Id.* Meanwhile, Juniper informed investors that it granted stock options at fair market value and that, while its stock option plans permitted Juniper to issue stock options at 85% of fair market value, Juniper never granted stock options for less than fair market value. *Id.* ¶ 43. Juniper's annual reports and proxy statements affirmed that it granted options at fair market value and that it did so to avoid a need to recognize a compensation expense. *Id.* ¶¶ 44, 45. Nevertheless, in March, 2007, Juniper announced that its audit committee had investigated its option granting practices and that the company would have to charge an additional $894.7 million in compensation expenses against its past six years of earnings. *Id.* ¶ 68.

1    The SEC alleges that Juniper's backdating began when Ms. Berry recommended that the

2    company form a stock option committee with the delegated authority to make stock option grants to

3    non-executives. *Id.* ¶ 47. Ms. Berry served on the committee and oversaw Juniper's stock option

4    administrator. *Id.* ¶ 48. From this perch, Ms. Berry allegedly orchestrated Juniper's myriad

5    backdating schemes. *Id.*

6    As alleged by the SEC, Juniper's backdating occurred for a variety of reasons. The first

7    species of backdating was used to reward new hires. To begin, Ms. Berry allegedly compiled lists of

8    newly hired employees and Juniper's stock prices. *Id.* ¶ 49. She then selected the date of a low

9    closing price and created minutes to indicate that the stock option committee had met on that date.

10   *Id.* At that "meeting," the stock option committee purportedly granted stock options to the newly

11   hired employees. *Id.* Ms. Berry then signed the minutes and either obtained the signatures of the

12   other members or used a signature stamp of the other committee members' signatures to perfect the

13   purported minutes. *Id.* ¶ 50. Ms. Berry then allegedly contacted the stock option administrator, who

14   entered the backdated option grant dates into Juniper's database. *Id.* ¶ 51. The SEC alleges that in

15   total Ms. Berry backdated more than 50 grants of stock options to new employees between June

16   1999 and May 2003 using this scheme. *Id.* ¶ 54; *see, e.g., id.* ¶¶ 52, 53.

17   The SEC alleges that Ms. Berry also masterminded Juniper's backdated "ongoing" grants to

18   retain employees. *Id.* ¶ 55. To illustrate, the SEC identifies the "evergreen" grant of October 4,

19   1999. *Id.* Despite what Juniper's meeting minutes say, the SEC alleges that the stock option

20   committee never met on October 4, but instead, Ms. Berry selected that date (the lowest in the

21   quarter to date) on November 5, 1999. *Id.* Using the October 4 date, Ms. Berry allegedly doled out

22   so many stock options from the "evergreen" grant that Juniper later incurred $100 million in

23   expenses from the grants. *Id.* ¶ 56.

24   Another alleged practice involved assigning "pools" of stock options to business unit

25   managers to grant to their employees at their discretion. *Id.* ¶ 57. Ms. Berry allegedly backdated

26   seven "pools" of options for managers to use to reward their employees. *Id.* For example, one pool

27   was purportedly created at a stock option committee meeting on December 21, 2000 (the lowest

28   stock price in six months). *Id.* ¶ 58. But Ms. Berry allegedly left the country early that morning and

ORDER GRANTING IN PART AND DENYING IN PART MS. BERRY'S MOTION TO DISMISS— C-07-04431 RMW
TSF                                                         7

no meeting actually occurred.  *Id.*  Once the pools had been created, the managers could presumably distribute the stock options at their discretion to reward their employees, all the while claiming the past grant date.

Finally, Juniper allegedly used stock option backdating to sweeten option repricing. Juniper's stock price in 2001 was substantially lower than in 1999 and 2000, and hence the stock options granted in those years (even the backdated ones) were essentially worthless by 2001.  *Id.* ¶ 60.  In April 2001, Ms. Berry allegedly implemented a program to grant new options to Juniper employees based on how many underwater stock options they owned and how long they had worked at Juniper.  *Id.*  While the stock options were purportedly granted on April 4 (when Juniper's stock traded at $29.19/share), the SEC alleges that Ms. Berry actually selected that date by hindsight and the options were really granted on April 19 (when Juniper's stock traded at $65.58/share).  *Id.*

### 2.   Ms. Berry's Knowledge Regarding the Juniper Backdating

The SEC generally alleges that Ms. Berry knew or was reckless in not knowing that the grant dates on Juniper's employees stock options were false and that these false grant dates rendered Juniper's public statements false and misleading.  *See* Compl. ¶ 61.  Unlike the two documents that the SEC quoted from Ms. Berry's tenure at KLA, the SEC does not allege any specific circumstances demonstrating Ms. Berry's knowledge regarding the backdating at Juniper.

