# Exhibit A

MARC J. FAGEL (Cal. Bar No. 154425)

SUSAN F. LA MARCA (Cal. Bar No. 215231)

lamarcas@sec.gov

~~JUDITH L. ANDERSON~~**MARK P. FICKES** (Cal. Bar No. ~~124281) andersonju~~**178570)**

**fickesm**@sec.gov

JEREMY E. PENDREY (Cal. Bar No. 187075)

pendreyj@sec.gov

ELENA RO (Cal. Bar No. 197308)

roc@sec.gov

Attorneys for Plaintiff

SECURITIES AND EXCHANGE COMMISSION

44 Montgomery Street, Suite 2600

San Francisco, California 94104

Telephone: (415) 705-2500

Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SECURITIES AND EXCHANGE COMMISSION, Civil Action No. **C-07-04431 RMW**

Plaintiff,

**FIRST AMENDED** COMPLAINT

vs.

LISA C. BERRY,

Defendant.

1       Workshare Professional comparison of file://C:/Documents and
Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and
Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.      From 1997 through 2003, the in-house corporate attorney for two different public companies caused each of those companies to report false financial information to the investing public by repeatedly backdating stock option grants and falsifying related paperwork. Defendant Lisa C. Berry devised the improper backdating scheme while serving as General Counsel of KLATencor Corporation ("KLA"), and then implemented similar practices after assuming the position of General Counsel for Juniper Networks, Inc. ("Juniper"). By facilitating the selection of fabricated option grant dates, Berry caused KLA, and then Juniper, to conceal hundreds of millions of dollars of employee and executive compensation from investors.

2.      Under well-settled accounting principles in effect throughout the relevant period, KLA and Juniper were not required to record an expense in their financial statements for options granted to employees at the then-current market price of the company's stock ("at-the-money"), but *were* required to record expenses for any options granted below the current market price ("in-the-money"). To help KLA and Juniper attract and retain executives and employees with more valuable "in-the- money" options, without disclosing to shareholders the hundreds of millions of dollars in compensation expenses associated with those grants, Berry, working with others, established procedures to falsify the options grant records to make it appear that the options had been granted at- the-money.

3.      On repeated occasions from 1997 until she left KLA in 1999, Berry and others caused KLA to backdate stock option grants to dates when KLA's stock price closed much lower. Just prior to her departure from KLA, Berry provided "how to" instructions to other employees so that KLA could continue the improper backdating procedures. In 1999, when

2      Workshare Professional comparison of file://C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

Berry moved to Juniper just before it became a public company, she immediately instituted similar backdating procedures. From mid-1999 through mid-2003, for dozens of different grants to groups of employees, Berry similarly caused Juniper to issue backdated options.

4.     By selecting option grant dates and prices with hindsight, Berry and others at the respective companies caused KLA, and then Juniper, to issue to executives and employees valuable in-the-money options without disclosing them, and further caused each company to materially misrepresent their publicly-reported income (or losses), and to falsely represent in public filings with the Commission that each company had no expenses related to their stock option grants.

5.     By engaging in the acts alleged in this Complaint, Berry, among other things, violated the antifraud provisions of the federal securities laws, falsified public companies' books and records, and caused both KLA and Juniper to falsely report their financial results. The Commission seeks an order enjoining Berry from future violations of the securities laws, requiring her to disgorge ill-gotten gains with prejudgment interest and to pay civil monetary penalties, barring Berry from serving as an officer or director of a public company, and providing other appropriate relief.

**JURISDICTION AND VENUE**

6.     The Commission brings this action pursuant to Section 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

7.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. § 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e) and 78aa].

8.    Berry, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

9.    This Court is a proper venue for this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because acts, transactions, practices, and courses of business constituting the violations alleged in this Complaint occurred within this District and Berry resides in the Northern District of California.

**INTRADISTRICT ASSIGNMENT**

10.    Intradistrict assignment to the San Jose Division is proper pursuant to Civil Local Rule 3-2(e) because acts or omissions giving rise to the Commission's claims occurred, among other places, in Santa Clara County, California.

**DEFENDANT**

11.    Berry, age 49,50, resides in Los Gatos, California. From September 1996 through June 1999, Berry was Vice President and General Counsel of KLA. From June 1999 to January 2004, Berry was General Counsel of Juniper, and beginning in July 1999, also served as Vice President and Secretary. Berry majored in accounting in college, received her juris doctorate and then obtained a masters of law in taxation. Berry is licensed to practice law in California, Arizona and Florida.

**RELEVANT ENTITIES**

4    Workshare Professional comparison of file://C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

12.     KLA is a Delaware corporation headquartered in San Jose, California that makes and sells systems for the semiconductor industry. At all relevant times, KLA's common stock was registered with the Commission pursuant to Section 12 of the Exchange Act and traded on the NASDAQ National Market. At all times relevant to this action, KLA used a fiscal year ending on June 30.

13.     Juniper is a Delaware corporation headquartered in Sunnyvale, California that makes and sells internet-related networking products. From June 1999 through 2004, Juniper's common stock was registered under Section 12 of the Exchange Act and was traded on the NASDAQ National Market. At all times relevant to this action, Juniper used a fiscal year ending on December 31.

**FACTUAL ALLEGATIONS**

**A.      Berry and Others Backdated Options at KLA**

**a. 1. KLA's Stock Option Disclosures**

14.     Throughout Berry's tenure as KLA's General Counsel, KLA regularly used employee stock options as a form of compensation to recruit, retain, and incentivize key employees. Each option gave the grantee the right to buy KLA common stock from the company at a set price, called the "exercise" or "strike" price, on and after a future date. The option was "in-the-money" when granted if the market price of KLA's common stock exceeded the option's exercise price. The option was "at-the-money" when granted if the market price of KLA's common stock and the exercise price were the same.

