# Exhibit C

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 UBdHYV1oHq0/kLVgk9U3VKn2OZ26tJw9eHoz5yi022QIaYwqjzGMKIc24z81Jjoe
 4jeNYm/9vLNm2RP5wZUHPQ==

&lt;SEC-DOCUMENT&gt;0000891618-98-000313.txt : 19980202
&lt;SEC-HEADER&gt;0000891618-98-000313.hdr.sgml : 19980202
ACCESSION NUMBER:          0000891618-98-000313
CONFORMED SUBMISSION TYPE:  S-8
PUBLIC DOCUMENT COUNT:      5
FILED AS OF DATE:           19980130
EFFECTIVENESS DATE:         19980130
SROS:              NASD

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:         KLA TENCOR CORP
                CENTRAL INDEX KEY:              0000319201
                STANDARD INDUSTRIAL CLASSIFICATION:   OPTICAL INSTRUMENTS & LENSES [3827
                IRS NUMBER:                     042564110
                STATE OF INCORPORATION:         DE
                FISCAL YEAR END:                0630

        FILING VALUES:
                FORM TYPE:          S-8
                SEC ACT:
                SEC FILE NUMBER:    333-45271
                FILM NUMBER:        98517876

        BUSINESS ADDRESS:
                STREET 1:           160 RIO ROBLES
                CITY:               SAN JOSE
                STATE:              CA
                ZIP:                95134
                BUSINESS PHONE:     4084344200

        MAIL ADDRESS:
                STREET 1:           160 RIO ROBLES
                CITY:               SAN JOSE
                STATE:              CA
                ZIP:                95161-9055

        FORMER COMPANY:
                FORMER CONFORMED NAME:  KLA INSTRUMENTS CORP
                DATE OF NAME CHANGE:    19920703
&lt;/SEC-HEADER&gt;
&lt;DOCUMENT&gt;
&lt;TYPE&gt;S-8
&lt;SEQUENCE&gt;1
&lt;DESCRIPTION&gt;FORM S-8
&lt;TEXT&gt;

&lt;PAGE&gt;   1
        As filed with the Securities and Exchange Commission on January 30, 1998

Registration No. 333-
===============================================================================

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM S-8
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

KLA-TENCOR CORPORATION
(Exact name of registrant as specified in its charter)

DELAWARE                           04-2564110
(State of incorporation)      (I.R.S. Employer Identification No.)

160 Rio Robles
San Jose, California 95134
(Address, including zip code, of principal executive offices)

SECOND AMENDED AND RESTATED 1981 EMPLOYEE STOCK PURCHASE PLAN
1997 EMPLOYEE STOCK PURCHASE PLAN
(Full Titles of the Plans)

LISA C. BERRY
VICE PRESIDENT, GENERAL COUNSEL
KLA-TENCOR CORPORATION
160 Rio Robles
San Jose, California 95134
(Name and address of agent for service)
(408) 468-4200
(Telephone number, including area code, of agent for service)

Copy to:
JUDITH M. O'BRIEN, ESQ.
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304

===============================================================================

CALCULATION OF REGISTRATION FEE

===============================================================================

<TABLE>
<CAPTION>

| Title of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Share(1) | Propo |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Common Stock, $.001 par value | | | |
| Newly reserved under Second Amended and Restated 1981 Employee Stock Purchase Plan | 800,000 | 36.4375 | |
| Newly reserved under 1997 | 200,000 | 36.4375 | |

Employee Stock
Purchase Plan

Total                                1,000,000              36.4375
                                     =========              =======

</TABLE>

     (1) The Proposed Maximum Offering Price Per Share was estimated in accordance with Rule 457(c) and Rule 457(h) under the Securities Act of 1933, as amended (the "SECURITIES ACT") solely for the purpose of calculating the registration fee, based on the average between the high and low price of the Registrant's stock as reported in the Nasdaq National Market System on January 27, 1998.

<PAGE>   2

                                   PART II

                 INFORMATION REQUIRED IN THE REGISTRATION STATEMENT

ITEM 3.   INCORPORATION OF DOCUMENTS BY REFERENCE.

     KLA-Tencor Corporation (the "REGISTRANT" or the "COMPANY") hereby incorporates by reference in this registration statement the following documents:

     (a)    Registrant's Annual Report on Form 10-K for the fiscal year ended June 30, 1997 (File No. 000-09992) pursuant to Section 13(a) of the Securities Exchange Act of 1934, as amended (the "EXCHANGE ACT");

     (b)    Registrant's definitive proxy statement dated October 10, 1997, filed in connection with the November 18, 1997 Annual Meeting of Stockholders of the Company;

     (c)    Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 1997, filed pursuant to Section 13(a) of the Exchange Act;

     (d)    Registration Statement on Form S-8 filed with the Securities and Exchange Commission on March 7, 1997 registering shares under the Second Amended and Restated 1981 Employee Stock Purchase Plan (File No. 333-22939).

     (e)    Registration Statement on Form S-8 filed with the Securities and Exchange Commission on June 28, 1995 registering shares under the 1981 Employee Stock Purchase Plan (File No. 033-88662).

     (f)    The description of the Registrant's Common Stock as set forth in the Registration Statement filed by the Registrant on Form 8-A on March 29, 1989 (File No. 000-09992) pursuant to Section 12(g) of the Exchange Act and any amendments or reports thereto filed with the Securities and Exchange Commission for the purpose of updating such description including Amendment No. 1 to Form 8-A filed September 25, 1995 and Amendment No. 2 to Form 8-A filed September 24, 1996.

ITEM 4.   DESCRIPTION OF SECURITIES.

        The class of securities to be offered is registered under Section 12 of
the Exchange Act.

ITEM 5.   INTERESTS OF NAMED EXPERTS AND COUNSEL.

        Inapplicable.

ITEM 6.   INDEMNIFICATION OF DIRECTORS AND OFFICERS.

        Section 145(a) of the Delaware General Corporation Law (the "DGCL")
provides in relevant part that "[a] corporation may indemnify any person who was
or is a party or is threatened to be made a party to any threatened, pending or
completed action, suit or proceeding, whether civil, criminal, administrative or
investigative (other than an action by or in the right of the corporation) by
reason of the fact that he is or was a director, officer, employee or agent of
the corporation, or is or was serving at the request of the corporation as a
director, officer, employee or agent of

                                    II-1


<PAGE>   3
another corporation, partnership, joint venture, trust or other enterprise,
against expenses (including attorneys' fees), judgments, fines and amounts paid
in settlement actually and reasonably incurred by him in connection with such
action, suit or proceeding if he acted in good faith and in a manner he
reasonably believed to be in or not opposed to the best interests of the
corporation, and, with respect to any criminal action or proceeding, had no
reasonable cause to believe his conduct was unlawful." With respect to
derivative actions, Section 145(b) of the DGCL provides in relevant part that
"[a] corporation may indemnify any person who was or is a party or is threatened
to be made a party to any threatened, pending or completed action or suit by or
in the right of the corporation to procure a judgment in its favor... [by reason
of his service in one of the capacities specified in the preceding sentence]
against expenses (including attorneys' fees) actually and reasonably incurred by
him in connection with the defense or settlement of such action or suit if he
acted in good faith and in a manner he reasonably believed to be in or not
opposed to the best interests of the corporation and except that no
indemnification shall be made in respect of any claim, issue or matter as to
which such person shall have been adjudged to be liable to the corporation
unless and only to the extent that the Court of Chancery or the court in which
such action or suit was brought shall determine upon application that, despite
the adjudication of liability but in view of all the circumstances of the case,
such person is fairly and reasonably entitled to indemnity for such expenses
which the Court of Chancery or such other court shall deem proper."

