# Exhibit E

# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549
# FORM 10-K

(MARK ONE)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED JUNE 30, 1999

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM _____ TO _____

*COMMISSION FILE NO. 0-9992*

# KLA-TENCOR CORPORATION

(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| | |
|---|---|
| DELAWARE | 04-2564110 |
| (STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION) | (I.R.S. EMPLOYER IDENTIFICATION |
| NUMBER) | |
| 160 RIO ROBLES, SAN JOSE, CALIFORNIA | 95134 |
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | (ZIP CODE) |

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (408) 875-3000

SECURITIES REGISTERED PURSUANT TO SECTION 12(B) OF THE ACT:

| TITLE OF EACH CLASS REGISTERED | NAME OF EACH EXCHANGE ON WHICH |
|---|---|
| NONE | NONE |

----------------------

SECURITIES REGISTERED PURSUANT TO SECTION 12(G) OF THE ACT:
COMMON STOCK, $0.001 PAR VALUE
COMMON STOCK PURCHASE RIGHTS
(TITLE OF CLASS)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

The aggregate market value of the voting stock held by non-affiliates of the registrant based upon the closing price of the registrant's stock, as of September 20, 1999, was $4,792,940,686. Shares of common stock held by each officer and director and by each person or group who owns 5% or more of the outstanding common stock have been excluded in that such persons or groups may be deemed to be affiliates. This

Powered By *EDGAR* Online  2002. EDGAR Online, Inc.

determination of affiliate status is not necessarily a conclusive determination for other purposes.

The registrant had 89,556,350 shares of Common Stock outstanding as of September 20, 1999.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Annual Report to Stockholders for the fiscal year ended June 30, 1999 ("1999 Annual Report to Stockholders") are incorporated by reference into Parts I, II and IV of this Report. Portions of the Proxy Statement for the Annual Meeting of Stockholders ("Proxy Statement") to be held on November 16, 1999, and to be filed pursuant to Regulation 14A within 120 days after registrant's fiscal year ended June 30, 1999, are incorporated by reference into Part III of this Report.

2

PART I

## ITEM 1. DESCRIPTION OF BUSINESS

This report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the of Securities Exchange Act of 1934. Actual results could differ materially from those projected in the forward-looking statements because of a number of factors, risks and uncertainties, including the risk factors described in this discussion and elsewhere in this report. Generally, the words "anticipate", "expect", "intend", "believe" and similar expressions identify forward-looking statements. The information included in this report is as of the filing date with the Securities and Exchange Commission and future events or circumstances could differ significantly from the forward-looking statements included here.

## THE COMPANY

KLA Instruments Corporation ("KLA") was incorporated in Delaware in July 1975. Effective April 30, 1997, Tencor Instruments ("Tencor") merged into a wholly-owned subsidiary of KLA. Immediately following this merger, KLA changed its name to KLA-Tencor Corporation and the headquarters of the combined company remained at 160 Rio Robles, San Jose, California. The merger of KLA and Tencor brought together two companies that, through largely complementary product lines, provide customers with yield management solutions and products facilitating the monitoring of the entire semiconductor manufacturing process.

## PRODUCTS

Our principal market is the semiconductor industry, in which profitability is largely determined by a manufacturer's ability to quickly attain and efficiently maintain high yields from the manufacturing process. The importance of high yields is magnified as wafer sizes increase and process geometries decrease. Building an integrated circuit (known colloquially as "chip") is accomplished by the deposition on a substrate of silicon, called a "wafer", of a series of film layers that act as conductors, semiconductors or insulators. Most chips are built on a wafer and consist of two main structures: the lower structure, typically consisting of transistors or capacitors, performs the "smart" functions of the chip, and the upper structure, typically consisting of the circuitry that connects the components in the lower structure, called the "interconnect material." Many advanced chip designs require well over 300 individual steps and many of these processes are performed multiple times.

Today, manufacturers of advanced integrated circuits require systems capable of measurements smaller than 0.25 micron (approximately 1/300 the thickness of a human hair). At the same time, advanced manufacturing facilities are producing integrated circuits on silicon wafers measuring 300 millimeters (12 inches) in diameter. This increase in the complexity of the sub-micron semiconductor manufacturing process coupled with the recently begun transition from aluminum to copper as the primary interconnect material in integrated circuits has caused dramatic growth in the demand for

3

increasingly precise process monitors. The continuing evolution of semiconductor devices to smaller line width geometries and more complex multi-level circuitry has significantly increased the cost and performance requirements of the capital equipment used to manufacture these devices. Construction of an advanced wafer fabrication facility can cost over $1 billion, a substantial increase over the cost of prior-generation facilities. As a result, there has been an increasing focus by the semiconductor industry on obtaining increased productivity and higher returns from manufacturing equipment, thereby reducing the effective cost of ownership of such equipment. Total yield management solutions play a more significant role in the semiconductor manufacturing process than in the past. Because our yield management and process monitoring equipment typically represent only a small percentage of the total investment required to build and equip a fabrication facility, our customers are able to better leverage these increasingly expensive facilities and thereby improve their returns on investment.

We are the leader in the design, manufacture, marketing and service of yield management and process monitoring systems for the semiconductor industry. With our portfolio of applications-focused technologies and our dedicated yield consulting expertise, we are in a unique position to be the single source for comprehensive yield management solutions. Our technical expertise and understanding of customer needs enable us to provide unique yield management solutions and one of the broadest lines of wafer inspection, thin film measurement, metrology and reticle inspection systems available in the semiconductor industry. Our systems are used to analyze product and process quality at critical points in the integrated circuits manufacturing process and provide feedback to our customers so that fabrication problems can be identified, addressed and contained. This ability to locate defect sources and contain them enables semiconductor manufacturers to increase yields, thus lowering manufacturing costs.

We market and sell products worldwide to all major integrated circuit manufacturers and semiconductor wafer manufacturers. Our revenues are derived primarily through product sales, principally through our direct sales force and, to a lesser extent, through distributors. Our product line consists of equipment capable of performing the yield management and process monitoring functions in the chip manufacturing process, including wafer inspection, electron-beam inspection and metrology, reticle inspection, film measurement and surface metrology.

## Yield Management

Maximizing yields is a key goal of modern semiconductor manufacturing because higher yields increase the revenue a manufacturer can obtain from each semiconductor wafer. As geometry line-widths decrease, yields become more sensitive to the size and density of defects. Semiconductor manufacturers use yield management and process monitoring systems to improve yields by identifying defects and analyzing them to determine process problems. After corrective action has been taken, subsequent results can be monitored to ensure that the defect has been contained. This monitoring and analysis takes place at various points in the fabrication process as wafers move through a production cycle consisting of hundreds of separate process steps.

The following are some of the methods used to manage yields, all of which require the capture and analysis of data gathered through many measurements:

-2-
4

Powered By EDGAR Online    2002. EDGAR Online, Inc.

- Engineering analysis: This method is performed off of the manufacturing line to identify and analyze defect sources. Engineering analysis equipment operates with very high sensitivity to enable comprehensive analysis of wafers. Because they operate off-line, engineering analysis systems do not require high operational speeds.

- In-line monitoring: This method is used to review the status of integrated circuits during production. Information generated is used to determine whether the fabrication process steps are within required tolerances and to make any necessary real-time process adjustments before wafer lots move to subsequent process stations. Because the information is needed quickly to be of greatest value, in-line monitoring requires both high throughput and high sensitivity.

- Pass/fail tests: This method may be used at several different points in the manufacturing process to evaluate products. For example, a pass/fail test is used to determine whether reticles used in photolithography are defect-free. Similarly, electrical pass/fail testing is performed at the end of the manufacturing process to determine whether products meet performance specifications.

The most significant opportunities for yield improvement generally occur when production is started at new factories and when chips and wafers are first built. Equipment that helps a manufacturer quickly increase new product yields enables the manufacturer to offer these new products in high volumes early in the product life cycle--the time when they are likely to generate the greatest profits. High yielding fabrication lines are continually subject to process variations and errors which may cause significant yield losses unless these variations or errors are detected quickly. Equipment that helps a manufacturer prevent these yield excursions will allow the manufacturer to maintain higher revenue and profit from the facility.

**Wafer Inspection**

We pioneered the market for automated defect inspection of semiconductor wafers over a decade ago. Our wafer inspection tools are used to find, count and characterize particles and pattern defects on wafers in off-line engineering applications and in-line at various stages during the semiconductor and wafer manufacturing processes. Semiconductor manufacturers base their purchase of wafer inspection systems on a variety of criteria, including sensitivity, capture rate, throughput, total cost of ownership, ease of use, degree of automation, system repeatability and correlation and the ability of the system to be integrated into overall yield management systems. Wafer defect detection systems inspect wafers as they move between processing steps and detect sub-micron defects and contaminants on bare silicon and on rough films.

In 1992 we introduced the 21xx Inspection Systems, which provided the sensitivity required not only for microprocessors and other logic devices but also for the logic and repeating array portions of memory devices. Each new model of the 21xx series has provided greater sensitivity and throughput than its predecessor. In 1997, we introduced the model 2138, a new patterned wafer inspection system combining an ultra-broadband illumination source and significantly improved brightfield optics. In 1999, we introduced the model 2139 which extended the capability of the 21xx product line to 0.18 micron processes and implemented additional sensitivity and ease-of-use enhancements.

-3-
5

Powered by EDGAR Online    2002, EDGAR Online, Inc.

In 1995 we introduced the AIT Inspection System, a platform designed with high throughput and low cost-of-ownership for fast and accurate feedback on process tool performance as well as advanced line monitoring for films, CMP, non-critical etch and photo modules. The AIT uses darkfield technology which is a low-angle illumination technique particularly effective for detecting defects on planar surfaces such as post-CMP wafers. In 1998, the AIT II expanded on the capability of the AIT by increasing sensitivity and throughput.

Scanning Electron Microscopes (SEMs) use an electron beam to image and measure surface features on a semiconductor wafer at a much higher resolution than images captured by optical microscopes. Working closely with customers who require the most advanced inspection systems, we developed the SEMSpec(TM), a fully automatic electron beam defect inspection system. In 1999, we developed the eS20, which has performance enhancements compared to the previous generation of e-beam defect inspection systems.

The SP1(TM), introduced in 1997, is used for bare wafer qualification, process monitoring and equipment monitoring. It provides the high sensitivity, fast throughput and low cost of ownership required in a production environment and is used in virtually all semiconductor manufacturing processes. The SP1 TBI was introduced in 1998 and was designed with additional optical configurations needed to detect submicron defects on metal films and rough surfaces while still providing sensitivity below 0.1 micron on polished silicon. It is also used for detecting defects on non-uniform films, a critical requirement for CMP applications.

We offer defect review capability using optical confocal technology as well as e-beam for higher sensitivity. The CRS optical review tool offers high throughput and low cost-of-ownership. Our 4300+ Defect Review Tool is an advanced, automated SEM designed to gather defect excursion information and analyze and report the results with the improved sensitivity required at smaller geometries.

We offer analysis and classification systems comprised of hardware and software to translate raw inspection data into patterns that reveal process problems. Our software productivity and analysis systems capture, store and analyze data collected by test equipment to show defect trends and help semiconductor manufacturers develop long-term yield improvement strategies. In 1997, we introduced IMPACT(TM) automated defect classification (ADC), enabling semiconductor manufacturers to utilize software systems both within and between fabrication facilities to accelerate the ramp to higher process yields. With IMPACT ADC, semiconductor manufacturers can develop a defect classification recipe on one system and then export it to any other system or fabrication facility running identical processes. An important new "run-time classification" (RTC) capability has been introduced recently on both the AIT II and 2139 products. RTC provides classification and binning of defect types in real time during inspection, thus providing better organized information in less time and at a lower cost.

Our Intelligent Line Monitoring solution includes the full line of wafer inspection systems, as well as the IMPACT/Online ADC, e-beam review (4300+) and optical review (CRS(TM)/Offline ADC) and

-4-
6

Powered By EDGAR ONLINE    2002.   EDGAR Online, Inc.

Klarity(TM) defect data analysis systems. This integrated yield management approach provides semiconductor device manufacturers with a comprehensive tool set providing time-to-yield enhancements and accelerated attainment of yield goals.

## Metrology

Critical Dimension (CD) SEMs are used by semiconductor makers to measure the linewidth feature on a chip, thus assuring the accuracy of the manufacturing process. Our current E-Beam metrology system, the 8100XP, is used for precision measurement of high aspect ratio structures in highly automated process control applications.

Lithography for sub-micron semiconductor fabrication requires increasingly stringent overlay tolerances. In particular, decreasing linewidths, larger die sizes and additional layers have made overlay mis-registration errors a crucial cause of yield loss. To address these challenges, we offer the 5000 series metrology systems for overlay measurement. The measurement algorithms for the 5000 series are more tolerant of process and substrate reflectivity variations than other optical systems. Based upon these measurements, users can fine-tune the stepper program to compensate for these errors and improve process yield. In 1999, we introduced the 5300 overlay system, which has performance enhancements compared to the previous generation of tools and is designed to handle both 200 millimeter and 300 millimeter wafers.

## Reticle Inspection

Reticles are high precision quartz plates that contain images of electronic circuits. These reticles are used to transfer circuit patterns onto wafers to fabricate integrated circuits. Error-free reticles are the first step in ensuring high yields in the manufacturing process because defects in reticles are replicated on wafers. Reticle inspection systems look for possible defects that could be transmitted to the design pattern on the wafer. We pioneered the market for automated inspection of reticles and photomasks for the semiconductor manufacturing industry over two decades ago and continue to be a market leader.

Our 3XX product family incorporates both a reference database generator and a data preparation system which give full die-to-database functionality, permitting inspection against the ideal reticle pattern as specified by the user's CAD program. We have continued to develop enhancements to the 3XX inspection system to improve performance, serviceability and reliability. In 1997, we introduced two new reticle and photomask inspection enhancements, the Advanced Performance Algorithm and the STARlight(TM) High Resolution option. These enhancements enable highly accurate and reliable inspection of next-generation sub-0.25 micron reticles, including reticles with complex optical proximity correction geometries. To satisfy the need for higher sensitivity, we developed the 353UV Automated Reticle Inspection System which uses a shorter wavelength to inspect complex reticles for deep UV lithography applications.

## Film Measurement

Our film thickness products measure a variety of optical properties of thin films, while our resistivity products measure the resistivity of the various layers used to make integrated circuits. These products are used to control a wide range of wafer fabrication steps, where within-wafer and wafer-

-5-
7

to-wafer uniformity of the process is of paramount importance to semiconductor manufacturers and enables them to achieve high yields at the lowest possible cost. In 1995, we introduced the UV-1250SE, which brought a powerful new technology, spectroscopic ellipsometry, to production. We recently introduced the ASET-F5, our third generation spectroscopic ellipsometer, which addresses the difficult film measurement needs that come from the continuing evolution of film development driven by shorter line widths. These new films demand an increasing capability to characterize and control them in production, a capability provided by the ASET-F5.

Our Quantox(R) product is a non-contact, electrical performance metrology system for gate dielectric films. Gate dielectric quality is critical to the speed and reliability of an integrated circuit. Quantox measures key parameters such as contamination and oxide thickness used for gate dielectric process control to help maximize device yield.

### Surface Metrology

Our Stylus profilers are used to measure the surface topography of films and etched surfaces and are used in basic research and development as well as semiconductor production and quality control. In addition, we produce stress measurement systems which detect reliability related problems such as film cracking, voiding and lifting. We recently introduced the high resolution profiler that combines the capabilities of in-line profilers which measure erosion and dishing with atomic force microscopes which identify nanoscale etch process control problems such as plug recess challenges.

"KLA", "Tencor", "Surfscan" and "Quantox" are registered trademarks of KLA-Tencor Corporation. "KLA-Tencor", "CRS", "IMPACT", "Klarity", "SP1", "SEMSpec" and "STARlight" are trademarks of KLA-Tencor Corporation.

## CUSTOMERS

We sell our systems to all major semiconductor manufacturers. In fiscal 1999, 1998 and 1997, no single customer accounted for more than 10% of our revenues.

## INTERNATIONAL REVENUES

We have wholly-owned subsidiaries or branches of U.S. subsidiaries in Japan, Korea, Taiwan, the United Kingdom, France, Germany, Italy, Israel, Singapore, China and Malaysia for marketing, sales and service of products. In addition, we have manufacturing operations in Israel for our optical metrology products. International sales accounted for approximately 60%, 56% and 65% of our revenues in fiscal 1999, 1998 and 1997, respectively. For information regarding our revenues from foreign operations for our last three fiscal years, see Note 8 of Notes to Consolidated Financial Statements in the 1999 Annual Report to Stockholders.

We believe that sales outside the U.S. will continue to be a significant percentage of our revenues. Our future performance will depend, in part, on our ability to continue to compete successfully in international markets. Our ability to compete internationally is dependent upon the continuation of favorable trading relationships between countries (especially Japan and Korea) and the United States,

Powered By EDGAR Online     2002, EDGAR Online, Inc.

and our continuing ability to maintain satisfactory relationships with leading semiconductor companies in the region. International sales and operations may be adversely affected by imposition of governmental controls, restrictions on export technology, political instability, trade restrictions, changes in tariffs and difficulties associated with staffing and managing international operations. In addition, international sales may be adversely affected by the economic conditions in each country. The revenues from our international business may be affected by fluctuations in currency exchange rates. Although we attempt to manage near term currency risks through "hedging," there can be no assurance that such efforts will be adequate. These factors could have a material adverse effect on our future business and financial results.

## SALES, SERVICE AND MARKETING

We believe that the size and location of our field sales, service and applications engineering organization represents a competitive advantage in our served markets. We have direct sales forces throughout the world for substantially all of our products. We maintain an export compliance program that is designed to meet the requirements of the U.S. Departments of Commerce and State.

Our facilities throughout the world employ over 1,800 sales personnel, service engineers and applications engineers. We maintain sales and service offices throughout the U.S. and in Japan, Korea, Taiwan, Singapore, China, Malaysia, the United Kingdom, France, Germany, Italy and Israel.

We do not consider our business to be seasonal in nature, but it is cyclical with respect to the capital equipment procurement practices of semiconductor manufacturers and is impacted by the investment patterns of such manufacturers in different global markets.

## RESEARCH AND DEVELOPMENT

The market for yield management and process monitoring systems is characterized by rapid technological development and product innovation. We believe that continued and timely development of new products and enhancements to existing products are necessary to maintain our competitive position. Accordingly, we devote a significant portion of our human and financial resources to research and development programs and seek to maintain close relationships with customers to remain responsive to their needs.

To meet continuing developments in the semiconductor industry, we are committed to significant engineering efforts toward product improvement and new product development. New product introductions may contribute to fluctuations in operating results, since customers may defer ordering existing products. If new products have reliability or quality problems, those problems may result in reduced orders, higher manufacturing costs, delays in acceptance of and payment for new products and additional service and warranty expenses. On occasion, we have experienced reliability and quality problems in connection with certain product introductions, resulting in some of these consequences. There can be no assurance that we will successfully develop and manufacture new hardware and software products, or that new

-7-

9

Powered By EDGAR Online    2002. EDGAR Online, Inc.

hardware and software products introduced by us will be accepted in the marketplace. If we do not successfully introduce new products, our business and results of operations will be harmed. For information regarding our research and development expense during the last three fiscal years, see Management's Discussion and Analysis of Results of Operations and Financial Condition in the 1999 Annual Report to Stockholders, filed as Exhibit 13.1 and incorporated by reference.

## MANUFACTURING

Our principal manufacturing activities take place in San Jose and Milpitas, California, Bedford, Massachusetts and Migdal Ha'Emek, Israel and consist primarily of manufacturing, assembling and testing components and subassemblies which are acquired from third party vendors and then integrated into our finished products. We employ approximately 2,000 manufacturing and engineering personnel and also cross-train personnel in order to respond to changes in product mix.

