# Exhibit O

ORIGINAL

FILED

03 JUN 30  AM 10: 38

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

Debra M. Patalkis (Lead Counsel)
Lawrence A. West
Daniel H. Rubenstein
Neil J. Welch, Jr.
Nancy E. McGinley
Cory C. Kirchert
John J. Field III
Securities and Exchange Commission
450 Fifth Street, NW
Washington, D.C.  20549-0911
(202) 942-7133

Nicolas Morgan (Local Counsel) CA Bar No. 166441
Securities and Exchange Commission
5670 Wilshire Blvd., 11th Floor
Los Angeles, CA  90036-3648
(323) 965-3880

Attorneys for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

## BY  FAX

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.  03 CV |
| Plaintiff, | **'03 CV  1276 K  (LAB)** |
| v. | **COMPLAINT** |
| PEREGRINE SYSTEMS, INC., | |
| Defendant. | |

Plaintiff Securities and Exchange Commission alleges:

## SUMMARY

1.     This case involves a massive financial fraud by defendant Peregrine Systems, Inc., a publicly traded San Diego-based software company.  The purpose of the fraud was to inflate Peregrine's revenue and stock price.  To achieve its unlawful purpose, Peregrine filed materially incorrect financial statements with the Commission for 11 consecutive quarters

between April 1, 1999, and December 31, 2001.  The fraud was uncovered in April 2002, and in February 2003, Peregrine restated its financial results for its fiscal years 2000 and 2001, and for the first three quarters of fiscal 2002.  Peregrine reduced previously reported revenue of $1.34 billion by $509 million, of which at least $259 million was reversed because the underlying transactions lacked substance.

2.      Through the actions of certain of its officers and employees, Peregrine engaged in deceptive practices to artificially inflate its revenue.  The heart of the fraud was the recording of hundreds of millions of dollars of revenue despite non-binding arrangements with customers, in violation of Generally Accepted Accounting Principles (GAAP).  Among other things, material sale contingencies were secretly added by oral or written side agreement to what appeared on their face to be binding contracts.

3.      Peregrine then took fraudulent action to conceal the revenue fraud through the actions of certain of its officers and employees.  When Peregrine booked the non-binding contracts, and the customers predictably did not pay, the receivables ballooned on Peregrine's balance sheet.  To make it appear that Peregrine was collecting its receivables more quickly than it actually was, a senior officer entered into financing arrangements with banks to exchange receivables for cash.  Peregrine improperly accounted for these financing arrangements as sales of the receivables and removed them from the company's balance sheet.  There were several problems with this.  First, because Peregrine had given the banks recourse, and frequently paid or repurchased unpaid receivables from them, Peregrine should have accounted for the financing arrangements as loans and left the receivables on its balance sheet.  Second, some of the "sold" receivables were not valid because the customers were not obligated to pay Peregrine.  Third, several of the "sold" invoices were fake.  One of the fake invoices purported to reflect a $19.58

million sale. Senior employees also concealed the revenue fraud and resulting collection problem by improperly writing off receivables.

4.    By engaging in the acts alleged in this Complaint, Peregrine violated the antifraud, books and records, internal accounting controls, and reporting provisions of the federal securities laws.

## THE DEFENDANT

5.    Peregrine, a Delaware corporation with principal offices in San Diego, California, sells infrastructure management software. Its fiscal year ends March 31. From its initial public offering in April 1997 to the present, Peregrine's common stock has been registered with the Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. § 78l(g)]. It traded on the Nasdaq National Market System from its initial public offering until August 30, 2002, when it was delisted. On September 22, 2002, Peregrine filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 (Securities Act) [15 U.S.C. §§ 77t(b), 77t(d), and 77v (a)], and Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].

7.    Venue properly lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Peregrine inhabits and transacts business in this judicial district, because offers and sales of the securities at issue in this case took place in this judicial district, and because certain of the acts and transactions constituting the violations in this case occurred within this judicial district.

8.    Peregrine made use of the means and instrumentalities of interstate commerce in connection with the acts alleged in this Complaint.

9.    The Commission requests that the Court permanently enjoin Peregrine from engaging in further violations; impose civil penalties upon it; and order it to pay disgorgement, plus prejudgment interest.

## PEREGRINE'S REVENUE INFLATION SCHEME

10.    Following its initial public offering in April 1997, Peregrine reported 17 consecutive quarters of revenue growth through the quarter ended June 30, 2001.  During this period, Peregrine's publicly reported financial results met or exceeded analysts' expectations, and the company's stock price increased from $2.25 per share (split-adjusted) to as high as $79.50 per share on March 27, 2000.

