# Exhibit P

EDWIN H. NORDLINGER (EN-6258)
Acting Regional Director
Northeast Regional Office
SECURITIES AND EXCHANGE COMMISSION
233 Broadway
New York, New York 10279
(646) 428-1630

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN - 3 2004 ★
BROOKLYN OFFICE

---

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

-against-

SYMBOL TECHNOLOGIES, INC.,
TOMO RAZMILOVIC, KENNETH JAEGGI,
LEONARD GOLDNER, BRIAN BURKE,
MICHAEL DEGENNARO, FRANK BORGHESE,
CHRISTOPHER DESANTIS, JAMES
HEUSCHNEIDER, GREGORY MORTENSON,
JAMES DEAN, and ROBERT DONLON,

    Defendants.

Civil Action No. 04 · 2276
WEXLER, J.
COMPLAINT WALL, M.J.

---

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against defendants Symbol Technologies, Inc. ("Symbol"), Tomo Razmilovic ("Razmilovic"), Kenneth Jaeggi ("Jaeggi"), Leonard Goldner ("Goldner"), Brian Burke ("Burke"), Michael DeGennaro ("DeGennaro"), Frank Borghese ("Borghese"), Christopher DeSantis ("DeSantis"), James Heuschneider ("Heuschneider"), Gregory Mortenson ("Mortenson"), James Dean ("Dean") and Robert Donlon ("Donlon"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1. From at least 1998 until as recently as February 2003, Symbol and the individual defendants, together with other former Symbol executives, engaged in a wide array of fraudulent accounting practices and other misconduct that had a cumulative net impact of over $230 million on Symbol's reported revenue and over $530 million on its reported pre-tax earnings. Symbol is a leading supplier of mobile information systems that employ handheld computers and wireless networks for barcode and other data capture technology. Defendant Razmilovic, Symbol's former president and CEO, and others at the company fostered an aggressive "numbers driven" corporate culture obsessed with meeting financial projections. To boost Symbol's stock price, Razmilovic imposed and demanded compliance with unrealistic revenue and other targets, and other executives knew that he expected them to achieve those figures by any means necessary.

2. The fraudulent practices through which Symbol manipulated its reported financial results included: (a) a so-called "Tango sheet" process through which fraudulent "topside" accounting entries were made to conform the unadjusted quarterly results to management's projections; (b) the fabrication and misuse of restructuring and other non-recurring charges to artificially reduce operating expenses, create "cookie jar" reserves and further manage earnings; (c) channel stuffing and other revenue recognition schemes, involving both product sales and customer services; and (d) the manipulation of inventory levels and accounts receivable data to conceal the adverse side effects of the revenue recognition schemes. Along with defendants Jaeggi, Symbol's former CFO, and Burke, a former chief accounting officer at Symbol and later the head of worldwide operations, Razmilovic signed Symbol's periodic reports with knowledge that those reports and the corresponding press releases misrepresented Symbol's financial results.

2

3. While the accounting fraud was occurring, defendant Goldner, Symbol's former general counsel, manipulated stock option exercise dates without regard to the stated terms of Symbol's stock option plans to enable certain senior executives, including himself, to profit unfairly at the company's expense. Capitalizing on the extended period in effect before July 30, 2002 for filing the forms on which executives were required to report stock purchases, Goldner "cherry picked" the exercise date during this period so as to reduce the cost of the exercise to the executive. Rather than using the actual exercise date as defined by the option plans, Goldner instituted, without board approval or public disclosure, a practice of using a more advantageous date chosen from a 30-day "look-back" period to calculate the cost of the exercise. Under this fraudulent practice, the exercise was usually deemed to have occurred on the date with the second most advantageous market price during the "look-back" period, though Razmilovic sometimes received the date with the most advantageous price.