### 3.   Ms. Berry's Alleged Misrepresentations at Juniper

The SEC alleges that various Juniper filings were fraudulent because of misstatements regarding Juniper's options practices.  Compl. ¶¶ 62, 65-67.  Again, the SEC alleges that Ms. Berry should be held liable for the Juniper public statements summarized below:

| Type of Filing | Dates | Ms. Berry's Alleged Role |
|---|---|---|
| Form 10-K | 1999 through 2002 | Ms. Berry "reviewed and discussed" Juniper's annual reports.  Compl. ¶¶ 62-64. |
| Form 10-Q | 1999 through 2003 | Ms. Berry "reviewed and discussed" Juniper's quarterly reports.  Compl. ¶ 65. |

| Form 8-K | April 10, 2003<br>July 10, 2003<br>Oct. 9, 2003 | Ms. Berry "reviewed" these documents containing announcements of Juniper's financial results.  Compl. ¶ 66. |
|---|---|---|
| Form S-8 | March 14, 2000<br>Aug. 18, 2000<br>Dec 12, 2000<br>March 29, 2001<br>Dec. 21, 2001<br>July 9, 2003 | Ms. Berry "reviewed" Juniper's Form S-8 registration statements.  These filings incorporated the false financial statements discussed above.  Compl. ¶ 39. |

**C.    Ms. Berry's Gains**

The SEC alleges that Ms. Berry received backdated options once during her time at KLA. Compl. ¶ 69.  Ms. Berry also allegedly received backdated options on five instances at Juniper.  *Id.*

Over time, Ms. Berry has exercised "certain" stock options.  *Id.* ¶ 71.  She has also sold stocks she received from exercising those options.  *Id.*  The SEC does not specifically allege, however, that Ms. Berry ever exercised a backdated stock option.  The SEC submits that Ms. Berry was motivated to continue backdating options to enrich herself and her fellow executives, but the SEC does not allege that Ms. Berry ever directly benefitted from backdating at KLA or at Juniper.

## II.   ANALYSIS

**A.    The Statute of Repose**

As a preliminary matter, Berry moves to bar the SEC from seeking relief for claims arising before August 28, 2002, which would effectively remove allegations regarding Ms. Berry's work at KLA from this case.

Unless otherwise provided by Congress, federal law has a general statute of repose that imposes a five-year window on enforcement proceedings seeking "any civil fine, penalty, or forfeiture, pecuniary or otherwise[.]"  28 U.S.C. § 2462.  According to the D.C. Circuit, a "penalty" as used in section 2462  is "a form of punishment imposed by the government for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties by the defendant's action."  *Johnson v. SEC*, 87 F.3d 484, 488 (D.C. Cir. 1996).  Berry argues that the

1    SEC's requested relief is punitive and therefore subject to the five-year period.  The SEC argues that

2    it seeks equitable relief, not punitive relief, and therefore the repose period does not apply.

3          The SEC's complaint specifically seeks four types of relief.  First, it requests a permanent

4    injunction barring Berry from violating various securities laws.  Compl. at 21.  Second, it seeks

5    disgorgement of ill-gotten gains with prejudgment interest.  *Id.* at 22.  Third, it requests civil

6    penalties pursuant to the Securities Act and the Exchange Act.  *Id.*  Fourth, it seeks to enjoin Berry

7    from serving as the officer or director of a publicly-traded company.  *Id.*

8          Applying the D.C. Circuit's definition of "penalty," other courts have held that a request for

9    disgorgement is not barred by section 2462, but requests for a permanent injunction, an officer and

10   director bar, and monetary penalties are subject to the statute of repose.  *See, e.g., SEC v. DiBella*,

11   409 F. Supp. 2d 122, 128 & fn. 3 (D. Conn. 2006).  The SEC's request for an injunction, officer and

12   director bar, and penalties do not seek to "remedy the damage caused," they seek to punish Ms.