15.     From approximately July 1997 through June 1999, KLA's primary stock option plan specifically prohibited the grant of in-the-money options to employees and executives. The plan required that the board of directors set the exercise price of the company's stock options,

and that the price on the date of grant could not be less than fair market value — that is, the closing price of KLA's common stock on the date when granted.

16.    On August 7, 1998, KLA filed with the Commission a registration statement on Form S-8 which attached the Company's primary stock option plan, and incorporated each of these key terms. Berry reviewed this statement and signed it as the company's General Counsel.

17.    KLA also publicly represented, in audited financial statements and other filings with the Commission made from 1997 through 1999, that its option grants were made at fair market value. In other words, KLA purported to issue options at-the-money, not in-the-money.

18.    KLA also stated in public filings that its audited financial statements conformed with generally accepted accounting principles (known as "GAAP"). In particular, KLA disclosed that it followed Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") in accounting for employee stock options. Under APB 25, public companies recorded an expense on their financial statements for the in-the-money portion of any options granted. Consequently, granting in-the-money options to employees could have a significant impact on the company's expenses and income (or loss) reported to the shareholders. APB 25 also allowed companies to grant employee stock options without recording any compensation expense, so long as the option exercise price was not below the closing market price for the company's stock on the date of the grant.

19.    KLA made the statements about its accounting for stock options in accordance with APB 25 in the notes to its audited financial statements, including in its annual reports to shareholders, filed with the Commission on Forms 10-K for its fiscal years 1998 and 1999.

20.    KLA also filed proxy statements that were sent to shareholders announcing the annual meeting of shareholders. In the proxy statements dated September 28, 1998 and October

15, 1999, KLA provided information on executive compensation and executive option grants in the last fiscal year from the date of filing. The discussion on executive compensation in each proxy statement represented that stock options were granted at the market price on the date of the grant. In addition, KLA's proxy statements filed on September 28, 1998 and October 15, 1999 stated that one of the material terms of certain grants to certain executives was that the exercise price of the options was the fair market value of the company's common stock as of the date of grant. These statements also were incorporated by reference into KLA's Forms 10-K.

21.    Berry reviewed, discussed, and finalized the company's annual reports filed with the Commission on Forms 10-K and its proxy statements filed with the Commission on September 28, 1998 and October 15, 1999, as KLA's General Counsel.

**b. 2. Berry Participated in the Scheme to Backdate KLA Option Grants**

22.    In 1997, KLA's board of directors delegated to a Stock Option Committee consisting of three directors the authority to grant stock options to non-officer employees. The board's delegation required that at least two members of the committee approve each options grant.

23.    From mid- 1997 through mid-1999, Berry worked with KLA's Stock Option Committee, which consisted of board members with such delegated authority. Berry oversaw the administration of the stock option grant process.

24.    Under procedures put in place by Berry and the Stock Option Committee, the option grant approvals did not reflect the date the Stock Option Committee met to approve them. Instead, grants to employees by the Stock Option Committee were deliberately delayed to allow the selection of historically low stock prices with the benefit of hindsight. **In addition, despite the fact that the Stock Option Committee did not have authority to grant stock options to**

**officers, with Berry's assistance the Committee priced certain officer and executive option grants with the benefit of hindsight, and such grants were later approved by KLA's board of directors**.

25.     Berry directed Human Resources ("HR") and stock administration department employees to prepare the grant approval paperwork. Berry then directed the process for selecting the exercise price by using historical information regarding low KLA stock prices of the preceding weeks. One or more members of the Stock Option Committee then executed the grant paperwork prepared at Berry's direction, bearing false grant dates that had been selected using hindsight.

26.     The grant approvals were then provided to HR and stock administration personnel who entered the grant information, including the backdated exercise prices, into KLA's options tracking database system.

27.     In this manner, Berry and others at KLA repeatedly backdated grants to newly hired and recently promoted employees ("new hire" grants), as well as to current employees **and executives** eligible for options at the end of KLA's annual review process (known as "peak performance" or "focal" grants), among others. These backdated grants reflected historically low prices for KLA stock for the weeks prior to the date on which the price was selected.

28.     For example, KLA awarded several grants to employees bearing a purported grant date of August 31, 1998, at an exercise price equal to that day's closing stock price of $10.63. The grants included peak performance grants to officers ~~and~~, non-officers **and executives**, as well as a new hire grant. However, these grants were actually made over a span of a couple weeks during October 1998, when KLA's stock was trading between $10.75 and $13.81, and

were backdated to August 31, 1998. The August 31 stock price of $10.63 was the lowest closing

price for KLA's common stock for at least three months prior to October 1998.

29.    Berry personally benefited from the grant backdated to August 31, 1998, as she

received options to purchase 22,000 shares at the lower $10.63 exercise price.

30.    In another example in late 1998, Berry and others at KLA backdated a one-time

hundred-share grant made to thousands of KLA employees. The backdated grant used the date of

October 19, 1998, and the closing stock price on that date of $27.6250 as the options' exercise

price. However, Berry and others actually selected the price and prepared the grant during

December 1998, by which time KLA's stock price had risen above $40.