        The Company's Amended and Restated Certificate of Incorporation
provides that to the fullest extent permitted by the DGCL, no director of the
Company shall be personally liable to the Company or its stockholders for
monetary damages for breach of fiduciary duty as a director. The Amended and
Restated Certificate of Incorporation also provides that no amendment or repeal
of such provision shall apply to or have any effect on the right to
indemnification permitted thereunder with respect to claims arising from acts or
omissions occurring in whole or in part before the effective date of such
amendment or repeal whether asserted before or after such amendment or repeal.

        The Company's Bylaws provide that the Company shall indemnify to the
full extent permitted by the DGCL each of its directors, officers, employees and
other agents against expenses actually and reasonably incurred in connection

with any proceeding arising by reason of the fact that such person is or was an agent of the Company.

The Company has entered into indemnification agreements with its directors and executive officers and intends to enter into indemnification agreements with any new directors and executive officers in the future.

ITEM 7.    EXEMPTION FROM REGISTRATION CLAIMED

Inapplicable.

ITEM 8.    EXHIBITS

See Exhibit Index.

ITEM 9.    UNDERTAKINGS

(a) The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

II-2

<PAGE>    4

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b) The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in

connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

II-3

<PAGE>    5

SIGNATURES

    Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-8 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Jose, State of California, on January 30, 1998.

KLA-TENCOR CORPORATION

By: /s/ Lisa C. Berry
    ---------------------------------------------------
    Lisa C. Berry, Vice President and General Counsel

II-4

<PAGE>    6

POWER OF ATTORNEY

    KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Kenneth Levy and Lisa C. Berry, and each of them, their true and lawful attorneys and agents, with full power of substitution, each with power to act alone, to sign and execute on behalf of the undersigned any amendment or amendments to this Registration Statement on Form S-8 and to perform any acts necessary in order to file such amendments, and each of the undersigned does hereby ratify and confirm all that said attorneys and agents, or their or his or her substitutes, shall do or cause to be done by virtue hereof. Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed by the following persons in the capacities and on the dates indicated.

<TABLE>
<CAPTION>

| Signature | Title | D |
|-----------|-------|---|
| <S> | <C> | <C> |
| /s/ Kenneth Levy | Chairman of the Board and | Januar |
| - ------------------------------- | | |
| Kenneth Levy | Director | |
| | | |
| /s/ Jon D. Tompkins | Chief Executive Officer and | Januar |
| - ------------------------------- | | |
| Jon D. Tompkins | Director | |
| | (Principal Executive Officer) | |

| | | |
|---|---|---|
| /s/ Kenneth L. Schroeder<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Kenneth L. Schroeder | President, Chief Operating<br>Officer and Director | Januar |
| /s/ Robert J. Boehlke<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Robert J. Boehlke | Vice President, Administration<br>and Finance, and Chief Financial<br>Officer (Principal Financial and<br>Accounting Officer) | Januar |
| /s/ James W. Bagley<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>James W. Bagley | Director | Januar |
| /s/ Edward W. Barnholt<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Edward W. Barnholt | Director | Januar |
| /s/ Leo J. Chamberlain<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Leo J. Chamberlain | Director | Januar |
| /s/ Richard J. Elkus, Jr.<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Richard J. Elkus, Jr. | Director | Januar |
| /s/ Dean O. Morton<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Dean O. Morton | Director | Januar |
| /s/ Yoshio Nishi<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Yoshio Nishi | Director | Januar |
| /s/ Samuel Rubinovitz<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Samuel Rubinovitz | Director | Januar |
| /s/ Dag Tellefsen<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Dag Tellefsen | Director | Januar |
| /s/ Lida Urbanek<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>Lida Urbanek | Director | Januar |

</TABLE>

II-5

<PAGE>     7

KLA-TENCOR CORPORATION

REGISTRATION STATEMENT ON FORM S-8

INDEX TO EXHIBITS

Exhibit
Number        Description

5.1     Opinion re: legality

10.1    Second Amended and Restated 1981 Employee Stock Purchase Plan,
        as amended on November 18, 1996

10.2    1997 Employee Stock Purchase Plan

23.1    Consent of Counsel (included in Exhibit 5.1)

23.2    Consent of Independent Accountants

24.1    Power of Attorney (see Page II-5)


                              II-6


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-5.1
<SEQUENCE>2
<DESCRIPTION>OPINION RE: LEGALITY
<TEXT>

<PAGE>    1

                                              EXHIBIT 5.1


                          [Letterhead]


                       January 30, 1998


KLA-Tencor Corporation
160 Rio Robles
San Jose, CA 95134

        RE:  REGISTRATION STATEMENT ON FORM S-8

Ladies and Gentlemen:

        We have examined the Registration Statement on Form S-8 to be filed by
you with the Securities and Exchange Commission on or about January 30, 1998
(the "Registration Statement"), in connection with the registration under the
Securities Act of 1933, as amended, of an additional 800,000 shares of Common
Stock reserved for issuance under the Second Amended and Restated 1981 Employee
Stock Purchase Plan, and 200,000 shares of Common Stock reserved for issuance
under the 1997 Employee Stock Purchase Plan (collectively, the "Shares")
(collectively, the "Plans"). As your legal counsel, we have examined the
proceedings taken and proposed to be taken in connection with the issuance, sale
and payment of consideration for the Shares to be issued under the Plans.

        It is our opinion that, when issued and sold in compliance with
applicable prospectus delivery requirements and in the manner referred to in the
Plans and pursuant to the agreements which accompany the Plans, the Shares will
be legally and validly issued, fully paid and non-assessable.

We consent to the use of this opinion as an exhibit to the Registration Statement and further consent to the use of our name wherever appearing in the Registration Statement and any amendments thereto.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

/s/ Wilson Sonsini Goodrich & Rosati

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.1
<SEQUENCE>3
<DESCRIPTION>AMENDED 1981 EMPLOYEE STOCK PURCHASE PLAN
<TEXT>