Many of the components and subassemblies are standard products, although certain items are made to our specifications. Certain of the components and subassemblies included in our systems are obtained from a single source or a limited group of suppliers. Those parts subject to single or limited source supply are routinely monitored by management and we endeavor to ensure that adequate supplies are available to maintain manufacturing schedules, should the supply of any part be interrupted. Although we seek to reduce our dependence on sole and limited source suppliers, in some cases the partial or complete loss of certain of these sources could disrupt scheduled deliveries to customers and have a material adverse effect on our business and results of operations and damage customer relationships.

## COMPETITION

The worldwide market for yield management and process control systems is highly competitive. In each of our product markets, we face competition from established and potential competitors, some of which may have greater financial, engineering, manufacturing and marketing resources than us, such as Applied Materials, Inc. and Hitachi Electronics Engineering Co., Ltd. We expect our competitors to continue to improve the design and performance of their current products and processes and to introduce new products and processes with improved price and performance characteristics. We believe that, to remain competitive, we will require significant financial resources to offer a broad range of products, to maintain customer service and support centers worldwide and to invest in product and process research and development.

Significant competitive factors in the market for yield management and process control systems include system performance, ease of use, reliability, installed base and technical service and support. We believe that, while price and delivery are important competitive factors, the customers' overriding requirement is for systems which easily and effectively incorporate automated and highly accurate inspection capabilities into their existing manufacturing processes, thereby enhancing productivity. Our yield management and process control systems for the semiconductor industry are generally higher priced than those of our present competitors and are intended to compete based

-8-
10

Powered By EDGAR Online    2002.  EDGAR Online, Inc.

upon performance and technical capabilities. These systems also compete with less expensive and more labor-intensive manual inspection devices.

## PATENTS AND OTHER PROPRIETARY RIGHTS

We protect our proprietary technology through reliance on a variety of intellectual property laws, including patent, copyright and trade secrets. Due to the rapid pace of innovation within the yield management and process control systems industry, we believe that our protection of patent and other intellectual property rights is less important than factors such as our technological expertise, continuing development of new systems, market penetration and the ability to provide comprehensive support and service to customers. There can be no assurance that we will be able to protect our technology or that competitors will not be able to independently develop similar or functionally competitive technology.

We have filed and obtained a number of patents in the U.S. and abroad. From time to time we acquire license rights under U.S. and foreign patents and other proprietary rights of third parties. No assurance can be given that patents will be issued on any of our applications, that license assignments will be made as anticipated or that our patents, licenses or other proprietary rights will be sufficiently broad to protect our technology. In addition, no assurance can be given that any patents issued to or licensed by us will not be challenged, invalidated or circumvented or that the rights granted thereunder will provide us with a competitive advantage.

## BACKLOG

Our backlog for systems totaled $449 million at June 30, 1999, compared to $424 million at June 30, 1998. In general, systems ship within six months to a year after receipt of a customer's purchase order. We expect to fill our June 30, 1999 backlog of orders during fiscal 2000.

## EMPLOYEES

As of June 30, 1999, we employed approximately 4,200 persons. None of our employees are represented by a labor union. We have experienced no work stoppages and believe that our employee relations are good.

Competition is intense in the recruiting of personnel in the semiconductor and semiconductor equipment industry. We believe that our future success will depend in part on our continued ability to hire and retain qualified management, marketing and technical employees.

## ITEM 2. PROPERTIES

Certain information concerning our properties at June 30, 1999 is set forth below:

| LOCATION | TYPE | PRINCIPAL USE | FOOTAGE | OWNERSHIP |
| --- | --- | --- | --- | --- |

-9-
11

Powered By EDGAR    2002. EDGAR Online, Inc.

| Location | Type | Use | Sq. Ft. | Tenure |
|---|---|---|---|---|
| San Jose, CA | Office, plant and warehouse | Corporate Headquarters, Research and Engineering, Marketing, Manufacturing, Sales, Service and Administration | 271,827<br>510,036 | Leased<br>Owned |
| Milpitas, CA | Office, plant and warehouse | Research and Engineering, Marketing, Manufacturing, Sales, Service and Administration | 18,463<br>554,207 | Leased<br>Owned |
| Scotts Valley, CA | Office, plant | Research and Development | 9,945 | Leased |
| Bedford, MA | Office, plant | Administration, Manufacturing, Sales and Service | 50,000 | Owned |
| Austin, TX | Office | Sales and Service, Training | 37,074 | Leased |
| Richardson, TX | Office | Sales and Service, Training | 22,507 | Leased |
| Basingstoke and Wokingham, England | Office, plant | Sales and Service, Warehouse | 16,475 | Leased |
| Grenoble and Evry, France | Office | Sales and Service | 8,834 | Leased |
| Dresden and Pucheim, Germany | Office | Sales and Service | 14,975 | Leased |
| Yokohama, Japan | Office | Sales and Service | 56,977 | Leased |
| Seoul, Korea | Office | Sales and Service | 17,558 | Leased |
| Hsinchu, Taiwan | Office | Sales and Service | 14,892 | Leased |
| Migdal Ha'Emek and Herzliya, Israel | Office | Research and Engineering, Marketing, Manufacturing, Sales, Service and Administration | 53,800 | Leased |

We lease several other facilities under operating leases that expire at various times through June 30, 2012 with renewal options at the fair market value for additional periods up to five years. For more information required by this Item, see Note 7 of Notes to Consolidated Financial Statements in the 1999 Annual Report to Stockholders, filed as Exhibit 13.1 and incorporated by reference.

## ITEM 3. LEGAL PROCEEDINGS

On August 30, 1999, we were named as a defendant in a lawsuit in which the plaintiff alleges trade secret misappropriation, unfair competition and trade slander. This lawsuit is in early stages of discovery and no trial date has been set. Although the outcome of these claims cannot be predicted with certainty, we do not believe that this legal matter will have a material adverse effect on our financial condition. Were an unfavorable ruling to occur, there exists the possibility of a material impact on the net income of the period in which the ruling occurs.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

-10-
12

Powered By EDGAR ONLINE    2002.  EDGAR Online, Inc.

**PART II**

## ITEM 5. MARKET FOR THE REGISTRANT'S COMMON STOCK AND RELATED STOCKHOLDER MATTERS

For the information required by this Item, see Note 10 of Notes to Consolidated Financial Statements in the 1999 Annual Report to Stockholders, which is filed herewith as Exhibit 13.1 and incorporated herein by reference.

## ITEM 6. SELECTED FINANCIAL DATA

For the information required by this Item, see "Financial Highlights" in the 1999 Annual Report to Stockholders, which is filed herewith as Exhibit 13.1 and incorporated herein by reference.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

For the information required by this Item, see "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the 1999 Annual Report to Stockholders, which is filed herewith as Exhibit 13.1 and incorporated herein by reference.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

For the information required by this Item, see "Management's Discussion and Analysis of Results of Operations and Financial Condition" in the 1999 Annual Report to Stockholders, which is filed herewith as Exhibit 13.1 and incorporated herein by reference.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

For the information required by this Item, see the Consolidated Financial Statements and Notes thereto in the 1999 Annual Report to Stockholders, which is filed herewith as Exhibit 13.1 and incorporated herein by reference.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

Powered By EDGAR ONLINE    2002. EDGAR Online, Inc.

**PART III**

## ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

Set forth below are the names of the directors and executive officers of KLA-Tencor as of August 31, 1999, their ages and positions held. For additional information required by Item 405 of Regulation S-K of the Securities Act of 1933, as amended, see "Directors and Executive Officers" in the Proxy Statement, which is incorporated by reference.

| NAME | AGE | POSITION |
| --- | --- | --- |
| Kenneth Levy | 56 | Chairman of the Board and Director |
| Kenneth L. Schroeder | 53 | President, Chief Executive Officer and Director |
| Gary E. Dickerson | 42 | Chief Operating Officer |
| Robert J. Boehlke | 58 | Executive Vice President and Chief Financial Officer |
| Dennis J. Fortino | 53 | Group Vice President, Reticle and Surfscan Group |
| Edward C. Grady | 52 | Executive Vice President, Wafer Inspection Group |
| Samuel A. Harrell | 59 | Senior Vice President, Strategic Business Development |
| John H. Kispert | 35 | Vice President, Finance and Accounting |
| Neil Richardson | 44 | Executive Vice President, E-Beam Inspection and Metrology Group |
| Arthur P. Schnitzer | 56 | Executive Vice President, Customer Group |
| Richard P. Wallace | 39 | Group Vice President, Lithography and Films Group |
| James W. Bagley | 60 | Director |
| Edward W. Barnholt | 56 | Director |
| Leo J. Chamberlain | 69 | Director |
| Richard J. Elkus, Jr. | 64 | Director |
| Dean O. Morton | 67 | Director |
| Samuel Rubinovitz | 69 | Director |
| Dag Tellefsen | 57 | Director |
| Jon D. Tompkins | 59 | Director |
| Lida Urbanek | 56 | Director |

Kenneth Levy is a co-founder of KLA-Tencor and since July 1, 1999 has been Chairman of the Board and a Director. From July 1, 1998 until June 30, 1999, he was the Chief Executive Officer and a Director. From April 30, 1997 until June 30, 1998 he was Chairman of the Board and a Director. From 1975 until April 30, 1997 he was Chairman of the Board, Chief Executive Officer and a Director. He currently serves on the boards of directors of Ultratech Stepper, Inc., SpeedFam-IPEC, Inc. and is a Director Emeritus of SEMI, an industry trade association.

Kenneth L. Schroeder has been President, Chief Executive Officer and a Director of KLA-Tencor since July 1, 1999. From November 1991 until June 30, 1999, he was President, Chief Operating Officer and a Director. Mr. Schroeder has been with the Company for 16 years and

Powered By EDGAR Online    2002. EDGAR Online, Inc.

has held a variety of senior management positions. He currently serves on the board of directors of GaSonics International and SEMI.

Gary E. Dickerson has been Chief Operating Officer since July 1, 1999. From July 1997 until June 30, 1999, he was Executive Vice President of the Customer Group. In January 1996, he was promoted to Group Vice President for the Wafer Inspection Group. In July 1994 he became the General Manager of the WISARD Division. Mr. Dickerson joined KLA-Tencor in 1986 and held a series of management positions.

Robert J. Boehlke has been Executive Vice President and Chief Financial Officer since April 1997. Mr. Boehlke joined KLA-Tencor in April 1983 as Vice President and General Manager of the RAPID Division. During the next 7 years he became Senior Vice President and then Executive Vice President in charge of several operating divisions including RAPID, WISARD and ATS. He was Chief Operating Officer from August 1989 until July 1990, when he became Chief Financial Officer. He currently serves on the board of directors of LTX Corporation and Entegris Corporation.

Dennis J. Fortino has been Group Vice president of the Reticle and Surfscan Group since July 1999. From November 1995 to June 1999 he served as Vice President and General Manager of the Surface Metrology and Surfscan Divisions. Mr. Fortino served as Vice President and General Manager for Spectra-Physics Lasers from July 1991 to November 1995.

Edward C. Grady has been Executive Vice President of the Wafer Inspection Group since July 1999. From August 1998 to July 1999, he was Executive Vice President of the Precision Measurement Group. From March 1996 until August 1998 he was Vice President and General Management of the RAPID Division. He held the position of Vice President of Marketing from July 1995 until March 1996. Prior to July 1995, Mr. Grady served as President and CEO of Hoya MicroMask. He currently serves on the board of directors of Informed Diagnostics, Inc.

Dr. Samuel A. Harrell joined KLA-Tencor in September 1995 as Senior Vice President of Strategic Business Development. Dr. Harrell served from October 1992 to December 1995 as the Senior Vice President and Chief Strategy Officer of SEMATECH. From August 1987 to September 1992, he served as President of SEMI/SEMATECH.

John H. Kispert has been Vice President of Finance and Accounting since July 1999. From February 1998 to July 1999 he was Vice President of Operations for the Wafer Inspection Group. From August 1997 to February 1998 he was Director of Operations. Mr. Kispert joined KLA-Tencor in February 1995 and has held a series of other management positions. Prior to KLA-Tencor, Mr. Kispert was with IBM for 6 years.

Dr. Neil Richardson has been Executive Vice President of the E-Beam Inspection and Metrology Group since May 1998. He was Executive Vice President of the Metrology Group from February 1997 to April 1998. He joined KLA-Tencor in June 1993 as Vice President and General Manager of the Metrology Division.

Powered By EDGAR ONLINE    2002. EDGAR Online, Inc.

Arthur P. Schnitzer has been Executive Vice President of the Customer Group since November 1998. From June 1997 to October 1998 he was Executive Vice President, Human Resources. From July 1993 to June 1997 he was Group Vice President responsible for RAPID , SEMSpec, Prism and manufacturing for WISARD and RAPID. From 1989 to July 1993 he was Vice President and General Manager of the WISARD Division. Mr. Schnitzer joined KLA-Tencor in July 1978 and has held a series of other management positions.

Richard P. Wallace has been the Group Vice President of the Lithography and Films Group since July 1999. From April 1998 to June 1999 he was Vice President and General Manager of the Mirage Division. From 1995 to March 1998 he was Vice President and General Manager of the WISARD Division. Mr. Wallace joined KLA-Tencor in 1988 and has held a series of other management positions.

James W. Bagley has been a Director of the Company since April 1997. He was a Director of Tencor from June 1993 until April 1997. He has been Chief Executive Officer and a Director of Lam Research Corporation since August 1997. From May 1996 until August 1997 he was Chairman of the Board and Chief Executive Officer of OnTrak Systems, Inc. until its merger with Lam Research Corporation in August 1997. From January 1994 until October 1995 he was Vice Chairman and Chief Operating Officer of Applied Materials, Inc., and Vice Chairman from November 1995 until May 1996. From December 1987 until December 1993, Mr. Bagley was President and Chief Operating Officer for Applied Materials, Inc. Mr. Bagley currently serves on the boards of directors of Teradyne, Inc., Kulicke & Soffa Industries, Inc., Micron Technology, Inc. and SEMI/SEMATECH.

Edward W. Barnholt has been a Director of the Company since 1995. Mr. Barnholt joined the Hewlett Packard Company in December 1966. From 1990 to 1997 he was the General Manager of the Test and Measurement Organization and from February 1998 to March 1999 he was General Manager of the Measurement Organization. Mr. Barnholt was elected a Vice President of the Hewlett Packard Company in July 1988, a Senior Vice President in November 1993 and an Executive Vice President in November 1996. Since March 1999, Mr. Barnholt has been the President and Chief Executive Officer of Agilent Technologies, Inc.

Leo J. Chamberlain has been a Director of the Company since 1982. He is a private investor.

Richard J. Elkus, Jr. has been a Director of the Company since April 1997. He was Executive Vice President and Vice Chairman of the board of directors of Tencor from February 1994 until April 1997. He currently serves on the boards of directors of Voyan Technology, SOPRA, Barcelona Design and Lam Research Corporation.

Dean O. Morton has been a Director of the Company since April 1997. From June 1993 until April 1997 he was a Director of Tencor. In October 1992 Mr. Morton retired as Executive Vice President, Chief Operating Officer and a Director of the Hewlett-Packard Company, where he held various positions from 1960 until his retirement. Mr. Morton currently serves as Chairman of the Board of Centigram Communications Corporation and as a member of the boards of directors of ALZA Corporation, The

-14-

16

Powered By EDGAR Online    2002. EDGAR Online, Inc.

Clorox Company and BEA Systems Inc. Mr. Morton is also a trustee of the Metropolitan Series Fund and State Street Research Funds Group and Portfolios Inc.

Samuel Rubinovitz has been a Director of the Company since 1990. He previously served as a Director from October 1979 to January 1989. He currently serves as Chairman of the Board of LTX Corporation and also serves on the boards of directors of Richardson Electronics, Ltd. and Kronos, Inc.

Dag Tellefsen has been a Director of the Company since 1978. He is the general partner and President and Managing Director of Glenwood Ventures I and II, venture capital funds and the general partner and Managing Director of Vision Capital. He currently serves on the boards of directors of Iwerks Entertainment Corporation and Metorex International.

Jon D. Tompkins has been a Director since April 1997. He was Chairman of the Board from July 1998 to June 30, 1999, when he retired his position as Chairman of the Board. From April 1997 until July 1998 he was Chief Executive Officer and a Director of KLA-Tencor. From April 1991 until April 1997 he was President and Chief Executive Officer of Tencor prior to its merger with KLA. He was a Director of Tencor from 1991 until April 1997 and was appointed Chairman of the board of directors of Tencor in November 1993. He currently serves on the boards of directors of Cymer, Electro Scientific Industries, Credence Systems, Levelite, Logic Vision and the Community Foundation of Silicon Valley.

Lida Urbanek has been a Director since April 30, 1997. She was a director of Tencor from August 1991 until April 30, 1997. She is a private investor.

For additional information required by this Item, see "Compliance with Section 16(a) of the Securities Exchange Act of 1934" in the Proxy Statement, which is incorporated herein by reference.

## ITEM 11. EXECUTIVE COMPENSATION

For the information required by this Item, see "Executive Compensation" in the Proxy Statement, which is incorporated herein by reference.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

For the information required by this Item, see "Security Ownership -- Principal Stockholders and Security Ownership of Management" in the Proxy Statement, which is incorporated herein by reference.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

For the information required by this Item, see "Certain Relationships and Related Transactions" in the Proxy Statement, which is incorporated herein by reference.

-15-
17

**PART IV**

**ITEM 14. EXHIBITS, FINANCIAL STATEMENTS, SCHEDULES, AND REPORT ON FORM 8-K**

(a) Financial Statements and Financial Statement Schedules.

1. FINANCIAL STATEMENTS.

Consolidated Balance Sheets - As of June 30, 1999 and 1998 Consolidated Statements of Operations - For the Three Years Ended June 30, 1999
Consolidated Statement of Stockholders Equity - For the Three Years Ended June 30, 1999 Consolidated Statements of Cash Flows - For the Three Years Ended June 30,1999
Notes to Consolidated Financial Statements Report of Independent Accountants

2. FINANCIAL STATEMENT SCHEDULES.

All schedules are omitted because they are either not applicable or the required information is shown in the consolidated financial statements or notes thereto.

(b) Exhibits

| Exhibit No. | Description |
| --- | --- |
| 3.1 | Amended and Restated Certificate of Incorporation(1) |
| 3.2 | Bylaws, as amended November 17, 1998(2) |
| 4.1 | Amended and Restated Rights Agreement dated as of August 25, 1996 between the Company and First National Bank of Boston, as Rights Agent.  The Agreement includes the Form of Right Certificate as Exhibit A and the Summary of Terms of Rights as Exhibit B(3) |
| 10.1 | 1998 Outside Director Option Plan(4) |
| 10.2 | 1990 Outside Directors Stock Option Plan(5) |
| 10.3 | Tencor Instruments 1993 Nonemployee Directors Stock Option Plan(6) |
| 10.4 | 1997 Employee Stock Purchase Plan(7) |
| 10.5 | Second Amended and Restated 1981 Employee Stock Purchase Plan(8) |
| 10.6 | Tencor Instruments Amended and Restated 1993 Equity Incentive Plan(9) |
| 10.7 | 1993 Employee Incentive Stock Option Plan of Prometrix Corporation(10) |
| 10.8 | Tencor Instruments Second Amended and Restated 1984 Stock Option Plan(11) |
| 10.9 | 1983 Employee Incentive Stock Option Plan of Prometrix Corporation(12) |
| 10.10 | Restated 1982 Stock Option Plan, as amended November 18, 1996(13) |
| 10.11 | Excess Profit Stock Plan(14) |
| 10.12 | Form of KLA-Tencor Corporation Corporate Officers Retention Plan(15) |
| 10.13 | Form of Retention and Non-Competition Agreement(16) |
| 10.14 | Form of Indemnification Agreement(17) |

-16-
18

Powered By EDGAR Online    2002. EDGAR Online, Inc.