11.    Beginning in or about the quarter ended June 30, 1999, to meet or exceed quarterly revenue forecasts, Peregrine "parked" significant amounts of its software with resellers known as channel partners.  Peregrine did this when it was unable to complete direct sales it was negotiating (or hoping to negotiate) with end-users, but needed revenue to achieve its forecasts. The channel partners often were not obligated to pay Peregrine.  In many cases, senior Peregrine officers, its sales personnel and channel partners knew, through secret oral or written side agreements, that:  (1) the channel partners were not obligated to pay Peregrine, but that Peregrine would later negotiate sales to end-users and arrange for the payment to "flow through" them; (2) the channel partners had 30 days or more to back out of the software license contracts; or (3) if the channel partners were unable to resell Peregrine's software licenses, they could invoice Peregrine for "services" in a dollar amount equal to what they had not resold.

12.    These arrangements did not qualify for revenue recognition, because GAAP (in particular, American Institute of Certified Public Accountants' (AICPA) Statement of Position (SOP) 97-2) required that Peregrine satisfy the following four criteria before recognizing revenue on the sale of its software:  (a) persuasive evidence of an arrangement must exist, (b) delivery must have occurred, (c) the vendor's fee must be fixed or determinable, and (d) collectibility must be probable.  Certain senior Peregrine officers, and sales and finance personnel, understood the revenue recognition rules that applied to software sales, and they knew, or were reckless in not knowing, that these rules prohibited revenue recognition on many transactions for which Peregrine recorded revenue.

13.    Peregrine used other deceptive practices to inflate the company's revenue.  To convince certain customers to purchase Peregrine's software, Peregrine entered into reciprocal agreements with them, including nonmonetary transactions, sometimes referred to as barters or swaps.  Under certain circumstances it is appropriate to recognize revenue on nonmonetary transactions.  However, Peregrine recognized revenue on transactions that did not satisfy the applicable revenue recognition rules, either because (a) Peregrine did not intend to use the product it purchased, (b) Peregrine was merely exchanging software inventory for resale, or (c) there was no vendor-specific objective evidence to support valuation.  Certain senior Peregrine officers, and sales and finance personnel, understood the revenue recognition rules that applied to nonmonetary transactions, and they knew, or were reckless in not knowing, that these rules prohibited revenue recognition on many transactions for which Peregrine recorded revenue.

14.    In other reciprocal transactions, Peregrine essentially paid for its customers' software purchases.  Peregrine invested stock or cash in customers.  Contemporaneously, the customers agreed to purchase Peregrine software.  Peregrine's investments in its customers

COMPLAINT - 5

enabled them to pay Peregrine for the "receivables." The net effect was a "round trip" of cash or stock from Peregrine to the customer, then cash (or proceeds from selling Peregrine stock) back to Peregrine to pay for purported receivables. Certain senior Peregrine officers, and sales and finance personnel, knew, or were reckless in not knowing, that Peregrine's investments in certain customers were not economically justified, but instead were a ploy to allow Peregrine to record revenue without placing the customers at financial risk.

15.    Peregrine routinely kept its books open after fiscal quarters ended, and improperly recorded as revenue, for the prior quarter, software transactions that were not consummated until after quarter end. On one or more occasions, certain Peregrine officers characterized these transactions—in their communications with each other—as having been completed on "the 37th of December." In some cases, transactions did not close for months after Peregrine had recorded revenue for them. Certain senior Peregrine officers, and sales and finance personnel, knew, or were reckless in not knowing, that these practices did not comply with the applicable revenue recognition rules.

## PEREGRINE COVERED UP THE SCHEME

16.    As a result of the revenue inflation scheme, Peregrine accumulated millions of dollars of aging receivables, some of which were bogus, on its balance sheet. Large aged accounts receivable were not being paid and, as a result, days sales outstanding (DSO) and other important indicators of Peregrine's financial health were deteriorating.

17.    DSO is the average number of days it takes a company to collect its accounts receivable. It is an analytical tool used by financial analysts and investors to track the age of a company's aggregate accounts receivable and to assess the quality of a company's receivables

and, ultimately, its revenue. The common formula for calculating DSO is accounts receivable divided by average daily sales.