4. Each defendant besides Goldner played a prominent role in Symbol's fraudulent accounting practices. Jaeggi and Burke directed the "Tango sheet" process, and Razmilovic approved proposed adjustments to reserves and other items that were set forth in schedules that they and others at Symbol referred to as "Tango sheets." These adjustments lacked any factual basis, grossly violated generally accepted accounting principles ("GAAP") and were made for the purpose of manipulating the raw data to match the forecasts given to analysts and Symbol's board of directors. Defendant DeGennaro, Symbol's senior vice president of corporate finance during the latter part of the fraud, was also involved in the quarterly Tango sheet process.

5. Jaeggi, Burke and DeGennaro also directed the manipulation and fabrication of restructuring charges and reserves. Symbol took large non-recurring charges in connection with an acquisition and the relocation of its manufacturing operations that were fraudulent because

3

they contained fictitious costs, improperly included numerous unrelated operating expenses and otherwise violated GAAP. Symbol also created a number of "cookie jar" reserves by overstating inventory write-offs and inflating accrued expenses when actual operating costs fell below the quarterly forecast. Symbol reversed these excess reserves when necessary to increase earnings in future periods. Defendant Dean, an operations finance director, carried out these schemes at the direction of Jaeggi, Burke and DeGennaro and knew that their purpose was to manage earnings by artificially reducing operating expenses and creating improper "cookie jar" reserves.

6. Defendant Borghese, Symbol's former head of sales, spearheaded the revenue recognition fraud. Whenever actual sales fell short of Razmilovic's target, Borghese stuffed the distribution channel by granting resellers return rights and contingent payment terms in side agreements that he negotiated or authorized. In some quarters, he used three-way "round trip" transactions involving both resellers and distributors, known at Symbol as "candy" deals, to create additional phony revenue. In addition, Borghese employed multiple schemes for claiming revenue before it was earned, such as shipping the wrong product when the product ordered by the customer was unavailable. Defendants DeSantis, Mortenson and Donlon worked under Borghese and, together with other sales executives, implemented his revenue recognition schemes. In a related scheme that Burke originated, Mortenson and Donlon also caused revenue to be recognized in several quarters on shipments that did not occur until the next quarter. To conceal this premature recognition of revenue, Mortenson and Donlon, acting at the direction of Borghese and others, secured backdated phony "bill and hold" letters from the customers.

7. Razmilovic, Jaeggi and DeGennaro were also directly involved in the revenue fraud. Jaeggi participated in negotiating an extensive warehousing arrangement with a large foreign distributor that served as a vehicle for improperly recognizing several millions of dollars

of revenue over multiple quarters, and he approved payments made to resellers to induce them to participate in Borghese's three-way "candy" deals. With DeGennaro's assistance, Razmilovic negotiated a quarter-end "swap" transaction whereby Symbol exchanged multi-million dollar wire transfers and products with a software company to boost sales revenue. When Symbol's "days sales outstanding" ("DSO") figure -- a measure of how rapidly a company collects cash from customers -- increased as a result of its fraudulent revenue recognition practices, Jaeggi and DeGennaro directed a scheme to reduce outstanding accounts receivable, including the undisclosed reclassification of past due trade receivables into notes receivable.

8.  Defendant Heuschneider, finance director for Symbol's customer service division, artificially inflated the service revenue reported by Symbol. He reacted to the pressure from senior management by directing subordinates to make multimillion dollar fraudulent entries that improperly accelerated revenue recognition on existing service contracts. Heuschneider also fabricated revenue by improperly "renewing" dormant or cancelled service contracts without the customer's approval.

9.  Jaeggi, Burke and DeSantis also engineered the schemes to suppress Symbol's reported inventory levels, a carefully watched metric for manufacturers like Symbol. Among other things, they directed employees to refrain from scanning new components or returned goods into the automated accounting system. Burke and DeSantis also directed an employee to make fictitious accounting entries eliminating inventory accruals. In addition, Burke arranged transactions with third parties to make it appear that Symbol had sold inventory when, in fact, Symbol retained possession of the goods.