13   Berry for her role in the alleged backdating.  *See id.*; *see also Johnson*, 87 F.3d at 489 (comparing a

14   six-month suspension and censure to disbarment and describing both as "penalties"). On the other

15   hand, the disgorgement request is not a "penalty" within the D.C. Circuit's construction of 2462

16   because it is limited to remedying the harm done.  *SEC v. Jones*, 476 F. Supp. 2d 374, 385 (S.D.N.Y.

17   2007).  Indeed, if the alleged scheme produced no ill-gotten gains, there is nothing to disgorge.

18         Ms. Berry argues that all of the relief sought by the SEC is "punitive" because the SEC has

19   chosen to pursue her alone, as indicated by its decision to sue her for aiding and abetting securities

20   fraud while not suing any primary violators.  Whether relief is "punitive" within section 2462 is an

21   objective inquiry, not a subjective one.  *Johnson*, 87 F.3d at 488.  Just as it is irrelevant that the

22   defendant finds the relief "painful" or "disagreeable" to deciding whether certain relief is "punitive,"

23   *see id.*, the SEC's motives cannot convert a suit seeking only to "remedy the damage caused" into

24   one seeking a punishment subject to the five-year bar.

25         On the other side, the SEC argues that "none" of its requested relief is punitive (despite the

26   fact that the third item listed in its prayer for relief is "civil penalties") within the meaning of section

27   2462.  The SEC argues that the injunctive relief it seeks is strictly equitable.  For support, the SEC

28   relies on *SEC v. Rind*, 991 F.2d 1486 (9th Cir. 1993), where the Ninth Circuit held that there is no

1 | statute of limitations governing SEC enforcement actions seeking equitable relief.  The court in *Rind*

2 | pointed out that a statute of limitations would frustrate the SEC's duty to vindicate a public right or

3 | interest and to safeguard the public interest by enjoining securities violations.  *Id.* at 1491.

4 | However, the Ninth Circuit's opinion in *Rind* is devoid of any consideration of section 2462, which

5 | explicitly applies to all actions unless Congress provides otherwise.  Accordingly, the rule in *Rind* is

6 | not particularly persuasive if the SEC seeks a "penalty."  The question, though, is whether the Ninth

7 | Circuit would follow the D.C. Circuit's definition of "penalty" or adopt a definition that excludes

8 | from the definition of a "penalty" any remedial action to protect the public.  In light of the policy

9 | considerations discussed in *Rind*, the court concludes that the relief sought by the SEC is not

10 | punitive except for the civil penalties it seeks.  Therefore, the only thing barred by section 2462 is

11 | the civil penalty for conduct occurring more than five years before the complaint was filed.[5]

12 | The SEC argues that in any event section 2462's limitations period is subject to equitable

13 | tolling or limited by the discovery rule.  Whether these principles apply to section 2462 may be

14 | unclear historically, *see SEC v. Alexander*, 248 F.R.D. 108, 119-20 (E.D.N.Y. 2007), but the Ninth

15 | Circuit rule is clear.  Section 2462 is not subject to the discovery rule, but "section 2462 is subject to

16 | equitable tolling."  *FEC v. Williams*, 104 F.3d 237, 241 (9th Cir. 1996); *accord with Alexander*, 248

17 | F.R.D. at 120 (suggesting in dictum that claims related to stock options backdating should be tolled

18 | if the backdating was fraudulently concealed).  If the SEC can demonstrate that (1) Ms. Berry's

19 | conduct resulted in concealment of the operative facts; (2) the SEC failed to discover the operative

20 | facts within the limitations period; and (3) the SEC acted with due diligence before it discovered Ms.

21 | Berry's alleged backdating, the section 2462 statute of repose may be tolled.

22 | In *Williams*, the Ninth Circuit held that the Federal Election Commission received sufficient

23 | information from campaign reporting disclosures that it could have discovered the impropriety had it

24 | investigated.  104 F.3d at 241.  At this stage, the court cannot say whether the SEC acted with

25 | diligence.  As alleged, Ms. Berry concocted a paper trail of falsified minutes to conceal her

26 | fraudulent scheme.  The SEC may be able to successfully allege that Ms. Berry fraudulently

27 |

28 | ———————————
[5]      The *Rind* opinion's holding that there is no statute of limitations on SEC enforcement of securities violations is correct with respect to the disgorgement remedy because disgorgement does not trigger section 2462.