31.    A KLA HR employee specifically questioned Berry about the propriety of

backdating the grant to October 19, 1998. The employee pointed out to Berry that using the date

in the past when the price was lower raised the question of "whether we would be able to pass

the 'audit' test of not setting a date in the past in order to get a better price." Berry responded,

acknowledging she understood, but nevertheless allowed KLA to use a backdated grant date and

corresponding low price without appropriately accounting for the in-the-money option grant.

32.    On approximately ten occasions for grants backdated to July 31, 1997 through

grants backdated to June 15, 1999, Berry and others thus used hindsight to choose option

exercise prices for new hire, peak performance/focal and other grants made to KLA employees

and executives.

33.    Berry was involved in most facets of KLA's options granting process. Berry

participated in conference calls and communications discussing accounting rules related to stock

options. She also wrote a memorandum in November 1998 in which she acknowledged that

9    Workshare Professional comparison of file://C:/Documents and
Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and
Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

repricing executive stock options by using an earlier grant date with a lower price would result in KLA having to take "a charge to its P&L."

34.    In June 1999, shortly before her departure from KLA, Berry instructed employees in KLA's HR department how to backdate stock option grants so that they could carry on with the scheme after she had departed. Berry advised the HR personnel to: (1) create a list of newly hired employees; (2) wait several weeks; (3) obtain a list of KLA's daily closing stock prices for the past several weeks; (4) highlight the three or four lowest prices; and (5) forward the new hire list and the highlighted stock price list to KLA's Stock Option Committee. As a consequence, KLA continued to backdate certain stock option grants in this manner following Berry's departure from the company.

35.    Berry knew, or was reckless in not knowing, that the grant documentation that she helped prepare falsely represented the date on which stock options were actually granted to employees **and executives**. Berry further knew, or was reckless in not knowing, that the stock option grant documentation that reflected the false information about the dates of the grants and exercise prices for the grants, resulted in KLA's failure to properly record expenses for these in-the-money grants and rendered KLA's public statements about its stock options grants false and misleading.

e. **3.** KLA's Publicly Reported Financial Results

36.    As a public company, KLA filed with the Commission annual reports that included audited financial statements, certified by the companies' outside auditors. KLA's failure to record a compensation expense in connection with the backdated, in-the-money option grants resulted in materially overstated net income in KLA's financial statements throughout Berry's tenure at KLA, and even after she had left. Because the in-the-money options continued

to affect the financial statements as employees became eligible to exercise their stock options, those misstatements continued through 2003.

37.    In particular, KLA's failure to record expenses related to stock options, granted in-the- money resulted in a 4 percent overstatement of KLA's net income in 1998, and a 46 percent overstatement of net income in 1999. KLA included those materially false representations about its financial results in its annual reports to shareholders filed with the Commission on Forms 10-K for its fiscal years 1998 and 1999. **As described below,** Berry reviewed and discussed KLA's false and misleading annual reports (and drafts of those reports) filed with the Commission on Forms 10-K for the fiscal years 1998 and 1999, as General Counsel of KLA.

38.    KLA also filed quarterly reports with the Commission on Forms 10-Q that included financial statements for each of its first three fiscal quarters. KLA's quarterly reports filed on Forms 10-Q for each of the company's first three fiscal quarters of 1997 and 1998, and for the quarterly period ended March 31, 1999, contained materially false and misleading financial statements due to the company's failure to record compensation expenses associated with granting undisclosed in-the-money options. **As further described below,** Berry also reviewed, discussed, and helped finalize, each of these false and misleading Forms 10-Q, as General Counsel of KLA.

39.    KLA also sold securities pursuant to offering documents, including registration statements on Forms S-8 filed with the Commission on January 30, 1998, August 7, 1998 and December 4, 1998, which incorporated the false financial statements. **As described below,** Berry reviewed and prepared each of these false and misleading Forms S-8, as General Counsel of

KLA. In addition, Berry signed the Forms S-8 filed with the Commission on January 30, 1998 and August 7, 1998.

40. **Berry was the driving force behind finalizing the preparation of drafts of KLA's annual reports, quarterly reports, registration statements on Forms S-8 and proxy statements filed with the Commission. Berry coordinated edits to such documents which she received from other persons or offered herself, and organized the final drafts of such documents that were filed with the Commission. As KLA's General Counsel, Berry thus controlled the drafts and the final products for each of these filings. She had a significant role and frequently acted as the final decision maker regarding any changes to these drafts. Berry was the person ultimately in charge of ensuring the completion of KLA's SEC filings, including the reporting of securities acquired, disposed of, or beneficially owned by KLA executives.**

**41.** The representations to KLA's shareholders in its public reports about the company's stock option program, including how KLA priced options and accounted for them and its financial results, were untrue. Berry knew, or was reckless in not knowing, that those statements and financial results were untrue, because she engineered with others and participated in the scheme to create option grant approvals that falsely represented the date of the grant to make it appear as though KLA was not required to record an expense for its backdated options. **Berry also knew, or was reckless in not knowing, that those statements and financial results were untrue, because she had a central role in editing and finalizing KLA's public reports. For example, KLA's proxy statements filed on September 28, 1998 and October 15, 1999 stated that one of the material terms of certain grants to certain executives was that the exercise price of the options was the fair market value of the company's common stock as**

12    Workshare Professional comparison of file://C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

of the date of grant. Berry knew this representation was false because she participated in KLA's backdating of certain options grants to executives referenced in these proxy statements, as described above, as part of KLA's peak performance or focal grant review process.