<PAGE>    1
```

EXHIBIT 10.1

KLA INSTRUMENTS CORPORATION

SECOND AMENDED AND RESTATED
1981 EMPLOYEE STOCK PURCHASE PLAN
(As Amended November 18, 1997)

1. Purpose. On October 6, 1981, the KLA Instruments Corporation 1981 Employee Stock Purchase Plan (the "Initial Plan") was adopted. On July 1, 1984, the Initial Plan was amended and restated in its entirety and retitled the KLA

Instruments Corporation 1981 Employee Stock Purchase Plan as Amended and
Restated (the "Second Plan"). On July 19, 1989, the Second Plan was amended and
restated in its entirety and retitled the KLA Instruments Corporation Amended
and Restated 1981 Employee Stock Purchase Plan (the "Third Plan"). On August 3,
1993, the Third Plan was amended and restated in its entirety as set forth
herein and retitled the KLA Instruments Corporation Second Amended and Restated
1981 Employee Stock Purchase Plan (the "Plan").

           Notwithstanding any other provision of the Plan to the
contrary, the terms and conditions of the Initial Plan, the Second Plan, and the
Third Plan shall remain in full force and effect as to options granted and as to
shares of common stock of KLA Instruments Corporation ("KLA") purchased pursuant
to the Initial Plan, the Second Plan, and the Third Plan, respectively.

           Notwithstanding any other provision of the Plan to the
contrary, if an employee participating in the Plan is subject to section 16 of
the Securities Exchange Act of 1934, as amended, (the "Exchange Act") any
provisions of the Plan resulting from the amendment and restatement of the
Second Plan and the Third Plan the application of which to such employee which
would result in a "material increase" in the benefits accruing to such employee
under the Plan such as to require stockholder approval of such provision for
purposes of complying with Rule 16b-3 shall not apply to such employee and,
instead, the applicable provision of the Initial Plan, the Second Plan, or the
Third Plan, as the case may be, if any, shall apply to such employee. The Plan
is established to provide eligible employees of KLA and any current or future
parent and/or subsidiary corporations of KLA (collectively referred to as the
"Company") with an opportunity through payroll deductions to acquire a
proprietary interest in the Company by the purchase of common stock of KLA. (KLA
and any such parent and/or subsidiary corporation of KLA shall be individually
referred to herein as a "Participating Company." For purposes of the Plan, a
parent corporation and a subsidiary corporation shall be as defined in sections
425(e) and 425(f) of the Internal Revenue Code of 1986, as amended (the
"Code").)

<div align="center">1</div>

&lt;PAGE&gt;   2           It is intended that the Plan shall qualify as an "employee
stock purchase plan" under section 423 of the Code (including any future
amendments or replacements of such section), and the Plan shall be so construed.
Any term not expressly defined in the Plan but defined for purposes of section
423 of the Code shall have the same definition herein.

           An employee participating in the Plan (a "Participant") may
withdraw such Participant's accumulated payroll deductions (if any) therein at
any time during an Offering Period (as defined below). Accordingly, each
Participant is, in effect, granted an option pursuant to the Plan (a "Purchase
Right") which may or may not be exercised at the end of an Offering Period and
which is intended to qualify as an option described in section 423 of the Code.

      2. Administration. The Plan shall be administered by the Board of
Directors of KLA (the "Board") and/or by a duly appointed committee of the Board
having such powers as shall be specified by the Board. Any subsequent references
to the Board shall also mean the committee if a committee has been appointed.
All questions of interpretation of the Plan or of any Purchase Right shall be
determined by the Board and shall be final and binding upon all persons having
an interest in the Plan and/or any Purchase Right. Subject to the provisions of
the Plan, the Board shall determine all of the relevant terms and conditions of
Purchase Rights granted pursuant to the Plan; provided, however, that all



Participants granted Purchase Rights pursuant to the Plan shall have the same rights and privileges within the meaning of section 423(b)(5) of the Code. All expenses incurred in connection with the administration of the Plan shall be paid by the Company.

3. Share Reserve. The maximum number of shares which may be issued under the Plan shall be five million six hundred thousand (5,600,000) shares of KLA's authorized but unissued common stock or treasury stock (the "Shares"). In the event that any Purchase Right for any reason expires or is cancelled or terminated, the Shares allocable to the unexercised portion of such Purchase Right may again be subjected to a Purchase Right.

4. Eligibility. Any employee of a Participating Company (including officers and directors who are also employees) is eligible to participate in the Plan except employees who own or hold options to purchase or who, as a result of participation in this Plan, would own or hold options to purchase, stock of the Company possessing five percent (5%) or more of the total combined voting power or value of all classes of stock of the Company within the meaning of section 423(b)(3) of the Code.

An employee who is also a director may participate in the Plan but may not purchase shares under the Plan until the Company's stockholders approve the

2

<PAGE>    3
Plan. In the event that stockholder approval of the Plan is not obtained prior to the last Purchase Date of an Offering Period in which a director who is also an employee is participating, then any cash balance in such Participant's account shall be refunded to the Participant as soon as practical after the last day of the Offering Period.

5.        Offering Dates.

(a) Offering Periods. Except as otherwise set forth below, the Plan shall be implemented by offerings (individually an "Offering") of two (2) years duration (an "Offering Period"). An Offering Period shall commence on the first day of January and July of each year. The first Offering Period shall commence on July 1, 1989. Notwithstanding the foregoing, the Board may establish a different term for one (1) or more Offerings and/or different commencing and/or ending dates for such Offerings and/or additional Offerings, including, without limitation, an Offering commencing October 1, 1989. An employee who becomes eligible to participate in the Plan after an Offering Period has commenced shall not be eligible to participate in such Offering but may participate in any subsequent Offering provided such employee is still eligible to participate in the Plan as of the commencement of any such subsequent Offering. The Company shall have the authority to designate the maximum number of Offerings in which an eligible employee may participate at any one time. The first day of an Offering Period shall be the "Offering Date" for such Offering Period. In the event the first and/or last day of an Offering Period is not a business day, the Company shall specify the business day that will be deemed the first or last day, as the case may be, of the Offering Period.

(b) Purchase Periods. Each Offering Period shall consist of four (4) consecutive purchase periods of six (6) months duration (a "Purchase Period"). The last day of each Purchase Period shall be the "Purchase Date" for such Purchase Period. Notwithstanding the foregoing, the Board may establish a different term for one (1) or more Purchase Periods and/or different commencing dates and/or Purchase Dates for such Purchase Periods. In the event the first

and/or last day of a Purchase Period is not a business day, the Company shall specify the business day that will be deemed the first or last day, as the case may be, of the Purchase Period.

(c) Governmental Approval; Stockholder Approval. Notwithstanding any other provision of the Plan to the contrary, any Purchase Right granted pursuant to the Plan shall be subject to (i) obtaining all necessary governmental approvals and/or qualifications of the sale and/or issuance of the Purchase Rights and/or the Shares, and (ii) in the case of Purchase Rights with an Offering Date after an amendment of the Plan, obtaining any necessary approval of the stockholders of the Company required by paragraph 22.

3

<PAGE>    4

6.        Participation in the Plan.

(a) Initial Participation. An eligible employee shall become a Participant on the first Offering Date after satisfying the eligibility requirements set forth in paragraph 4 and delivering to the Company not later than the close of business on the date seven (7) days prior to such Offering Date or on a date as may be established by the Company from time to time (the "Subscription Date") a subscription agreement indicating the employee's election to participate in the Plan and authorizing payroll deductions. An eligible employee who does not deliver a subscription agreement to the Company on or before the Subscription Date shall not participate in the Plan for that Offering Period or for any subsequent Offering Period unless such eligible employee subsequently enrolls in the Plan by complying with the provisions of paragraph 4 and by filing a subscription agreement with the Company on or before the Subscription Date for such subsequent Offering Period. The Company may, from time to time, change the Subscription Date as deemed advisable by the Company in its sole discretion for proper administration of the Plan.

(b) Continued Participation. Participation in the Plan shall continue until (i) the Participant ceases to be eligible as provided in paragraph 4, (ii) the Participant withdraws from the Plan pursuant to paragraph 11, or (iii) the Participant terminates employment as provided in paragraph 12. If a Participant is automatically withdrawn from an Offering at the end of a Purchase Period of such Offering pursuant to paragraph 11(c), then the Participant shall automatically participate in the Offering Period commencing on the next business day. At the end of an Offering Period, each Participant in such terminating Offering Period shall automatically participate in the first subsequent Offering Period according to the same elections contained in the Participant's subscription agreement effective for the Offering Period which has just ended, provided such Participant is still eligible to participate in the Plan as provided in paragraph 4. However, a Participant may file a subscription agreement with respect to such subsequent Offering Period if the Participant desires to change any of the Participant's elections contained in the Participant's then effective subscription agreement.

7. Right to Purchase Shares. During an Offering Period each Participant in such Offering Period shall have a Purchase Right consisting of the right to purchase that number of whole Shares arrived at by dividing Twenty Thousand Dollars ($20,000) by eighty-five percent (85%) of the fair market value of the Shares on the Offering Date of such Offering Period; provided, however, that in no event shall a Participant have a Purchase Right for more than four thousand (4,000) Shares.

8. Purchase Price. The purchase price at which Shares may be acquired at the end of an Offering pursuant to the exercise of all or any portion of a Purchase Right granted under the Plan (the "Offering Exercise Price") shall be set by the Board;

4

<PAGE>    5

provided, however, that the purchase price shall not be less than eighty-five percent (85%) of the lesser of (a) the fair market value of the Shares on the Offering Date of such Offering Period, or (b) the fair market value of the Shares at the time of exercise of all or any portion of the Purchase Right. Unless otherwise provided by the Board prior to the commencement of an Offering Period, the Offering Exercise Price shall be eighty-five percent (85%) of the lesser of (a) the fair market value of the Shares on the Offering Date of such Offering Period or (b) the fair market value of the Shares at the time of exercise of all or any portion of the Purchase Right. For purposes of the Plan, the fair market value of the Shares at any point in time shall be determined by the Board based on such factors as the Board deems relevant; including, without limitation, the mean of the bid and asked price of the Shares on the date in question (or the immediately preceding business day in the event the date in question falls on a weekend or legal holiday) as reported on the National Association of Securities Dealers Automated Quotations system, if available.