10.15          Separation Agreement between Graham Siddall and the
Company

13.1           1999 Annual Report to Stockholders (deemed to be filed to
               the extent that information is specifically incorporated
by

               reference)

21.1           List of Subsidiaries

23.1           Consent of Independent Accountants

27.1           Financial Data Schedule

Notes
-----

(1)         Filed as Exhibit 3.1 to the Company's form 10-Q for
the
            quarter ended March 31, 1997.

(2)         Filed as Exhibit 3.2 to the Company's Registration
            Statement on Form S-8 filed December 4, 1998, SEC File
            No. 333-68415.

(3)         Filed as Exhibit 1 to the Company's report on form
            8-A/A, Amendment No. 2 to the Registration Statement
on
            Form 8-A filed September 24, 1996, SEC File No.
0-9992.

(4)         Filed as Exhibit 10.1 to the Company's Registration
            Statement on Form S-8 filed December 4, 1998, SEC File
            No. 333-68423.

(5)         Filed as Exhibit 4.6 to the Company's Annual Report on
            Form 10-K for the year ended June 30, 1991.

(6)         Filed as Exhibit 10.3 to the Company's Registration
            Statement on Form S-8 filed May 8, 1997, SEC File No.
            333-26681.

(7)         Filed as Exhibit 10.2 to the Company's Registration
            Statement on Form S-8 filed January 30, 1998, SEC File
            No. 333-45271.

(8)         Filed as Exhibit 10.1 to the Company's Registration
            Statement on Form S-8 filed January 30, 1998, SEC File
            No. 333-45271.

(9)         Filed as Exhibit 10.2 to the Company's Registration
            Statement on Form S-8 filed May 8, 1997, SEC File No.
            333-26681.

(10)        Filed as Exhibit 10.7 to the Company's Registration
            Statement on Form S-8 filed May 8, 1997, SEC File No.
            333-26681.

(11)        Filed as Exhibit 10.1 to the Company's Registration
            Statement on Form S-8 filed May 8, 1997, SEC File No.
            333-26681.

(12)        Filed as Exhibit 10.6 to the Company's Registration
            Statement on Form S-8 filed May 8, 1997, SEC File No.
            333-26681.

Powered By EDGAR    2002. EDGAR Online, Inc.

(13)         Filed as Exhibit 10.74 to the Company's Registration
             Statement on Form S-8 filed March 7, 1997, SEC File
No.
             333-22941.

(14)         Filed as Exhibit 10.15 to the Company's Registration
             Statement on Form S-8 filed August 7, 1998, SEC File
             No. 333-60887.

(15)         Filed as Exhibit 10.2 to the Company's Registration
             Statement on Form S-4 filed March 11, 1997, SEC File
             No. 333-23075.

(16)         Filed as Exhibit 10.1 to the Company's Registration
             Statement on Form S-4 filed March 11, 1997, SEC File
             No. 333-23075.

(17)         Filed as Exhibit 10.3 to the Company's Annual Report
on
             Form 10-K for the year ended June 30, 1997.


(c) Reports on Form 8-K

None.

-18-
20

Powered By EDGAR ONLINE   2002. EDGAR Online, Inc.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on September 28, 1999.

### KLA-Tencor Corporation

```
By: /s/ Kenneth Levy

----------------------------------------
Kenneth Levy, Chairman of the Board
```

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

```
SIGNATURE                              TITLE                              DATE
---------                              -----                              ----

/s/ Kenneth Levy
----------------------------           Chairman of the Board and         September 28, 1999
Kenneth Levy                           Director


/s/ Kenneth L. Schroeder
----------------------------           President, Chief Executive        September 28, 1999
Kenneth L. Schroeder                   Officer and Director
                                       (Principal Executive Officer)

/s/ Robert J. Boehlke
----------------------------           Executive Vice President and      September 28, 1999
Robert J. Boehlke                      Chief Financial Officer
                                       (Principal Accounting Officer)

/s/ James W. Bagley
----------------------------           Director                          September 28, 1999
James W. Bagley


/s/ Edward W. Barnholt
----------------------------           Director                          September 28, 1999
Edward W. Barnholt


----------------------------           Director
Leo J. Chamberlain


/s/ Richard J. Elkus, Jr.
----------------------------           Director                          September 28, 1999
Richard J. Elkus, Jr.


/s/ Dean O. Morton
----------------------------           Director                          September 28, 1999
Dean O. Morton



----------------------------           Director
Samuel Rubinovitz


/s/ Dag Tellefsen
----------------------------           Director                          September 28, 1999
Dag Tellefsen

/s/ Jon D. Tompkins
----------------------------           Director                          September 28, 1999
Jon D. Tompkins
```

-19-
21

Powered By EDGAR Online  2002. EDGAR Online, Inc.

```
SIGNATURE                      TITLE                 DATE
---------                      -----                 ----
/s/ Lida Urbanek               Director              September 28, 1999
--------------------------
Lida Urbanek
```

-20-
22

Powered By EDGAR ONLINE    2002.  EDGAR Online, Inc.

**Exhibit Index**

| Exhibit Number | Description |
| --- | --- |
| 10.15 | Separation Agreement between Graham J. Siddall and the Company |
| 13.1 | 1999 Annual Report to Stockholders (deemed to be filed to the extent that the information is specifically incorporated by reference) |
| 21.1 | List of Subsidiaries of KLA-Tencor Corporation |
| 23.1 | Consent of Independent Accountants |
| 27.1 | Financial Data Schedule |

1

## SEPARATION AGREEMENT

This Separation Agreement (the "Agreement") is between KLA-Tencor Corporation (the "Company"), and Graham J. Siddall ("Employee").

WHEREAS, Employee was employed by the Company;

WHEREAS, the Company and Employee have agreed that (i) Employee's full-time employment relationship with the Company shall terminate as of the date set forth herein, (ii) Employee shall release the Company from any claims arising from or related to the full-time employment relationship, and (iii) Employee shall be engaged as a part-time employee of the Company consistent with the terms herein;

NOW THEREFORE, in consideration of the mutual promises made herein and the benefits provided pursuant to such promises the Company and Employee (the "Parties") hereby agree as follows:

A. Resignation. Employee hereby resigns from his full-time employment with the Company as of April 30, 1999 (the "Full-Time Employment Termination Date").

2. Consideration. As consideration for Employee entering into this Agreement and agreeing to provide ongoing services to the Company at the same level of performance as if Employee were not resigning, the Company shall provide the following to Employee:

(a) Payment of Salary. The Company shall continue to pay Employee all salary, wages, accrued vacation and any and all other benefits due to Employee through the Full-Time Employment Termination Date. From May 1, 1999 through June 30, 2001 Employee shall be a part-time employee of the Company providing such services as the parties mutually agree upon (the "Part-Time Period").

(b) Part-Time Period Benefits. During the Part-Time Period, Employee shall receive his full salary, and shall be eligible to participate in the Company's 401(k) Plan (without Company match), the Executive Deferred Savings Plan and the Company's medical, disability and life insurance plans for so long as Employee does not work for a non-Competitor. "Full salary" shall be deemed to be that amount paid to Employee prior to the 10% reduction instituted by the Company during fiscal 1999.

(c) Bonus Payments. During the Part-Time Period Employee shall be eligible to receive bonuses as determined by the Board of Directors. The Company shall have the obligation to pay any and all bonuses referred to in this Agreement only at the same time as bonuses are normally paid to senior management of the Company and contingent in each case upon the Company's payment of bonuses to senior officers of the Company in such

2

Powered By EDGAR Online    2002.  EDGAR Online, Inc.

fiscal year. Employee shall be entitled to receive a full bonus for each of the Company's fiscal years ended June 30, 1999 and June 30, 2000 and for 83% of a full bonus for the fiscal year ended June 30, 2001. The bonus amount shall be determined using a combination of individual and Company objectives and assuming that Employee has achieved 100% of his individual bonus objectives in distinction to Company objectives which shall be based upon actual Company performance for such fiscal year. Bonuses shall only be payable so long as Employee does not work for a non-Competitor.

(d) Stock Option Vesting. During the Part-Time Period, Employee's stock options granted on or before April 30, 1997 shall continue to vest as set forth in the applicable stock option agreements pursuant to which options were granted. Upon termination of the Part-Time Period, Employee shall be entitled to exercise those vested options pursuant to the terms of the applicable stock option agreements.

(e) No Other Benefits. Except as other specifically provided herein, Employee agrees that all employee benefits shall cease as of the Full-Time Employment Termination Date.

(f) Non-competition; Non-Solicitation. Payment of all benefits hereunder, including the continued vesting of stock options, shall be contingent on Employee not working for a "Competitor" of the Company. For purposes of this Agreement, a "Competitor" shall include ADE, Applied Materials, Bio-Rad, Electroglas, Estek , FEI, Hermes Microvision, Hitachi, Holon, Horiba, Inspex, IVS, JEOL, Lasertec, Leica, Nanometrics, NEC, Nikon, n&k Technology, OSI, Park Scientific, PDF Solutions, QC Optics, Rudolph Technologies, Schlumberger, Sopra, Technical Instruments, Therma-Wave, TKK, TSK, Topcon, Topometrix, Toshiba, Veeco, Wyko and Zygo. Further, payment of all benefits hereunder also be contingent on Employee not soliciting for hire any employees of the Company for a period of two years from the Full-Time Employment Termination Date.

3. Release of Claims. Employee agrees that the foregoing consideration represents settlement in full of all outstanding obligations owed to Employee by the Company. Employee, on behalf of Employee and his heirs, executors and assigns, hereby fully and forever releases the Company and its officers, directors, employees, investors, stockholders, administrators, predecessor, subsidiary and successor corporations, and assigns, of and from any claim, duty, obligation or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that any of them may possess arising from any omissions, acts or facts that have occurred up until and including the effective date of this Agreement including, without limitation,

(a) any and all claims relating to or arising from Employee's employment relationship with the Company and the termination of that relationship;

3

Powered By EDGAR Online    2002, EDGAR Online, Inc.

(b) any and all claims relating to, or arising from, Employee's right to purchase, or actual purchase of shares of stock of the Company;

(c) any and all claims for wrongful discharge of employment; breach of contract, both express and implied; breach of a covenant of good faith and fair dealing, both express and implied; negligent or intentional infliction of emotional distress; negligent or intentional misrepresentation; negligent or intentional interference with contract or prospective economic advantage; and defamation;

(d) any and all claims for violation of any federal, state or municipal statute, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, and the California Fair Employment and Housing Act;

(e) any and all claims arising out of any other laws and regulations relating to employment or employment discrimination;

(f) ANY RIGHTS HE MAY HAVE UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 ("ADEA"). EMPLOYEE FURTHER ACKNOWLEDGES THAT HE HAS BEEN ADVISED BY THIS WRITING THAT (I) HE SHOULD CONSULT WITH AN ATTORNEY PRIOR TO EXECUTING THIS AGREEMENT; (II) HE HAS AT LEAST TWENTY-ONE (21) DAYS WITHIN WHICH TO CONSIDER THIS AGREEMENT; (III) HE HAS AT LEAST SEVEN (7) DAYS FOLLOWING THE EXECUTION OF THIS AGREEMENT BY THE PARTIES TO REVOKE THE AGREEMENT; AND (IV) THIS AGREEMENT SHALL NOT BE EFFECTIVE UNTIL THE REVOCATION PERIOD HAS EXPIRED; AND

(g) any and all claims for attorneys' fees and costs.

The Company and Employee agree that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement.

4. Tax Consequences. The Company makes no representations or warranties with respect to the tax consequences of the payment of any sums to Employee under the terms of this Agreement. Employee agrees and understands that he or she is responsible for payment, if any, of local, state and/or federal taxes on the sums paid hereunder by the Company and any penalties or assessments thereon.

5. No Admission of Liability. No action taken by the Parties hereto, or either of them, either previously or in connection with this Agreement shall be deemed or construed to

4

Powered By EDGAR Online    2002, EDGAR Online, Inc.

be (a) an admission of the truth or falsity of any claims heretofore made or (b) an acknowledgment or admission by either party of any fault or liability whatsoever to the other party or to any third party.

6. Costs. The Parties shall each bear their own costs, expert fees, attorneys' fees and other fees incurred in connection with this Agreement.

7. Arbitration and Equitable Relief.

(a) The parties hereto agree that any dispute or controversy arising out of, relating to, or in connection with this Agreement, or the interpretation, validity, construction, performance, breach, or termination thereof shall be settled by arbitration to be held in Santa Clara County, California, in accordance with the National Rules for the Resolution of Employment Disputes then in effect of the American Arbitration Association (the "Rules"). The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction.

(b) The arbitrator shall apply California law to the merits of any dispute or claim, without reference to rules of conflict of law. The arbitration proceedings shall be governed by federal arbitration law and by the Rules, without reference to state arbitration law. The parties hereto hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any action or proceeding arising from or relating to this Agreement and/or relating to any arbitration in which the parties are participants.

(c) The Company and Employee shall each pay one-half of the costs and expenses of such arbitration, and shall separately pay its counsel fees and expenses.

(d) THE PARTIES HERETO HAVE READ AND UNDERSTAND SECTION 8, WHICH DISCUSSES ARBITRATION. THE PARTIES HERETO UNDERSTAND THAT BY SIGNING THIS AGREEMENT, THEY AGREE TO SUBMIT ANY FUTURE CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH, OR TERMINATION THEREOF TO BINDING ARBITRATION, AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF THEIR RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE EMPLOYER/EMPLOYEE RELATIONSHIP, INCLUDING BUT NOT LIMITED TO, THE FOLLOWING CLAIMS:

5

Powered By EDGAR Online    2002. EDGAR Online, Inc.

(i) ANY AND ALL CLAIMS FOR WRONGFUL DISCHARGE OF EMPLOYMENT; BREACH OF CONTRACT, BOTH EXPRESS AND IMPLIED; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BOTH EXPRESS AND IMPLIED; NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT OR INTENTIONAL MISREPRESENTATION; NEGLIGENT OR INTENTIONAL INTERFERENCE WITH CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE; AND DEFAMATION;

(ii) ANY AND ALL CLAIMS FOR VIOLATION OF ANY FEDERAL STATE OR MUNICIPAL STATUTE, INCLUDING, BUT NOT LIMITED TO, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE CIVIL RIGHTS ACT OF 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE FAIR LABOR STANDARDS ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, AND LABOR CODE SECTION 201, et seq; AND

(iii) ANY AND ALL CLAIMS ARISING OUT OF ANY OTHER LAWS AND REGULATIONS RELATING TO EMPLOYMENT OR EMPLOYMENT DISCRIMINATION.

8. Authority. The Company represents and warrants that the undersigned has the authority to act on behalf of the Company and to bind the Company and all who may claim through it to the terms and conditions of this Agreement. Employee represents and warrants that he has the capacity to act on his own behalf and on behalf of all who might claim through Employee to bind them to the terms and conditions of this Agreement.

9. No Representations. Each party represents that it has had the opportunity to consult with an attorney, and has carefully read and understands the scope and effect of the provisions of this Agreement. Neither party has relied upon any representations or statements made by the other party hereto which are not specifically set forth in this Agreement.

10. Severability. In the event that any provision hereof becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, this Agreement shall continue in full force and effect without said provision.

11. Entire Agreement. This Agreement represents the entire agreement and understanding between the Company and Employee concerning Employee's separation from the Company, and supersedes and replaces any and all prior agreements and understandings concerning Employee's relationship with the Company and compensation from the Company.

6

12. No Oral Modification. This Agreement may only be amended in writing signed by Employee and the Chief Executive Officer or Chairman of the Board of the Company.

13. Effective Date. This Agreement is effective seven days after it has been signed by both parties.

14. Counterparts. This Agreement may be executed in counterparts, and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.

15. Voluntary Execution of Agreement. This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto, with the full intent of releasing all claims. The Parties acknowledge that:

(a) They have read this Agreement;

(a) They have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;

(a) They understand the terms and consequences of this Agreement and of the releases it contains;

(a) They are fully aware of the legal and binding effect of this Agreement.


```
KLA-TENCOR CORPORATION                    EMPLOYEE


By: /s/ Kenneth Levy                      By: /s/ Graham J. Siddall
    ------------------------------------
    ------------------------------------
```

Powered By EDGAR Online    2002.  EDGAR Online, Inc.

1

99 Annual Report
[LOGO]

2

**FINANCIAL HIGHLIGHTS**

In thousands, except per share data

| Year ended June 30, | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|
| **Operations** | | | | | |
| Revenues | $ 695,950 | $ 1,094,492 | $ 1,031,824 | $ 1,166,325 | $ 843,181 |
| Income (loss) from operations | $ 156,609 | $ 296,266 | $ 145,832 | $ 164,631 | $ (10,334) |
| Income from operations | | | | | |
| excluding other charges(1) | $ 181,849 | $ 296,266 | $ 206,384 | $ 187,105 | $ 32,366 |
| Net income | $ 104,811 | $ 196,634 | $ 105,396 | $ 134,096 | $ 39,212 |
| Basic earnings per share | $ 1.40 | $ 2.42 | $ 1.29 | $ 1.58 | $ 0.45 |
| Diluted earnings per share | $ 1.34 | $ 2.34 | $ 1.24 | $ 1.52 | $ 0.43 |
| Net income excluding other charges(1) | $ 120,965 | $ 196,634 | $ 151,272 | $ 155,574 | $ 66,966 |
| Diluted earnings per share | | | | | |
| excluding other charges(1) | $ 1.54 | $ 2.34 | $ 1.78 | $ 1.76 | $ 0.73 |
| **Year End Status** | | | | | |
| Cash, cash equivalents and | | | | | |
| marketable securities | $ 385,040 | $ 468,475 | $ 687,249 | $ 723,481 | $ 755,183 |
| Working capital | $ 452,350 | $ 591,397 | $ 531,313 | $ 605,688 | $ 590,024 |
| Total assets | $ 850,406 | $ 1,157,919 | $ 1,343,307 | $ 1,548,397 | $ 1,584,900 |
| Stockholders' equity | $ 652,222 | $ 870,999 | $ 1,014,613 | $ 1,197,714 | $ 1,232,583 |

(1) Excludes non-recurring acquisition, merger and restructuring charges of $25 million, $61 million, $22 million and $43 million in 1995, 1997, 1998 and 1999, respectively.

3

**LETTER TO OUR STOCKHOLDERS**

While some companies sought merely to survive the past year, KLA-Tencor focused on strategies to thrive in the new millennium. These included: LEADERSHIP THROUGH new technologies, market strategies and a next generation management team. SOLUTIONS THAT are comprehensive yet tailored to meet emerging device challenges. And most importantly, strategically grouped hardware, software and consulting services to HELP CUSTOMERS achieve and maintain their competitive edge.

4

[GRAPH]

THIS PAST FISCAL YEAR MARKED ONE OF THE MOST CHALLENGING ECONOMIC PERIODS IN MANY YEARS FOR THE SEMICONDUCTOR INDUSTRY Overall, equipment purchases by customers world-wide dropped significantly as semiconductor companies delayed plans for new or updated manufacturing facilities. As a result, KLA-Tencor revenues for fiscal 1999 declined to $843 million with net income of $67 million or 73 cents per share (excluding non-recurring restructuring and acquisition charges of $43 million or $28 million after tax). While we were disappointed that revenues declined year over year, we were pleased that the company was able to maintain profitability--one of the few semiconductor equipment companies to do so during this period. o Moving forward, we remain focused on our primary objective: to maintain our record of fiscal strength while continuing to out pace the industry's growth. Recent quarter results show that we are making progress towards this goal. As outlined in this letter, we have initiated a number of programs designed to sustain our momentum and position our company for the future.