18.    Peregrine removed receivables from its balance sheet by selling them to banks at quarter end. Each quarter, Peregrine's senior treasury manager calculated the dollar amount of receivables she needed to sell to manage the DSO number down to the target range senior management had set for her. After the senior treasury manager sold the receivables for cash, Peregrine removed them from its balance sheet. This practice reduced Peregrine's DSO to the level prescribed by senior management.

19.    Financing receivables, in itself, is not illegal. However, Peregrine abused the receivables financing process to conceal the revenue recognition scheme. By 1999, Peregrine had agreed with the banks that Peregrine would collect the receivables from its customers, and then pay the banks. Peregrine also gave the banks recourse on the receivables. As a result, when Peregrine's customers did not pay Peregrine, Peregrine often paid the banks itself (without informing them that Peregrine, rather than Peregrine's customer, had paid), or repurchased the uncollected receivables. Through certain of its officers and employees, Peregrine knew, or was reckless in not knowing, that some of the purported receivables it sold to banks should never have been recorded as revenue, that the banks had recourse on the receivables, and that Peregrine sometimes repurchased receivables from the banks.

20.    The receivables Peregrine "sold" to banks did not qualify for off–balance-sheet treatment under the applicable accounting rules. Accordingly, in its February 2003 restatement, Peregrine added a loan balance of $141.6 million to its March 31, 2002 balance sheet. Peregrine explained this addition as follows: "Peregrine sold, or factored, receivables to multiple financial institutions over the past three years. Peregrine recorded these factoring transactions as true

COMPLAINT - 7

sales of receivables recording the cash received and removing the related receivables from the balance sheet, as if the risk of collection loss had passed to the buyer without recourse. However, based on the terms of the factoring agreements and based on past servicing practices of the Company, these accounts receivable factoring arrangements should have been recorded as loans instead of sales of receivables." Through certain of its officers and employees, Peregrine knew, or was reckless in not knowing, that—because the risk of collection loss had not passed from Peregrine to the banks—it should never have removed the receivables from its balance sheet.

21.    Although required by applicable accounting rules, Peregrine did not properly disclose this off-balance-sheet financing in its financial statements.  For example, in the last Form 10-Q Peregrine filed before the fraud was uncovered, it made the following minimal, but false, disclosure about its receivables financing:  "The Company may at times market certain client receivable balances <u>without recourse</u>."  (Emphasis supplied.)

## PEREGRINE SOLD FALSE INVOICES TO BANKS

22.    To increase Peregrine's cash balance and lower its DSO, Peregrine sold false invoices to banks.  As the June 30, 1999 quarter came to a close, Peregrine had sold all available receivables but still needed to reduce DSO to make the target senior management set to avoid alerting investors to Peregrine's poor collections.  Peregrine prepared invoices for several million dollars in transactions that had not closed, and then sold a bank the "receivables" that the invoices supposedly represented.  However, not all of the contracts closed, leaving Peregrine with a shortfall of several million dollars.

23.    In June 2001, Peregrine concluded that it would miss the target DSO number because its receivables were approximately $20 million too high.  Its senior treasury manager,

with senior management's approval and encouragement, created a false $19.58 million invoice and sold it to a bank. Peregrine's chief financial officer signed and submitted to the bank a Form of Sale and Assignment in which he falsely represented that the invoice reflected a valid receivable. As a result, Peregrine's financial statements and books and records overstated Peregrine's cash flow from operations, and understated its accounts receivable and liabilities to the banks.

## PEREGRINE IMPROPERLY ACCOUNTED FOR CASH COLLECTIONS

24.     Peregrine further falsified its balance sheet and DSO by improperly accounting for cash collected from customers. Peregrine and the banks buying its receivables agreed that even after Peregrine sold the banks the receivables, Peregrine would collect the receivables and then remit payment to the banks within a certain time period. Thus there was generally a permissible lag time between the date Peregrine collected cash and the date Peregrine had to remit payment to the banks. Peregrine's practice was to reduce accounts receivable when Peregrine sold a receivable to a bank. Then, if and when Peregrine collected the receivable, its senior treasury manager would reduce the accounts receivable again by the amount of the collection. When this practice resulted in Peregrine's holding money at quarter end, the senior treasury manager called it the "double dip," because Peregrine had already taken the receivable off its books. In addition, Peregrine would fail to increase accounts payable to reflect its liability to the bank, and would record the cash as its own, instead of holding it in trust as required by the banks.