10.  The fraudulent accounting practices and manipulation of stock option exercise dates had a material impact on Symbol's reported financial results. Symbol recently restated

5

most of the financial results it originally reported from 1998 through September 30, 2002, including its annual financial statements for 2000 and 2001. The restatement touched upon virtually every single line item of the annual and quarterly financial statements at issue.

11. In addition to committing securities fraud, some of the defendants interfered with two internal investigations into Symbol's accounting practices and impeded the Commission's investigation. After the Commission began its investigation, Jaeggi directed subordinates to discard copies of Tango sheets and other incriminating documents. During the same relevant period, DeGennaro rigged the revenue recognition data provided to the forensic accountants involved in the first internal inquiry, instructed subordinates to withhold or delay providing information to subsequent internal investigators, and directed an employee to sanitize key portions of schedules that the employee intended to provide to the investigators.

12. By virtue of the foregoing conduct, each of the defendants, directly or indirectly, singly or in concert, has engaged in acts, practices and courses of business that constitute violations, or give rise to liability for violations, of the federal securities laws and rules and regulations thereunder, as follows:

(a) Symbol violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2) and 78n(a)] and Rules 10b-5, 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9];

(b) Razmilovic violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and

he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Symbol's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and he is further liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person for Symbol's violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

(c)     Jaeggi violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Symbol's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and he is further liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person for Symbol's violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

(d)     Goldner violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(b)(5) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5)] and 78p(a)] and Rules 10b-5, 13b2-1 and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.16a-3]; and he is also liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person for Symbol's violations of Sections 13(a), 13(b)(2), and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2) and 78n(a)] and Rules 12b-20, 13a-1 and

13a-13, 14a-3 and 14a-9 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9];

(e) Burke violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Symbol's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and he is further liable, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], as a controlling person for Symbol's violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13];

(f) DeGennaro violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting Symbol's violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78(m)(b)(2)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13]; and

(g) Borghese, DeSantis, Heuschneider, Mortenson, Dean and Donlon each violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1]; and each one of them is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and

abetting Symbol's violations of Sections 10(b), 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78(m)(b)(2)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

13.  Unless the defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

14.  The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], and seeks to restrain and enjoin the defendants from engaging in the acts, practices, transactions and courses of business alleged herein. The Commission also seeks an order: (a) requiring the defendants to disgorge the ill-gotten gains received as a result of the violations for which they are liable and, where indicated, pay prejudgment interest on those amounts; (b) requiring the defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, as to Razmilovic, Jaeggi, Goldner and Burke, also pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and (c) prohibiting Razmilovic, Jaeggi, Goldner, Burke, DeGennaro and Borghese from acting as an officer or director of a public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and, as to Razmilovic, Jaeggi, Goldner and Burke, also pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

15.  This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

16. The defendants, directly and indirectly, have made use of the means or instrumentalities of, or the means or instruments of transportation or communication in, interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein. Some of these transactions, acts, practices and courses of business occurred in the Eastern District of New York.

## THE DEFENDANTS

17. During the time of the transactions and events alleged herein, **Symbol** was, and remains: (a) a Delaware corporation with principal offices in Holtsville, New York; (b) engaged in the design, manufacture, marketing and servicing of mobile information systems using bar code scanners and similar devices; and (c) a public company whose common stock is traded on the New York Stock Exchange and registered with the Commission pursuant to Section 12(b) of the Exchange Act.

18. **Razmilovic**, age 62, was Symbol's President and Chief Operating Officer from 1995 through June 2000. From July 2000 until his resignation in February 2002, Razmilovic was President and Chief Executive Officer. He was also a member of the Board of Directors from 1995 until his departure.

19. **Jaeggi**, age 58, was Symbol's Chief Financial Officer from 1997 until his forced resignation in December 2002.

20. **Goldner**, age 56, was Symbol's Secretary and General Counsel from 1990 until his resignation in June 2003. In June 2001, he was also promoted to Executive Vice President from Senior Vice President. Before joining Symbol, he was a partner for ten years at a major corporate law firm.