ORDER GRANTING IN PART AND DENYING IN PART MS. BERRY'S MOTION TO DISMISS— C-07-04431 RMW
TSF
11

1    concealed her conduct at KLA and some of her conduct at Juniper (the remainder of her conduct

2    occurred within the five years before the complaint was filed). The SEC may also be able to

3    demonstrate its due diligence in policing stock options grants. Accordingly, the court will grant the

4    SEC leave to amend its complaint to allege that the statute of repose has been tolled by Ms. Berry's

5    fraudulent concealment.

6         **B.    The Applicable Pleading Standards**

7         The parties begin by contesting numerous aspects of the pleading standard.

8         A heightened pleading standard applies to claims of fraud. Fed. R. Civ. P. 9(b). The

9    heightened pleading standard applies to any claim "grounded" in fraud, that is, claims where some

10   fraudulent (as opposed to negligent) conduct serves as an element of the claim. *See In re Stac Elecs.*

11   *Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996). For its claims grounded in fraud, the SEC must

12   allege the "who, what, where, when, and how" of the fraudulent conduct. *Vess v. Ciba-Geigy Corp.*,

13   317 F.3d 1097, 1106 (9th Cir. 2003).

14        The heightened pleading standard imposed by Rule 9(b) does not extend to every element of

15   a claim grounded in fraud. Rule 9(b) is explicit that "[m]alice, intent, knowledge, and other

16   conditions of a person's mind may be alleged generally." Accordingly, the SEC may allege scienter

17   generally. *E.g., SEC v. Levin*, 232 F.R.D. 619, 623 (C.D. Cal. 2005); *SEC v. ICN Pharmaceuticals,*

18   *Inc.*, 84 F. Supp. 2d 1097, 1098-99 (C.D. Cal. 2000).

19        Congress created a limited exception to this general rule for private securities fraud suits

20   when it passed the Private Securities Litigation Reform Act (PSLRA). *See* 15 U.S.C. § 78u-4(b)(2).

21   In *private* actions for securities fraud, the plaintiff must allege intent with particularity and create a

22   strong inference that the defendant acted with that intent. *Id.* The Supreme Court recently explained

23   that the requirement of a strong inference discourages abusive private litigation. *See Tellabs, Inc. v.*

24   *Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2507-09 (2007). The court also placed the PSLRA's

25   stricture in context, explaining how it diverges from Rule 9(b) and repeatedly noting the limitation

26   of its application to private actions. *See id.*

27

28

1      Ms. Berry recognizes that the PSLRA does not apply to the SEC but argues that the "strong

2  inference" of scienter it requires applies to SEC actions by analogy.  For support, Ms. Berry relies on

3  a number of district court opinions.  While such opinions exist, their reasoning is not convincing.

4      Ms. Berry first cites *SEC v. Durgarian*, 477 F. Supp. 2d 342 (D. Mass. 2007).  The

5  *Durgarian* court clearly held that "the SEC must also 'set forth facts giving rise to a 'strong

6  inference' that the defendants acted with the required state of mind.'"  477 F. Supp. 2d at 353.  The

7  court quotes its legal standard from a recent First Circuit case, *In re Stone & Webster, Inc.,*

8  *Securities Litigation*, 414 F.3d 187, 204 (1st Cir.2005).  As its name demonstrates, however, *Stone*

9  *& Webster* was a private securities class action subject to the PSLRA's strong inference standard.