42.    Berry circumvented KLA's internal controls to create option grant approvals that falsely represented the dates of grants to make it appear as though KLA was not required to record an expense for its backdated options. For example, Berry recorded incorrect grant dates on the options approvals; allowed such false approval dates to be recorded in KLA's stock plan management and reporting software; failed to inform KLA's outside auditors, who relied upon such options approvals to test the fair market value of the options awarded to employees and executives, of the true nature of how employee and executive options were priced; and failed to inform the company's audit committee of the true nature of how employee and executive options were priced.

43.    In May 2006, the special committee of KLA's board of directors began to investigate the company's historical options granting practices. As a result of the special committee investigation, KLA announced in February 2007 restated financial results to record expenses for options granted to employees and executives.

44.    Berry's preparation of grant documentation that falsely represented the date on which stock options were actually granted to employees and executives concealed the true grant dates of these options. Although Berry oversaw the administration of the stock option grant process, she did not inform various persons who relied on the documentation she helped to create, including KLA's outside auditor and the Audit Committee of its board of directors, that stock option grants were priced at KLA with the benefit of

13    Workshare Professional comparison of file://C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

hindsight. When KLA employees questioned the human resources department about the delays in receiving grant pricing information, Berry instructed at least one employee in the department to tell other employees that options would be priced at the next meeting of KLA's Stock Option Committee. By such actions, Berry concealed the fact that the Stock Option Committee did not actually meet on the date option grant prices were selected with the benefit of hindsight.

45.    Because of Berry's concealment of the above facts, the Commission did not have reason to question the accuracy and reliability of KLA's representations to its shareholders regarding its compensation expenses and the way in which options were priced until the special committee of KLA's board of directors announced in May 2006 that the company had begun to investigate its historical options granting practices. In May 2006, the Commission learned facts for the first time indicating that KLA may not have accurately recorded stock option compensation expense in its periodic reports filed with the SEC. During KLA's investigation, Berry refused to answer questions by the special committee. The Commission diligently pursued its own investigation after learning that KLA's prior representations in its public filings might not be accurate; however, owing to Berry's concealment of the routine use of hindsight to price options at KLA, the extent and cause of the inaccuracy in KLA's filings could only be uncovered with intensive inquiry. During the Commission's investigation, Berry asserted her Fifth Amendment privilege against self-incrimination when she was asked questions regarding how stock options at KLA were priced and granted.

**B.    Berry Similarly Caused Juniper to Backdate Stock Option Grants**

14    Workshare Professional comparison of file://C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

41.46. On June 18, 1999, Berry became Juniper's General Counsel. In applying for the position, Berry held herself out as having experience in stock administration and the review of financial statements.

**a.1.    Juniper's Stock Option Disclosures**

42.47. On June 24, 1999, Juniper became a public company through an initial public offering of its stock (an "IPO"). Juniper grew rapidly following its IPO, hiring hundreds of employees through early June 2003. To support this rapid growth and to achieve its recruiting and compensation objectives, Juniper relied heavily on stock options as a recruiting and retention incentive. By compensating employees with stock options, Juniper avoided paying greater salaries or other forms of compensation that would have been necessary to attract and retain employees. Juniper granted stock options to nearly all new full-time employees. Juniper also granted options to existing Juniper employees (called "ongoing" options), based on performance or other factors.

43.48. Juniper publicly represented, in audited financial statements and other filings with the Commission made for or during its fiscal years 1999 through 2003, that its stock option grants were made at fair market value. In particular, Juniper stated in its annual reports to shareholders filed with the Commission on Forms 10-K for its fiscal years 1999 through 2002: "Incentive stock options are granted at an exercise price of not less than the fair value per share of the common stock on the date of grant." Juniper further stated in each of those reports on Forms 10-K that, although the company's plans allowed for the granting of so-called "nonstatutory" stock options at an exercise price of not less than 85 percent of the then-market value, "no nonstatutory stock options have been granted for less than fair market value on the date of the grant."

44.49. Juniper's public filings also affirmatively stated that the company accounted for its employee stock option plans in accordance with GAAP, and particularly, that the company followed APB 25. Thus, in each of its Forms 10-K filed with the Commission for fiscal years 1999 through 2002, Juniper represented that it had "elected to follow APB 25," and that "[b]ecause the exercise price of the Company's stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."

45.50. Juniper also sent to shareholders proxy statements announcing its annual meetings of shareholders for 2000 through 2003, filed with the Commission on April 13, 2000, March 28, 2001, April 11, 2002 and March 28, 2003. **Berry drafted, edited and signed as Juniper's General Counsel each of these Juniper proxy statements announcing Juniper's annual meetings of shareholders. Berry also worked with Juniper's finance department to draft the compensation data that each of these proxy statements contained.** The proxy statements for 2000, 2001 and 2003, in describing executive compensation and particularly options granted to officers, represented that "options are granted at fair market value on the date of grant." Similarly, the 2002 proxy statement, in responding to a shareholder proposal regarding the company's repricing (or regranting) of stock options, represented that employees at Juniper who have been awarded stock options "have a right to purchase stock in the future at a price which is the fair market value on the date of the stock option grant." **Each of these statements was false because, as described below, Berry routinely backdated grants to a date in the past when Juniper's stock closing price was lower.**

46.    Berry reviewed**51.    As described in detail later in this complaint, Berry was responsible for, controlled and managed the drafting of** Juniper's annual**public filings, including** reports filed on Forms 10-K, and other periodic reports filed with the Commission,**10-**