9. Payment of Purchase Price. Shares which are acquired pursuant to the exercise of all or any portion of a Purchase Right for a given Offering Period may be paid for only by means of payroll deductions from the Participant's Compensation accumulated during the Offering Period. For purposes of the Plan, a Participant's "Compensation" with respect to an Offering shall include all amounts paid in cash and includable as "wages" subject to tax under section 3101(a) of the Code without applying the dollar limitation of section 3121(a) of the Code. Accordingly, Compensation shall include, without limitation, salaries, commissions, bonuses, overtime and amounts contributed to the Participant's Salary Reduction Account, as that term is defined in the Company's Employee Savings and Investment Plan (the "Savings and Investment Plan"). Compensation shall not include reimbursements of expenses, allowances, or any amount deemed received without the actual transfer of cash or any amounts directly or indirectly paid pursuant to the Plan or any other stock purchase or stock option plan or credits or benefits under the Savings and Investment Plan (other than as set forth above) or any other Company contributions or payments to any trust, fund, or plan to provide retirement, pension, profit sharing, health, welfare, death, insurance or similar benefits to or on behalf of such Participant or any other payments not specifically referenced above, except to the extent that the inclusion of any such item with respect to all Participants on a nondiscriminatory basis is specifically approved by the Board. Except as set forth below. the amount of Compensation to be withheld from a Participant's Compensation during each month shall be determined by the Participant's subscription agreement.

(a) Election to Decrease Withholding. During an Offering Period, a Participant may elect to decrease the amount withheld from his or her Compensation by filing an amended subscription agreement with the Company on or before the Change Notice Date. The "Change Notice Date" shall initially be the date fifteen (15)

5

<PAGE>    6

days prior to the end of the first pay period for which such election is to be effective; provided, however, the Company may change such Change Notice Date

from time to time. A Participant may not elect to increase the amount withheld from the Participant's Compensation during an Offering Period.

(b) Limitations on Payroll Withholding. The amount of payroll withholding with respect to the Plan for any Participant shall be at least Ten Dollars ($10.00) per month but shall not exceed ten percent (10%) of the Participant's Compensation for any relevant pay period. Amounts shall be withheld in whole percentages only and shall be reduced by any amounts contributed by the Participant and applied to the purchase of Company stock pursuant to any other employee stock purchase plan qualifying under section 423 of the Code.

(c) Payroll Withholding. Payroll deductions shall commence on the first payday following the Offering Date and shall continue to the end of the Offering Period unless sooner altered or terminated as provided in the Plan.

(d) Participant Accounts. Individual accounts shall be maintained for each Participant. All payroll deductions from a Participant's Compensation shall be credited to such account and shall be deposited with the general funds of the Company. All payroll deductions received or held by the Company may be used by the Company for any corporate purpose.

(e) No Interest Paid. Interest shall not be paid on sums withheld from a Participant's Compensation

(f) Exercise of Purchase Right. On each Purchase Date of an Offering Period, each Participant who has not withdrawn from the Offering or whose participation in the Offering has not terminated on or before such last day shall automatically acquire pursuant to the exercise of the Participant's Purchase Right the number of whole Shares arrived at by dividing the total amount of the Participant's accumulated payroll deductions for the Purchase Period by the Offering Exercise Price; provided, however, that in no event shall the number of Shares purchased by the Participant exceed the number of Shares subject to the Participant's Purchase Right. No Shares shall be purchased on behalf of a Participant whose participation in the Offering or the Plan has terminated on or before the date of such exercise.

(g) Return of Cash Balance. Any cash balance remaining in the Participant's account shall be refunded to the Participant as soon as practical after the last day of the Offering Period. In the event the cash to be returned to a Participant pursuant to the preceding sentence is an amount less than the amount necessary to purchase a whole Share, the Company may establish procedures whereby such cash

6

<PAGE>    7
is maintained in the Participant's account and applied toward the purchase of Shares in the subsequent Purchase Period or Offering Period.

(h) Withholding. At the time the Purchase Right is exercised, in whole or in part, or at the time some or all of the Shares are disposed of, the Participant shall make adequate provision for foreign, federal and state tax withholding obligations of the Company, if any, which arise upon exercise of the Purchase Right and/or upon disposition of Shares. The Company may, but shall not be obligated to, withhold from the Participant's Compensation the amount necessary to meet such withholding obligations.

(i) Company Established Procedures. The Company may, from time to time, establish or change (i) a minimum required withholding amount for



participation in any Offering, (ii) limitations on the frequency and/or number of changes in the amount withheld during an Offering, (iii) an exchange ratio applicable to amounts withheld in a currency other than United States dollars, (iv) payroll withholding in excess of or less than the amount designated by a Participant in order to adjust for delays or mistakes in the Company's processing of subscription agreements, (v) the date(s) and manner by which the fair market value of the Shares is determined for purposes of the administration of the Plan, and/or (vi) such other limitations or procedures as deemed advisable by the Company in the Company's sole discretion which are consistent with the Plan.

(j) Expiration of Purchase Right. Any portion of a Participant's Purchase Right remaining unexercised after the end of the Offering Period to which such Purchase Right relates shall expire immediately upon the end of such Offering Period.

10.    Limitations on Purchase of Shares; Rights as a Stockholder.

(a) Fair Market Value Limitation. Notwithstanding any other provision of the Plan, no Participant shall be entitled to purchase Shares under the Plan at a rate which exceeds Twenty-Five Thousand Dollars ($25,000) in fair market value, determined as of the Offering Date for each Offering Period (or such other limit as may be imposed by the Code), for each calendar year in which the Participant participates in the Plan.

(b) Allocation of Shares. In the event the number of Shares which might be purchased by all Participants in the Plan exceeds the number of Shares available in the Plan pursuant to all Offerings which have commenced, the Company shall make a pro rata allocation of the remaining Shares (and within each Offering, to each Participant in such Offering) in as uniform a manner as shall be practicable and as the Company shall determine to be equitable.

7

<PAGE>    8
(c) Rights as a Stockholder and Employee. A Participant shall have no rights as a stockholder by virtue of the Participant's participation in the Plan until the date of the issuance of a stock certificate(s) for the Shares being purchased pursuant to the exercise of the Participant's Purchase Right. No adjustment shall be made for cash dividends or distributions or other rights for which the record date is prior to the date such stock certificate(s) are issued. Nothing herein shall confer upon a Participant any right to continue in the employ of the Company or interfere in any way with any right of the Company to terminate the Participant's employment at any time.

11.    Withdrawal.

(a) Withdrawal From an Offering. A Participant may withdraw from an Offering by signing a written notice of withdrawal on a form provided by the Company for such purpose and delivering such notice to the Company at any time prior to the end of an Offering Period; provided, however, that if a Participant withdraws after the Purchase Date for a Purchase Period of an Offering, the withdrawal shall not affect Shares acquired by the Participant in such Purchase Period. Unless otherwise indicated by the Participant, withdrawal from an Offering shall not result in a withdrawal from the Plan or any succeeding Offering therein. By withdrawing from an Offering on a Purchase Date, a Participant may have Shares purchased on such Purchase Date and immediately commence participating in the Offering commencing immediately after such Purchase Date. A Participant is prohibited from again participating in an Offering upon withdrawal from such Offering. The Company may impose, from time

to time, a requirement that the notice of withdrawal be on file with the Company for a reasonable period prior to the effectiveness of the Participant's withdrawal from an Offering.

(b) Withdrawal from the Plan. A Participant may withdraw from the Plan by signing a written notice of withdrawal on a form provided by the Company for such purpose and delivering such notice to the Company. Withdrawals made after a Purchase Date of an Offering Period shall not affect shares acquired by the Participant on such Purchase Date. In the event a Participant voluntarily elects to withdraw from the Plan, the Participant may not resume participation in the Plan during the same Offering Period, but may participate in any subsequent Offering under the Plan by again satisfying the requirements of paragraph 6. The Company may impose, from time to time, a requirement that the notice of withdrawal be on file with the Company for a reasonable period prior to the effectiveness of the Participant's withdrawal from the Plan.

(c) Automatic Withdrawal From an Offering. If the fair market value of the Shares on a Purchase Date of an Offering is less than the fair market value of the Shares on the Offering Date for such Offering, then every Participant

8

<PAGE>  9
shall automatically (i) be withdrawn from the Offering at the close of the Purchase Date and after the acquisition of Shares for such Purchase Period, and (ii) be enrolled in the Offering commencing on the first business day subsequent to such Purchase Period. A Participant may elect not to be automatically withdrawn from an Offering pursuant to this paragraph 11(c) by delivering to the Company not later than the close of business on the last business day before the date seven (7) days prior to the Purchase Date a written notice indicating such election; provided, however, that the Company may change the date such notice is required to be delivered to the Company from time to time.

12. Termination of Employment. Termination of a Participant's employment with the Company for any reason, including retirement or death or the failure of a Participant to remain an employee eligible to participate in the Plan, shall terminate the Participant's participation in the Plan immediately. A Participant whose participation has been so terminated may again become eligible to participate in the Plan by again satisfying the requirements of paragraphs 4 and 6.

13. Repayment of Payroll Deductions. In the event a Participant's interest in the Plan or any Offering therein is terminated for any reason, the balance held in the Participant's account shall be returned as soon as practical after such termination to the Participant (or, in the case of the Participant's death, to the Participant's legal representative) and all of the Participant's rights under the Plan shall terminate. Such account balance may not be applied to any other Offering under the Plan. No interest shall be paid on sums returned to a Participant pursuant to this paragraph 13.

14. Transfer of Control. A "Transfer of Control" shall be deemed to have occurred in the event any of the following occurs with respect to the Control Company. For purposes of applying this paragraph 14, the "Control Company" shall mean the Participating Company whose stock is subject to the Purchase Right.