5

Powered By EDGAR ONLINE    2002.  EDGAR Online, Inc.

DESPITE ESCALATING COMPETITION IN OUR SERVED MARKET, KLA-TENCOR HAS MAINTAINED, AND IN SEVERAL CASES EVEN EXTENDED, ITS LEADERSHIP ROLE BOTH IN TERMS OF TECHNI- CAL INNOVATION AND MARKET SHARE. As a result, today we are uniquely able to deliver the combination of systems, software and yield management expertise device manufacturers need to accelerate their critical technology transitions and develop the device technologies of the future. o While new market strategies and breakthrough technologies are essential to our continued growth, we believe that the strength of our management team is equally important to sustaining KLA-Tencor's industry leading position. Over the past decade, we have been fortunate to be able to cultivate a team with the technical and management expertise needed to lead us into the 21st century. With the retirement of Jon Tompkins in July 1999, Kenneth Levy assumed the role of chairman, and the board of directors promoted Kenneth Schroeder to chief executive officer and Gary Dickerson to chief operating officer. These changes were an integral part of our strategic succession plan, designed to ensure a seamless leadership transition without any loss of corporate focus or direction. o As with many of our top executives, both Schroeder and Dickerson are corporate veterans and bring an exceptional combination of long-term perspective and high energy into our leadership. We look forward to the tremendous strategic and operational strengths they will bring to the growth and evolution of KLA-Tencor in the coming years.

LEADERSHIP          [Photo of Kenneth Levy] [Photo of Kenneth Schroeder] [Photo of Gary Dickerson]

                    Left to right: Kenneth Levy, Chairman; Kenneth Schroeder,
                    President and CEO; Gary Dickerson, COO

                    Newly appointed CEO Kenneth Schroeder has played a vital role in
                    helping KLA-Tencor grow more than five hundred percent in
                    revenues during his 16 year tenure with the company.

                    Gary Dickerson joined the company in 1986 and prior to his
                    recent appointment to COO served in a variety of capacities
                    including management of the Wafer Inspection and Yield
                    Management Groups.

6

KLA-Tencor is helping to drive the yield management and process control technologies of the future. The company has maintained its leadership in this growing segment through advanced systems, software, and expertise that span the entire semiconductor process -- from wafer fabrication to the finished device.

While the company's primary focus is semi-conductor device manufacturing, KLA-Tencor technology is also well suited for applications in such related industries as reticle and wafer manufacturing, as well as in the data storage industry.

## SOLUTIONS

IN THE SEMICONDUCTOR INDUSTRY, MARKET REQUIREMENTS CHANGE MORE QUICKLY WITH EACH PASSING YEAR. Our customers' needs are now so complex that customized solutions are no longer optional--they are essential. KLA-Tencor has always delivered leading technologies to help customers achieve their technical and business objectives. While historically these products were primarily hardware-related, in recent years, KLA-Tencor has expanded into advanced software and consulting services that facilitate analysis and bring broad-based expertise to bear on the yield optimization process. o The ability to combine these elements together into focused solutions is the next logical step in our evolution. During the past year we initiated a program to develop Process Module Control solutions (PMCs) for all of the key process areas in the fab including etch, deposition, lithography, and planarization (CMP). With our extensive hardware, software and expertise, only KLA-Tencor has the ability to both provide and integrate all the necessary elements of a module control solution from a single source. o The first of our process module control solutions targeted the copper interconnect process since integration and yield are the greatest obstacles in transitioning to this next-generation technology. Today we are already involved in a number of projects with customers developing copper processing lines. Although it is still early in the technology adoption curve, delivering the optimal solution during this initial phase is essential for accelerating process development and the eventual transfer to production, where our comprehensive solutions can deliver the greatest advantage to our customers.

7

CRITICAL TO THE CONTINUED ENHANCEMENT OF OUR PMCS IS ONGOING TECHNICAL INNOVA- TION AND PRODUCT STRENGTH. Despite the industry downturn this past year, we were pleased to be able to enhance our strong product portfolio through both continued high internal R&D investment and strategic acquisitions. Our goal, as always, is to develop both revolutionary and evolutionary systems that can meet emerging process and production requirements. New products that provide capabilities unique in the industry, such as the eS20 for in-line scanning electron-beam inspection, and the 2401 for automated macro defect inspection, are opening the door for new inspection strategies. Acquisitions of technologies for oxide monitoring, electron beam and optical defect review, and data analysis software, further broadened our product offering with complementary technologies. Consistent with this strategy, we also continue to enhance all of our top-of-the-line systems with new features and capabilities. o Another vital KLA-Tencor strength is our long-standing relationships with customers. Working closely to understand their issues and challenges, we are better able to develop the products needed to address them. Our comprehensive solution sets will allow customers to continue to rely on us for the process module control capabilities needed to initiate any technology transition. Moreover, our customized solutions for any tool set, process configuration or fab-specific criteria, offer customers the ability to create and sustain the differentiation that gives them a competitive advantage.

**CUSTOMERS**

KLA-Tencor continuously monitors the global semiconductor industry to pinpoint major opportunities for inspection and monitoring equipment in new and remodeled manufacturing facilities worldwide. Today, there are more than twice as many significant opportunities as there were just one year ago

8

Powered By EDGAR Online    2002. EDGAR Online, Inc.

This letter documents recent events, but staying ahead of the industry means responding quickly to market changes. To keep pace with KLA-Tencor's continuous evolution year-round, keep an eye on our website for information on new product launches, business developments, executive appointments, earnings announcements, and management presentations.

our website

IN THE COMING YEAR, KLA-TENCOR WILL CONTINUE TO EXECUTE ON THESE STRATEGIES AND INVEST IN THE TECHNOLOGIES THAT WILL HELP ADVANCE OUR VISION OF COMPREHENSIVE, TAILORED SOLUTIONS. As changing industry requirements mandate an evolution--from delivering stand-alone tools to integrating and implementing complete process module control solutions--KLA-Tencor is uniquely positioned to address these needs. As a result, we are helping customers worldwide in their quest to control critical processes, speed yield ramps and enhance their overall yield and profitability. To further enhance our own profitability, we will continue our efforts to streamline our operations; bringing greater efficiency and focus on delivering value to our customers and stockholders. In light of this priority and our fast-paced business development, this year we are enhancing the information available on our investor website, in addition to providing this annual report, so you can quickly find the latest information about KLA-Tencor throughout the year. As always, we deeply appreciate your continued support as KLA-Tencor moves forward to embrace both the challenges and opportunities we see in the coming millennium.

```
/s/ KENNETH LEVY          /s/ KENNETH SCHROEDER
--------------------      ----------------------
--------------------
    Kenneth Levy              Kenneth Schroeder
      Chairman                President and CEO
```

9

VISIT OUR INVESTOR WEBSITE                              [INVESTOR RELATIONS GRAPHICS]
www.kla-tencor.com/investors

Company Profile
View quick facts about KLA-Tencor
including company background, executive
management team, and analyst coverage.

Earnings Release
Learn the next earnings
release date and link to the most recent
earnings release data available.

Stock Price and Charts
Find the latest stock price and link to
interactive stock charts from NASDAQ.

News and Events
Read recent press releases, other
related news from NASDAQ, and a list of
upcoming events.

Annual Report
View our online annual report and
download copies of annual reports from
prior years.

Recent SEC filings
Download recent Form 10K and 10Qs and
link to other recent SEC filings through
EDGAR.

INVESTOR WEBSITE

Investor FAQs
Read frequently asked questions and
answers regarding KLA-Tencor stock,
company and product information.

Presentations
View a selection of presentation slides
with accompanying notes and information.

Investor Package
Obtain online or through the mail,
copies of our available investor
materials.

Main Website Links
Link to the rest of our corporate
website for the latest technical
developments, product information, Yield
Management Solutions magazine, trade
shows, seminars and events, as well as
our employment website.

10

financial review

MANAGEMENT'S DISCUSSION & ANALYSIS
8

FINANCIAL STATEMENTS
20

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
24

REPORT OF INDEPENDENT ACCOUNTANTS
37

CORPORATE INFORMATION
38

[PHOTO OF ROBERT J. BOEHLKE]

**Robert J. Boehlke, Executive Vice President and CFO**

11

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

This Annual Report contains forward-looking statements within the meaning of
Section 27A of the Securities Act of 1933 and Section 21E of the of Securities Exchange Act of 1934. Actual results could differ materially
from those projected in the forward-looking statements as a result of a number of factors, risks and uncertainties, including the risk factors set
forth in this discussion and elsewhere in this Annual Report. Generally, the words "anticipate", "expect", "intend", "believe" and similar
expressions identify forward-looking statements. The information included in this Annual Report is as of the filing date with the Securities and
Exchange Commission and future events or circumstances could differ significantly from the forward-looking statements included here.

## RESULTS OF OPERATIONS

KLA-Tencor Corporation exited fiscal 1999 with long-awaited improvement in business conditions and new orders during the last two quarters
of fiscal 1999. During much of fiscal 1998 and the first half of fiscal 1999, we faced a significant downturn in the semiconductor industry. The
industry-wide decline initially began with high inventory levels, particularly of DRAM devices, at semiconductor manufacturers and
distributors and was followed by an overall decline in demand for semiconductors worldwide. This reduced demand was prompted by the weak
economy in the Asia Pacific region, especially in South Korea and Japan. Combined with the movement of end-users to sub-$1,000 personal
computers, this weakness in demand caused price reductions in the semiconductor marketplace, a slowdown in the manufacture of
semiconductors, and resulted in delays and cancellations of new fabrication facility construction. Consequently, we experienced reduced order
levels and some cancellations in orders through the second quarter of fiscal 1999.

In response to the downturn in the semiconductor industry, we adopted a restructuring plan in the second quarter of fiscal 1999. The plan
included a consolidation of facilities, a write-down of assets associated with canceled programs, and reductions in our global workforce. These
measures, although difficult, allowed us to endure the challenges of the recent industry-wide downturn and enabled us to enter fiscal 2000 in a
stronger position to serve our customers and meet the new technological requirements of our business (see further information at pages 9 to 11
of this discussion).

During the third quarter of fiscal 1999, business conditions began to improve, driven by our customers' advanced inspection requirements for
deep sub-quarter micron technologies and the transition to copper dual damascene structures (copper technology). Growth also was prompted
by market share increases in our metrology and film measurement business. Increased orders in the Asia Pacific region were the result of
capacity expansion in foundries and investments in yield improvement.

Our financial position has remained strong throughout the recent down cycle of the semiconductor industry and we continue to have no
long-term debt.

## REVENUES AND GROSS MARGINS

Revenues decreased $323 million, or 28% to $843 million, in fiscal 1999 from $1.17 billion in fiscal 1998. Overall revenue declines were
mostly the result of reduced capital spending, particularly in the Asia Pacific region, as a result of the semiconductor industry downturn. Sales
of substantially all our product lines were negatively affected by this down cycle when compared to sales in fiscal 1998. These declines in fiscal
1999, were offset in part by an increase in field service and spare parts revenues, primarily due to our increasing installed base worldwide.
Revenues in fiscal 1998 increased 13% when compared to fiscal 1997, primarily due to sales from newer products lines.

12

Gross margins as a percentage of revenues decreased to 47% in fiscal 1999 from 52% in fiscal 1998 and 54% in fiscal 1997. The decrease in gross margins during the last two fiscal years was primarily due to sequentially lower sales volume of our higher-margin products and increased infrastructure costs of our field service organization.

## ENGINEERING, RESEARCH AND DEVELOPMENT

Net engineering, research and development expenses were $165 million, $182 million and $134 million in fiscal 1999, 1998 and 1997, respectively. The decrease in fiscal 1999 compared to fiscal 1998 is primarily attributable to development programs that were terminated as part of the realignment and streamlining of our product lines, as well as other cost-reduction measures implemented during our second quarter fiscal 1999 restructuring. Costs were also offset by additional external funding received on strategic development and engineering programs during fiscal 1999. The increase in fiscal 1998 compared to fiscal 1997 was primarily attributable to increases in headcount and project material costs associated with our ongoing efforts to develop products which address new market segments; enhancements to existing products including next-generation 300mm products; and inspection enhancements for sub-quarter micron technology. Our future operating results will depend significantly on our ability to produce products and services that have a competitive advantage in our marketplace. To do this, we believe that we must continue to make substantial investments in our research and development efforts. We remain committed to product development in new and emerging technologies as we address the requirements of 0.18 micron and 0.13 micron feature sizes, real-time review, and the transition to copper technology. Our investments in new technology and existing product enhancements are intended to enable our customers to achieve higher productivity through cost-effective, leading edge technology solutions.

## SELLING, GENERAL AND ADMINISTRATIVE

Selling, general and administrative expenses were $199 million, $242 million and $219 million, or 24%, 21% and 21% of revenues, in fiscal 1999, 1998 and 1997, respectively. The decrease in fiscal 1999, compared to fiscal 1998, was primarily attributable to our restructuring program, which included a consolidation of facilities and reductions in headcount and other cost saving measures. The increase in fiscal 1998 compared to fiscal 1997 was primarily attributable to increased spending in our worldwide sales and applications organization.

## NON-RECURRING ACQUISITION,

## RESTRUCTURING AND OTHER CHARGES

NON-RECURRING ACQUISITION CHARGES. In December 1998, we purchased assets and related technology from Uniphase Corporation for an aggregate purchase price of $3 million. The confocal laser review station technology acquired is currently used for analysis of defects on silicon wafers. Assets acquired of $3 million consisted primarily of inventory.

In November 1998, we purchased assets and technology from Keithley Instruments, Inc. for an aggregate purchase price of $10 million. The corona wire gate oxide monitoring tool technology we acquired had not yet reached the alpha stage and the cost to complete the development of this equipment was estimated at the time of acquisition to be $1 million. We recorded a charge of $8 million for purchased in-process research and development, representing the appraised value of product that was not considered to have reached technological feasibility. The appraised value under the income approach used for our calculation did not differ materially from the result under the percentage of completion approach currently preferred by the Securities and Exchange Commission. Net assets acquired of $1 million consisted primarily of inventory

13

Powered By EDGAR® ONLINE    2002.  EDGAR Online, Inc.

MANAGEMENT'S DISCUSSION AND ANALYSIS OF

FINANCIAL CONDITION AND RESULTS OF OPERATIONS

and equipment and the remaining $1 million was allocated to other intangibles including acquired technology and goodwill.

In June 1998, we acquired Groff Associates, Inc. (dba VARS Inc.) for an aggregate purchase price of $13 million. The digital and in-line-monitoring image archiving retrieval software technology we acquired had not yet reached the alpha stage and the cost to complete the development of these software products was estimated at the time of acquisition to be $2 million. We recorded a charge of $13 million for purchased in-process research and development, representing the appraised value of products that were not considered to have reached technological feasibility. The appraised value under the income approach used for our calculation did not differ materially from the result under the percentage of completion approach currently preferred by the Securities and Exchange Commission. The in-line-monitoring image archiving retrieval software technology acquired had not reached commercial feasibility as of June 30, 1999. The value of the tangible net assets acquired was nominal.

In May 1998 we acquired DeviceWare, Inc., a company in its development stage, for an aggregate purchase price of $3 million. The bit mapping defect characterization technology acquired had not yet reached the alpha stage and the cost to complete the development of this software product was estimated at the time of acquisition to be $1 million. We recorded a charge of $3 million for purchased in-process research and development, representing the appraised value of product that was not considered to have reached technological feasibility. The appraised value under the income approach used for our calculation did not differ materially from the result under the percentage of completion approach currently preferred by the Securities and Exchange Commission. The technology acquired had not reached commercial feasibility as of June 30, 1999. The value of the tangible net assets acquired was nominal.

In February 1998, we acquired Nanopro GmbH (Freiburg, Germany) for an aggregate purchase price of $3 million. This privately-held company specialized in the development of advanced interferometric wafer inspection. The identified in-process research and development of $3 million was estimated and expensed, because technological feasibility of the advanced interferometric wafer technology had not yet been reached. The technology acquired had not reached commercial feasibility as of June 30, 1999. The value of the tangible net assets acquired was nominal.

Each of the above acquisitions was accounted for using the purchase method of accounting and the developmental products acquired were evaluated in the context of Interpretation 4 of SFAS No. 2 and SFAS No. 86. The allocation of the purchase price to in-process research and development cost was determined by identifying research projects in areas for which technological feasibility had not been established and no alternative future uses existed. Substantially all of the in-process research and development projects acquired were expected to be complete and generating revenues within the 24 months following the acquisition date. However, development of these technologies remains a significant risk due to the remaining effort required to achieve technical feasibility, rapidly changing customer markets and significant competitive threats from numerous companies. Failure to bring any of these products to market in a timely manner could adversely affect our sales and profitability in the future. Additionally, the value of net assets and other intangible assets acquired may become impaired.

In April 1998, we acquired Amray, Inc. (Amray) for 1,800,000 shares of our common stock accounted for under the pooling of interest method of accounting. A privately-owned provider of scanning electron microscope systems, Amray's historical operations, net assets, and cash flows were less than 3% of our consolidated financial results and, therefore, were not reflected in the

14

Powered By EDGAR ONLINE    2002.  EDGAR Online, Inc.

consolidated financial results prior to the acquisition. We incurred $2 million in professional fees and restructuring charges related to this acquisition.

RESTRUCTURING AND OTHER CHARGES. During fiscal 1999, we implemented a restructuring plan to address the impact on our business of the downturn in the semi-conductor industry. Estimated restructuring costs of $35 million are classified in four main categories: facilities, inventory, severance and benefits, and other restructuring costs. Facilities costs of $12 million include $8 million for lease expense resulting from consolidation and closure of certain offices located primarily in the United States and Japan; $3 million for leasehold improvements impaired in those facilities; and $1 million in other facilities-related exit costs. Inventory-related costs of $10 million resulted from impaired assets related to unique parts and non-cancelable purchase commitments of certain development programs, which were terminated as part of the realignment and streamlining of our product lines. Severance and benefit-related costs of $8 million include involuntary termination of approximately 250 personnel from manufacturing, engineering, sales, marketing, and administration throughout the United States, Japan and Europe. Other restructuring costs of $5 million relate primarily to the write-off of software licenses and related non-cancelable maintenance contracts for closed locations.

Of the $35 million restructuring accrual, we utilized $18 million as of June 30, 1999. Payments under severance plans and contractual obligations that existed when the plan was executed are expected to extend into fiscal 2001. Facilities and severance payments of $8 million and $6 million, respectively, are expected to be spread fairly evenly over the next ten fiscal quarters. Inventory related costs of $3 million are expected to be incurred as assets are disposed during the first two quarters of fiscal 2000.

During fiscal 1997, we recorded charges totaling $61 million for merger, restructuring and other non-recurring events. Of this amount, $46 million was the result of the merger between KLA Instruments and Tencor Instruments on April 30, 1997, $6 million was a result of the write-off of a Tencor bad debt and $9 million was additional restructuring charges, primarily related to lease exit costs incurred by Tencor Instruments prior to the merger. This restructuring plan was completed as of December 31, 1998.

## INTEREST INCOME AND OTHER, NET

Interest income and other, net is comprised primarily of gains realized on sales of marketable securities, interest income earned on the investment and cash portfolio and income recognized upon settlement of certain foreign currency contracts. The increase in fiscal 1999 as compared to fiscal 1998 was primarily attributable to $17 million in gains realized on sale of equity securities held in a former supplier company. The increase in fiscal 1998 as compared to fiscal 1997 was primarily the result of income realized upon settlement of foreign currency contracts and interest resulting from higher average investment balances.