25.     When the double dip occurred, Peregrine's reported receivables and DSO were artificially reduced, and its cash was overstated. In the following quarter, when Peregrine remitted the cash to the banks, Peregrine would reverse the double dip entries. Peregrine double

1  dipped almost every quarter, beginning in September 1999. One of the most egregious examples

2  of the quarter-end double dip occurred in the third quarter of 2002. On December 11, 2001, a

3  Peregrine customer made an early payment of $13.8 million on a receivable that Peregrine had

4  sold to a bank. The payment was not actually due from the customer until February 12, 2002.

5  Although Peregrine's contract with the bank required Peregrine to remit customer payments

6  within two weeks and to hold them in trust, Peregrine did neither. As a result, Peregrine's

7  reported cash at quarter-end was overstated by $13.8 million, and its accounts receivable were

8  understated by $13.8 million.

9
10
11                **PEREGRINE IMPROPERLY WROTE OFF RECEIVABLES**

12      26.     As the dollar amount of uncollectible—primarily sham—receivables increased in

13  the first quarter of fiscal 2001 (the quarter ended June 30, 2000), Peregrine improperly wrote off

14  receivables that, through its officers and employees, it knew, or was reckless in not knowing,

15  should not have been recorded as revenue in the first place. Although Peregrine, through officers

16  and employees, knew the write-offs had nothing to do with acquisitions, to conceal them from

17  investors, Peregrine improperly recorded them as "Acquisition Costs & Other" expense in its

18  income statement. Peregrine's write-offs of sham receivables to acquisition-related accounts

19  further misled investors because it did not include these write-offs in its disclosed pro forma

20  operating results. The write-offs appeared on Peregrine's income statement as one-time charges

21  rather than expenses from operations. During the first three quarters of fiscal 2001, Peregrine

22  buried approximately $12 million in uncollectible—primarily sham—receivables in this way.

23      27.     In the last quarter of fiscal 2001 (the quarter ended March 31, 2001), Peregrine

24  exploited its acquisition of the company Extricity to conceal sham receivables from public view.

25  That quarter Peregrine improperly wrote off $30 million in receivables to the "Acquisition Costs

26
27
28

& Other" expense line item of Peregrine's income statement.  Through its officers and employees, Peregrine knew at the time, that (a) a substantial portion of these receivables should not have been recorded as revenue in the first place, (b) the receivables were not impaired as a result of the Extricity acquisition, and therefore (c) it was inappropriate to make it appear to the investing public that the write-off related to a non-recurring event.

28.     In the quarter ended September 2001, Peregrine exploited its acquisition of Remedy Corporation to write off $26.65 million to the "Acquisition Cost & Other" expense line item, and $16.93 million to a balance sheet item called "Remedy Acquisition Accrual."  Through its officers and employees, Peregrine knew at the time that (a) a substantial portion of these receivables should not have been recorded as revenue in the first place, and (b) the receivables were not impaired as a result of the Remedy acquisition, and therefore (c) it was inappropriate to make it appear to the investing public that the write-off related to a non-recurring event.

## PEREGRINE IMPROPERLY ACCOUNTED FOR STOCK OPTIONS

29.     Peregrine improperly failed to record a compensation expense when it issued incentive stock options.  At each quarterly Board meeting, Peregrine's Board of Directors approved the total number of stock options that could be granted to employees before the next quarterly Board meeting.  Peregrine then allocated the options to employees during the quarter, but did not price the options until the day after the next quarterly Board meeting.  On that day, Peregrine's Stock Administrator looked back at the market price of Peregrine's stock between the two quarterly Board meetings, to find the lowest price at which Peregrine's stock had traded.  That is where Peregrine set the stock option exercise price, to benefit those who received the stock options.  Peregrine's then outside auditors knew that this was how Peregrine was pricing its options.  Under the applicable accounting rules, any positive difference in the stock price

between the exercise price and that on the measurement date (here, the date on which the Stock Administrator looked back) had to be accounted for as compensation expense.  By failing to record the compensation expense, Peregrine understated its expenses by approximately $90 million.

## PEREGRINE FAILED TO MAINTAIN ADEQUATE BOOKS AND RECORDS

30.     Peregrine failed to maintain adequate books and records to support its financial statements.  For example, Peregrine did not maintain detailed accounts receivable sub ledgers that reconciled to the company's general ledger.  Nor did Peregrine maintain a detailed sales journal that reconciled to the general ledger.  Peregrine used a "back of the envelope" system to track and record license revenue.  Instead of appropriately using Peregrine's computerized accounting system, company personnel used a spreadsheet, known as the "Revenue Report," to record license revenue.  At the end of each quarter, Peregrine personnel recorded a manual entry to force the general ledger to match the Revenue Report, but did not reconcile the variance—sometimes greater than $10 million—between the general ledger and the Revenue Report.