10  *See generally* 414 F.3d at 191, 194-96 (describing the plaintiff class and the application of the

11  PSLRA).  Simply, the *Durgarian* court appears to questionably extend the authority of *Stone &*

12  *Webster* to an SEC enforcement proceeding.[6]

13      Ms. Berry cites in her reply *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y.

14  2007).  There, the court noted that the PSLRA's strong inference standard applies only to private

15  securities litigation, but that Rule 9(b) nonetheless requires a "strong inference" of scienter under

16  Second Circuit law.  524 F. Supp. 2d at 487-88.  While binding in the Second Circuit, that precedent

17  is of questionable validity given that it is irreconcilable with the plain text of Rule 9(b).  *See Tellabs*,

18  127 S.Ct. at 2507-08.[7]  Furthermore, the Second Circuit rule underlying the *Collins & Aikman*

19  decision is contrary to Ninth Circuit precedent holding that Rule 9(b) explicitly allows intent to be

20  alleged generally.   *In re GlenFed, Inc. Secs. Litig.*, 42 F.3d 1541, 1546-47 (9th Cir. 1994) (en banc),

21  *cf. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163

22  (1993) (strictly construing the text of Rule 9(b) and applying it only to claims of fraud and mistake).

23  _____

24      [6]      This court's recent statement that scienter may be pleaded generally only where the
matter does not involve fraud or mistake in footnote eight of *SEC v. Baxter*, 2007 WL 2013958

25  (N.D. Cal. 2007) is incorrect as applied to enforcement actions brought by the SEC.  *Accord In re
GlenFed*, 42 F.3d at 1546.

26      [7]      The Court explained in *Tellabs* that the Second Circuit had developed the strictest

27  interpretation of Rule 9(b).  127 S.Ct. at 2507-08.  Congress then adopted this standard, but
expressly limited it to private securities suits.  *Id.* at 2508.  Congress did not adopt such a standard

28  for suits brought by the SEC.  Had Congress intended to apply a "strong inference" of scienter
pleading requirement to all securities cases, it would not have expressly limited its application to
private securities cases.

1    Similarly, the court questions the "strong inference" required by *SEC v. Lucent Technologies*

2   *Inc.*, 2005 WL 1206841 (D.N.J. 2005). That court too recognized that the PSLRA does not apply to

3   the SEC, but that the Third Circuit's interpretation of Rule 9(b) required pleading facts that support a

4   "strong inference" of scienter. 2005 WL 1206841 at *5 (citing *In re Burlington Coat Factory Secs.*

5   *Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)). As discussed above, the Ninth Circuit has not construed

6   Rule 9(b) so expansively. Instead, it has followed Rule 9(b)'s text, which permits intent to be

7   alleged generally. Hence, just as Rule 9(b)'s heightened pleading standard applies to the SEC's

8   claims grounded in fraud, Rule 9(b)'s exception allowing for a general allegation of intent also

9   applies to the SEC's claims.

10   **C.    The Securities Fraud Claims**

11    The SEC's first and third claims allege that Ms. Berry violated section 10(b) of the Exchange

12   Act and Rule 10b-5 and section 17(a)(1) of the Securities Act. Ms. Berry moves to dismiss both by

13   arguing that the SEC has failed to adequately plead scienter and she moves to dismiss the 10(b) and

14   10b-5 claims by arguing that the SEC has failed to adequately plead any fraudulent conduct.

15        **1.    Scienter**

16    Ms. Berry's first argument is that the SEC's complaint does not adequately allege that she

17   acted with scienter. As discussed above, Ms. Berry overstates the SEC's burden. Unlike a private

18   plaintiff, the SEC may allege the scienter element of a securities fraud claim generally. The SEC

19   has done so here. *See* Compl. ¶¶ 35, 61. Obviously, the SEC will have to eventually prove that Ms.

20   Berry acted with scienter, but the SEC does not have to allege it with particularity.

21        **2.    Fraudulent Conduct**

22    The SEC argues that Ms. Berry herself made material misstatements or omissions and that

23   Ms. Berry participated in a scheme to defraud. *See* Opp'n at 10. The court must therefore consider

24   the SEC's allegations under both theories.

25        **i.    Material Misrepresentations**

26    Ms. Berry argues that she did not make any false statements, and hence could not have

27   committed securities fraud. Signing a document containing a false statement can satisfy the conduct

28   prong of Rule 10b-5. *E.g., Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000).

1    Substantial or intricate involvement in preparing a false statement that is later made by another also

2    supports a claim for securities fraud.  *E.g.*, *In re Software Toolworks Inc. Securities Litig.*, 50 F.3d

3    615, 628-29 & n.3 (9th Cir.1994).