**Q, 8-K and S-8,** while she was Juniper's General Counsel. Berry was also responsible for**,**

**controlled and managed the** drafting **of** Juniper's proxy statements announcing annual

meetings of ~~shareholder~~**shareholders**, which she signed as Juniper's General Counsel. **When**

**asked in testimony about her role in preparing Juniper's periodic Commission filings and**

**proxy statements, Berry asserted her Fifth Amendment privilege and refused to testify**.

### ~~b~~**2.**    **Berry's Scheme to Backdate Juniper Option Grants**

~~47.~~**52.** On July 21, 1999, based on Berry's recommendation, Juniper's Board of

Directors created a three-member Stock Option Committee, to which it delegated authority to

grant stock options to Juniper's non-executive employees. **Despite the fact that the Stock**

**Option Committee did not have authority to grant stock options to senior executive**

**officers, Berry did in some instances price grants to such executives with the benefit of**

**hindsight, such as when the Stock Option Committee had been granted such authority by**

**Juniper's Compensation Committee for a particular grant or when a grant was later**

**ratified by Juniper's Board of Directors, examples of which are described below.**

Throughout her tenure with Juniper, Berry served as a member of the Stock Option Committee,

along with two other persons, Juniper's chief executive officer and chief financial officer.

~~48.~~**53.** Berry was responsible for overseeing Juniper's stock option granting process,

including supervising Juniper's stock administrator. From mid-1999 through mid-2003, Berry

used the procedures she put in place for most Juniper stock option grants by backdating the

grants to a date in the past when Juniper's closing stock price was lower. Berry then routinely

created backdated "minutes" for purported Stock Option Committee meetings that never

occurred.

### ~~i~~**a.**    **Berry Backdated New Hire Stock Option Grants**

17    Workshare Professional comparison of file://C:/Documents and
Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and
Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

49.**54.** Beginning in the second half of 1999, Berry routinely prepared backdated stock option grants to issue options to recently hired employees of Juniper. For these new hire grants, Berry collected the names of recently hired employees and had lists prepared. She then selected as the exercise price of the new hire grants the closing price of Juniper's stock on a date in the past, reflecting the low closing price during a particular period around the time the employees were hired. For each backdated grant from 1999 through 2003, Berry then created Stock Option Committee meeting "minutes" that falsely represented that the Stock Option Committee had met on the date of the low closing price and granted options on that date.

50.**55.** Berry signed the backdated committee "minutes" as a Stock Option Committee member. In addition, for each backdated grant she either presented the minutes to the other Stock Option Committee members for signature or stamped the minutes with a signature stamp she maintained bearing the other Stock Option Committee members' signatures.

51.**56.** Once Berry selected a backdated grant date and a corresponding exercise price, she informed Juniper's stock administrator, who then entered the grants into Juniper's stock option tracking software using the backdated date as the grant date. Juniper did not reflect in its books an expense related to the in-the-money portion of the options.

52.**57.** For example, Juniper granted options to six new Juniper employees on the purported, but false, grant date of October 27, 1999. The six employees were hired on Monday, October 25, 1999, at which time Juniper's stock traded at $257.75. Juniper's stock price dipped to a low of $249.94 on Wednesday, October 27, then rose to $275.63 by the end of the week. Berry actually selected the grant date in mid-November 1999, when Juniper's stock was trading around $283.50, using information about Juniper's historical closing prices for its stock during the week the employees were hired.

18    Workshare Professional comparison of file://C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

53. **58.** Similarly, Juniper granted stock options to employees hired between October 8, 2002 through January 2, 2003, using the backdated January 2, 2003 closing price of $7.36 as the purported "fair market value" of the stock on the grant date. The Stock Option Committee never met on January 2, 2003. Instead, Berry selected that date during mid-February, when Juniper's stock was trading around $9 per share. The January 2, 2003 closing price for Juniper's stock, $7.36, used as the exercise price, was Juniper's lowest closing price of the year up to the time Berry selected the grant date.

54. **59.** Using dates selected with hindsight between mid-June 1999 through the end of May 2003, Berry backdated more than 50 grants to groups of new employees. More than $300 million in expenses associated with the in-the-money portion of those grants were not disclosed by Juniper as a consequence of Berry's scheme.

### ii**b.**  Berry Backdated Juniper's "Ongoing" Stock Option Grants

55. **60.** From her arrival in 1999 through mid-2003, Berry also backdated performance-related grants to existing employees and officers, which Juniper called "ongoing" grants. Berry thus backdated large grants to officers and employees that were made to create retention and performance incentives (and which at times included new hires), on approximately nine occasions throughout her tenure.

56. **61.** For instance, Juniper granted options to a large group of existing employees and **executive** officers (and to certain new hires), which it called an "evergreen" grant, using the backdated grant date of October 4, 1999. The Stock Option Committee did not meet on October 4, 1999, and no one determined to grant the employees and officers options that day. Instead, on November 5, 1999, when Juniper's stock price traded at $273.13, Berry created Stock Option Committee meeting minutes dated October 4, 1999, when Juniper's stock priced closed at

$182.13 – the lowest price of that quarter to date. Berry subsequently caused Juniper's board of directors to be falsely informed that the grant had been made on October 4, 1999. **At the subsequent Board meeting, the Board ratified the portion of the grant to executive officers.** More than $100 million in expenses, associated with the in-the-money portion of this "evergreen" grant were not disclosed by Juniper as a consequence of Berry's actions.