(a) the direct or indirect sale or exchange by the stockholders of the Control Company of all or substantially all of the stock of the Control Company where the stockholders of the Control Company before such

sale or exchange do not retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the Control Company;

    (b) a merger in which the stockholders of the Control Company before such merger do not retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the Control Company; or

    (c) the sale, exchange, or transfer of all or substantially all of the Control Company's assets (other than a sale, exchange, or transfer to one (1) or more

9

<PAGE>    10
corporations where the stockholders of the Control Company before such sale, exchange, or transfer retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the corporation(s) to which the assets were transferred).

    In the event of a Transfer of Control, the Board, in its sole discretion, shall either (i) provide that Purchase Rights granted under the Plan shall be fully exercisable to the extent of each Participant's account balance for the Offering Period as of a date prior to the Transfer of Control, as the Board so determines or (ii) arrange with the surviving, continuing, successor, or purchasing corporation, as the case may be, that such corporation assume the Company's rights and obligations under the Plan. All Purchase Rights shall terminate effective as of the date of the Transfer of Control to the extent that the Purchase Right is neither exercised as of the date of the Transfer of Control nor assumed by the surviving, continuing, successor, or purchasing corporation, as the case may be.

    15. Capital Changes. In the event of changes in the common stock of the Company due to a stock split, reverse stock split, stock dividend, combination, reclassification, or like change in the Company's capitalization, or in the event of any merger, sale or other reorganization, appropriate adjustments shall be made by the Company in the Plan's share reserve, the number and class of shares of stock subject to a Purchase Right and in the purchase price per share of any outstanding Purchase Right, including, without limitation, the number of Shares subject to a Purchase Right as set forth in paragraph 7.

    16. Non-Transferability. A Purchase Right may not be transferred in any manner otherwise than by will or the laws of descent and distribution and shall be exercisable during the lifetime of the Participant only by the Participant.

    17. Reports. Each Participant who exercised all or part of the Participant's Purchase Right for a Purchase Period shall receive as soon as practical after the last day of such Purchase Period a report of such Participant's account setting forth the total payroll deductions accumulated, the number of Shares purchased and the remaining cash balance to be refunded or retained in the Participant's account pursuant to paragraph 9(g), if any.

    18. Plan Term. This Plan shall continue until terminated by the Board or until all of the Shares reserved for issuance under the Plan have been issued or until December 31, 2000, whichever shall first occur.

    19. Restriction on Issuance of Shares. The issuance of shares pursuant to the Purchase Right shall be subject to compliance with all applicable requirements of federal or state law with respect to such securities. The Purchase Right may not be exercised if the issuance of shares upon such exercise would constitute a violation of

10

<PAGE>   11
any applicable federal or state securities laws or other law or regulations. In
addition, no Purchase Right may be exercised unless (i) a registration statement
under the Securities Act of 1933, as amended, shall at the time of exercise of
the Purchase Right be in effect with respect to the shares issuable upon
exercise of the Purchase Right, or (ii) in the opinion of legal counsel to the
Company, the shares issuable upon exercise of the Purchase Right may be issued
in accordance with the terms of an applicable exemption from the registration
requirements of said Act. As a condition to the exercise of the Purchase Right,
the Company may require the Participant to satisfy any qualifications that may
be necessary or appropriate, to evidence compliance with any applicable law or
regulation and to make any representation or warranty with respect thereto as
may be requested by the Company.

        20. Legends. The Company may at any time place legends or other
identifying symbols referencing any applicable federal and/or state securities
restrictions and any provision convenient in the administration of the Plan on
some or all of the certificates representing shares of stock issued under the
Plan. The Participant shall, at the request of the Company, promptly present to
the Company any and all certificates representing shares acquired pursuant to a
Purchase Right in the possession of the Participant in order to effectuate the
provisions of this paragraph.

        21. Transfer Restrictions. The Company, in its absolute discretion, may
impose such restrictions on the transferability of the shares purchasable upon
the exercise of a Purchase Right as it deems appropriate and any such
restriction shall be set forth in the respective subscription agreement and may
be referred to on the certificates evidencing such shares. The Company may
require the employee to give the Company prompt notice of any disposition of
shares of stock acquired by exercise of a Purchase Right within two years from
the date of granting such Purchase Right or one year from the date of exercise
of such Purchase Right. The Company may direct that the certificates evidencing
shares acquired by exercise of a Purchase Right refer to such requirement to
give prompt notice of disposition.

        22. Amendment or Termination of the Plan. The Board may at any time
amend or terminate the Plan, except that (i) such termination shall not affect
Purchase Rights previously granted under the Plan except as permitted by the
Plan, and (ii) no amendment may adversely affect a Purchase Right previously
granted under the Plan (except to the extent permitted by the Plan or as may be
necessary to qualify the Plan as an "employee stock purchase plan" pursuant to
section 423 of the Code). In addition, an amendment to the Plan must be approved
by the stockholders of the Company, within the meaning of section 423 of the
Code, within twelve (12) months of the adoption of such amendment if such
amendment would authorize the sale of more shares than are authorized for
issuance under the Plan or would change the

11

<PAGE>   12
designation of corporations whose employees may be offered Purchase Rights under
the Plan. Notwithstanding any other provision of the Plan to the contrary, in
the event of an amendment to the Plan which affects the rights or privileges of
Purchase Rights to be offered under the Plan, each Participant with an
outstanding Purchase Right shall have the right to exercise such outstanding
Purchase Right on the effective date of the amendment.

12

<PAGE>    13

## KLA INSTRUMENTS CORPORATION

### SECOND AMENDED AND RESTATED
### 1981 EMPLOYEE STOCK PURCHASE PLAN

#### SUBSCRIPTION AGREEMENT

_____    Original Application
_____    Change in Percentage of Payroll Deductions

I hereby elect to participate in the Second Amended and Restated 1981 Employee Stock Purchase Plan (the "Stock Purchase Plan") of KLA Instruments Corporation (the "Company") and subscribe to purchase shares of the Company's common stock (the "Shares") as determined in accordance with the terms of the Stock Purchase Plan.

I hereby authorize payroll deductions in the amount of $_____ or _____ percent of my compensation from each paycheck throughout the "Offering Period" (as defined in the Stock Purchase Plan) in accordance with the terms of the Stock Purchase Plan. (The amount deducted each [pay period] [month] must be at least [$ ] and may be no greater than 10% of compensation for any pay period (if stated in percentages, must be in whole percentages).) I understand that these payroll deductions will be accumulated for the purchase of Shares at the applicable purchase price determined in accordance with the Stock Purchase Plan. I further understand that, except as otherwise set forth in the Stock Purchase Plan, Shares will be purchased for me automatically on the last day of the Purchase Period unless I withdraw from the Stock Purchase Plan or from the Offering Period by giving written notice to the Company or unless I terminate employment.

I understand that I will automatically participate in each subsequent Offering Period under the Stock Purchase Plan until such time as I file with the Company a notice of withdrawal from the Stock Purchase Plan or any such subsequent Offering Period on such form as may be established from time to time by the Company or I terminate employment.

I understand that I will be automatically withdrawn from an Offering Period and be automatically enrolled in the subsequent Offering Period if the fair market value of the Shares on the purchase date of an Offering Period is less than the fair market value of the Shares on the first day of such Offering Period; provided, however, that I may elect not to be automatically withdrawn if I notify the Company in writing of such election no later than the close of business on the last business day before the date 7 days prior to the purchase date of such Offering Period.

13

<PAGE>    14

Shares purchased for me under the Stock Purchase Plan should be issued in the name set forth below. I understand that Shares may be issued either in my name alone or together with my spouse as community property or in joint tenancy.)

NAME: _____

ADDRESS: _____
_____
_____

MY SOCIAL SECURITY NUMBER: _____

I am familiar with the terms and provisions of the Stock Purchase Plan and hereby agree to participate in the Stock Purchase Plan subject to all of the terms and provisions thereof. I understand that the Board reserves the right to amend the Stock Purchase Plan and my right to purchase stock under the Stock Purchase Plan as may be necessary to qualify the Plan as an employee stock purchase plan as defined in section 423 of the Internal Revenue Code of 1986, as amended. I understand that the effectiveness of this subscription agreement is dependent upon my eligibility to participate in the Stock Purchase Plan.

Date: _____    Signature: _____

14

<PAGE>    15

KLA INSTRUMENTS CORPORATION

SECOND AMENDED AND RESTATED
1981 EMPLOYEE STOCK PURCHASE PLAN

NOTICE OF WITHDRAWAL

I hereby elect to withdraw from the current offering (the "Offering") of the common stock of KLA Instruments Corporation (the "Company") under the Second Amended and Restated 1981 Employee Stock Purchase Plan (the "Stock Purchase Plan"), and hereby request that all payroll deductions credited to my account under the Stock Purchase Plan with respect to the Offering (if any), and not previously used to purchase shares of common stock of the Company under the Stock Purchase Plan, be paid to me as soon as is practical. I understand that this Notice of Withdrawal automatically terminates my interest in the Offering.

As to participation in future offerings of stock under the Stock Purchase Plan, I elect as follows:

_____ I elect to participate in future offerings under the Stock Purchase Plan.

I understand that by making the election set forth above I will automatically participate in each subsequent Offering under the Stock Purchase Plan until such time as I file with the Company a notice of withdrawal from the Stock Purchase Plan or any such subsequent offering on such form as may be established from time to time by the Company or I terminate employment.

_____ I elect not to participate in future offerings under the Stock Purchase Plan.

I understand that by making the election set forth above I
terminate my interest in the Stock Purchase Plan and that no
further payroll deductions will be made unless I elect in
accordance with the Stock Purchase Plan to become a
participant in another offering under the Stock Purchase Plan.

I understand that if no election is made as to participation in future
offerings under the Stock Purchase Plan, I will be deemed to have elected to
participate in such future offerings.

Date: _____          Signature: _____

15

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.2
<SEQUENCE>4
<DESCRIPTION>1997 EMPLOYEE STOCK PURCHASE PLAN
<TEXT>

<PAGE>    1
```