## PROVISION FOR INCOME TAXES

KLA-Tencor's effective income tax rate decreased to 22% in fiscal 1999 from 35% in fiscal 1998 and 39% in fiscal 1997. In general, our effective income tax rate differs from the statutory rate of 35% largely as a function of benefits realized from our Foreign Sales Corporation, income derived from tax exempt interest, foreign taxes, state taxes, and non-deductible merger and acquisition related costs. During fiscal 1999, income related to tax exempt interest increased as a component of total net income and resulted in a significantly lower effective tax rate as compared to fiscal 1998 and fiscal 1997.

15

Powered By EDGAR Online    2002, EDGAR Online, Inc.

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS

## LIQUIDITY AND CAPITAL RESOURCES

Working capital was $590 million as of June 30, 1999 compared to $606 million as of June 30, 1998. The major components of working capital and liquidity continue to be over $300 million of cash, cash equivalents and short-term investments. In addition, we maintained in excess of $400 million in marketable securities classified as long-term as of June 30, 1998 and 1999. Cash provided by operating activities was $122 million, $74 million and $246 million in fiscal 1999, 1998 and 1997, respectively. The increase in cash provided by operating activities in fiscal 1999 compared to fiscal 1998 was primarily due to decreased levels of accounts receivable and inventory and, increases in depreciation and amortization, partially offset by decreases in net income, accounts payable, other current liabilities and increases in other assets. The decrease in cash provided by operating activities in fiscal 1998 from fiscal 1997 reflects increases in accounts receivable, inventories, and other assets and decreases in depreciation and amortization, partially offset by increases in net income and other current liabilities.

During fiscal 1999, we invested $61 million in the acquisition of capital assets. Of this amount, we spent $27 million during fiscal 1999 to acquire land and buildings that previously were leased. The remainder of these expenditures related to the purchase of computers and manufacturing equipment. Capital expenditures for each of the fiscal years 1998 and 1997 were $64 million and $57 million, respectively, and related primarily to purchase of computers and manufacturing equipment.

During fiscal 1999, we sold, with recourse, trade notes and accounts receivable from Japanese customers. As of June 30, 1999, $29 million of these receivables were outstanding. In addition, during fiscal 1998, we entered into certain lease arrangements in Milpitas and San Jose, California. In connection with these agreements, we have a contingent liability to the lessor for $100 million in residual value guarantees of the properties under lease. The impact of these agreements is not expected to be material to our liquidity. We believe that the existing cash balances and investments, along with cash generated from operations, will be sufficient to meet our working capital requirements through fiscal year 2000.

In August 1997, we initiated the systematic repurchase of shares of our common stock in the open market to reduce the dilution created by our stock-based employee benefit and incentive plans. In fiscal 1999, we repurchased 1,076,000 shares of our common stock at an average price of $45.32 per share, for a total cash outlay of $49 million. In fiscal 1998, we repurchased 378,000 shares of our common stock at an average price of $42.43 per share, for a total cash outlay of $16 million.

## YEAR 2000 ISSUE

The Year 2000 computer issue presents risks for us as it does for other companies. The Year 2000 problem arises from the use of a two-digit field to identify years in computer programs, and the assumption of a single century, the 1900s. Any program so created may read, or attempt to read, "00" as the year 1900. There are two other related issues which could also lead to incorrect calculations or failure. First, some systems' programming assigns special meaning to certain dates, and second, the year 2000 is a leap year. Accordingly, some computer hardware and software, including programs embedded within machinery and parts, will need to be modified prior to the year 2000 in order to remain functional. We use a significant number of computer software programs and operating systems in our internal operations, including applications used in our financial, product development, order management and manufacturing systems, as well as in the products we manufacture and sell. Additionally, we are dependent upon our critical suppliers, contract manufacturers, other vendors, and customers to determine if their operations, products, services and the payments they provide are Year 2000 ready.

16

Powered By EDGAR ONLINE    2002.  EDGAR Online, Inc.

The inability of computer software programs to accurately recognize, interpret and process date codes designating the year 2000 and beyond could cause errors or operating problems that would disrupt business operations. If this occurs in our internal systems it could adversely affect our ability to process orders, forecast production requirements or issue invoices. A significant failure of our computer integrated manufacturing systems that monitor and control factory equipment, would disrupt manufacturing operations and cause a delay in the completion and shipping of products. Similarly, if our critical suppliers' or customers' systems or products fail because of a Year 2000 malfunction, their disruption could negatively affect our operating results. Finally, if our own products malfunctioned as a result of a failure in date recognition, we could experience warranty claims and litigation.

YEAR 2000 READINESS PROGRAM. To avoid these kinds of disruptions, KLA-Tencor commenced a broad-ranging Year 2000 readiness program during fiscal 1997. The Year 2000 project was established to ensure that all of our company-wide systems, components, infrastructure, critical suppliers and products will operate in such a manner that business is uninterrupted into and beyond the year 2000. The goals of the Year 2000 readiness project were to:

- establish and maintain up-to-date communication with users;

- determine systems/items that need to be addressed for Year 2000 readiness;

- test the above systems;

- correct Year 2000 problems as necessary;

- maintain sustained support;

- develop a contingency/recovery plan for unanticipated Year 2000 issues.

We are on schedule to meet each of these goals in our three main areas of focus. The three focus areas of our Year 2000 readiness program are: internal information and operating systems, our supply chain, and external product readiness.

INTERNAL INFORMATION AND OPERATING SYSTEMS. The first focus area is our internal information and operating systems. The project team for information and operating systems is composed of managers and individual contributors from our computer information systems group and other functional areas including finance and human resources, augmented by representatives from each operational division. We also have project managers responsible for readiness in functional areas such as treasury, facilities, security, engineering, manufacturing, and service. This internal Year 2000 readiness project includes three major activities:

- Inventory collection and categorization, which includes identification of all our systems and items that need to be addressed for Year 2000 readiness and creation of a master list categorized by critical need;

- Assessment, in which each functional group evaluates the readiness of systems inventoried, including as necessary, researching vendor documentation, direct vendor contact, code search, and/or execution of a detailed test plan; and

- Remediation or correction of the problems found, which include vendor-provided application patches, correction of bugs as necessary and needed upgrades of software and hardware.

SUPPLY CHAIN. The second area of emphasis in our Year 2000 readiness program is to ensure our supply chain is prepared. Product divisions identified over 400 key suppliers that needed to be evaluated. Questionnaires were sent to each of these suppliers, whose responses were reviewed and classified. On-site audits were performed at 37 critical suppliers where readiness issues could be of serious consequence to KLA-Tencor operations. In addition, over 100 more suppliers are being systematically reviewed by telephone to confirm that their preparations will be completed as required. As of June 30, 1999 we were able to classify all our key suppliers as low risk with respect to Year 2000 readiness,

17

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

and we continue to monitor the addition of new suppliers to assure readiness is maintained. However, the readiness of third parties overall varies widely. Because our readiness is dependent on timely Year 2000 readiness of third parties, there can be no assurances that our efforts alone will resolve all Year 2000 issues applicable to our internal processes or our products.

EXTERNAL PRODUCTS. The final area of focus for our Year 2000 readiness program is our external products. KLA-Tencor has over 18,000 installed tools at our customers' sites. We know that Year 2000 readiness is a major issue for our customers, who face critical logistical issues in assuring their continued operations. Our field service engineers have audited the majority of our tools for their configuration to determine what needs to be done to bring our products, including older out-of-warranty products, to a state of readiness for the year 2000. Readiness, upgrade requirements or "never ready" status has been reviewed through a series of system audits and an implementation plan put in place as required for each of our products. Information regarding the readiness of all our products is available on our corporate web site at www.kla-tencor.com. The framework of this project is similar to that established for our internal systems. This program has covered several key areas including date inspections, operating system investigations, runtime tests, software inspections and third party software component inventory. As of the end of fiscal 1999, we have met the majority of the goals of this project, and we continue to address the remaining issues to ensure accurate information will be available prior to January 1, 2000.

COSTS TO ADDRESS YEAR 2000 READINESS. Although a large portion of our Year 2000 readiness program used existing internal resources, we estimate we have incurred approximately $5 million of incremental external spending directly associated with this program through June 30, 1999. We anticipate we will incur future incremental external spending to complete our readiness program of approximately $3 million. However, the actual future incremental spending may prove to be higher. Also, this estimate does not include the costs that could be incurred if one or more of our significant third party service providers fails to achieve Year 2000 readiness. We have not separately identified the costs incurred for our Year 2000 readiness program that are the result of use of internal resources and therefore, these costs are not included in the above estimates.

YEAR 2000 UNCERTAINTIES. Based on currently available information, management does not believe that the Year 2000 issues related to internal systems or products sold by us to customers, as discussed above, will have a material impact on our financial condition or overall trends in results of operations. While we have undertaken a Year 2000 readiness program and have performed extensive testing of our internal systems and the products we manufacture, we are uncertain to what extent we may be affected by such matters. A significant disruption of our financial management and control systems or a lengthy interruption in our manufacturing operations caused by a Year 2000 readiness program-related issue could result in a material adverse impact on our operating results and financial condition. A supplier's failure to ensure Year 2000 capability or our customer's concerns about Year 2000 readiness of our product could seriously harm our business.

We believe that Year 2000 readiness will be achieved prior to January 1, 2000, however, due to the substantial nature of the work and the extensive testing that must take place, there can be no assurance that there will not be delays or material costs associated with the plan or that there will not be adverse effects on operations relating to or as a result of Year 2000

18

Powered By EDGAR Online    2002. EDGAR Online, Inc.

readiness planning and implementation, or that such programs will successfully detect and remedy all potential Year 2000 problems in advance.

## OTHER FACTORS AFFECTING RESULTS,

## INCLUDING RISKS AND UNCERTAINTIES

SEMICONDUCTOR EQUIPMENT INDUSTRY VOLATILITY. The semiconductor equipment industry is highly cyclical. The purchasing decisions of our customers are highly dependent on the economies of both the local markets in which they are located and the semiconductor industry worldwide. The timing, length and severity of the up-and-down cycles in the semiconductor equipment industry are difficult to predict. For example, demand for our products increased in fiscal 1998 from the prior year, but decreased in fiscal 1999, primarily as a result of widespread economic difficulties experienced in Japan and other parts of the Asia Pacific region. This cyclical nature of our marketplace affects our ability to accurately budget our expense levels, which are based in part on our projections of future revenues. When cyclical fluctuations result in lower than expected revenue levels, operating results may be adversely affected and cost reduction measures may be necessary in order for us to remain competitive and financially sound. For example, during the second quarter of fiscal 1999, we implemented a restructuring plan that resulted in a non-recurring pre-tax charge of $35 million. During a down cycle we must be in a position to adjust our cost and expense structure to the prevailing market condition and to continue to motivate and retain our key employees. In addition, during periods of rapid growth, we must be able to increase manufacturing capacity and personnel to meet customer demand. We can provide no assurance that these objectives can be met in a timely manner in response to industry cycles. If we fail to respond to industry cycles, our business could be seriously harmed.

During the most recent down cycle, the semiconductor industry experienced excess production capacity that caused semiconductor manufacturers to decrease capital spending. We generally do not have long-term volume production contracts with our customers and we do not control the timing or volume of orders placed by our customers. Whether and to what extent our customers place orders for any specific products and the mix and quantities of products included in those orders are factors beyond our control. Insufficient orders will result in under-utilization of our manufacturing facilities and infrastructure and will negatively affect our operating results and financial condition.

FLUCTUATIONS IN OPERATING RESULTS AND STOCK PRICE. Our operating results have varied widely in the past and our future operating results will continue to be subject to quarterly variations based upon a wide variety of factors including those listed in this section and throughout this Annual Report. In addition, future operating results may not follow any past trends. The factors we believe make our results more likely to fluctuate and difficult to predict include:

- the cyclical nature of the semiconductor industry;

- change in the price and profitability of our products;

- the timing of new product introductions;

- our ability to develop and implement new technologies;

- delays in our customers' schedules for fulfillment of orders;

- potential cancellation of contracts by major customers; and

- our ability to manage our manufacturing requirements.

Operating results also could be affected by sudden changes in customer requirements, currency exchange rate fluctuations and other economic conditions affecting

19

Powered By EDGAR Online    2002. EDGAR Online, Inc.

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS

customer demand and the cost of operations in one or more of the global markets in which we do business. As a result of these or other factors, we could fail to achieve our expectations as to future revenues, gross profit and income from operations. Our failure to meet the performance expectations set and published by external sources could result in a sudden and significant drop in the price of our stock, particularly on a short-term basis, and could negatively affect the value of any investment in our stock.

INTERNATIONAL TRADE AND ECONOMIC CONDITIONS. Ours is an increasingly global market. In fiscal 1997, 1998 and 1999, a significant percentage of our revenues were derived from outside the United States and we expect that international revenues will continue to represent a substantial percentage of our revenues. Our international revenues and operations are affected by economic conditions specific to each country and region. Although economies in the Asia Pacific region have stabilized to some degree, compared to early-to-mid fiscal 1999, and certain countries such as Taiwan have relatively healthy economies, we remain cautious about general macroeconomic developments in the Asia Pacific region, particularly Japan. Japan's economy is important to the overall financial health of the region. If the economies in the Asia Pacific region stagnate or deteriorate, the economies of other regions could also be adversely affected. Because of our significant dependence on international revenues, our operating results could be negatively affected by a continued or additional decline in the economies of any of the countries or regions in which we do business.

Managing global operations and sites located throughout the world presents challenges associated with, among other things, cultural diversity and organizational alignment. Moreover, each region in the global semiconductor equipment market exhibits unique characteristics that can cause capital equipment investment patterns to vary significantly from period to period. Periodic local or international economic downturns, trade balance issues, political instability and fluctuations in interest and currency exchange rates could negatively affect our business and results of operations. Although we attempt to manage near term currency risks through the use of hedging instruments, there can be no assurance that such efforts will be adequate.

COMPETITION. Our industry includes large manufacturers with substantial resources to support customers world-wide. Our future performance depends, in part, upon our ability to continue to compete successfully worldwide. Some of our competitors are diversified companies with greater financial resources and more extensive research, engineering, manufacturing, marketing and customer service and support capabilities than we can provide. We face competition from companies whose strategy is to provide a broad array of products, some of which compete with the products and services that we offer. These competitors may bundle their products in a manner that may discourage customers from purchasing our products. In addition, we face competition from smaller emerging semiconductor equipment companies whose strategy is to provide a portion of the products and services which we offer, using innovative technology to sell products into specialized markets. Loss of competitive position could impair our prices, customer orders, revenues, gross margins, and market share, any of which would negatively affect our operating results and financial condition. Our failure to compete successfully with these other companies would seriously harm our business.

TECHNOLOGICAL CHANGE AND CUSTOMER REQUIREMENTS. Success in the semiconductor equipment industry depends, in part, on continual improvement of existing

20

technologies and rapid innovation of new solutions. For example, the semiconductor industry continues to shrink the size of semiconductor devices and recently has begun to commercialize the process of copper-based interconnects. These and other evolving customer needs require us to respond with continued development programs and to cut back or discontinue older programs which may no longer have industry-wide support. Technical innovations are inherently complex and require long development cycles and appropriate professional staffing. Our competitive advantage and future business success depend on our ability to accurately predict evolving industry standards, develop and introduce new products which successfully address changing customer needs, win market acceptance of these new products and manufacture these new products in a timely and cost-effective manner. If we do not develop and introduce new products and technologies in a timely manner in response to changing market conditions or customer requirements, our business could be seriously harmed.

In this environment, we must continue to make significant investments in research and development in order to enhance the performance and functionality of our products, to keep pace with competitive products and to satisfy customer demands for improved performance, features and functionality. There can be no assurance that revenues from future products or product enhancements will be sufficient to recover the development costs associated with such products or enhancements or that we will be able to secure the financial resources necessary to fund future development. Substantial research and development costs typically are incurred before we confirm the technical feasibility and commercial viability of a product, and not all development activities result in commercially viable products. In addition, we cannot ensure that these products or enhancements will receive market acceptance or that we will be able to sell these products at prices that are favorable to us. Our business will be seriously harmed if we are unable to sell our products at favorable prices or if our products are not accepted by the market in which we operate.

KEY SUPPLIERS. We use a wide range of materials in the production of our products including custom electronic and mechanical components, and we use numerous suppliers to supply materials. We generally do not have guaranteed supply arrangements with our suppliers. Because of the variability and uniqueness of customers' orders, we do not maintain an extensive inventory of materials for manufacturing. We seek to minimize the risk of production and service interruptions and/or shortages of key parts by selecting and qualifying alternative suppliers for key parts, monitoring the financial stability of key suppliers, and maintaining appropriate inventories of key parts. Although we make reasonable efforts to ensure that parts are available from multiple suppliers, key parts may be available only from a single supplier or a limited group of suppliers. There can be no assurance that our business will not be harmed if we do not receive sufficient parts to meet our production requirements in a timely and cost-effective manner.

Operations at our primary manufacturing facilities and our assembly subcontractors are subject to disruption for a variety of reasons, including work stoppages, fire, earthquake, flooding or other natural disasters, as well as Year 2000 related problems. Such disruption could cause delays in shipments of products to our customers. We cannot ensure that alternate production capacity would be available if a major disruption were to occur, or that if it were available, it could be obtained on favorable terms. Such a disruption could result in cancellation of orders or loss of customers and could seriously harm our business.

21

Powered By EDGAR Online    2002. EDGAR Online, Inc.

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF**
**FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

INTELLECTUAL PROPERTY OBSOLESCENCE AND INFRINGEMENT. Our success is dependent in part on our technology and other proprietary rights. We own various United States and international patents and have additional pending patent applications relating to some of our products and technologies. The process of seeking patent protection is lengthy and expensive, and we cannot be certain that pending or future applications will actually result in issued patents, or that, issued patents will be of sufficient scope or strength to provide meaningful protection or commercial advantage to us. Other companies and individuals, including our larger competitors, may develop technologies that are similar or superior to our technology or design around the patents we own.

We also maintain trademarks on certain of our products and services and claim copyright protection for certain proprietary software and documentation. However, we can give no assurance that our trademarks and copyrights will be upheld or successfully deter infringement by third parties.

While patent, copyright and trademark protection for our intellectual property is important, we believe our future success in highly dynamic markets is most dependent upon the technical competence and creative skills of our personnel. We attempt to protect our trade secrets and other proprietary information through agreements with our customers, suppliers, employees and consultants and through other security measures. We also rely on trade secret protection for our technology, in part through confidentiality agreements with our employees, consultants and third parties. We also maintain exclusive and non-exclusive licenses with third parties for strategic technology used in certain products. However, these employees, consultants and third parties may breach these agreements, and we may not have adequate remedies for wrongdoing. In addition, the laws of certain territories in which we develop, manufacture or sell our products may not protect our intellectual property rights to the same extent as do the laws of the United States.

As is typical in the semiconductor equipment industry, from time to time we have received communications from other parties asserting the existence of patent rights, copyrights, trademark rights or other intellectual property rights which they believe cover certain of our products, processes, technologies or information. Our customary practice is to evaluate such assertions and consider whether to seek licenses where appropriate. Based on industry practice and prior experience, we believe that licenses or other rights, if necessary, will be available on commercially reasonable terms for existing or future claims. Nevertheless, we cannot ensure that licenses can be obtained, or if obtained will be on acceptable terms or that litigation or other administrative proceedings will not occur. The inability to obtain necessary licenses or other rights on reasonable terms could seriously harm our operating results and financial condition.

KEY EMPLOYEES. Our employees are vital to our success, and our key management, engineering and other employees are difficult to replace. We generally do not have employment contracts with our key employees. Further, we do not maintain key person life insurance on any of our employees. The expansion of high technology companies worldwide has increased demand and competition for qualified personnel. We may not be able to attract, assimilate or retain additional highly qualified employees in the future. These factors could seriously harm our business.