## PEREGRINE'S OFFERS AND SALES OF SECURITIES DURING THE FRAUD

31.     Between 1999 and 2002, Peregrine repeatedly offered and sold equity securities in order to acquire corporations and other assets.  In 2000, Peregrine offered and sold debt securities to investors, to raise capital for Peregrine.  Peregrine's registration statements and offering prospectuses for these transactions included Peregrine's materially false financial statements.

COMPLAINT - 12

## FIRST CLAIM

### Peregrine Violated Securities Act Section 17(a), Exchange Act Section 10(b) and Exchange Act Rule 10b-5
### [Financial Fraud]

32.     Paragraphs 1 through 31 are realleged and incorporated herein by reference.

33.     Peregrine knowingly or recklessly made misrepresentations and omissions of fact with the intent of materially misstating its publicly reported financial results.

34.     By reason of the foregoing, Peregrine violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5[1]].

## SECOND CLAIM

### Peregrine Violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)
### [Books and Records and Internal Controls Violations]

35.     Paragraphs 1 through 31 are realleged and incorporated herein by reference.

36.     Peregrine failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

37.     Peregrine failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

38.     By reason of the foregoing, Peregrine violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

---

[1] 2002 ed., p. 60, promulgated 12/22/48, as amended 8/11/51.

COMPLAINT - 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## THIRD CLAIM

**Peregrine Violated Exchange Act Section 13(a) and Exchange Act
Rules 12b-20, 13a-1, and 13a-13
[Reporting Violations]**

39.    Paragraphs 1 through 31 are realleged and incorporated herein by reference.

40.    Peregrine included financial statements that were not presented in conformity with GAAP in its annual, quarterly, and other reports filed with the Commission from the first quarter of fiscal year 2000 (the period ended June 30, 1999) through the third quarter of fiscal year 2002 (the period ended December 31, 2001).

41.    By reason of the foregoing, Peregrine violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20[2], 240.13a-1[3], and 240.13a-13[4]].

## RELIEF REQUESTED

WHEREFORE, Plaintiff Securities and Exchange Commission respectfully requests that this Court:

### I.

Issue an order of permanent injunction restraining and enjoining Peregrine, and its agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with it, and each of them, from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78j(b), 78m(a),

---

[2]  2002 ed., p. 112, promulgated 2/13/65.
[3]  2002 ed., p. 128, promulgated 7/24/97.
[4]  2002 ed., p. 132, promulgated 5/12/77, as amended 5/3/83, 7/9/85, 3/13/89, 3/27/92, and 6/14/96.

COMPLAINT - 14

78m(b)(2)(A), and 78m(b)(2)(B)], and Exchange Act Rules 10b-5, 12b-20, 13a-1, and 13a-13

[17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13].

**II.**

Order Peregrine to disgorge, with prejudgment interest, all ill-gotten gains resulting from its conduct described in this complaint.

**III.**

Order Peregrine to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

**IV.**

Grant such other and further relief as this Court may deem just and proper.

Dated: June 30, 2003

Debra M. Patalkis (Lead Counsel)
Lawrence A. West
Daniel H. Rubenstein
Neil J. Welch, Jr.
Nancy E. McGinley
Cory C. Kirchert
John J. Field III
Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC 20549-0911
Telephone: (202) 942-7133  (Patalkis)
Facsimile:  (202) 942-9581

Local Counsel:

Nicolas Morgan
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036-3648
Telephone: (323) 965-3877
Facsimile: (323) 965-3908

COMPLAINT - 15

## INSERT TO IV

This is a securities enforcement action alleging (a) financial fraud under 15 U.S.C. § 78(b) and 17 C.F.R. § 240.10b-5; (b) insider trading under 15 U.S.C. § 78(b), 17 C.F.R. § 240.10b-5 and 15 U.S.C. §77q(a); (c) aiding and abetting books and records, internal controls and reporting violations under 15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a and 240.13a, and 15 U.S.C. § 78m(b)(2)(A) and § 78m(b)(2)B, and 15 U.S.C. § 78(b)f; and (d) misleading and issuer's auditors under 17 C.R.F. § 240.13b2-2.