4         The SEC's allegations fall short of these thresholds.  The SEC's conclusory pleadings that

5    Ms. Berry "reviewed" and "discussed" various filings is insufficient to plead (with particularity) Ms.

6    Berry's role in the purported fraud.  With respect to certain filings at KLA, the SEC goes one verb

7    further and alleges that Ms. Berry "reviewed, discussed, and finalized" various public filings.

8    Finalizing a document for another executive to sign may suffice.  *In re Software Toolworks*, 50 F.3d

9    at 628 & n.3 (holding auditor liable for its "significant role in drafting and editing" a false filing).

10   Yet the SEC fails to allege with particularity what Ms. Berry's role was in "finalizing" these filings.

11   The SEC presumably knows what Ms. Berry's role was as it has already obtained significant

12   document discovery from Ms. Berry's former employers.

13        The SEC has found Ms. Berry's signature on a limited number of documents – two Forms S-

14   8 filed with the SEC on January 30, 1998 and August 7, 1998 and two proxy statements to KLA

15   shareholders.  The registration statements incorporated the financial statements that KLA later

16   restated.  The proxy statements stated that KLA was complying with the terms of its stock option

17   plan.

18        Focusing on the registration statements, Ms. Berry argues that she should not be liable for the

19   incorporated false statements of others.  Ms. Berry cites to a single case from the infamous Enron

20   litigation, where the court dismissed with prejudice claims against a law firm that signed offering

21   memoranda that incorporated allegedly false financial statements.  *In re Enron Corp. Sec., Deriv. &*

22   *"ERISA" Litig.*, 2005 WL 3704688, at *10-*11 (S.D. Tex. 2005).  Ms. Berry misreads the court's

23   holding, however.  The *Enron* court dismissed the law firm because the private plaintiffs failed to

24   allege any facts sufficient to support a "strong inference" that the law firm knew about the false

25   financial statements,  *id.* at *11, not because the law firm did not make a false statement.  Indeed,

26   even if the case stood for the proposition that Ms. Berry suggests, it would run contrary to the Ninth

27   Circuit's admonition that a person "makes" a false statement that he or she signs, even if he or she

28   played no role in preparing it.  *See Howard*, 228 F.3d at 1062.

1    Ms. Berry next argues that the proxy statements do not contain any false statements because

2    they did not contain KLA's financial statements.  The SEC does not allege that KLA's financial

3    statements were the material misstatements in KLA's proxies.  Instead, it alleges that the proxy

4    statements contained a misleading discussion regarding executive compensation because the proxy

5    statements stated that executives were granted stock options at fair market value.  *See* Compl. ¶ 20.

6    Having alleged "what" was fraudulent, the SEC must also allege, among other things, "how" these

7    statements were fraudulent, which is where the SEC's complaint fails.

8    The SEC's entire complaint against Ms. Berry regarding KLA focuses on her role in

9    backdating stock options to employees.  The complaint makes cursory references to option grants to

10   executives, and at one point uses a discussion regarding executive stock option grants to suggest Ms.

11   Berry possessed scienter.  But at no point does the SEC clearly allege with particularity that KLA

12   backdated stock options to executives.  Absent such an allegation, there is no basis for concluding

13   that the discussion regarding executive stock option grants in the proxy statements was false.  On the

14   contrary, the option discussion in the proxy statements could be true.

15   To recap, Ms. Berry has carried her burden of demonstrating the SEC has failed to allege

16   with particularity any securities fraud claim based on misstatements, other than the SEC's allegations

17   arising from Ms. Berry signing KLA's two Forms S-8.  With respect to the Forms S-8, the SEC's

18   allegations are adequate.

19                              **ii.    A Scheme to Defraud**

20   While Rule 10b-5's more familiar, second prong proscribes "untrue statement[s] of material

21   fact" and omissions, its first and third prongs reach farther.  *See* 17 CFR § 240.10b-5.  Rule 10b-5

22   also prohibits "schemes" and "artifices" to defraud as well as any act or practice that would defraud

23   another person.  *Id.*  Under these more malleable bases for liability, a defendant can be liable for a

24   fraudulent scheme if she has "engaged in conduct that had the principal purpose and effect of

25   creating a false appearance of fact in furtherance of the scheme."  *Simpson v. AOL Time Warner*

26   *Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006).  To clarify, "[i]t is not enough that a transaction in which

27   a defendant was involved had a deceptive purpose and effect; the defendant's own conduct

28   contributing to the transaction or overall scheme must have had a deceptive purpose and effect."  *Id.*

1    For example, masterminding a misleading accounting scheme can suffice as conduct that furthers a

2    fraudulent scheme.  *Id.* at 1049 (citing *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319,

3    336-337 (S.D.N.Y.2004)).