~~57.~~**62.**  On occasion, Juniper granted "pools" of stock options to certain business units to be awarded to employees based on the discretion of the business unit manager. Berry backdated "pool" grants Juniper made seven times between 2000 and 2003 (which also included certain grants to **senior executives and** new hires). More than $200 million in expenses associated with the in-the-money portion of these "pool" grants were not disclosed by Juniper due to Berry's actions.

~~58.~~**63.**  For example, Juniper granted options to existing employees and senior executives (as well as some new hires) in one such "pool" grant, using the backdated grant date of December 21, 2000. **The grant included options granted to senior executives because, on November 8, 2000, Juniper's Compensation Committee had met and authorized the Stock Option Committee to price grants to senior executives at its next meeting.** Juniper's stock price closed at $93.94 on December 21, 2000, which was the lowest stock price of the six months up to that date. No Stock Option Committee meeting occurred on that date; in fact, Berry left the country early in the morning of December 21, 2000. The grant was actually made in or around early January 2001, when Juniper's stock price was trading over $100 per share.

~~59.~~**64.**  In the spring of 2001, Juniper's stock price had declined substantially from the levels experienced during 1999 and 2000. Consequently, many options awarded during those

earlier years had strike prices well above the then-current stock price (known as "underwater" options).

60.**65.** In approximately April 2001, Juniper instituted a program to award additional options to existing employees using a formula based on the number of underwater options each employee then had, and the length of time each had been employed by Juniper. As part of the program, Juniper granted one block of this "formula" grant using as the grant date April 4, 2001, when Juniper's stock price closed at $29.19. Berry caused the grant to be backdated to April 4, selecting that date with hindsight on or around April 19, 2001, when Juniper's stock price had more than doubled to $65.58.

61.**66.** Berry knew, or was reckless in not knowing, that the grant documentation that she helped prepare falsely represented the date on which stock options were actually granted to employees. Berry further knew, or was reckless in not knowing, that using the stock option grant documentation that reflected the false information about the dates of the grants and exercise prices for the grants caused Juniper to fail to properly record expenses for these in-the-money grants. Berry further knew, or was reckless in not knowing, that the scheme rendered Juniper's public statements made in proxy statements dated April 13, 2000, March 28, 2001, April 11, 2002 and March 28, 2003, and in Forms 10-K filed with the Commission for fiscal years 1999 through 2002, that Juniper granted stock options at the fair market value on the date of the grant and that the company did not grant stock options for less than fair market value, materially false and misleading.

e.**3.**    Berry Caused Juniper to Falsely Report Its Financial Results

62.**67.** As a public company, Juniper filed with the Commission annual reports on Form 10-K that included the audited financial statements, certified by the companies' outside auditors,

which falsely represented Juniper's financial results. Due to Juniper's failure to record an expense for in-the-money options, Juniper's financial statements were materially misstated in each fiscal year from 1999 through ~~2002, and Berry reviewed and discussed~~**2002. Berry was substantially and intricately involved**, *as Juniper's General Counsel,* **with preparing** those Forms 10-K that contained these false representations, ~~as Juniper's General Counsel.~~ **. In particular, Berry was responsible for, controlled and managed the drafting and preparation of the Forms 10-K. She made sure all tasks associated with preparing the Forms 10-K were completed. She reviewed all sections of the Forms 10-K before they were filed and weighed in where changes needed to be made. Berry also communicated with Juniper's auditors on issues of concern to the auditors. Juniper's CFO relied on Berry to confirm that the Forms 10-K were prepared properly. Juniper's CFO, and Juniper's SEC Reporting Manager, both relied on Berry to identify and correct any inaccuracies in the Forms 10-K concerning Juniper's stock option-related disclosures. Berry was the person involved in the 10-K preparation process who knew Juniper had backdated stock options and was the person expected to ensure the accuracy of such disclosures, but Berry did not correct Juniper's inaccurate disclosures about stock options nor did she inform others involved in the Form 10-K preparation process that Juniper's stock option related disclosures were false.**

 **68.**   Berry's fraud continued to affect the company's financial statements through 2005.~~63.~~—— For example, for its fiscal year 2001, Juniper originally reported a loss of $13.4 million. However, after the company ultimately recorded a compensation expense for previously undisclosed in-the-money option grants in restated financials for this period, the company

reported an additional expense of $513.1 million, which (after adjusting for taxes) brought Juniper's loss for the year to $501.5 million.

64.**69.**  Similarly, for its fiscal year 2003, Juniper originally reported net income of $39.2 million, representing the company's first profitable year ever. As a result of Juniper's failure to record a compensation expense for backdated, in-the-money option grants, Juniper's pre-tax income was reduced by $19.3 million, which, after adjusting for taxes, reduced its net income to $30.7 million for the year, a profit reduction of 21.68%.

65.**70.**  Juniper also publicly announced quarterly financial results, which were described in financial statements included in quarterly reports filed with the Commission on Forms 10-Q, that were materially false and misleading due to Juniper's failure to record~~.~~ compensation expenses associated with in-the-money options. Thus, Juniper's quarterly reports filed on Forms 10-Q beginning with the quarter ended September 30, 1999, and for each of the company's first three quarters in fiscal years 2000 through 2002, and the first two quarters of fiscal year 2003, contained materially false and misleading financial statements. Berry ~~reviewed and discussed~~**was substantially and intricately involved with preparing,** as Juniper's General Counsel, each of Juniper's Forms 10-Q that contained these false representations. **In particular, Berry was responsible for, controlled and managed the drafting and preparation of the Forms 10-Q. She made sure all tasks associated with preparing the Forms 10- Q were completed. She reviewed all sections of the Forms 10-Q before they were filed and weighed in where changes needed to be made. Berry also communicated with Juniper's auditors on issues of concern to the auditors. Juniper's CFO relied on Berry to confirm that the Forms 10-Q were prepared properly. Juniper's CFO and SEC Reporting Manager both relied on Berry to identify and correct any inaccuracies in the Forms 10-Q. Berry was the person involved**