EXHIBIT 10.2

KLA-TENCOR CORPORATION

1997 EMPLOYEE STOCK PURCHASE PLAN

The following constitute the provisions of the 1997 Employee Stock
Purchase Plan (the "Plan") of KLA-Tencor Corporation (the "Company"). Certain
definitions of terms used in the Plan are provided in Section 2 below.

1.    PURPOSE

The purpose of the Plan is to provide employees of the Company and its
Designated Subsidiaries with an opportunity to purchase Common Stock of the
Company through accumulated payroll deductions. It is the intention of the
Company to have the Plan qualify as an "Employee Stock Purchase Plan" under
Section 423 of the Code. The provisions of the Plan shall, accordingly, be
construed so as to extend and limit participation in a manner consistent with
the requirements of that section of the Code. The Plan will also be extended to
employees of foreign subsidiaries subject to adjustments, in the sole discretion
of the Board of Directors, to take into account the requirements of the local
laws associated with the particular subsidiary. These local requirements may not
provide the same favorable tax consequences as are available to participants in
the United States.

2.    DEFINITIONS

(a) "BOARD" shall mean the Board of Directors of the Company.

(b) "CODE" shall mean the Internal Revenue Code of 1986, as amended.

(c) "COMMON STOCK" shall mean the Common Stock, $.001 par value, of the
Company.

(d) "COMPANY" shall mean KLA-Tencor Corporation, a Delaware corporation.

(e) "COMPENSATION" Compensation shall mean all amounts includable as "wages" subject to tax under section 3101(a) of the Code without applying the dollar limitation of section 3121(a) of the Code. Accordingly, Compensation shall include, without limitation, salaries, commissions, bonuses and overtime. Compensation shall not include reimbursements of expenses, allowances, or any amount deemed received without the actual transfer of cash or any Company contributions or payments to any trust, fund, or plan to provide retirement, pension, profit sharing, health, welfare, death, insurance or similar benefits to or on behalf of such Participant or any other payments not specifically referenced above, except to the extent that the inclusion of any such item with respect to all Participants on a nondiscriminatory basis is specifically approved by the Board.

1

<PAGE>    2

(f) "CONTINUOUS STATUS AS AN EMPLOYEE" shall mean the absence of any interruption or termination of service as an Employee. Continuous Status as an Employee shall not be considered interrupted in the case of a leave of absence agreed to in writing by the Company, provided that such leave is for a period of not more than 90 days or re-employment upon the expiration of such leave is guaranteed by contract or statute.

(g) "DESIGNATED SUBSIDIARIES" shall mean the Subsidiaries which have been designated by the Board from time to time in its sole discretion as eligible to participate in the Plan.

(h) "EMPLOYEE" shall mean any person, including an officer, who is customarily employed for at least 20 hours per week and more than five months in a calendar year by the Company or one of its Designated Subsidiaries.