ACQUISITIONS. We seek to develop new technologies from both internal and external sources. As part of this effort, we may make acquisitions of, or significant investments in, businesses with complementary products, services and/or technologies. Acquisitions involve numerous risks,

22

Powered By EDGAR Online    2002,  EDGAR Online,  Inc.

including management issues and costs in connection with integration of the operations, technologies, and products of the acquired companies, possible write-downs of impaired assets, and the potential loss of key employees of the acquired companies. The inability to manage these risks effectively could seriously harm our business.

LITIGATION. From time to time we are involved in litigation which alleges infringement of intellectual property rights and other damages. This type of litigation tends to be expensive and requires significant management time and attention. In addition, if we lose in this type of litigation, a court could require us to pay substantial damages and/or royalties, prohibiting us from using essential technologies. For these and other reasons, this type of litigation could have a material adverse effect on our business, financial condition and results of operations. Also, although we may seek to obtain a license under a third party's intellectual property rights in order to bring an end to certain claims or actions asserted against us, we may not be able to obtain such a license on reasonable terms or at all.

## EFFECTS OF RECENT
## ACCOUNTING PRONOUNCEMENTS

In June 1998, the Financial Accounting Standards Board issued Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). It establishes accounting and reporting standards for derivative instruments including stand-alone instruments, such as forward currency exchange contracts and interest note swaps or embedded derivatives, such as conversion options contained in convertible debt investments and requires that these instruments be marked-to-market on an ongoing basis. We are required to adopt SFAS 133 in the first quarter of our fiscal year ending June 30, 2001. The effect of SFAS No. 133 will not be material to our financial statements.

## MARKET RISK DISCLOSURE

KLA-Tencor is exposed to financial market risks, including changes in interest rates, foreign currency exchange rates and marketable equity security prices. To mitigate these risks, we utilize derivative financial instruments. We do not use derivative financial instruments for speculative or trading purposes. All of the potential changes noted below are based on sensitivity analyses performed on our financial position at June 30, 1999. Actual results may differ materially.

At the end of fiscal 1999, we had an investment portfolio of fixed income securities of $457 million, excluding those classified as cash and cash equivalents (see Note 4 of Notes to Consolidated Financial Statements). These securities, as with all fixed income instruments, are subject to interest rate risk and will fall in value if market interest rates increase. If market interest rates were to increase immediately and uniformly by 10% from levels as of June 30, 1999, the fair value of the portfolio would decline by $8 million.

As of June 30, 1999 we had forward contracts to sell $221 million in foreign currency in order to hedge currency exposures (see Note 1 of the Notes to the Consolidated Financial Statements). The fair market value of these contracts, based on prevailing exchange rates on June 30, 1999, was $218 million. A 10% adverse move in currency exchange rates affecting the contracts would decrease the fair value of the contracts by $20 million. However, if this occurred, the fair value of the underlying exposures hedged by the contracts would increase by a similar amount. Accordingly, we believe that the hedging of our foreign currency expenses should have no material impact to the income or cash flows.

23

Powered By EDGAR Online    2002. EDGAR Online, Inc.

CONSOLIDATED BALANCE SHEETS

| June 30, (in thousands, except per share data) | 1998 | 1999 |
|---|---|---|
| ASSETS | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 215,970 | $ 271,488 |
| Short-term investments | 92,343 | 59,574 |
| Accounts receivable, net | 304,140 | 280,070 |
| Inventories | 234,565 | 195,679 |
| Deferred income taxes | 90,729 | 113,037 |
| Other current assets | 18,624 | 22,493 |
| Total current assets | 956,371 | 942,341 |
| Land, property and equipment, net | 140,937 | 168,335 |
| Marketable securities | 415,168 | 424,121 |
| Other assets | 35,921 | 50,103 |
| Total assets | $1,548,397 | $1,584,900 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Notes payable | $ 21,482 | $ 14,567 |
| Accounts payable | 46,353 | 35,249 |
| Other current liabilities | 282,848 | 302,501 |
| Total current liabilities | 350,683 | 352,317 |
| Commitments and contingencies (Note 7) | | |
| **Stockholders' equity:** | | |
| Common stock, $0.001 par value, 250,000 authorized, 87,444 and 88,682 shares issued and outstanding | 87 | 89 |
| Capital in excess of par value | 497,496 | 504,263 |
| Retained earnings | 683,836 | 723,048 |
| Accumulated other comprehensive income | 16,295 | 5,183 |
| Total stockholders' equity | 1,197,714 | 1,232,583 |
| Total liabilities and stockholders' equity | $1,548,397 | $1,584,900 |

See accompanying notes to consolidated financial statements.

Powered By EDGAR ONLINE    2002. EDGAR Online, Inc.

CONSOLIDATED STATEMENTS OF INCOME

| Year ended June 30, (in thousands, except per share data) | 1997 | 1998 | 1999 |
|---|---|---|---|
| Revenues | $1,031,824 | $1,166,325 | $843,181 |
| Costs and operating expenses: | | | |
| Cost of goods sold | 471,910 | 554,917 | 447,059 |
| Engineering, research and development | 134,105 | 181,903 | 164,699 |
| Selling, general and administrative | 219,425 | 242,400 | 199,057 |
| Non-recurring acquisition, restructuring and other charges | 60,552 | 22,474 | 42,700 |
| Total costs and operating expenses | 885,992 | 1,001,694 | 853,515 |
| Income (loss) from operations | 145,832 | 164,631 | (10,334) |
| Interest income and other, net | 28,147 | 41,680 | 60,643 |
| Income before income taxes | 173,979 | 206,311 | 50,309 |
| Provision for income taxes | 68,583 | 72,215 | 11,097 |
| Net income | $ 105,396 | $ 134,096 | $ 39,212 |
| Earnings per share: | | | |
| Basic | $ 1.29 | $ 1.58 | $ 0.45 |
| Diluted | $ 1.24 | $ 1.52 | $ 0.43 |
| Weighted average number of shares: | | | |
| Basic | 81,943 | 85,097 | 87,737 |
| Diluted | 85,203 | 88,522 | 91,672 |

See accompanying notes to consolidated financial statements.

25

Powered By EDGAR Online    2002.   EDGAR Online, Inc.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| (in thousands) | Common Stock and Capital in Excess of Par Value | | Retained Earnings | Accumulated other comprehensive income | Totals |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances at June 30, 1996 | 81,746 | $ 426,430 | $ 437,310 | $ 7,259 | $ 870,999 |
| Components of comprehensive income: | | | | | |
| Net income | -- | -- | 105,396 | -- | 105,396 |
| Change in unrealized gain on investments | -- | -- | -- | 8,388 | 8,388 |
| Currency translation adjustments | -- | -- | -- | (2,048) | (2,048) |
| Total comprehensive income | -- | -- | -- | -- | 111,736 |
| Net issuance under employee stock plans | 2,013 | 22,235 | -- | -- | 22,235 |
| Tax benefits of stock option transactions | -- | 9,643 | -- | -- | 9,643 |
| Balances at June 30, 1997 | 83,759 | 458,308 | 542,706 | 13,599 | 1,014,613 |
| Components of comprehensive income: | | | | | |
| Net income | -- | -- | 134,096 | -- | 134,096 |
| Change in unrealized gain on investments | -- | -- | -- | 8,517 | 8,517 |
| Currency translation adjustments | -- | -- | -- | (5,821) | (5,821) |
| Total comprehensive income | -- | -- | -- | -- | 136,792 |
| Net issuance under employee stock plans | 2,263 | 34,537 | -- | -- | 34,537 |
| Repurchase of common stock | (378) | (16,038) | -- | -- | (16,038) |
| Tax benefits of stock option transactions | -- | 20,529 | -- | -- | 20,529 |
| Issuance of common stock in connection with acquisition | 1,800 | 247 | 7,034 | -- | 7,281 |
| Balances at June 30, 1998 | 87,444 | 497,583 | 683,836 | 16,295 | 1,197,714 |
| Components of comprehensive income: | | | | | |
| Net income | -- | -- | 39,212 | -- | 39,212 |
| Change in unrealized gain on investments | -- | -- | -- | (14,877) | (14,877) |
| Currency translation adjustments | -- | -- | -- | 3,765 | 3,765 |
| Total comprehensive income | -- | -- | -- | -- | 28,100 |
| Net issuance under employee stock plans | 2,314 | 41,324 | -- | -- | 41,324 |
| Repurchase of common stock | (1,076) | (48,767) | -- | -- | (48,767) |
| Tax benefits of stock option transactions | -- | 14,212 | -- | -- | 14,212 |
| Balances at June 30, 1999 | 88,682 | $ 504,352 | $ 723,048 | $ 5,183 | $ 1,232,583 |

See accompanying notes to consolidated financial statements.

26

Powered By EDGAR Online    2002.  EDGAR Online, Inc.

| Year ended June 30, (in thousands) | 1997 | 1998 | 1999 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $105,396 | $134,096 | $ 39,212 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 52,340 | 38,917 | 48,217 |
| Restructuring charges | -- | -- | 35,000 |
| In-process technology | -- | 20,546 | 7,700 |
| Net gain on sale of marketable securities | -- | -- | (18,819) |
| Deferred income taxes | (17,267) | (46,225) | (27,930) |
| Changes in assets and liabilities: | | | |
| Accounts receivable | 34,859 | (57,542) | 40,898 |
| Inventories | 21,307 | (62,271) | 30,834 |
| Other assets | (11,817) | (16,951) | (15,449) |
| Accounts payable | (3,580) | 3,821 | (12,145) |
| Other current liabilities | 64,737 | 59,769 | (5,172) |
| Net cash provided by operating activities | 245,975 | 74,160 | 122,346 |
| **Cash flows from investing activities:** | | | |
| Purchase of technology and net assets | -- | (18,771) | (10,047) |
| Purchase of property and equipment | (56,793) | (64,389) | (60,736) |
| Purchases of available for sale securities | (997,283) | (915,185) | (598,170) |
| Proceeds from sale of available for sale securities | 870,391 | 825,643 | 631,188 |
| Net cash used in investing activities | (183,685) | (172,702) | (37,765) |
| **Cash flows from financing activities:** | | | |
| Issuance of common stock, net | 22,235 | 34,537 | 41,324 |
| Stock repurchases | -- | (16,038) | (48,767) |
| Net payments under short term debt obligations | (6,752) | (2,636) | (8,714) |
| Net cash provided by (used in) financing activities | 15,483 | 15,863 | (16,157) |
| Effect of exchange rate changes on cash and cash equivalents | (252) | 19,424 | (12,906) |
| Net increase (decrease) in cash and cash equivalents | 77,521 | (63,255) | 55,518 |
| Cash and cash equivalents at beginning of period | 201,704 | 279,225 | 215,970 |
| Cash and cash equivalents at end of period | $279,225 | $215,970 | $271,488 |
| **Supplemental cash flow disclosures:** | | | |
| Income taxes paid | $ 68,430 | $ 85,394 | $ 10,437 |
| Interest paid | $ 1,551 | $ 2,303 | $ 2,073 |

See accompanying notes to consolidated financial statements.

27

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1 SUMMARY OF SIGNIFICANT

ACCOUNTING POLICIES

DESCRIPTION OF THE OPERATIONS AND PRINCIPLES OF CONSOLIDATION. KLA-Tencor Corporation ("the Company") is a global provider of yield management solutions for semiconductor manufacturing and related industries. The Company has subsidiaries in the United States and in key markets throughout the world. The consolidated financial statements include the financial statements of KLA-Tencor and its wholly owned subsidiaries. All significant intercompany transactions and accounts have been eliminated.

CASH EQUIVALENTS AND INVESTMENTS. Cash equivalents consist of highly liquid investments that are valued at amortized cost, which approximates market value, and have original maturity dates of three months or less from the date of acquisition. Investments include debt and equity securities with maturities greater than three months from the date of acquisition. The Company has classified all securities as available-for-sale, as the sale of such securities may be required prior to maturity to implement management strategies. Investments classified as available-for-sale are reported at fair value with unrealized gains or losses excluded from earnings and reported as a separate component of stockholders' equity, net of applicable taxes, until realized.

INVENTORIES. Inventories are stated at the lower of cost (on a first-in, first-out basis) or market. Demonstration units are stated at their manufacturing cost and reserves are recorded to state the demonstration units at their net realizable value.

PROPERTY AND EQUIPMENT. Property and equipment are recorded at cost. Depreciation of property and equipment is based on the straight-line method over the estimated useful lives of the assets, which are 30 years for buildings, 10 years for building improvements, 5 to 7 years for furniture and fixtures, and 3 to 5 years for machinery and equipment. The life of the lease or the useful life, whichever is shorter, is used for the amortization of leasehold improvements.

CONCENTRATION OF CREDIT RISK. Financial instruments, which potentially subject the Company to credit risk, consist principally of investments, accounts receivable and financial instruments used in hedging activities.

Investments are maintained with high-quality institutions, and the composition and maturities of investments are regularly monitored by management. Generally, these securities are traded in a highly liquid market, may be redeemed upon demand and bear minimal risk. The Company, by policy, limits the amount of credit exposure to any one financial institution or commercial issuer. The Company has not experienced any material losses on its investments.

A majority of the Company's trade receivables are derived from sales to large multinational semiconductor manufacturers. Concentration of credit risk with respect to trade receivables is considered to be limited due to its customer base and the diversity of its geographic sales areas. The Company performs ongoing credit evaluations of its customers' financial condition. The Company maintains a provision for potential credit losses based upon expected collectibility of all accounts receivable.

The Company is exposed to credit loss in the event of nonperformance by counterparties on the foreign exchange contracts used in hedging activities. The Company does not anticipate nonperformance by these counterparties.

FOREIGN CURRENCY. The functional currencies of the Company's significant foreign subsidiaries are the local currencies. Accordingly, all assets and liabilities of the foreign operations are translated to U.S. dollars at current period end exchange rates, and revenues and expenses are translated to U.S. dollars using weighted average exchange rates in effect during the period. The gains and losses from foreign currency translation of these subsidiaries' financial statements are recorded directly into a separate component of stockholders' equity under the caption "Accumulated other comprehensive income." Currency transaction gains and losses have not been significant.

The Company's foreign subsidiaries operate and sell the Company's products in various global markets. As a

28

result, the Company is exposed to changes in interest rates and foreign currency exchange rates. The Company utilizes foreign currency forward exchange contracts to hedge against certain future movements in foreign exchange rates that affect certain foreign currency denominated sales and purchase transactions. The Company attempts to match the forward contracts with the underlying items being hedged in terms of currency, amount, and maturity. The Company does not use derivative financial instruments for speculative or trading purposes. Since the impact of movements in currency exchange rates on forward contracts offsets most of the related impact on the exposures hedged, these financial instruments generally do not subject the Company to speculative risk that would otherwise result from changes in currency exchange rates. Realized gains and losses on forward exchange contracts are included in interest income and other, net, which offset foreign exchange gains or losses from revaluation of foreign currency-denominated receivable and payable balances. The cash flows related to gains and losses on these contracts are classified in the same category as the hedged transactions in the Consolidated Statements of Cash Flows.

At June 30, 1999, the Company had forward exchange contracts maturing throughout fiscal 2000 and early fiscal 2001 to sell and purchase $247 million and $26 million, respectively, in foreign currency, primarily Japanese yen. At June 30, 1998, the Company had forward contracts maturing throughout fiscal 1999 and early 2000 to sell and purchase $219 million and $6 million, respectively, in foreign currency, primarily Japanese yen. Of the forward exchange contracts existing at June 30, 1999, $119 million and $12 million of contracts hedge foreign currency assets and liabilities, respectively, were carried on the consolidated balance sheet as of June 30, 1999, and consequently, the consolidated financial statements reflect the fair market value of the contracts and their underlying transactions. Contracts of $128 million and $14 million hedge firm commitments for future sales and purchases, respectively, denominated in foreign currency. The fair market value of these contracts on June 30, 1999, based upon prevailing market rates on that date, was $126 million and $13 million, respectively. As of June 30, 1999, and based on prevailing market rates on that date, the unrealized loss on each set of contracts was $1 million.

FAIR VALUE OF FINANCIAL INSTRUMENTS. The Company has evaluated the estimated fair value of financial instruments using available market information and valuation methodologies. The amounts reported as investments and bank borrowings reasonably estimate their fair value. The fair value of the Company's cash, cash equivalents, accounts receivable, accounts payable and other current liabilities approximates the carrying amount due to the relatively short maturity of these items.

REVENUE RECOGNITION. The Company recognizes revenue when the product has been shipped and collection of the resulting receivable is probable. A provision for the estimated costs of fulfilling warranty and installation obligations is recorded at the time the related revenue is recognized. Service and maintenance contract revenues are deferred and recognized ratably over the period of the related contract.

EARNINGS PER SHARE. The Company computes its earnings per share under the provisions of Statement of Financial Accounting Standards No. 128, "Earnings per Share" (EPS). Basic earnings per share is computed by dividing net income available to common stockholders by the weighted average number of common shares outstanding during the period. Diluted earnings per share is computed by using the weighted average number of common shares outstanding during the period and gives effect to all dilutive potential common shares outstanding during the period. The reconciling difference between the computation of basic and diluted earnings per share for all periods presented is the inclusion of the dilutive effect of stock options issued to employees under employee stock option plans.

Options to purchase 760,287, 1,078,708, and 674,028 shares were outstanding at June 30, 1999, 1998, and 1997 respectively, but not included in the computation of diluted EPS because the exercise price was greater than the average market price of common shares in each respective year. The exercise price ranges of these options

29

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

were $42.25 to $69.88, $48.06 to $69.88, and $33.81 to $48.31 at June 30, 1999, 1998 and 1997 respectively.

MANAGEMENT ESTIMATES. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results could differ from those estimates.

STOCK-BASED COMPENSATION PLANS. The Company accounts for its employee stock option plans and employee stock purchase plan in accordance with provisions of the Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to Employees." The Company provides additional proforma disclosure required by Financial Accounting Standard (SFAS) No. 123, "Accounting for Stock-Based Compensation" (see Note 6).

RECLASSIFICATIONS. Certain amounts in fiscal years prior to 1999 have been reclassified to conform to the 1999 financial statement presentation.

RECENT ACCOUNTING PRONOUNCEMENTS. In June 1998, the Financial Accounting Standards Board issued Statement No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). SFAS 133 establishes accounting and reporting standards for derivative instruments including stand-alone instruments, such as forward currency exchange contracts and interest note swaps or embedded derivatives, such as conversion options contained in convertible debt investments and requires that these instruments be marked-to-market on an ongoing basis. Along with the derivatives, the underlying hedged items are also to be marked-to-market on an ongoing basis. These market value adjustments are to be included either in the income statement or stockholders' equity, depending on the nature of the transaction. The Company currently only participates in hedge transactions of assets, liabilities and firm commitments and does not anticipate that the adoption of this Statement will have a material impact on the financial statements as the gains and losses on the hedge transactions offset the losses and gains on the underlying items being hedged. The Company is required to adopt SFAS 133 in the first quarter of its fiscal year ending June 30, 2001.