4         Ms. Berry fails to differentiate between these different bases for imposing liability under

5    Rule 10b-5 when she argues that she did not make any false statements.  To be liable under Rule

6    10b-5, she need not have made any false statements.  She need only have made an intentionally

7    deceptive contribution to an overall fraudulent scheme.  As alleged, Ms. Berry falsified stock option

8    grants at both KLA and Juniper to avoid properly accounting for compensation charges.  The overall

9    scheme was deceptive, and Ms. Berry's alleged contribution was fraudulent.  Accordingly, the SEC's

10   first claim for securities fraud does adequately allege a "scheme" theory of liability.

11        **D.    Aiding and Abetting**

12        The SEC claims that Ms. Berry aided and abetted KLA, Juniper, and "other persons" in

13   violating various securities laws.  The SEC's second claim is that Ms. Berry aided and abetted in

14   violating section 10(b) and rule 10b-5.  Its fifth claim is that Ms. Berry aided and abetted in the

15   filing of false reports with the SEC.  Its sixth claim is that Ms. Berry aided and abetted in failing to

16   maintain accurate books and records.  The SEC's seventh claim is that Ms. Berry aided and abetted

17   in failing to maintain internal accounting controls.  Finally, the SEC's tenth claim is that Ms. Berry

18   aided and abetted in providing false proxy materials.

19        Ms. Berry responds that the SEC has failed to allege that she knowingly aided and abetted

20   any of the alleged violations of the securities laws.  The cases cited by Ms. Berry are inapposite.

21   While they all demonstrate that knowledge is required to violate the law, the cases are silent on how

22   knowledge must be pleaded.  The exception, *SEC v. Lucent Technologies, Inc.*, 363 F. Supp. 2d 708

23   (D.N.J. 2005), is inapplicable as discussed above.  Again, the plain text of Rule 9(b) requires only a

24   general allegation of "knowledge, and other conditions of a person's mind[.]"  The SEC has met its

25   burden under Rule 9(b) on this point.

26        Ms. Berry next argues that all of the aiding and abetting claims require proof that she

27   "substantially assisted" the primary violator, and that the complaint does not allege facts that support

28   a conclusion that she conferred substantial assistance.  To the extent the aiding and abetting claims

1    are grounded in fraud, they require particularized allegations.  The complaint details a variety of Ms.

2    Berry's alleged practices for backdating stock option grants – these allegations are particularized.

3    These allegations demonstrate that Ms. Berry played the central role in the backdating and that the

4    backdating was essential to the primary violations alleged by the SEC.  Without it, there would be

5    no false statements, false public filings, inaccurate books and records, accounting failures, or

6    misleading proxy materials.  Accordingly, the court cannot conclude that the SEC's complaint fails

7    to allege Ms. Berry's "substantial assistance."

8        Ms. Berry's final argument regarding the aiding and abetting claims is that the second claim

9    for aiding and abetting securities fraud must be dismissed to the extent it alleges that Ms. Berry

10   aided and abetted KLA because the SEC has not charged KLA with committing securities fraud.[8]  In

11   essence, Ms. Berry argues that she should not be held liable for assisting her employer to break the

12   law while her employer is let off the hook.  While the argument may have some equitable appeal, it

13   has no legal basis.

14       The two cases Ms. Berry cites offer her no help.  In *SEC v. Druffner*, 353 F. Supp. 2d 141

15   (D. Mass. 2005), the court dismissed aiding and abetting claims against some stock brokers because

16   the SEC did not adequately allege that the stock brokers' clients had committed a primary violation.