**in the 10-Q preparation process who knew Juniper had backdated stock options without recording compensation expenses and that as a result, its financial statements were materially false. Yet Berry did not inform others involved in the Form 10-Q preparation process of this fact.**

66.**71.** Juniper filed with the Commission current reports on Forms 8-K on April 10, 2003, July 10, 2003 and October 9, 2003, each of which included announcements about the company's financial results for prior quarters that were materially false and misleading due to Juniper's failure to record compensation expenses associated with undisclosed grants of in-the-money stock options. ~~Berry reviewed, as Juniper's General Counsel, each of Juniper's Forms~~**As Juniper's General Counsel, Berry decided if and when the company should file Form 8-K's. Berry also was responsible for and controlled their preparation in that she determined what information each Form** 8-K that contained these false representations~~.~~ **should contain.**

67.**72.** During Berry's tenure as Juniper's General Counsel, Juniper filed with the Commission registration statements on Form S-8 on March 14, 2000, August 18, 2000, December 12, 2000, March 29, 2001, December 21, 2001 and July 9, 2002, each of which incorporated by reference false and misleading periodic reports. Berry **was responsible for the preparation of and** reviewed each of these registration statements filed on Form S-8. **Berry also prepared and signed a legal opinion filed as an exhibit to each Form S-8 described above that stated that Juniper had authorized the issuance of the shares.**

**73.     Berry circumvented Juniper's internal controls over the stock option granting process and reporting of expenses by preparing and signing Stock Option Committee meeting minutes that falsely represented the dates of stock option grants to make it appear as though Juniper was not required to record an expense for its backdated**

**options. The false Stock Option Committee meeting minutes were used by Juniper's stock administrator, whom Berry supervised, to record grant dates in Juniper's stock plan management and reporting software. Juniper's auditors relied on the false minutes to test the accuracy of Juniper's stock option compensation expenses in connection with their reviews and audits of Juniper's financial statements. Also, Berry failed to inform Juniper's Audit Committee of the true nature of how the company priced employee and executive stock options.**

68.**74.**  In May 2006, the audit committee of Juniper's board of director's began to investigate the Company's historical options granting practices. As a result of the audit committee investigation, Juniper announced in March 2007 restated financial results to record expenses for options granted to employees. Juniper announced- the recording of additional pre-tax, non-cash, stock-based compensation expense of $894.7 million for fiscal years 1999 through 2005 under APB 25, $879.1 million of which was for fiscal years 1999 through 2003.

**75.     Berry's preparation of grant documentation that falsely represented the date on which stock options were actually granted to employees and executives concealed the true grant dates of those options. Although Berry oversaw Juniper's stock option granting process while she was its General Counsel, she did not inform Juniper's executives, Board of Directors or auditors that she priced stock option grants with the benefit of hindsight. When certain Juniper executives questioned Berry regarding the stock option granting process at Juniper, in response, she misrepresented to those Juniper executives that grants were priced on the date of meetings of the Stock Option Committee, when in fact, she knew that no such meetings occurred and that she had determined option pricing with the**

**benefit of hindsight. By such actions, Berry concealed the fact that she had determined stock option pricing with the benefit of hindsight.**

**76.    As a result of Berry's concealment of her pricing of Juniper stock options with hindsight, as described above, despite its diligence the Commission did not have reason to question the accuracy and reliability of Juniper's representations to its shareholders regarding its compensation expenses and the way in which options were priced. In May 2006, Juniper publicly announced that the company's Audit Committee had begun to review its historical stock options granting practices. Berry refused to answer questions by Juniper's Audit Committee during its investigation. The Commission diligently pursued its own investigation after learning that Juniper's prior representations in its public filings might not be accurate; however, owing to Berry's concealment of the routine use of hindsight to price options at Juniper, the extent and cause of the inaccuracy in Juniper's filings could only be uncovered with intensive inquiry. During the Commission's investigation, Berry asserted her Fifth Amendment privilege against self-incrimination when she was asked questions regarding how stock options at Juniper were priced and granted.**

C.    Berry Received Backdated KLA and Juniper Options and Sold Shares.

69. 77.    While at KLA, Berry herself received backdated options purportedly granted on August 31, 1998 that were in-the-money when granted. As a result, she personally benefited from the backdating and received unreported compensation from backdated KLA options.

70. 78.    Similarly, while at Juniper, Berry also received backdated options purportedly granted on May 11, 2000, December 21, 2000, April 11, 2001, July 1, 2002 and March 12, 2003 that were in-the-money when granted. As a result, she personally benefited from the backdating and received unreported compensation from backdated Juniper options.

~~71.~~**79.** In addition, Berry exercised certain stock options she received. Berry further sold shares in each company's stock, including shares she received based on her exercise of stock options. Berry knew that she and other officers of KLA and Juniper similarly received options backdated as of the same dates as the backdated employee options. She thus was motivated to continue backdating options, in part, to enrich herself and her fellow officers at each company.

FIRST CLAIM FOR RELIEF

Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

~~72.~~**80.** The Commission realleges and incorporates by reference paragraphs 1 through ~~71~~**79** above.