(i) "ENROLLMENT DATE" shall mean the first day of each Offering Period.

(j) "EXERCISE DATE" shall mean each December 31 and June 30 of each Offering Period of the Plan.

(k) "EXERCISE PERIOD" shall mean a period commencing on January 1 and terminating on the following June 30 or commencing on July 1 and terminating on the following December 31.

(l) "OFFERING PERIOD" shall mean a period of twenty-four (24) months commencing on January 1 and July 1 of each year during which an option granted pursuant to the Plan may be exercised.

(m) "PLAN" shall mean this 1997 Employee Stock Purchase Plan.

(n) "SUBSIDIARY" shall mean a corporation, domestic or foreign, of which not less than 50% of the voting shares are held by the Company or a Subsidiary, whether or not such corporation now exists or is hereafter organized or acquired by the Company or a Subsidiary.

3.    ELIGIBILITY

(a) Any Employee who shall be employed by the Company on a given

Enrollment Date shall be eligible to participate in the Plan, subject to limitations imposed by Section 423 (b) of the Code or other applicable local law.

(b) Any provisions of the Plan to the contrary notwithstanding, no Employee shall be granted an option under the Plan (i) if, immediately after the grant, such Employee (or any other person whose stock would be attributed to such Employee pursuant to Section 425(d) of the Code) would own stock and/or hold outstanding options to purchase stock

2

<PAGE>    3

possessing five percent or more of the total combined voting power or value of all classes of stock of the Company or of any Subsidiary, or (ii) which permits such Employee's rights to purchase stock under all employee stock purchase plans of the Company and its Subsidiaries to accrue at a rate which exceeds US$25,000 of fair market value of such stock (determined at the time such option is granted) for each calendar year in which such option is outstanding at any time.

4.    OFFERING PERIODS

The Plan shall be implemented by consecutive Offering Periods with a new Offering Period commencing on January 1 and July 1 of each year, commencing January 1, 1998, or as otherwise determined by the Board, and continuing thereafter until terminated in accordance with Section 19 hereof. The Board shall have the power to change the duration of Offering Periods with respect to future offerings without stockholder approval if such change is announced at least 15 days prior to the scheduled beginning of the first Offering Period to be affected.

5.    PARTICIPATION

(a) An eligible Employee may become a participant in the Plan by completing a subscription agreement authorizing payroll deductions on the form provided by the Company and filing it with the Company's payroll office prior to the applicable Enrollment Date, unless a later time for filing the subscription agreement is set by the Board for all eligible Employees with respect to a given Offering Period. An eligible Employee may participate in an Offering Period only if, as of the Enrollment Date of such Offering Period, such Employee is not participating in any prior Offering Period which is continuing at the time of such proposed enrollment.

(b) Payroll deductions for a participant shall commence on the first payroll date following the Enrollment Date and shall end on the last payroll date in the Offering Period to which such authorization is applicable, unless sooner terminated by the participant as provided in Section 10.

6.    PAYROLL DEDUCTIONS

(a) At the time a participant files his subscription agreement, he shall elect to have payroll deductions made on each pay date during the Offering Period in an amount not exceeding 10% of the Compensation which he receives on each pay date during the Offering Period, and the aggregate of such payroll deductions during the Offering Period shall not exceed 10% of his aggregate Compensation during said Offering Period.

(b) All payroll deductions made by a participant shall be credited to his account under the Plan. A participant may not make any additional payments

into such account.

3

<PAGE>    4

    (c) A participant may discontinue his participation in the Plan as provided in Section 10, may lower the rate of his payroll deductions effective immediately or may increase (but not above 10%) the rate of his payroll deductions effective as of the first date of the next Exercise Period within such Offering Period by completing or filing with the Company a new authorization for payroll deductions.

    (d) Notwithstanding the foregoing, to the extent necessary to comply with section 423(b)(8) of the Code and Section 3(b) herein, a participant's payroll deductions may be decreased to zero percent at such time during any Exercise Period which is scheduled to end during the current calendar year. Payroll deductions shall recommence at the rate provided in such participant's subscription agreement at the beginning of the first Exercise Period which is scheduled to end in the following calendar year, unless terminated by the participant as provided in Section 10.

7.    GRANT OF OPTION

    (a) On the Enrollment Date of each Offering Period, each eligible Employee participating in such Offering Period shall be granted an option to purchase on each Exercise Date during such Offering Period (at the per share option price) up to a number of shares of the Company's Common Stock determined by dividing such Employee's payroll deductions accumulated during such Exercise Period by 85% of the fair market value of a share of the Company's Common Stock on the Enrollment Date or on the Exercise Date, whichever is lower, provided that the number of shares subject to the option shall not exceed 200% of the number of shares determined by dividing 10% of the Employee's Compensation over the Offering Period (determined as of the Enrollment Date) by 85% of the fair market value of a share of the Company's Common Stock on the Enrollment Date, subject to the limitations set forth in Sections 3(b) and 12 hereof. Fair market value of a share of the Company's Common Stock shall be determined as provided in Section 7(b) herein.

    (b) The option price per share of the shares offered in a given Offering Period shall be the lower of: (i) 85% of the fair market value of a share of the Common Stock of the Company on the Enrollment Date; or (ii) 85% of the fair market value of a share of the Common Stock of the Company on the applicable Exercise Date. The fair market value of the Company's Common Stock on a given date shall be determined by the Board in its discretion; provided, however, that where there is a public market for the Common Stock, the fair market value per share shall be the closing price of the Common Stock for such date, as reported by Nasdaq National Market. If a closing price is not available for an Enrollment Date or an Exercise Date, the fair market value of a share of the Common Stock of the Company on such date shall be the fair market value of a share of the Common Stock of the Company on the last business day prior to such date.

4

<PAGE>    5
8.    EXERCISE OF OPTION

Unless a participant withdraws from the Plan as provided in Section 10, his option for the purchase of shares will be exercised automatically on each Exercise Date of the Offering Period, and the maximum number of full shares subject to his option will be purchased for him at the applicable option price with the accumulated payroll deductions in his account. During his lifetime, a participant's option to purchase shares hereunder is exercisable only by him. Any amount remaining in the participant's account after an Exercise Date shall be held in the account until the next Exercise Date in such Offering Period, unless the Offering Period has been over-subscribed or has terminated with such Exercise Date, in which event such amount shall be refunded to the participant.

9.        DELIVERY

As promptly as practicable after each Exercise Date, the Company shall arrange the delivery to each participant, as appropriate, of a certificate representing the shares purchased upon exercise of his option.

10.       WITHDRAWAL; TERMINATION OF EMPLOYMENT

(a) A participant may withdraw all but not less than all of the payroll deductions credited to his account under the Plan at any time by giving written notice to the Company. All of the participant's payroll deductions credited to his account will be paid to him promptly after receipt of his notice of withdrawal and his participation in the Plan will be automatically terminated, and no further payroll deductions for the purchase of shares will be made. Payroll deductions will not resume on behalf of a participant who has withdrawn from the Plan unless written notice is delivered to the Company within the open enrollment period preceding the commencement of an Exercise Period directing the Company to resume payroll deductions.

(b) Upon termination of the participant's Continuous Status as an Employee prior to the Exercise Date of an Offering Period for any reason, including retirement or death, the payroll deductions credited to the participant's account will be returned to the participant or, in the case of death, to the person or persons entitled thereto under Section 14, and such participant's option will be automatically terminated.

(c) If an Employee fails to maintain Continuous Status as an Employee for at least 20 hours per week during an Offering Period in which the Employee is a participant, he will be deemed to have elected to withdraw from the Plan and the payroll deductions credited to his account will be returned to him and his option terminated.

(d) A participant's withdrawal from an Offering Period will not have any effect upon his eligibility to participate in a succeeding Offering Period or in any similar plan which may hereafter be adopted by the Company.