NOTE 2    BALANCE SHEET COMPONENTS

| June 30, (in thousands) | 1998 | 1999 |
|---|---|---|
| **Accounts receivable, net** | | |
| Accounts receivable, gross | $ 312,402 | $ 296,708 |
| Allowance for doubtful accounts | (8,262) | (16,638) |
| | $ 304,140 | $ 280,070 |
| **Inventories:** | | |
| Customer service parts | $ 31,671 | $ 41,276 |
| Raw materials | 49,630 | 45,906 |
| Work-in-process | 79,238 | 52,913 |
| Demonstration equipment | 47,234 | 37,469 |
| Finished goods | 26,792 | 18,115 |
| | $ 234,565 | $ 195,679 |
| **Property and equipment:** | | |
| Land | $ 10,687 | $ 16,187 |
| Buildings and improvements | 11,169 | 30,370 |
| Machinery and equipment | 158,317 | 183,135 |
| Office furniture and fixtures | 22,280 | 24,742 |
| Leasehold improvements | 54,440 | 64,461 |
| | 256,893 | 318,895 |
| Less: accumulated depreciation and amortization | (115,956) | (150,560) |
| | $ 140,937 | $ 168,335 |
| **Other current liabilities:** | | |
| Warranty, installation and retrofit | $ 60,008 | $ 44,665 |
| Compensation and benefits | 101,975 | 122,851 |
| Unearned revenue | 13,947 | 20,055 |
| Income taxes payable | 57,660 | 59,934 |
| Restructuring accrual | 4,586 | 16,930 |
| Other accrued expenses | 44,672 | 38,066 |
| | $ 282,848 | $ 302,501 |
| **Accumulated other comprehensive income:** | | |
| Currency translation adjustments | $ (9,813) | $ (6,048) |
| Unrealized gains on investments, net | 26,108 | 11,231 |
| | $ 16,295 | $ 5,183 |

30

**NOTE 3 NON-RECURRING ACQUISITION,**

**RESTRUCTURING AND OTHER CHARGES**

ACQUISITIONS. In December 1998, the Company purchased a confocal review station product and related technology from Uniphase Corporation for an aggregate purchase price of $3 million. Assets acquired of $3 million consisted primarily of inventory.

In November 1998, the Company purchased assets and technology from Keithley Instruments, Inc. for an aggregate purchase price of $10 million. The corona wire gate oxide monitoring tool technology we acquired had not yet reached the alpha stage and the cost to complete the development of this equipment was estimated at the time of acquisition to be $1 million. The Company recorded a charge of $8 million for purchased in-process research and development, representing the appraised value of product that was not considered to have reached technological feasibility. The calculated appraised value under the income approach used by the Company did not differ materially from the result under the percentage of completion approach currently preferred by the Securities and Exchange Commission. Net assets acquired of $1 million consisted primarily of inventory and equipment and the remaining $1 million was allocated to other intangibles including acquired technology and goodwill.

In June 1998, the Company acquired Groff Associates, Inc. (dba VARS Inc.) for an aggregate purchase price of $13 million. The digital and in-line-monitoring image archiving retrieval software technology acquired had not yet reached the alpha stage and the cost to complete the development of these software products was estimated at the time of acquisition to be $2 million. The Company recorded a charge of $13 million for purchased in-process research and development, representing the appraised value of products that were not considered to have reached technological feasibility. The calculated appraised value under the income approach used by the Company did not differ materially from the result under the percentage of completion approach currently preferred by the Securities and Exchange Commission. The in-line monitoring image archiving retrieval software technology acquired had not reached commercial feasibility as of June 30, 1999. The value of the tangible net assets acquired was nominal.

In May 1998, the Company acquired DeviceWare, Inc., a company in its development stage, for an aggregate purchase price of $3 million. The bit mapping defect characterization technology acquired had not yet reached the alpha stage and the cost to complete the development of this software product was estimated at the time of acquisition to be $1 million. The Company recorded a charge of $3 million for purchased in-process research and development, representing the appraised value of product that was not considered to have reached technological feasibility. The calculated appraised value under the income approach used by the Company did not differ materially from the result under the percentage of completion approach currently preferred by the Securities and Exchange Commission. The technology acquired had still not reached commercial feasibility as of June 30, 1999. The value of the tangible net assets acquired was nominal.

In February 1998, the Company acquired Nanopro GmbH (Freiburg, Germany) for an aggregate purchase price of $3 million. This privately-held company specialized in the development of advanced interferometric wafer inspection. The identified in-process research and development of $3 million was estimated and expensed, as technological feasibility of the viable advanced interferometric wafer technology had not yet been reached. The technology acquired had not reached commercial feasibility as of June 30, 1999. The value of the tangible net assets acquired was nominal.

Each of the above acquisitions was accounted for using the purchase method of accounting and the developmental products acquired were evaluated in the context of Interpretation 4 of SFAS No. 2 and SFAS No. 86. The allocation of the purchase price to in-process research and development cost was determined

31

Powered By EDGAR ONLINE     2002, EDGAR Online, Inc.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

by identifying research projects in areas for which technological feasibility had not been established and no alternative future uses existed. Substantially all of the in-process research and development projects acquired were expected to be complete and generating revenues within the 24 months following the acquisition date. However, development of these technologies remains a significant risk due to the remaining effort required to achieve technical feasibility, rapidly changing customer markets and significant competitive threats from numerous companies. Failure to bring any of these products to market in a timely manner could adversely affect sales and profitability of the Company in the future. Additionally, the value of net assets and other intangible assets acquired may become impaired.

In April 1998, the Company acquired Amray, Inc. (Amray) in exchange for 1,800,000 shares of its common stock accounted for under the pooling method of accounting. A privately-owned provider of scanning electron microscope systems, Amray's historical operations, net assets, and cash flows were less than 3% of the Company's consolidated financial results and, therefore, were not reflected in the consolidated financial results prior to the acquisition. The Company incurred $2 million in professional fees and restructuring charges related to this acquisition.

RESTRUCTURING AND OTHER CHARGES. In November 1998, the Company entered into a restructuring plan to address the downturn in the semiconductor industry. The plan included a consolidation of facilities, a write-down of assets associated with affected programs and a reduction in the Company's global workforce, resulting in a restructuring charge of $35 million. Restructuring costs have been assigned to four main categories including facilities, inventory, severance and benefits, and other restructuring charges. Facilities costs totaling $12 million include $8 million for lease expense resulting from consolidation and closure of certain offices located primarily in the U.S. and Japan; $3 million for leasehold improvements in those facilities; and $1 million in other facilities-related exit costs. Inventory-related costs of $10 million are assets related to unique parts and non-cancelable purchase commitments of certain development programs which were terminated as part of the realignment and streamlining of the Company's product lines. Severance and benefit-related costs totaling $8 million included involuntary termination of approximately 250 personnel from manufacturing, engineering, sales, marketing, and administration throughout the U.S., Japan and Europe during fiscal 1999. Other restructuring costs of $5 million relate primarily to the write-off of software licenses and related non-cancelable maintenance contracts for closed locations.

Payments under certain contractual obligations, which existed as of the date the plan was executed, and certain severance agreements are expected to extend into fiscal 2001. Facilities and severance payments of $8 million and $6 million, respectively, are expected to be spread fairly evenly over the next ten fiscal quarters. Inventory dispositions of $3 million are expected to be executed during the first two quarters of fiscal 2000. The following table sets forth the restructuring during fiscal 1999 (in thousands):

| | Facilities | Inventory | Severance and Benefits | Other | Total |
|---|---|---|---|---|---|
| Restructuring provision | $ 12,491 | $ 9,721 | $ 8,126 | $ 4,662 | $ 35,000 |
| Write-down of assets | (2,035) | (6,729) | -- | (3,168) | (11,932) |
| Cash expenditures | (2,109) | (409) | (2,620) | (1,000) | (6,138) |
| Balance at June 30, 1999 | $ 8,347 | $ 2,583 | $ 5,506 | $ 494 | $ 16,930 |

32

During fiscal 1997, the Company recorded charges totaling $61 million for merger, restructuring and other non-recurring events. Of this amount, $46 million was the result of the merger between KLA Instruments and Tencor Instruments on April 30, 1997, $6 million was a result of the write-off of a Tencor bad debt and $9 million was additional restructuring charges primarily related to lease exit costs incurred by Tencor Instruments prior to the merger. This restructuring plan was completed as of December 31, 1998.

**NOTE 4 INVESTMENTS**

The amortized cost and estimated fair value of securities available for sale as of June 30, 1998 and 1999, are as follows (in thousands):

| Estimated | Gross Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| **June 30, 1998** | | | | |
| U.S. Treasuries | $ 22,849 | $    102 | $     21 | $ 22,930 |
| Mortgage-backed securities | 39,951 | 567 | 76 | 40,442 |
| Municipal bonds | 414,760 | 3,649 | 140 | 418,269 |
| Corporate debt securities | 63,439 | 155 | 53 | 63,541 |
| Corporate equity securities | 10,895 | 38,292 | -- | 49,187 |
| Other | 84,727 | 139 | 233 | 84,633 |
| | 636,621 | 42,904 | 523 | 679,002 |
| Less:cash equivalents | 171,466 | 43 | 18 | 171,491 |
| short-term investments | 73,260 | 19,406 | 323 | 92,343 |
| Long-term investments | $391,895 | $ 23,455 | $    182 | $415,168 |
| **June 30, 1999** | | | | |
| U.S. Treasuries | $ 53,097 | $     85 | $    728 | $ 52,454 |
| Mortgage-backed securities | 40,522 | 51 | 421 | 40,152 |
| Municipal bonds | 386,719 | 1,358 | 2,416 | 385,661 |
| Corporate debt securities | 63,880 | 18 | 517 | 63,381 |
| Corporate equity securities | 5,931 | 21,164 | -- | 27,095 |
| Other | 93,075 | 123 | 357 | 92,841 |
| | 643,224 | 22,799 | 4,439 | 661,584 |
| Less:cash equivalents | 177,891 | -- | 2 | 177,889 |
| short-term investments | 38,361 | 21,232 | 19 | 59,574 |
| Long-term investments | $ | $ | $ 4,418 | $424,121 |

Powered By EDGAR Online, Inc. 2002

The contractual maturities of securities classified as available for sale as of June 30, 1999, regardless of the consolidated balance sheet classification, are as follows (in thousands):

```
                                              Estimated
                                              Fair
            Value
            -------------------------------------------------------
            Due within one year               $204,106
            Due after one year through five years  274,157
            Due after five years              156,226
            -------------------------------------------------------

                                              $634,489
            =======================================================
```

33

Actual maturities may differ from contractual maturities because borrowers may have the right to call or prepay obligations with or without call or prepayment penalties. The realized gains and losses for the year ended June 30, 1999 and 1998, were not material to the Company's financial position or results of operations.

## NOTE 5 INCOME TAXES

The components of income before income taxes are as follows:

| Year ended June 30, (in thousands) | 1997 | 1998 | 1999 |
|---|---|---|---|
| Domestic income before income taxes | $152,778 | $172,964 | $ 30,097 |
| Foreign income before income taxes | 21,201 | 33,347 | 20,212 |
| | $173,979 | $206,311 | $ 50,309 |

The provision (benefit) for income taxes are comprised of the following:

| Year ended June 30, (in thousands) | 1997 | 1998 | 1999 |
|---|---|---|---|
| Current: | | | |
| Federal | $ 66,439 | $ 94,402 | $ 22,902 |
| State | 10,603 | 13,598 | 7,040 |
| Foreign | 8,808 | 10,440 | 9,085 |
| | 85,850 | 118,440 | 39,027 |
| Deferred: | | | |
| Federal | (15,238) | (42,149) | (22,256) |
| State | (1,766) | (4,376) | (6,273) |
| Foreign | (263) | 300 | 599 |
| | (17,267) | (46,225) | (27,930) |
| Provision for income taxes | $ 68,583 | $ 72,215 | $ 11,097 |

34

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Actual current tax liabilities are lower than reflected above for fiscal years 1997, 1998 and 1999 by $10 million, $21 million and $14 million, respectively, due to the stock option deduction benefits recorded as credits to capital in excess of par value.

The significant components of deferred income tax assets (liabilities) are as follows:

| June 30, (in thousands) | 1998 | 1999 |
|---|---|---|
| Deferred tax assets: | | |
| Federal and state loss and credit carryforwards | $ 1,633 | $ 5,231 |
| Employee benefits accrual | 26,606 | 27,889 |
| Non-deductible reserves and other | 98,218 | 119,035 |
| | 126,457 | 152,155 |
| Deferred tax liabilities: | | |
| Depreciation | (4,625) | (6,202) |
| Unremitted earnings of foreign subsidiaries not permanently reinvested | (11,501) | (12,138) |
| Unrealized (gain) loss on investments | (15,330) | (7,104) |
| Other | (6,951) | (2,840) |
| | (38,407) | (28,284) |
| Deferred tax assets valuation allowance | (1,633) | (1,298) |
| Total net deferred tax assets | $ 86,417 | $ 122,573 |

The reconciliation of the United States federal statutory income tax rate to the Company's effective income tax rate is as follows:

| June 30, | 1997 | 1998 | 1999 |
|---|---|---|---|
| Federal statutory rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | 3.3 | 2.9 | 1.0 |
| Effect of foreign operations taxed at various rates | 0.7 | -- | 4.8 |
| Benefit from foreign sales corporation | (3.3) | (2.8) | (3.3) |
| Realized deferred tax assets previously reserved | -- | (1.4) | (0.7) |
| Merger and acquisition costs | 4.5 | 3.0 | -- |
| Tax exempt interest | (2.0) | (2.6) | (11.8) |
| Other | 1.2 | 0.9 | (2.9) |
| | ---- | ---- | ---- |
| | 39.4% | 35.0% | 22.1% |

Undistributed earnings of certain of the Company's foreign subsidiaries, for which no United States federal income taxes have been provided, aggregated $14 million at June 30, 1999. The amount of the unrecognized deferred tax expense related to the investments in foreign subsidiaries is estimated at $4 million at June 30, 1999.

The IRS is currently auditing the Company's federal income tax returns for fiscal 1995 to 1996. Management believes sufficient taxes have been provided in prior years and that the ultimate outcome of the IRS audits will not have a material adverse impact on the Company's financial position or results of operations.

**NOTE 6 STOCKHOLDERS' EQUITY AND EMPLOYEE BENEFITS**

In March 1989, the Company implemented a plan to protect stockholders' rights in the event of a proposed takeover of the Company. The Plan provides that if any person or group acquires 15% or more of the Company's Common Stock, each Right not owned by such person or group will entitle its holder to purchase, at the then-current exercise price, the Company's Common Stock at a value of twice that exercise price. The rights are redeemable by the Company and expire in April 2006.

STOCK REPURCHASE PROGRAM. In July 1997, the Board of Directors authorized the Company to systematically repurchase shares of its common stock in the open market. This plan was entered into to reduce the dilution from the Company's employee benefit and incentive plans such as the stock option and employee stock purchase plans. In fiscal 1998, 378,000 shares were repurchased under this plan at an average price of $42.43 per share. In fiscal 1999, 1,076,000 shares were repurchased under this plan at an average price of $45.32 per share. The Company has a remaining 241,600 shares authorized for repurchase under this program as of June 30, 1999.

STOCK OPTION AND INCENTIVE PLANS. The Company has various stock option and management incentive plans for selected employees, officers, directors, and consultants. The plans provide for awards in the form of stock options, stock appreciation rights, stock purchase rights,

35

and performance shares. As of June 30, 1999, only stock options have been awarded under the plans.

On August 31, 1998, employees of the Company, excluding certain executive officers, holding options with exercise prices of $28.00 or higher were granted the opportunity to surrender those options and replace them with new options having an exercise price of $21.25, the fair market value of the Company's stock on that date, and begin a new vesting schedule from the date of grant. In addition, on October 31, 1998, certain executive officers were granted the opportunity to surrender their options and replace them with a reduced number of options having an exercise price of $33.94, the fair market value on that date, and begin a new vesting schedule from the date of grant. A total of 4,179,697 options were repriced during fiscal 1999.

The activity under the option plans, combined, was as follows:

| | Available For Grant | Options Outstanding | Weighted- Average Exercise Price |
|---|---|---|---|
| Balances at June 30, 1996 | 4,395,360 | 8,860,905 | $16.70 |
| Additional shares reserved | 1,600,000 | -- | -- |
| Options granted | (4,479,879) | 4,479,879 | 30.15 |
| Options canceled/expired | 610,357 | (1,992,129) | 31.22 |
| Options exercised | -- | (1,087,689) | 8.20 |
| Balances at June 30, 1997 | 2,125,838 | 10,260,966 | 20.65 |
| Additional shares reserved | 2,501,603 | -- | -- |
| Options granted | (3,629,888) | 3,629,888 | 46.44 |
| Options canceled/expired | 751,710 | (915,914) | 30.56 |
| Options exercised | -- | (1,380,175) | 10.33 |
| Balances at June 30, 1998 | 1,749,263 | 11,594,765 | 29.11 |
| Additional shares reserved | 3,618,837 | | |
| Options granted | (7,655,613) | 7,655,613 | 24.23 |
| Options canceled/expired | 5,541,546 | (5,541,546) | 42.06 |
| Options exercised | -- | (1,494,680) | 15.41 |
| Balances at June 30, 1999 | 3,254,033 | 12,214,152 | $21.84 |

The options outstanding at June 30, 1999, have been segregated into ranges for additional disclosure as follows:

| Range of Exercise Prices | Options Outstanding | | | Options Vested and Exercisable | |
|---|---|---|---|---|---|
| | Number of Shares Outstanding at June 30, 1999 | Weighted-Average Remaining Contract Life (in years) | Weighted-Average Exercise Price at June 30, 1999 | Number Vested and Exercisable | Weighted-Average Exercise Price at June 30, 1999 |
| $ 2.35–$17.63 | 1,679,352 | 4.37 | $ 9.52 | 1,602,177 | $ 9.13 |
| $17.75–$18.63 | 1,236,633 | 5.24 | 18.57 | 1,100,448 | 18.61 |
| $18.75–$19.06 | 268,548 | 7.37 | 19.06 | 218,576 | 19.06 |
| $19.38–$21.25 | 5,716,726 | 9.16 | 21.25 | 15,593 | 20.77 |
| $21.63–$21.88 | 1,225,732 | 7.26 | 21.70 | 422,797 | 21.72 |
| $22.06–$33.94 | 1,265,071 | 8.67 | 29.95 | 193,584 | 25.54 |
| $34.06–$69.88 | 822,090 | 8.93 | 44.65 | 189,063 | 42.84 |
| $ 2.35–$69.88 | 12,214,152 | 7.81 | $21.84 | 3,742,238 | $16.52 |

The weighted average fair value of options granted in 1999, 1998 and 1997 was $14.93, $26.36 and $14.61, respectively. Options exercisable were 3,742,238, 5,111,912, and 4,592,963 as of June 30, 1999, 1998 and 1997, respectively.

EMPLOYEE STOCK PURCHASE PLAN. The Company's employee stock purchase plan provides that eligible employees may contribute up to 10% of their base earnings toward the semi-annual purchase of the Company's Common Stock. The employee's purchase price is derived from a formula based on the fair market value of the Common Stock. No compensation expense is recorded in connection with the plan. In 1999, 1998 and 1997, employees purchased 819,667, 882,869 and 925,311 shares, respectively. At June 30, 1999, 1,299,639 shares were reserved and available for issuance under this plan. The weighted average fair value of shares issued in 1999, 1998 and 1997 is $10.48, $11.20, and $7.67, respectively.

36

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Pro Forma Net Income and Earnings Per Share Pro forma information regarding net income and net income per share is required by SFAS 123, and has been determined as if the Company had accounted for its employee stock purchase plan and employee stock options granted subsequent to June 30, 1995, under the fair value method of SFAS 123. The fair value of each option grant is estimated on the date of grant using the Black-Scholes option pricing model for the single option approach with the following weighted-average assumptions:

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| Stock option plan: | | | |
| Expected stock price volatility | 50.0% | 55.0% | 65.0% |
| Risk free interest rate | 6.2% | 5.8% | 5.0% |
| Expected life of options (years) | 5.4 | 5.6 | 5.6 |
| Stock purchase plan: | | | |
| Expected stock price volatility | 50.0% | 55.0% | 65.0% |
| Risk free interest rate | 5.6% | 5.4% | 4.8% |
| Expected life of options (years) | 1-2 | 1-2 | 1-2 |

The Black-Scholes option valuation model was developed for use in estimating the fair value of traded options which have no vesting restrictions and are fully transferable. In addition, option valuation models require the input of highly subjective assumptions including the expected stock price volatility. Because the Company's employee stock option and employee stock purchase plans have characteristics significantly different from those of traded options, and because changes in the subjective input assumptions can materially affect the fair value estimate, in management's opinion, the existing models do not necessarily provide a reliable single measure of the fair value of such Company options.