17   *See* 353 F. Supp. 2d at 151.  The court did not dismiss the claim because the SEC had not pursued

18   the clients; the claim was dismissed because there was no allegation that the clients had actually

19   done anything illegal.  Here, the SEC sufficiently alleges that KLA, Juniper, or others violated the

20   securities laws.  Hence, *Druffner* is not on point.  For identical reasons, *SEC v. Gann*, 2006 WL

21   616005 (N.D. Tex. 2006), also offers no support for Ms. Berry's theory.  The SEC enjoys discretion

22   in choosing its quarry and how vigorously it pursues them.  *United States v. Batchelder*, 442 U.S.

23   114, 124 (1979); *see also Dirks v. SEC*, 463 U.S. 646, 678 & n.16 (1983) (Blackmun, J., dissenting).

24   As Justice Blackmun noted, that the SEC has not charged one party "says nothing" about whether

25   the other may be found liable.  *Dirks*, 463 U.S. at 678 & n.16.

26       **E.    Books and Records Violations**

27

28   _____

        [8]    Ms. Berry makes similar arguments regarding the books and records claims and the
     "non-scienter" fraud claim, which the court also rejects.

ORDER GRANTING IN PART AND DENYING IN PART MS. BERRY'S MOTION TO DISMISS— C-07-04431 RMW
TSF                                                18

The SEC has also charged Ms. Berry with violating section 13(b)(5) of the Exchange Act and Rule 13b2-1 for falsifying certain books or records or circumventing internal controls. Ms. Berry repeats her argument that the SEC has failed to allege that she knowingly falsified books and records. As discussed, the SEC may allege knowledge generally, which it has.

Ms. Berry also argues that the SEC has not particularly alleged what internal controls she circumvented. Ms. Berry's attack ignores that the SEC's claim for relief lies in either knowing circumvention or falsification of books and records. The SEC's complaint is replete with details of falsified options grants, though Ms. Berry correctly points out that while the complaint implies that certain controls were insufficient or circumvented, it does not state them. To the extent the SEC wishes to rely on this alternate theory for its eighth claim of relief, it must plead the factual allegations to support it.

### F.    "Non-Scienter" Fraud

Finally, Ms. Berry seeks to dismiss the SEC's claim for the violation of sections 17(a)(2) and (a)(3) by arguing that the SEC has not alleged that she made any negligent misrepresentations in relation to any public statement. As discussed above, the SEC is vague with its accusations that Ms. Berry committed securities fraud on the basis of misrepresentations because it appears she made very few representations. The SEC's focus on Juniper's six registration statements overlooks the facts that Ms. Berry did not sign those registration statements. The most that the SEC alleges is that she "reviewed" them, which is insufficient by itself to establish liability. The only alleged misrepresentations made by Ms. Berry stem from the incorporation of the erroneous financial statements in the Forms S-8 she signed at KLA. These public filings can serve as a basis for the SEC's fourth claim for relief, but no other statements are sufficiently alleged.

### III. ORDER

For the foregoing reasons, the court grants Ms. Berry's motion to dismiss as to the SEC's claims for civil penalties for conduct occurring more than 5 years before the complaint was filed, grants the motion with respect to securities fraud based upon alleged material misstatements other than those contained in the Form S-8's, and grants the motion as to the negligent misrepresentation

1  claims other than those based upon the Form S-8's.  The motion is otherwise denied.  The SEC is

2  given 30 days leave to amend.

3

4  DATED:      5/7/2008

_Ronald M Whyte_

RONALD M. WHYTE

United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for plaintiff, the SEC:**

| | |
|---|---|
| Judith L. Anderson | andersonju@sec.gov |
| Marc J. Fagel | fagelm@sec.gov |
| Mark Philip Fickes | fickesm@sec.gov |
| Susan F. LaMarca | lamarcas@sec.gov |
| Jeremy Emerson Pendrey | pendreyj@sec.gov |
| Elena Ro | roe@sec.gov |

**Counsel for defendant, Lisa C. Berry:**

| | |
|---|---|
| Lucy Edmond Buford | lbuford@orrick.com |
| Melinda Haag | mhaag@orrick.com |
| James Neil Kramer | jkramer@orrick.com |
| Randall Scott Luskey | rluskey@orrick.com |
| James A. Meyers | jmeyers@orrick.com |
| Mozhgan Saniefar | msaniefar@orrick.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** _____5/7/2008_____    _____TSF_____
                                    **Chambers of Judge Whyte**