~~73.~~**81.** By engaging in the conduct described above, Berry, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

a.    Employed devices, schemes, or artifices to defraud;

b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c.    Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

~~74.~~**82.** By reason of the foregoing, Berry has violated, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]. SECOND CLAIM FOR RELIEF Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

75.**83.** The Commission realleges and incorporates by reference paragraphs 1 through 71**79** above.

76.**84.** By engaging in the conduct described above, KLA, Juniper and/or other persons, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with[2] scienter:

a.    Employed devices, schemes, or artifices to defraud;

b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

77.**85.** Berry knowingly provided substantial assistance to KLA's, Juniper's and/or other persons' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], and therefore is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)].

78.**86.** Unless restrained and enjoined, Berry will continue to violate and aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**

**Violations of Securities Act Section 17(a)(1)**

79.**87.** The Commission realleges and incorporates by reference Paragraphs 1 through 71**79** above.

28    Workshare Professional comparison of file://C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file://C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

80.**88.** By engaging in the conduct described above, Berry, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails with scienter employed devices, schemes or artifices to defraud.

81.**89.** By reason of the foregoing, Berry violated, and unless restrained and enjoined, will continue to commit violations of, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Violations of Securities Act Sections 17(a)(2) and (3)

82.**90.** The Commission realleges and incorporates by reference Paragraphs 1 through 71**79** above.

83.**91.** By engaging in the conduct described above, Berry, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a.      Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b.      Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

84.**92.** By reason of the foregoing, Berry has violated, and unless restrained and enjoined, will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder

~~85.~~**93.** The Commission realleges and incorporates by reference Paragraphs 1 through ~~71~~**79** above.

~~86.~~**94.** Based on the conduct alleged above, KLA and Juniper each violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate annual, current and quarterly reports.

~~87.~~**95.** By engaging in the conduct alleged above, Berry knowingly provided substantial assistance to KLA's and to Juniper's respective filing of materially false and misleading reports with the Commission.

~~88.~~**96.** By reason of the foregoing, Berry aided and abetted violations by KLA and by Juniper of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a- 13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]. Unless restrained and enjoined, Berry will continue to aid and abet such violations.

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)

~~89.~~**97.** The Commission realleges and incorporates by reference Paragraphs 1 through ~~71~~**79** above.

~~90.~~**98.** Based on the conduct alleged above, KLA and Juniper each violated Section 13(b) (2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities ~~,~~ registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

91. **99.** By engaging in the conduct alleged above, Berry knowingly provided substantial assistance to KLA's and Juniper's respective failures to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

92. **100.** By reason of the foregoing, Berry has aided and abetted violations by KLA and by Juniper of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. Unless restrained and enjoined, Berry will continue to aid and abet such violations.

**SEVENTH CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(B)**

93. **101.** The Commission realleges and incorporates by reference Paragraphs 1 through 71 **79** above.

94. **102.** Based on the conduct alleged above, KLA and Juniper violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to devise and maintain a sufficient system of internal accounting controls.

95. **103.** By engaging in the conduct alleged above, Berry knowingly provided substantial assistance to KLA's and Juniper's respective failures to devise and maintain a sufficient system of internal accounting controls.

96. **104.** By reason of the foregoing, Berry has aided and abetted violations by KLA and by Juniper of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]. Unless restrained and enjoined, Berry will continue to aid and abet such violations.

**EIGHTH CLAIM FOR RELIEF**

**Violations of Exchange Act Section 13(b)(5)**

97.**105.**        The Commission realleges and incorporates by reference Paragraphs 1 through 71**79** above.

98.**106.**        By the conduct alleged above, Berry violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], which prohibits anyone from knowingly circumventing a system of internal accounting, or knowingly falsifying certain books, records, and accounts.

99.**107.**        Unless restrained and enjoined, Berry will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

**NINTH CLAIM FOR RELIEF**

**Violations of Exchange Act Rule 13b2-1**

100.**108.**        The Commission realleges and incorporates by reference Paragraphs 1 through 71**79** above.

101.**109.**        By engaging in the conduct described above, Berry falsified or caused to be falsified KLA's and Juniper's respective books, records and accounts in violation of Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

102.**110.**        Berry has violated and, unless restrained and enjoined, will continue to violate, Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b201].

**TENTH CLAIM FOR RELIEF**

**Violations of Exchange Act Section 14(a) and Rule 14a-9 thereunder**

103.**111.**        The Commission realleges and incorporates by reference Paragraphs 1 through 71**79** above.

104.**112.**        Based on the conduct alleged above, KLA and Juniper each violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, that contain a statement which, at the time and

in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

~~105.~~**113.**    By engaging in the conduct alleged above, Berry knowingly provided substantial assistance to KLA's and Juniper's respective solicitations by means of false or misleading proxy statements.

~~106.~~**114.**    By reason of the foregoing, Berry has aided and abetted violations by KLA and by Juniper of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9] thereunder. Unless restrained and enjoined, Berry will continue to aid and abet such violations.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

**I.**

Permanently enjoin Berry from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2- 1], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)] and Rules 12b- 20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.14a-9] thereunder;

**II.**

33    Workshare Professional comparison of file:///C:/Documents and Settings/ssr/Desktop/Berry complaint.DOC and file:///C:/Documents and Settings/ssr/Desktop/Berry Amended Complaint.DOC. Performed on 6/18/2008.

Order Berry to disgorge ill-gotten gains from conduct alleged herein, plus prejudgment interest;

**III.**

Order Berry to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Prohibit Berry, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d);

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**VI.**

Grant such other relief as this Court may deem just and appropriate.