5

<PAGE>   6
11.       INTEREST

No interest shall accrue on the payroll deductions of a participant in the Plan.

12.       STOCK

(a) The maximum number of shares of the Company's Common Stock which shall be made available for sale under the Plan shall be 200,000. If on a given Exercise Date the number of shares with respect to which options are to be exercised exceeds the number of shares then available, the Company shall make a pro rata allocation of the shares remaining available for option grant in as uniform a manner as shall be practicable and as it shall determine to be equitable. In such event, the Company shall give written notice of such reduction of the number of shares subject to the option to each Employee affected thereby and shall similarly reduce the rate of payroll deductions, if necessary.

(b) The participant will have no interest or voting right in shares covered by his option until such option has been exercised.

(c) Shares to be delivered to a participant under the Plan will be registered in the name of the participant or in the name of the participant and his or her spouse.

13.    ADMINISTRATION

The Plan shall be administered by the Board of Directors of the Company or a committee appointed by the Board. The Board may delegate routine matters to management. The administration, interpretation or application of the Plan by the Board or its committee shall be final, conclusive and binding upon all participants. Members of the Board who are eligible Employees are permitted to participate in the Plan, provided that:

(a) Members of the Board who are eligible to participate in the Plan may not vote on any matter affecting the administration of the Plan or the grant of any option pursuant to the Plan.

(b) If a committee is established to administer the Plan, no member of the Board who is eligible to participate in the Plan may be a member of the committee.

14.    DESIGNATION OF BENEFICIARY

(a) A participant may file a written designation of a beneficiary who is to receive any shares and cash, if any, from the participant's account under the Plan in the event of such participant's death subsequent to the end of the Offering Period but prior to delivery to him of such shares and cash. In addition, a participant may file a written designation of a beneficiary who is to receive any cash from the participant's account under the Plan in the event of such participant's death prior to the exercise of the option.

6

<PAGE>    7

(b) Such designation of beneficiary may be changed by the participant at any time by written notice. In the event of the death of a participant and in the absence of a beneficiary validly designated under the Plan who is living at the time of such participant's death, the Company shall deliver such shares and/or cash to the executor or administrator of the estate of the participant, or if no such executor or administrator has been appointed (to the knowledge of the Company), the Company, in its discretion, may deliver such shares and/or cash to the spouse or to any one or more dependents or relatives of the participant, or if no spouse, dependent or relative is known to the Company, then to such other person as the Company may designate.

15.    TRANSFERABILITY

Neither payroll deductions credited to a participant's account nor any rights with regard to the exercise of an option or to receive shares under the Plan may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will, the laws of descent and distribution or as provided in Section 14 hereof) by the participant. Any such attempt at assignment, transfer, pledge or other disposition shall be without effect, except that the Company may treat such act as an election to withdraw funds in accordance with Section 10.

16.    USE OF FUNDS

All payroll deductions received or held by the Company under the Plan may be used by the Company for any corporate purpose, and the Company shall not be obligated to segregate such payroll deductions.

17.    REPORTS

Individual accounts will be maintained for each participant in the Plan. Statements of account will be given to participating Employees semi-annually promptly following each Exercise Date, which statements will set forth the amounts of payroll deductions, the per share purchase price, the number of shares purchased and the remaining cash balance, if any.

18.    ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

Subject to any required action by the stockholders of the Company, the number of shares of Common Stock covered by each option under the Plan which has not yet been exercised and the number of shares of Common Stock which have been authorized for issuance under the Plan but have not yet been placed under option (collectively, the "Reserves"), as well as the price per share of Common Stock covered by each option under the Plan which has not yet been exercised, shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split or the payment of a stock dividend (but only on the Common Stock) or any other

7

<PAGE>    8

increase or decrease in the number of shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration". Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issue by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an option.

In the event of the proposed dissolution or liquidation of the Company, the Offering Period will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Board. In the event of a proposed sale of all or substantially all of the assets of the Company, or the merger of the Company with or into another entity, the Board, in its sole discretion, may provide that (i) each option under the Plan shall be assumed, (ii) an equivalent option shall be substituted by such successor entity or a parent or subsidiary of such successor entity, or in lieu of such assumption or

substitution, that the participant shall have the right to exercise the option, including shares as to which the option would not otherwise be exercisable, or (iii) the Plan shall terminate and a shortened Exercise Period may take place or a participant's contributions returned. If the Board makes an option fully exercisable in lieu of assumption or substitution in the event of a merger or sale of assets, the Board shall notify the participant that the option shall be fully exercisable for a period of 30 days from the date of such notice, and the option will terminate upon the expiration of such period.

The Board may, if it so determines in the exercise of its sole discretion, also make provision for adjusting the Reserves, as well as the price per share of Common Stock covered by each outstanding option, if the Company effects one or more reorganizations, recapitalizations, rights offerings or other increases or decreases of the shares of its outstanding Common Stock, and if the Company is being consolidated with or merged into any other corporation.

19.    AMENDMENT OR TERMINATION

The Board of Directors of the Company may at any time terminate or amend the Plan. No such termination can affect options previously granted, nor may an amendment make any change in any option theretofore granted which adversely affects the rights of any participant, nor may an amendment be made without prior approval of the stockholders of the Company if such amendment is required by law or otherwise to be approved by the stockholders.

Amendments to the Code which impact the Plan shall be automatically implemented without further action by the Board unless such amendments require independent action by either the Board or the stockholders.

8

<PAGE>    9
20.    NOTICES

All notices or other communications by a participant to the Company under or in connection with the Plan shall be deemed to have been duly given when received in the form specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

21.    STOCKHOLDER APPROVAL

Continuance of the Plan shall be subject to approval by the stockholders of the Company within 12 months before or after the date the Plan is adopted. If such stockholder approval is obtained at a duly held stockholders meeting, it may be obtained by the affirmative vote of the holders of a majority of the outstanding shares of the Company present or represented and entitled to vote thereon, which approval shall be:

(a) (i) solicited substantially in accordance with Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Act") and the rules and regulations promulgated thereunder, or

(ii) solicited after the Company has furnished in writing to the holders entitled to vote substantially the same information concerning the Plan as that which would be required by the rules and regulations in effect under Section 14(a) of the Act at the time such information is furnished; and

(b) obtained at or prior to the first annual meeting of stockholders

held subsequent to the first registration of Common Stock under Section 12 of the Act.

In the case of approval by written consent, it must be obtained by the unanimous written consent of all stockholders of the Company.

22.     CONDITIONS UPON ISSUANCE OF SHARES

Shares shall not be issued with respect to an option unless the exercise of such option and the issuance and delivery of such shares pursuant thereto shall comply with all applicable provisions of law, domestic or foreign, including, without limitation, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the rules and regulations promulgated thereunder, and the requirements of any stock exchange upon which the shares may then be listed, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an option, the Company may require the person exercising such option to represent and warrant at the time of any such exercise that the shares are being purchased only for investment and without any present intention to sell or distribute such shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned applicable provisions of law.

<div align="center">9</div>

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.2
<SEQUENCE>5
<DESCRIPTION>CONSENT OF INDEPENDENT ACCOUNTANTS
<TEXT>

<PAGE>    1
```
                                                          EXHIBIT 23.2


                        CONSENT OF INDEPENDENT ACCOUNTANTS

We hereby consent to the incorporation by reference in this Registration Statement on Form S-8 of our report dated July 28, 1997, which appears on page 30 of the 1997 Annual Report to Stockholders of KLA-Tencor, which is incorporated by reference in KLA-Tencor's Annual Report on Form 10-K for the year ended June 30, 1997.


PRICE WATERHOUSE LLP

San Jose, California
January 30, 1998

```
</TEXT>
</DOCUMENT>
```

```
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```