For purposes of pro forma disclosures required by SFAS 123, the estimated fair value of the options is amortized to expense over the options' vesting periods.

The Company's pro forma information for the years ended June 30, 1997, 1998, 1999 follows (in thousands except for earnings per share information):

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| Pro forma net income | $89,608 | $106,882 | $ 5,278 |
| Pro forma earnings per share: | | | |
| Basic | $  1.09 | $  1.26 | $ 0.06 |
| Diluted | $  1.07 | $  1.24 | $ 0.06 |

The pro forma effect on net income and earnings per share for fiscal 1999, fiscal 1998 and fiscal 1997 is not representative of the pro forma effect net income in future years because it does not take into consideration pro forma compensation expense related to grants made prior to fiscal 1996.

Other Employee Benefit Plans The Company has a profit sharing program for eligible employees which distributes, on a quarterly basis, a

percentage of pretax profits. In addition, the Company has an employee savings plan that qualifies as a deferred salary arrangement under Section 401(k) of the Internal Revenue Code. During 1999, the Company matched dollar-for-dollar up to $500 of an eligible employee's contribution. The total charge to operations under the profit sharing and 401(k) programs aggregated $24 million, $22 million and $7 million in 1997, 1998 and 1999, respectively.

The Company has a non-qualified deferred compensation plan whereby certain key executives may defer a portion of their salary and bonus. Participants direct the investment of their account balances among mutual funds selected by the participants. Distributions from the plan commence following a participant's retirement or termination of employment. At June 30, 1999, the Company had a deferred compensation liability under the plan of $36 million.

32 KLA-TENCOR

37

## NOTE 7 COMMITMENTS AND CONTINGENCIES

The Company has an agreement with a bank to sell, with recourse, certain of its trade receivables. The total amount of the facility is the yen equivalent of $80 million based upon exchange rates as of June 30, 1999. The Company has accounted for the sale of certain of these receivables as an off-balance sheet financing arrangement. During fiscal 1999, $91 million of receivables were sold under this arrangement. As of June 30, 1999, $29 million were outstanding. The Company does not believe it is materially at risk for any losses as a result of this agreement.

In November 1997, the Company entered into a master operating lease for land, office and manufacturing facilities constructed for its use in Milpitas and San Jose, California. Monthly rent payments under this lease vary based upon the London Interbank Offering Rate (LIBOR). Under the terms of the lease, the Company, at its option, can acquire the properties at their original cost or arrange for the properties to be acquired. In April 1999, the Company chose to exercise its option to purchase certain of the land and facilities for a total aggregate value of $27 million. If the Company does not purchase the remaining properties by the end of the lease, the Company will be contingently liable to the lessor for residual value guarantees aggregating $100 million. In addition, under the terms of the lease, the Company must maintain compliance with certain financial covenants. As of June 30, 1999, the Company was in compliance with all of its covenants. Management believes that the contingent liability relating to the residual value guarantees does not currently have a material adverse effect on the Company's financial position or results of operations.

The Company leases several other facilities under operating leases that expire at various times through fiscal 2012, with renewal options at the fair market value for additional periods up to five years. The Company also leases equipment and other facilities under operating leases.

Total rent expense under all operating leases was $18 million, $18 million and $15 million for the years ended June 30, 1999, 1998 and 1997, respectively.

Future minimum lease commitments under these operating leases at June 30, 1999 (which include estimated lease payments for the Company's Milpitas and San Jose, California, facilities using a LIBOR of 5.7% and total construction costs of $119 million), are $15 million, $12 million, $12 million, $6 million, $3 million, and $8 million in fiscal 2000 through 2004 and thereafter, respectively.

## NOTE 8 SEGMENT REPORTING AND GEOGRAPHIC INFORMATION

In fiscal 1999, the Company adopted SFAS No. 131, "Disclosures about Segments of an Enterprise and Related Information." SFAS No. 131 establishes standards for reporting information about operating segments in annual financial statements and requires that certain selected information about operating segments be reported in interim financial reports. It also establishes standards for related disclosures about products and services, and geographic areas. Operating segments are defined as components of an enterprise about which separate financial information is evaluated regularly by the chief operating decision maker, or decision-making group, in deciding how to allocate resources and in assessing performance. The Company's chief operating decision makers are the Chief Executive Officer and the Chief Operating Officer. SFAS No. 131 differs from the previous accounting standard SFAS No. 14, which required companies to disclose certain financial information about each industry segment in which they operate.

38

Powered By EDGAR ONLINE   2002. EDGAR Online, Inc.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company is engaged primarily in designing, manufacturing, and marketing yield management and process monitoring systems for the semiconductor industry. All operating units have been aggregated due to their inter-dependencies, commonality of long-term economic characteristics, products and services, the production processes, class of customer and distribution processes. No single customer accounted for 10% or more of net revenues or accounts receivable in any of the periods presented.

Long-lived assets consist of net property and equipment, goodwill, capitalized software and other intangibles, and other long-term assets, excluding long-term deferred tax assets.

The Company's significant operations outside the United States include a manufacturing facility in Israel and sales, marketing and service offices in Western Europe, Japan, and the Asia Pacific region. The following is a summary of operations by entities located within the indicated geographic areas for fiscal years 1999, 1998 and 1997.

| Year ended June 30, (in thousands) | 1997 | 1998 | 1999 |
|---|---|---|---|
| **Revenues:** | | | |
| United States | $ 364,162 | $ 513,065 | $ 338,791 |
| Western Europe | 137,314 | 147,070 | 133,099 |
| Japan | 257,382 | 291,175 | 198,196 |
| Asia Pacific | 272,966 | 215,015 | 173,095 |
| Total | $1,031,824 | $1,166,325 | $ 843,181 |
| **Long-lived assets:** | | | |
| United States | $ 128,741 | $ 149,776 | $ 192,869 |
| Western Europe | 6,202 | 9,132 | 21,630 |
| Japan | 9,186 | 13,044 | 13,068 |
| Asia Pacific | 6,162 | 4,906 | 4,601 |
| Total | $ 150,291 | $ 176,858 | $ 232,168 |

**NOTE 9 SUBSEQUENT EVENT**

The Company is subject to various legal proceedings and claims, either asserted or unasserted, that arise in the ordinary course of business. On August 30, 1999, the Company was named as a defendant in a lawsuit in which the plaintiff alleges trade secret misappropriation, unfair competition and trade slander. This lawsuit is in early stages of discovery and no trial date has been set. Although the outcome of these claims cannot be predicted with certainty, management does not believe that any of these legal matters will have a material adverse effect on the Company's financial condition. Were an unfavorable ruling to occur, there exists the possibility of a material impact on the net income of the period in which ruling occurs.

Powered By EDGAR Online    2002. EDGAR Online, Inc.

NOTE 10 QUARTERLY CONSOLIDATED

RESULTS OF OPERATIONS (UNAUDITED)

| In thousands, except per share amounts | September 30 | December 31 | March 31 | June 30 |
|---|---|---|---|---|
| **Fiscal 1998:** | | | | |
| Revenues | $ 312,420 | $ 326,361 | $ 274,164 | $ 253,380 |
| Gross profit | 171,656 | 176,126 | 139,940 | 123,686 |
| Income from operations | 64,341 | 67,224 | 30,708(1) | 2,358(2) |
| Net income | 49,722 | 52,058 | 28,971(1) | 3,345(2) |
| Net income per share: | | | | |
| Basic | $ 0.59 | $ 0.61 | $ 0.34(1) | $ 0.04(2) |
| Diluted | $ 0.56 | $ 0.59 | $ 0.33(1) | $ 0.04(2) |
| **Fiscal 1999:** | | | | |
| Revenues | $ 205,230 | $ 193,371 | $ 210,939 | $ 233,641 |
| Gross profit | 92,575 | 88,462 | 100,259 | 114,826 |
| Income (loss) from operations | (2,924) | (42,674)(3) | 12,964 | 22,300 |
| Net income (loss) | 10,180 | (17,597)(3) | 20,782 | 25,847 |
| Net income (loss) per share: | | | | |
| Basic | $ 0.12 | $ (0.20)(3) | $ 0.24 | $ 0.29 |
| Diluted | $ 0.11 | $ (0.20)(3) | $ 0.22 | $ 0.28 |

(1)Includes non-recurring acquisition and restructuring charges of $3 million. Net income, basic and diluted net income per share would have been $31 million, $0.37 and $0.35, respectively, excluding these costs.

(2)Includes non-recurring acquisition and restructuring charges of $19 million. Net income, basic and diluted net income per share would have been $23 million, $0.26 and $0.26, respectively, excluding these costs.

(3)Includes non-recurring acquisition and restructuring charges of $43 million. Net income, basic and diluted net income per share would have been $10 million, $0.12 and $0.11, respectively, excluding these costs.

40

Powered By EDGAR ONLINE    2002. EDGAR Online, Inc.

**QUARTERLY COMMON STOCK MARKET PRICE**

| Fiscal 1999 Quarter ended | September 30 | December 31 | March 31 | June 30 |
|---|---|---|---|---|
| High | 32 5/16 | 45 3/4 | 61 7/8 | 64 7/8 |
| Low | 21 1/4 | 21 1/2 | 45 3/4 | 43 11/16 |

| Fiscal 1998 Quarter ended | September 30 | December 31 | March 31 | June 30 |
|---|---|---|---|---|
| High | 76 7/8 | 74 | 48 | 43 1/4 |
| Low | 48 1/4 | 33 1/2 | 33 3/8 | 24 1/4 |

The preceding table sets forth the high and low closing prices of the Company's Common Stock as traded on the Nasdaq National Market during the last two years. As of September 1, 1999, there were 1,755 shareholders of record of the Company's Common Stock. The closing price for the Company's Common Stock as reported by the Nasdaq National Market as of the close of business on September 1, 1999 was $65.25 per share. The Company has never paid cash dividends to its stockholders. The Company does not presently plan to pay cash dividends in the foreseeable future.

41

**REPORT OF INDEPENDENT ACCOUNTANTS**

To the Board of Directors and Stockholders of KLA-Tencor Corporation

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, of stockholders' equity and of cash flows present fairly, in all material respects, the financial position of KLA-Tencor Corporation and its subsidiaries at June 30, 1999 and 1998, and the results of their operations and their cash flows for each of the three years in the period ended June 30, 1999, in conformity with generally accepted accounting principles. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with generally accepted auditing standards which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

```
/s/ PricewaterhouseCoopers
LLP
-------------------------------

    PricewaterhouseCoopers LLP
```

San Jose, California

July 27, 1999, except as to Note 9, which is as of August 30, 1999

42

Powered By EDGAR ONLINE     2002. EDGAR Online, Inc.

CORPORATE INFORMATION

BOARD OF DIRECTORS

Kenneth Levy
Chairman of the Board

Kenneth L. Schroeder
President and
Chief Executive Officer

James W. Bagley
Chairman and
Chief Executive Officer
Lam Research Inc.

Edward W. Barnholt
President and Chief Executive Officer
Agilent Technologies, Inc.

Leo J. Chamberlain
Private Investor

Richard J. Elkus, Jr.
Co-Chairman, Voyan Technology and
Director, Lam Research Inc.

Dean O. Morton
Retired Executive Vice President
and Chief Operating Officer
Hewlett Packard Co.

Samuel Rubinovitz
Retired Executive Vice President
EG&G, Inc.

Dag Tellefsen
Managing Partner
Glenwood Ventures/Vision Capt.

Jon D. Tompkins
Retired Chairman
KLA-Tencor Corporation

Lida Urbanek
Private Investor

CORPORATE SECRETARY

Larry W. Sonsini
Partner
Wilson Sonsini Goodrich & Rosati

CORPORATE OFFICERS

Kenneth Levy
Chairman of the Board

Kenneth L. Schroeder
President and
Chief Executive Officer

Gary E. Dickerson
Chief Operating Officer

Robert J. Boehlke
Executive Vice President
and Chief Financial Officer

Edward C. Grady
Executive Vice President
Wafer Inspection Group

Neil Richardson, Ph.D.
Executive Vice President
E-Beam Inspection and
Metrology Group

Arthur P. Schnitzer
Executive Vice President
Customer Group

Samuel A. Harrell, Ph.D.
Senior Vice President
Strategic Business Development

J. Dennis Fortino
Group Vice President
Reticle and Surfscan Group

John H. Kispert
Vice President
Finance and Accounting

Richard P. Wallace
Group Vice President
Lithography and Films Group

SUBSIDIARY OPERATING

OFFICERS

Yasuo Mizokami
President
KLA-Tencor Japan Ltd.

Hee-June Choi
President
KLA-Tencor Korea Inc.

Russell W. Weiss
President
KLA-Tencor Europe

Avi Cohen
President
KLA-Tencor (Israel) Corporation

CORPORATE HEADQUARTERS

KLA-Tencor Corporation
160 Rio Robles
San Jose, California 95134
(408) 875-3000
www.kla-tencor.com

INTERNATIONAL OFFICES

KLA-Tencor Limited
Wokingham, United Kingdom

KLA-Tencor GmbH
Munich, Germany

KLA-Tencor France SARL
Evry Cedex, France

KLA-Tencor Limited
West Lothian, Scotland

KLA-Tencor Italy SRL
Vimercate, Italy

KLA-Tencor (Israel) Corporation
Migdal Ha'Emek, Israel

KLA-Tencor Japan Ltd.
Yokohama, Japan

KLA-Tencor Korea Inc.
Seoul, Korea

KLA-Tencor Taiwan Branch
Hsinchu, Taiwan

KLA-Tencor (Malaysia) Sdn Bhd
Selangor, Malaysia

KLA-Tencor (Singapore) Pte Ltd
Singapore

LEGAL COUNSEL

Wilson Sonsini Goodrich & Rosati
Palo Alto, California

INDEPENDENT ACCOUNTANTS

PricewaterhouseCoopers LLP
San Jose, California

TRANSFER AGENT/REGISTRAR

Boston Equiserve LLP
Boston, Massachusetts

STOCK SYMBOL

Common Stock traded on the
Nasdaq National Market under the
symbol KLAC

ANNUAL MEETING

Stockholders are invited to attend
the Annual Meeting at 11:00 am on
Tuesday, November 16, 1999 at
KLA-Tencor's Milpitas facility:
One Technology Drive, Milpitas,
California.

Additional copies of this report as well
as copies of the Company's annual
report on Form 10K for the year
ended June 30, 1999 may be obtained
at www.kla-tencor.com, by calling
(408) 875-3600, or by writing to:

KLA-Tencor Corporation
Attn: Investor Relations
160 Rio Robles
San Jose, CA 95134

43

Powered By EDGAR ONLINE   2002.  EDGAR Online, Inc.

[LOGO]

Powered By EDGAR Online    2002.  EDGAR Online, Inc.

1

**EXHIBIT 21.1**

**KLA-Tencor Subsidiaries**

| Name | State or Other Jurisdiction of Incorporation |
| ---- | ---- |
| DOMESTIC SUBSIDIARIES | |
| International Sales & Business, Inc. | California |
| KLA-Tencor Building Corporation | California |
| KLA-Tencor DISC Corporation | California |
| KLA-Tencor International Corporation | California |
| KLA-Tencor Klinnik Corporation | California |
| KLA-Tencor Management Corporation | California |
| KLA-Tencor (Thailand Branch) Corporation | California |
| VLSI Standards, Inc. | California |
| | |
| INTERNATIONAL SUBSIDIARIES | |
| KLA-Tencor (Cayman) Limited I | Cayman Islands |
| KLA-Tencor (Cayman) Limited II | Cayman Islands |
| KLA-Tencor (Cayman) Limited III | Cayman Islands |
| KLA-Tencor (Israel) Corporation | Israel |
| KLA-Tencor Holding Corporation 1987 Limited | Israel |
| KLA-Tencor Corporation 1992 Limited | Israel |
| KLA-Tencor Italy S.R.L. | Italy |
| KLA-Tencor Japan, Ltd. | Japan |
| KLA-Tencor Foreign Sales Corporation | Barbados |
| KLA-Tencor GmbH | Germany |
| KLA-Tencor France SARL | France |
| KLA-Tencor Korea, Inc. | Korea |
| KLA-Tencor Limited | United Kingdom |
| KLA-Tencor (Malaysia) Sdn Bhd | Malaysia |
| KLA-Tencor (Singapore) PTE, Ltd. | Singapore |
| KLA-Tencor (Service) Limited | United Kingdom |
| VLSI Standards, KK | Japan |
| KLA-Tencor International Trading (Shanghai) Co. Ltd. | China |
| KLA Instruments Switzerland, S.A. | Switzerland |

1

**EXHIBIT 23.1**

### Consent of Independent Accountants

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (No. 33-15784, No. 2-71584, No. 2-75314, No. 33-26002, No. 33-42973, No. 33-42982, No. 33-42975, No. 33-55362, No. 33-88662, No. 333-03003, No. 333-22939, No. 333-22941, No. 333-26681, No. 333-32537, No. 333-45271, No. 333-60887, No. 333-60883, No. 333-68423, No. 333-68415, No. 333-85121 and No. 333-85123) and in the Prospectus constituting part of the Registration Statement on Form S-3 (No. 333-52393) of KLA-Tencor Corporation of our report dated July 27, 1999 appearing on page 37 of the Annual Report to Stockholders which is incorporated in this Annual Report on Form 10-K.

```
/s/
PricewaterhouseCoopers

PricewaterhouseCoopers
LLP
```

San Jose, California
September 27, 1999

**ARTICLE 5**

THIS SCHEDULE CONTAINS SUMMARY FINANCIAL INFORMATION EXTRACTED FROM THE CONSOLIDATED STATEMENT OF OPERATIONS, THE CONSOLIDATED BALANCE SHEET AND THE ACCOMPANYING NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO SUCH FINANCIAL STATEMENTS.

MULTIPLIER: 1,000

| | |
|---|---|
| PERIOD TYPE | YEAR |
| FISCAL YEAR END | JUN 30 1999 |
| PERIOD START | JUL 01 1998 |
| PERIOD END | JUN 30 1999 |
| CASH | 271,488 |
| SECURITIES | 483,695 |
| RECEIVABLES | 296,708 |
| ALLOWANCES | 16,638 |
| INVENTORY | 195,679 |
| CURRENT ASSETS | 942,341 |
| PP&E | 318,895 |
| DEPRECIATION | 150,560 |
| TOTAL ASSETS | 1,584,900 |
| CURRENT LIABILITIES | 352,317 |
| BONDS | 0 |
| PREFERRED MANDATORY | 0 |
| PREFERRED | 0 |
| COMMON | 504,352 |
| OTHER SE | 728,231 |
| TOTAL LIABILITY AND EQUITY | 1,584,900 |
| SALES | 843,181 |
| TOTAL REVENUES | 843,181 |
| CGS | 447,059 |
| TOTAL COSTS | 447,059 |
| OTHER EXPENSES | 406,456 |
| LOSS PROVISION | 0 |
| INTEREST EXPENSE | 1,344 |
| INCOME PRETAX | 50,309 |
| INCOME TAX | 11,097 |
| INCOME CONTINUING | 39,212 |
| DISCONTINUED | 0 |
| EXTRAORDINARY | 0 |
| CHANGES | 0 |
| NET INCOME | 39,212 |
| EPS BASIC | 0.45 |
| EPS DILUTED | 0.43 |

# End of Filing

Powered By *EDGAR*    2002, EDGAR Online, Inc.