1  MARC J. FAGEL (Cal. Bar No. 154425)
   SUSAN F. LaMARCA (Cal. Bar No. 213251)
2   lamarcas@sec.gov
   MARK P. FICKES (Cal. Bar No. 178570)
3   fickesm@sec.gov
   JEREMY E. PENDREY (Cal. Bar No. 187075)
4   pendreyj@sec.gov
   ELENA RO (Cal. Bar No. 197308)
5   roe@sec.gov

6  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
7  44 Montgomery Street, Suite 2600
   San Francisco, California  94104
8  Telephone:  (415) 705-2500
   Facsimile:  (415) 705-2501

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                  SAN JOSE DIVISION

13

14  SECURITIES AND EXCHANGE COMMISSION,        Case No. C-07-4431-RMW (HRL)

15              Plaintiff,

16         vs.                                 **SECURITIES AND EXCHANGE
                                               COMMISSION'S OPPOSITION TO
                                               MOTION TO DISMISS THE FIRST
17  LISA C. BERRY,                             AMENDED COMPLAINT**

18              Defendant.                     Date:  August 15, 2008
                                               Time:  9:00 a.m.
19                                             Location:   Courtroom 6, 4th Floor
                                                           Hon. Ronald M. Whyte
20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................... 1

II.     ISSUES TO BE DECIDED ........................................................................ 2

III.    PROCEDURAL BACKGROUND ............................................................. 2

IV.     SUMMARY OF PERTINENT FACTS ALLEGED IN THE
        COMMISSION'S FAC ............................................................................... 3

        A.      Defendant's Role In Authoring False Periodic Reports at
                Juniper .......................................................................................... 4

        B.      Defendant's Role in Creating Juniper's False Proxy
                Statements ..................................................................................... 5

        C.      Defendant Prepared Juniper's False Current Reports and
                Registration Statements ................................................................ 7

        D.      Defendant's Role In Authoring KLA's False Filings ................... 7

        E.      Defendant Concealed Her Scheme, Despite the Commission's
                Diligence ....................................................................................... 8

V.      ARGUMENT ............................................................................................. 9

        A.      The FAC Specifically and Adequately Alleges Defendant's
                Primary Liability for Misrepresentations and Material
                Omissions of Fact ....................................................................... 10

                1.      Defendant Is Primarily Liable for Her Substantial and
                        Intricate Involvement in Misrepresentations ................. 11

                2.      Defendant Is Primarily Liable for Misleading Filings
                        She Signed ...................................................................... 17

        B.      The FAC Alleges the Same Well-Pled Bases for Scheme
                Liability ....................................................................................... 18

        C.      The FAC Adequately and Appropriately Alleges Berry's
                Liability for Aiding and Abetting Misrepresentations and
                Omissions in Proxy Statements .................................................. 20

        D.      Application of the Doctrine of Equitable Tolling to the Facts
                Pled in the FAC Renders All of Defendant's Unlawful
                Conduct Subject to Civil Penalties ............................................. 21

V.     CONCLUSION..................................................................................................... 24

# TABLE OF AUTHORITIES

PAGE

CASES

*Branch v. Tunnell*,
  14 F.3d 449 (9th Cir. 1994) ................................................................................. 10

*Cahill v. Liberty Mut. Ins. Co.*,
  80 F.3d 336 (9th Cir. 1996) ............................................................................ 10, 18

*Cooper v. Pickett*,
  137 F.3d 616, 623-24 (9th Cir. 1998) ................................................................. 11

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ............................................................................... 10

*Galbraith v. County of Santa Clara*,
  307 F.3d 1119 (9th Cir. 2002) ............................................................................. 10

*Hobson v. Wilson*,
  737 F.2d 1 (D.C. Cir. 1984) ................................................................................. 23

*Holmberg v. Armbrecht*,
  327 U.S. 392 (1946) ............................................................................................ 23

*Howard v. Everex Systems, Inc.*,
  228 F.3d 1057, 1061-62 (9th Cir. 2000) ........................................................ 11, 17

*In re CNET Networks, Inc. Deriv. Litig.*,
  No. C-06-03817 WHA (N.D. Cal. Apr. 11, 2007)
  (Alsup, J.), 2007 WL 1089690 ........................................................................... 19

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) ............................................................................... 10

*In re Software Toolworks Inc. Securities Litig.*,
  50 F.3d 615 (9th Cir. 1994) ........................................................... 1, 11, 13, 14

*In re UnitedHealth Group PSLRA Litig.*,
  (D. Minn. June 4, 2007), Slip op.,
  2007 WL 1621456 ............................................................................................... 20

*In re Zoran Corp. Deriv. Litig.*,
  511 F. Supp.2d 986 (N.D. Cal. 2007) .................................................................. 11

*In re ZZZZ Best Securities Litig.*,
  864 F. Supp. 960 (C.D. Cal. 1994) ................................................................ 13, 14

*Iolab Corp. v. Seaboard Sur. Co.*,
  15 F.3d 1500 (9th Cir. 1994) ........................................................................... 10, 18

*Moore v. Kayport Package Exp., Inc.*,
  885 F.2d 531 (9th Cir. 1989) ........................................................................... 11, 12

*Santa Maria v. Pacific Bell*,
    202 F.3d. 1170 (9th Cir. 2000) ................................................................................. 23

*SEC v. Alexander*,
    2007 WL 2816195 (Sept. 26, 2007) ......................................................................... 23

*SEC v. Baxter*,
    No. C-05-03843 RMW (N.D. Cal. Jul. 11, 2007),
    2007 WL 2013958 ............................................................................................. 11, 13

*SEC v. Druffner*,
    353 F. Supp.2d 141 (D. Mass. 2005) ....................................................................... 21

*SEC v. Gann*,
    2006 WL 616005 (N.D. Tex. 2006) .......................................................................... 21

*SEC v. Holschuh*,
    694 F.2d 130 (7th Cir. 1982) .............................................................................. 11, 16

*SEC v. Jones*,
    476 F. Supp.2d 374 (S.D.N.Y. 2007) ....................................................................... 23

*SEC v. Rana Research, Inc.*,
    8 F.3d 1358 (9th Cir. 1993) ..................................................................................... 19

*SEC v. Trabulse*,
    526 F.Supp.2d 1001 (N.D. Cal. 2007) ............................................................ 11, 18, 19

*State of New York v. Hendrickson Brothers, Inc.*,
    840 F.2d 1065 (2d Cir. 1988) ................................................................................... 23

*Stoneridge Investment Partners, LLC v.
    Scientific-Atlanta, Inc.*,
    128 S.Ct. 761 (2008) ................................................................................................ 19

*Union Carbide Corp. Cons. Prod. Bus. Sec. Lit.*,
    676 F. Supp. 458 (S.D.N.Y. 1987) ........................................................................... 13

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ................................................................................ 11, 15

*Wool v. Tandem Computers, Inc.*,
    818 F.2d 1433 (9th Cir. 1987) .................................................................................. 12

STATUTES

15 U.S.C. § 78(b) ........................................................................................................... 2

15 U.S.C. § 78u(a) ....................................................................................................... 23

15 U.S.C. § 80a-30(b) .................................................................................................. 23

28 U.S.C. § 2462 ..................................................................................................... 2, 10

<u>RULES</u>

Fed. Rule Civ. Proc. 9(b) .......................................................................................... 12

<u>REGULATIONS</u>

17 C.F.R. § 240.10b-5 ................................................................................................ 2

17 C.F.R. § 240.14a-9 .............................................................................................. 22

## I.    INTRODUCTION

The Securities and Exchange Commission's First Amended Complaint details a years-long scheme by defendant Lisa Berry to defraud shareholders of two successive public companies, by creating false option paperwork to justify granting "in-the-money" options to employees and executives at the companies and concealing the true costs the company incurred from the shareholders.  Defendant Berry accomplished her fraud by sitting as a gatekeeper for the shareholders – the senior legal officer first of KLA Tencor, and then of Juniper Networks.  She abused her position of trust, devising fraudulent schemes, drafting each company's public filings with the Commission that misrepresented their stock options programs, and creating false records that were the basis of their announced financial results.  The Commission's First Amended Complaint ("FAC") makes abundantly clear how defendant misled shareholders:  how at each company she backdated stock option grants and then hid the true cost of the stock options from other persons, including the companies' shareholders, their auditors, and the Commission.

Defendant once again challenges the Commission's allegations.  This time defendant argues that she should not be held accountable for the misrepresentations she created because she did not sign many of the documents in which her falsehoods were contained.  However, the controlling authority in the Ninth Circuit does not provide for a free pass for authors of fraudulent statements who do not sign the corporate disclosures.  *In re Software Toolworks Inc. Securities Litig.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994).  The defendant also complains that the additional facts alleged in the FAC about the important ways in which Berry controlled the drafting process for filings, such as periodic reports of the companies' financial results on Forms 10-K and 10-Q, somehow weaken the fraud case the Court already found well-pled.  Her complaint in this regard is nonsensical, and finds no support in the law.  Finally, defendant takes issue with the Commission's additional pleading of specific facts regarding her concealment of her fraud that equitably tolled the statute of limitations that applies to the Commission's request for civil penalties against her.  Her arguments in this regard, however, are grounded in her unwillingness to accept the well-pled facts about her fraud and concealment as true – a requirement on any motion to dismiss.  Consequently, each of defendant's latest arguments fails and the Court should deny her motion in its entirety.

## II.    ISSUES TO BE DECIDED

1.    Whether the FAC's specifications of defendant's substantial and intricate involvement in creating misrepresentations and omissions contained in two public companies' public filings sufficiently pleads securities fraud.

2.    Whether the Court's prior ruling that the Commission had pled scheme liability with sufficient particularity should stand.

3.    Whether the FAC's allegations of defendant's fraudulent concealment, and the Commission's failure to uncover her fraud despite its diligence adequately pleads facts sufficient for an equitable tolling of 28 U.S.C. § 2462 such that civil monetary penalties may be assessed based on conduct that occurred more than five years before the filing of the complaint.

## III.    PROCEDURAL BACKGROUND

On August 28, 2007, the Commission brought this action under the federal securities laws to enforce defendant's compliance with the antifraud and related provisions of the securities laws, and to obtain certain remedial relief.  The original complaint alleged that beginning in approximately 1997 and continuing through 2003, while serving as the top legal officer of two successive public companies, Berry carried out a scheme to backdate stock options granted to employees and executives and authored materially false representations about compensation and expenses in public reports Juniper and KLA made to their respective shareholders, and to the Commission.  The Commission's complaint was instituted based on two investigations, during each of which Berry declined to answer questions based on her Fifth Amendment privilege against self incrimination.

On November 19, 2007, defendant moved to dismiss the complaint, noticing a hearing on her motion for February 15, 2008.  On May 7, 2008, the Court issued the Order Granting in Part and Denying in Part Ms. Berry's Motion to Dismiss.  In the Order, this Court considered and ruled upon three separate bases alleged for defendant's liability under Section 10(b) of the Exchange Act, 15 U.S.C. § 78(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5:  defendant's primary liability for misrepresentations and omissions of material fact; defendant's primary liability for deceptive acts in contribution to an overall scheme to defraud; and defendant's liability as an aider and abetter of fraudulent conduct.  The Court found that the Commission's complaint adequately alleged the two

1   latter bases for liability, stating in particular, with respect to scheme liability: "As alleged, Ms. Berry

2   falsified stock option grants at both KLA and Juniper to avoid properly accounting for compensation

3   charges. The overall scheme was deceptive, and Ms. Berry's alleged contribution was fraudulent.

4   Accordingly, the SEC's first claim for securities fraud does adequately allege a "scheme" theory of

5   liability." Order at 17.

6          Although the Court also found that the complaint required further specificity in order to

7   support the claim that defendant was primarily liable for misrepresentations and omissions in certain

8   public filings by Juniper and KLA, the Court provided a road map for the Commission to follow in

9   amending its complaint, if it so chose.  The Court also permitted the Commission to amend the

10  complaint to include allegations in support of the equitable tolling of the statute of limitations for any

11  conduct that occurred prior to five years before the institution of the action.  However, the Court

12  made clear that the application of the statute of limitations was limited to the Commission's request

13  for a penalty against the defendant.

14         On June 6, 2008, the Commission filed the FAC, adding the specific allegations, as described

15  below, detailing how defendant authored the false statements and was primarily responsible for

16  omissions in public filings by Juniper and KLA regarding stock options.  In addition, as also

17  described below, the Commission included new allegations regarding the defendant's concealment of

18  her fraud, and the Commission's inability to discover her fraud notwithstanding its diligence.  The

19  Commission otherwise left its allegations regarding defendant's scheme to defraud as originally pled.

20  **IV.     SUMMARY OF PERTINENT FACTS ALLEGED IN THE COMMISSION'S FAC**

21         As described in the original complaint, and as alleged without change in the FAC, from mid-

22  1997 through mid-1999 when she left KLA, Berry orchestrated a scheme to grant backdated stock

23  options to employees and executives, in order to create the false appearance that the options were

24  issued "at-the-money" without the necessity for the company to recognize an expense. Comp., ¶¶ 4,

25  25-27, 32, 34; FAC, ¶¶ 4, 25-27, 32, 34.  Then, from mid-1999 through mid-2003, Berry orchestrated

26  a similar scheme at Juniper.  Comp., ¶¶ 47, 48, 53-55, 61; FAC, ¶¶ 52, 53, 58-60, 66.  Berry was able

27  to carry out each scheme based on her unique role in overseeing the stock option granting process at

28  both companies.  Thus, at Berry's recommendation, Juniper's board established and delegated its

1  authority to a Stock Option Committee, with Berry as a member throughout her tenure at Juniper.

2  Comp., ¶ 47; FAC, ¶ 52.  Berry also supervised Juniper's stock administrator, created so-called

3  "minutes" of stock option committee meetings (that did not actually occur), and signed the meeting

4  minutes as a committee member.  Comp., ¶¶ 48, 50, 53; FAC, ¶¶ 53, 55, 58.  Similarly, at KLA,

5  Berry oversaw the administration of the stock option grant process, and directed human resource and

6  stock administration department employees to prepare the stock option grant approval paperwork,

7  and even provided instructions to employees on how to backdate stock option grants so that they

8  could carry on with the scheme after she left KLA.  Comp., ¶¶ 23-24, 34; FAC, ¶¶ 23-24, 34.

9  **A.    Defendant's Role In Authoring False Periodic Reports at Juniper**

10         The additional factual allegations in the FAC spell out Berry's substantial and intricate

11  involvement in preparing Juniper's annual and quarterly reports that contained the false

12  representations and omissions of material fact regarding the company's stock options.  In particular,

13  the FAC alleges that "Berry was responsible for, controlled and managed the drafting and preparation

14  of the Forms 10-K.  She made sure all tasks associated with preparing the Forms 10-K were

15  completed.  She reviewed all sections of the Forms 10-K before they were filed and weighed in

16  where changes needed to be made."  FAC, ¶ 67.  The FAC makes substantially similar allegations

17  regarding defendant's role in the preparation of Juniper's quarterly reports on Forms 10-Q filed for

18  the quarter ended September 30, 1999, through the second quarter of the fiscal year 2003.  *Id.*, ¶ 70.

19  In addition, with respect to both the annual and quarterly reports, "Berry also communicated with

20  Juniper's auditors on issues of concern to the auditors."  *Id.*, ¶¶ 67, 70.  As the FAC specifies:

21         Juniper's CFO relied on Berry to confirm that the Forms 10-K were prepared properly.
       Juniper's CFO, and Juniper's SEC Reporting Manager, both relied on Berry to identify
22     and correct any inaccuracies in the Forms 10-K concerning Juniper's stock option-
       related disclosures.  Berry was the person involved in the 10-K preparation process who
23     knew Juniper had backdated stock options and was the person expected to ensure the
       accuracy of such disclosures, but Berry did not correct Juniper's inaccurate disclosures
24     about stock options nor did she inform others involved in the Form 10-K preparation
       process that Juniper's stock option related disclosures were false."
25

26  FAC, ¶ 67.  *See Id.*, ¶ 70 (substantially similar allegations regarding Berry's role in preparing

27  Juniper's false Forms 10-Q).  As the FAC also explains, Berry controlled the means by which the

28  false information was injected into Juniper's financial statements:  "Once Berry selected a backdated

1   grant date and a corresponding exercise price, she informed Juniper's stock administrator, who then

2   entered the grants into Juniper's stock option tracking software using the backdated date as the grant

3   date. Juniper did not reflect in its books an expense related to the in-the-money portion of the

4   options." *Id.*, ¶ 56.[1]

5       The FAC thus makes clear that Berry was a primary author of the material misrepresentations

6   contained in Juniper's financial statements about the expenses the company incurred in granting

7   options. The FAC further details specific falsehoods and omissions, in addition to the false expense

8   information, contained in each of its Forms 10-K filed with the Commission for fiscal years 1999

9   through 2002, which Berry substantially and intricately authored. Juniper thus stated in its Forms 10-

10  K that "[i]ncentive stock options are granted at an exercise price of not less than the fair value per

11  share of the common stock on the date of grant," and that "no nonstatutory stock options have been

12  granted for less than fair market value on the date of the grant." FAC, ¶ 48. The company also

13  affirmatively represented that it accounted for its employee stock option plans in accordance with

14  generally accepted accounting principles ("GAAP"), and that it had elected to follow a particular

15  GAAP provision, known as APB 25, "[b]ecause the exercise price of the Company's stock options

16  equals the market price of the underlying stock on the date of grant, no compensation expense is

17  recognized." *Id.*, ¶ 49. As the FAC alleges, Berry was the person relied upon within the company to

18  ensure the accuracy of such disclosures, but she failed to do so. *Id.*, ¶ 67.

19      **B.      Defendant's Role in Creating Juniper's False Proxy Statements**

20      The FAC further describes four proxy statements announcing Juniper's annual meetings of

21  shareholders that "Berry drafted, edited and signed as Juniper's General Counsel," including by

22  "work[ing] with Juniper's finance department to draft the compensation data that each of these proxy

23  ───────────────
    [1]   According to the FAC, by preparing and signing meeting minutes that falsely represented the

24  dates of stock option grants to make it appear as though Juniper was not required to record an
    expense for its backdated options, "Berry circumvented Juniper's internal controls over the stock

25  option granting process and reporting of expenses." FAC, ¶ 73. Berry's false minutes were used,
    first, by Juniper's stock administrator to record grant dates in Juniper's books and records. *Id.*

26  Then, Juniper's auditors relied on them (as well as the books prepared from them) "to test the
    accuracy of Juniper's stock option compensation expenses in connection with their reviews and

27  audits of Juniper's financial statements." *Id.*

28

statements contained." FAC, ¶ 50. The statements falsely described options granted to officers, by misrepresenting that "options are granted at fair market value on the date of grant." One of the statements also falsely responded to a shareholder proposal by stating that *employees* at Juniper who had been awarded stock options "have a right to purchase stock in the future at a price which is the fair market value on the date of the stock option grant." *Id*. Moreover, the defendant, according to the FAC, "was also responsible for, controlled and managed the drafting of Juniper's proxy statements announcing annual meetings of shareholders, which she signed as Juniper's General Counsel. When asked in testimony about her role in preparing Juniper's periodic Commission filings and proxy statements, Berry asserted her Fifth Amendment privilege and refused to testify." *Id*. at 51. The FAC further clarifies that, although the stock option committee to which Berry belonged "did not have authority to grant stock options to senior executive officers, Berry did in some instances price grants to such executives with the benefit of hindsight, such as when the Stock Option Committee had been granted such authority by Juniper's Compensation Committee for a particular grant or when a grant was later ratified by Juniper's Board of Directors." *Id*., ¶ 52.

According to the FAC, at the same time Juniper filed these proxy statements, Berry engineered backdated grants to executives, and then engaged in other conduct to cover her tracks. The complaint details, for instance, a backdated grant to "a large group of existing employees and *executive officers* (and to certain new hires), which it called an "evergreen" grant, using the backdated grant date of October 4, 1999." *Id.*, ¶ 61 (emphasis supplied). In reality, "no one determined to grant the employees and *officers* options that day"; instead Berry created the false minutes reflecting the October 4, 1999 date and stock price approximately one month later. *Id*. (emphasis supplied). She then "subsequently caused Juniper's board of directors to be falsely informed that the grant had been made on October 4, 1999," and "the Board ratified the portion of the grant to *executive officers*." *Id*. (emphasis supplied). The FAC therefore alleges that the proxy statement "filed with the Commission on April 13, 2000," was false due to Berry's backdating. *Id.*, ¶ 50. Indeed, the FAC further describes how "Berry backdated 'pool' grants Juniper made seven times between 2000 and 2003 (which also included certain grants to *senior executives* and new hires)." *Id*., ¶ 62. The FAC specifies how a particular "pool" grant, made around early January 2001, "us[ed] the

1  backdated grant date of December 21, 2000.  The grant included options granted to senior executives

2  because, on November 8, 2000, Juniper's Compensation Committee had met and authorized the

3  Stock Option Committee to price grants to senior executives at its next meeting."  *Id.*, ¶ 63.  The

4  proxy statement that incorporated this grant, filed with the Commission on April 11, 2002, was

5  therefore also false.  *Id.*, ¶ 50.

6  ### C.    Defendant Prepared Juniper's False Current Reports and Registration Statements

7

8  The FAC also describes how Berry authored false statements and was primarily responsible

9  for omissions of material fact from three current reports on Forms 8-K filed with the Commission.

10  The Forms 8-K were false and misleading because they announced financial results based on the

11  company's "failure to record compensation expenses associated with undisclosed grants of in-the-

12  money stock options."  FAC, ¶ 71.  "As Juniper's General Counsel, Berry decided if and when the

13  company should file Form 8-K's.  Berry also was responsible for and controlled their preparation in

14  that she determined what information each Form 8-K that contained these false representations

15  should contain."  *Id.*  Similarly, the FAC details six registration statements filed on Forms S-8 during

16  Berry's tenure as General Counsel of Juniper which were materially false and misleading.  *Id.*, ¶ 72.

17  As the FAC states, "Berry was responsible for the preparation of and reviewed each of these

18  registration statements filed on Form S-8.  Berry also prepared and signed a legal opinion filed as an

19  exhibit to each Form S-8 described above that stated that Juniper had authorized the issuance of the

20  shares."  *Id.*

21  ### D.    Defendant's Role In Authoring KLA's False Filings

22  Likewise, while at KLA:

23  Berry was the driving force behind finalizing the preparation of drafts of KLA's annual
   reports, quarterly reports, registration statements on Forms S-8 and proxy statements filed
24  with the Commission.  Berry coordinated edits to such documents which she received from
   other persons or offered herself, and organized the final drafts of such documents that were
25  filed with the Commission.  As KLA's General Counsel, Berry thus controlled the drafts
   and the final products for each of these filings.  She had a significant role and frequently
26  acted as the final decision maker regarding any changes to these drafts.  Berry was the
   person ultimately in charge of ensuring the completion of KLA's SEC filings, including the
27  reporting of securities acquired, disposed of, or beneficially owned by KLA executives.

28  FAC, ¶ 40.

1        Just as she did at Juniper, Berry authored the original false statements regarding the dates of

2   grants and the purported "fair market value" of KLA's stock, which wended their way into KLA's

3   books and records again at the direction of Berry.  FAC, ¶ 26.  She thus owned the process for

4   granting stock options leading up to the preparation of the financial statements, and she controlled the

5   drafts and final product that was publicly filed with her false information.  As the top legal officer,

6   and a gatekeeper for financial statements and public filings at KLA, as she was at Juniper, Berry bore

7   responsibility as an author of the false representations and omissions included in each of the public

8   filings.

9        **E.**     **Defendant Concealed Her Scheme, Despite the Commission's Diligence**

10        As the FAC sets forth, Berry's entire scheme relied heavily on her use of false documents to

11   conceal the true dates on which she determined to grant options, and the true "fair market value" of

12   each company's securities on those dates.  Berry thus "failed to inform Juniper's Audit Committee of

13   the true nature of how the company priced employee and executive stock options" (FAC, ¶ 73); Berry

14   did not correct Juniper's inaccurate disclosures about stock options nor did she inform others

15   involved in the Form 10-K [and Form 10-Q] preparation process that Juniper's stock option related

16   disclosures were false" (*Id.*, ¶¶ 67, 70); and although Juniper's CFO and its SEC Reporting Manager

17   "both relied on Berry to identify and correct any inaccuracies in the Forms 10-K [and Forms 10-Q]

18   concerning Juniper's stock option-related disclosures" and although "Berry also communicated with

19   Juniper's auditors on issues of concern to the auditors," she did not inform those persons that the

20   disclosures to shareholders were false (*Id.*, ¶¶ 67, 70).  Similarly, while at KLA, Berry did not inform

21   various persons who relied on the stock option granting records that she helped to create, "including

22   KLA's outside auditor and the Audit Committee of its board of directors, that stock option grants

23   were priced at KLA with the benefit of hindsight."  *Id.*, ¶ 44.  Indeed, the FAC states that "[w]hen

24   KLA employees questioned the human resources department about the delays in receiving grant

25   pricing information, Berry instructed at least one employee in the department to tell other employees

26   that options would be priced at the next meeting of KLA's Stock Option Committee."  *Id.*

27   Consequently, persons who needed to know the truth – each company's outside auditors and the

28

1  companies' respective shareholders – were kept in the dark about her stock options backdating

2  scheme.

3      Indeed, it was not until May 2006, when the audit committee of Juniper's board of directors

4  and a special committee of KLA's board of directors each announced that they had begun to

5  investigate their respective company's historical options granting practices, that the accuracy of the

6  companies' financial statements was called into question.  FAC, ¶¶ 43, 45, 74.  Even then, "Berry's

7  preparation of grant documentation that falsely represented the date on which stock options were

8  actually granted to employees and executives concealed the true grant dates of these options."  *Id*., ¶

9  44.  *See also Id*., ¶ 75.  During each company's internal investigation, Berry refused to answer

10  questions by the representatives of their boards' investigating committees.  *Id*., ¶¶ 45, 76.   As the

11  FAC makes clear, "the Commission diligently pursued its own investigation" into the options

12  granting practices at each company; "however, owing to Berry's concealment of the routine use of

13  hindsight to price options" at each company, "the extent and cause of the inaccuracy in [each

14  company's] filings could only be uncovered with intensive inquiry."  *Id*., ¶¶ 45, 76.  And the

15  defendant did not aid in the investigations. Rather, she asserted her Fifth Amendment privilege

16  against self-incrimination when asked how stock options at each company were priced and granted.

17  *Id*., ¶¶ 45, 76.

18  **V.    ARGUMENT**

19      Notwithstanding the significant detail set forth in the Commission's FAC describing how

20  Berry engaged in a scheme to backdate options at two companies, and then ensured through her

21  control of the company's filings that her fraud would become part of each company's representation

22  to shareholders, Berry again asserts that the Commission's allegations lack sufficient particularity for

23  her to prepare an answer.  She attempts to minimize the detailed information about how Berry

24  controlled the drafting process for the filings by quoting only part of the Commission's allegations

25  and then declaring that the conduct described was not sufficiently "substantive."  See Motion at 7-8.

26  However, her attempts to minimize her role by ignoring the actual allegations fail.

27      Below, we set forth precisely how Berry authored the false statements, from the beginning of

28  the options granting process through the filing of the false periodic reports, and registration and proxy

1    statements.  The new facts described in the FAC add detail sufficient to state a claim for her primary

2    liability for fraudulent representations and omissions.  We next address Berry's inappropriate attempt

3    to relitigate the sufficiency of the Commission's claims that she is primarily liable for her role in a

4    fraudulent scheme and for aiding and abetting the filing of false proxy statements.  Finally, we

5    address how the newly-pled facts in the FAC establish the equitable tolling of 28 U.S.C. § 2462, and

6    set straight the law on which defendant purports to rely in challenging the sufficiency of the

7    Commission's allegations of fraudulent concealment and the Commission's diligence.

8           Because defendant once again asks the Court to stray from the actual FAC, and make

9    conclusions inconsistent with the allegations, the legal standards applying to motions to dismiss

10   under Federal Rule of Civil Procedure 9(b) bear mentioning.  In ruling on a motion to dismiss, all

11   material allegations of the complaint must be taken as true and construed in the light most favorable

12   to the nonmoving party.  *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 340 (9th Cir. 1996).  And all

13   reasonable inferences must be drawn in the plaintiff's favor.  *Iolab Corp. v. Seaboard Sur. Co.*, 15

14   F.3d 1500, 1504 (9th Cir. 1994).  Although, pursuant to Rule 9(b), the Commission's complaint must

15   plead with particularity the circumstances constituting the fraud, *Fecht v. Price Co.*, 70 F.3d 1078,

16   1082 (9th Cir. 1995), "[w]e do not test the evidence at this stage."  *In re GlenFed, Inc. Sec. Litig.*, 42

17   F.3d 1541, 1547 (9th Cir. 1994).[2]

18       **A.    The FAC Specifically and Adequately Alleges Defendant's Primary Liability for**
             **Misrepresentations and Material Omissions of Fact**
19

20          Persons who knowingly sign a document containing a material misrepresentation or omission

21   of fact may be liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 as a primary

22   _____

23   [2]  Because the Court must consider the Commission's factual allegations as true, the Court generally
     "may not consider any material beyond the pleadings."  *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.
24   1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.
     2002).  Exceptions may be made for documents specifically cited in the complaint, which are relevant
25   to the issues presented in the motion.  However, there is no basis for looking outside these documents
     and the FAC to take "judicial notice" or otherwise consider materials not relied upon in the FAC nor
26   in any way relevant to the Court's consideration.  Accordingly, the Commission objects to the
     defendant's Request for Judicial Notice to the extent it seeks to introduce extraneous and irrelevant
27   materials not referenced in the FAC; in particular, the Court should decline to take notice of Exhibits
     K through Q.
28

1  violator.  *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000).  Also, a person

2  who does not sign the document, but is substantially or intricately involved in the preparation of the

3  false statement or omission, is liable for a primary violation.  *In re Software Toolworks Inc. Securities*

4  *Litig.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994).   Moreover, a person who makes a false statement

5  that is then communicated publicly by another is also primarily liable for fraud.  *Cooper v. Pickett*,

6  137 F.3d 616, 623-24 (9th Cir. 1998); *SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982); *SEC v.*

7  *Trabulse*, 526 F.Supp.2d 1001, 1007 (N.D. Cal. 2007) (citing  *Warshaw v. Xoma Corp.,* 74 F.3d 955,

8  959-60 (9th Cir. 1996)).  Ninth Circuit precedent rejects any "bright line" test dividing defendants

9  who sign false financials from those who author but do not sign them.  In either event, the

10  defendant's liability depends on whether she "substantially participated" or had "intricate

11  involvement" in the preparation of the fraudulent statements.  "'[S]ubstantial participation or intricate

12  involvement in the preparation of fraudulent statements is grounds for primary liability even though

13  that participation might not lead to the actor's actual making of the statements.'  Furthermore,

14  employees and directors who sign or prepare financial disclosures can be held liable for

15  misstatements and omissions therein." *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp.2d 986, 1011

16  (N.D. Cal. 2007) (citing *Howard v. Everex Sys., Inc.,* 228 F.3d at 1061 n.5).

### 1.   Defendant Is Primarily Liable for Her Substantial and Intricate Involvement in Misrepresentations

19       As this Court reiterated in the Order on defendant's original motion to dismiss, "[f]inalizing a

20  document for another executive to sign may suffice" to hold a person primarily liable for false

21  statements in the document.  Order at 15 (citing *In re Software Toolworks*, 50 F.3d at 628 & n.3).

22  Furthermore, as this Court has previously stated in denying a motion to dismiss a financial fraud:

> [T]he Ninth Circuit has recognized that it is difficult to attribute particular fraudulent conduct to each defendant individually in cases where corporate fraud is alleged. . . . Therefore, "[t]o overcome such difficulties in cases of corporate fraud, the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations."

27  *SEC v. Baxter*, No. C-05-03843 RMW (N.D. Cal. Jul. 11, 2007), 2007 WL 2013958 at *6 (quoting

28  *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir. 1989)).  Of course, these typical

challenges are made more difficult here, where the defendant has refused to answer any questions regarding her involvement based on her privilege against self-incrimination.[3]  Notwithstanding these challenges, the Commission's complaint presents a complete narrative, from beginning to end, of Berry's personal involvement in preparing and filing the annual and quarterly reports to shareholders containing the false statements for which she is chiefly responsible.

As an example, Berry's substantial role in the misrepresentations contained in the 1999 annual report filed on Form 10-K begins with her doctoring of the underlying stock option grants. On November 5, 1999, Berry prepared options grant documentation for a large "evergreen" grant to existing employees, to executive officers, and to certain new hires as well.  FAC, ¶ 61.  However, rather than indicate that the grant was actually made on that November 5 date – when Juniper's stock price closed at approximately $273.13 per share – Berry backdated the grant to a date about a month earlier, October 4, 1999.  *Id.*  She selected October 4 as Juniper's stock had hit a quarterly low of $182.13, and she used that lower closing price as the supposed fair market value of Juniper's stock on the date of the grant which was therefore selected as the strike price for the options.  *Id.*  Berry then created the stock option committee meeting "minutes" that falsely represented that the committee, including her and two other persons, had met on October 4, 1999; she then signed the false "minutes" as a member and obtained actual or stamped signatures from the other two members.  *Id.*, ¶¶ 54-55. Berry thus created in-the-money grants for the numerous executives, current and new employees who received the evergreen grant.

Her involvement did not end there, however.  Berry oversaw the stock administration function at Juniper, through which options grants were recorded in the company's books.  FAC, ¶ 53.  Berry provided the information in the meeting "minutes" to Juniper's stock administrator, who then entered the grants into Juniper's stock option tracking software using the backdated date as the grant date, without indicating that the options were in-the-money, and without reflecting the necessary expense in Juniper's books.  *Id.*, ¶ 56.  As a consequence, Juniper's books for that period did not record the

---

[3]  Where matters are within the opposing party's knowledge, the pleading requirements of Fed. Rule Civ. Proc. 9(b) may be relaxed.  *Moore v. Kayport*, 885 F.2d 531, 540 (9th Cir. 1989); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987).

1    more than $100 million in expenses associated with the in-the-money portion of this "evergreen"

2    grant. *Id.*, ¶ 61.

3    Berry's involvement did not end there, either. She was also intimately involved in Juniper's

4    preparation and filing of its quarterly and annual reports. FAC, ¶¶ 67, 70. The backdated evergreen

5    grant, which fell within Juniper's final quarter of its fiscal year ended December 31, 1999, resulted in

6    materially false financials included with the Form 10-K filed on March 29, 2000. *Id.*, ¶¶ 13, 48-49,

7    67. Berry orchestrated this filing. As the FAC describes:

8       Berry was responsible for, controlled and managed the drafting and preparation of the
        Forms 10-K. She made sure all tasks associated with preparing the Forms 10-K were
9       completed. She reviewed all sections of the Forms 10-K before they were filed and
        weighed in where changes needed to be made. Berry also communicated with Juniper's
10      auditors on issues of concern to the auditors. Juniper's CFO relied on Berry to confirm
        that the Forms 10-K were prepared properly. Juniper's CFO, and Juniper's SEC
11      Reporting Manager, both relied on Berry to identify and correct any inaccuracies in the
        Forms 10-K concerning Juniper's stock option-related disclosures. Berry was the person
12      involved in the 10-K preparation process who knew Juniper had backdated stock options
        and was the person expected to ensure the accuracy of such disclosures, but Berry did not
13      correct Juniper's inaccurate disclosures about stock options nor did she inform others
        involved in the Form 10-K preparation process that Juniper's stock option related
14      disclosures were false.

15   FAC, ¶ 67-68. The FAC thus specifically alleges that Berry reviewed the disclosures regarding stock

16   options; was expected to "weigh[] in where changes needed to be made," as she did for other portions

17   of the filing; and that both the chief financial officer and the SEC reporting manager counted on her

18   and looked to her to "identify and correct any inaccuracies . . . concerning Juniper's stock option-

19   related disclosures." *Id.* Thus, to the management at Juniper, Berry was *the author* of those false

20   disclosures.

21   These important steps taken by Berry – controlling and managing the drafting of the filings,

22   reviewing them for the purpose of correcting inaccuracies in representations about options, and

23   ensuring the accuracy of disclosures to shareholders – constitute precisely the type of conduct upon

24   which primary liability may be founded. *In Re Software Toolworks*, 50 F.3d 625, 628-29 & n.3; *SEC

25   v. Baxter*, 2007 WL 2013958 at *6; *In re ZZZZ Best Securities Litig.*, 864 F. Supp. 960, 970 (C.D.

26   Cal. 1994); *Union Carbide Corp. Cons. Prod. Bus. Sec. Lit.*, 676 F. Supp. 458, 467-69 (S.D.N.Y.

27   1987). Thus, in *In Re Software Toolworks*, the Ninth Circuit found that a plaintiff class had

28   sufficiently pled fraud against underwriters and independent auditors who participated in the drafting

1  of a letter to the SEC from the public company, which those defendants did not sign. 50 F.3d at 625,

2  628-29. The letter was a product of "a joint effort of all professionals working on the offering,"

3  including the underwriters and auditors, who were part of the "working group" that participated in

4  conference calls discussing it and making comments and changes to the letter. *Id.* at 625, 628.

5  Berry's conduct surpasses the role of the defendants in *In Re Software Toolworks*; here, other persons

6  responsible for preparing the document looked specifically to Berry to ensure the accuracy of

7  disclosures in the Form 10-K about stock options. Moreover, as the FAC alleges, Berry authored the

8  false statements about when options were granted and the purported "fair market value" of the

9  company's stock on the date of grant that were carried forward into the financial statements included

10  with the Forms 10-K.[4]

11      As the FAC further alleges, Berry took additional steps to disrupt the disclosure process to

12  make sure that others, including board members and Juniper's shareholders, would not realize that

13  options were in-the-money when granted. For instance, after assuring the "evergreen" grant was

14  recorded in Juniper's books without recording the necessary expense, Berry subsequently caused

15  Juniper's board of directors to be falsely informed that the grant had been made on October 4, 1999,

16  so that they would ratify the grant made to executive officers, which the board did at its subsequent

17  meeting. FAC, ¶ 61. Berry, who as General Counsel acted as the board's secretary, misled the board

18  members so that they, in turn, would misrepresent executive compensation to Juniper's shareholders.

19  _____

20  [4] The factual allegations in the FAC also contrast sharply with defendant's attempt to assume away Berry's involvement in the preparation of the companies' financial statements – particularly in the false statements contained therein. *Compare* FAC, ¶¶ 53-56, 61, 67; *with* Motion at 8 ("the SEC does

21  not allege that Ms. Berry had any role in the preparation of the accounting for or disclosures regarding stock options grants or, more generally, in the preparation of the companies' financial

22  statements"). In the *ZZZZ Best* decision denying summary judgment to the defendant accounting firm, Ernst & Young, the court noted that plaintiffs had cited no facts suggesting any of the

23  fraudulent statements "included any public indication within them that E & Y had anything to do with their existence. None of these additional statements attributes its existence to E & Y or even

24  hints that E & Y might have been involved in the issuance of any of those statements." 864 F. Supp. at 965. However, there nevertheless existed "a disputed issue of fact as to whether E & Y actively

25  participated in the preparation, review or release of the additionally alleged acts." *Id.* at 970. A defendant's role in the preparation of fraudulent statements cannot be assumed away merely because

26  she holds the title of General Counsel and therefore may not be the person most traditionally associated with the preparation of various parts of the public disclosures. Here, the SEC has

27  explicitly alleged Berry owned the false statements made, including the "disclosures regarding stock options grants" and those contained in "the companies' financial statements." Defendant's

28  unfounded protestations to the contrary are not appropriate for a motion to dismiss.

1    *See, e.g., Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (reversing dismissal of

2    complaint alleging defendants' responsibility for false public statements by securities analysts, since

3    defendants were alleged to have intentionally misled the analysts in order to disseminate the false

4    information).

5         Berry's efforts worked.  Having created the false minutes, having directed the transfer of the

6    information from the minutes into Juniper's books and records, and having personally shepherded the

7    preparation and finalization of the Form 10-K, Berry ensured that Juniper's disclosures to its

8    shareholders were false.  Thus, in addition to misrepresenting expenses by more than $100 million,

9    the 1999 Form 10-K contained the following misrepresentation:

10        Juniper Networks' 1996 Stock Option Plan (the Plan) provides for the granting of
          incentive stock options to employees and nonstatutory stock options to employees,
11        directors and consultants. Incentive stock options are granted at an exercise price of not
          less than the fair value per share of the common stock on the date of grant. Nonstatutory
12        stock options may be granted at an exercise price of not less than 85% of the fair value
          per share on the date of grant; however, no statutory stock options have been granted for
13        less than fair market value on the date of grant.

14   Ex. 1 to SEC's Req. for Judicial Notice; FAC, ¶ 48.  As described in the FAC, Berry substantially

15   participated in, and was intricately involved in, the making of misrepresentations about the stock

16   option program and about the expenses incurred by the company in granting stock options in each of

17   the annual and quarterly reports filed on Forms 10-K and 10-Q from 1999 through the second fiscal

18   quarter of 2003.  Accordingly, she is primarily liable for that fraud.

19        Berry was also intricately involved in the preparation of other false filings, including three

20   current reports Juniper filed on Form 8-K and seven registration statements Juniper filed on Forms S-

21   8. As the FAC alleges, each of the current reports announced the false and misleading financial

22   results as a consequence of Berry's having prepared undisclosed grants of in-the-money stock

23   options.  Similarly, each registration statement incorporated by reference false and misleading

24   periodic reports.   As the FAC states:  "Berry decided if and when the company should file Form 8-

25   K's."  FAC, ¶ 71.  Indeed, in controlling the preparation of the Forms 8-K, Berry specifically

26   "determined what information each Form 8-K that contained these false representations should

27   contain."  *Id.*  She was likewise responsible for the preparation of and reviewed each registration

28   statement. *Id.*, ¶ 72.  Moreover, Berry's signature appears in each filed Form S-8, in the legal opinion

1   filed as an exhibit to the statement, which stated that Juniper had authorized the issuance of the

2   shares.

3        Similarly, at KLA, Berry coordinated the drafting, editing and preparation of the documents

4   ultimately filed with the Commission, including the annual and quarterly reports on Forms 10-K

5   and 10-Q, as well as registration statements filed on Form S-8 and annual proxy statements.  FAC,

6   ¶ 40.  "Berry was the person ultimately in charge of ensuring the completion of KLA's SEC

7   filings."  *Id*.  She was in control of both the drafts and the final products for each of these filings,

8   and she "frequently acted as the final decision maker regarding any changes to these drafts."  *Id*.  In

9   particular, Berry was the person particularly responsible for "the reporting of securities acquired,

10  disposed of, or beneficially owned by KLA executives."  *Id*.

11       Berry also authored material misrepresentations in each of KLA's annual proxy statements

12  for 1998 and 1999.  For instance, the 1999 proxy statement declares with respect to grants of stock

13  options to executive officers, "[s]tock options are granted at market price on the date of grant and

14  provide value to the executive officers only when the price of the Company's Common Stock

15  increases over the exercise price."  Ex. 2 to SEC's Req. for Judicial Notice (page 18 of definitive

16  proxy statement).  This statement was not true.  As the FAC details, in October 1998 (when KLA's

17  stock was trading between $10.75 and $13.81), Berry backdated a "peak performance" grant to

18  officers and executives to August 31, 1998 (a date when KLA's stock price closed at $10.63, its

19  lowest closing price for the three months prior to October).  FAC, ¶ 28.  As further set forth in the

20  FAC, Berry employed processes for creating the false option grant documentation, recording in

21  KLA's books and records the false option grant dates without the attendant expenses, and

22  controlling the drafting and finalizing of KLA's filings, including its quarterly and annual reports.

23  Where a falsehood is "traceable" to prior statements or information supplied by the defendant,

24  courts have found primary liability for false statements and omissions of material fact, even though

25  the defendant did not personally draft the document disseminated to investors.  *SEC v. Holschuh*,

26  694 F.2d at 142.  "Although Mr. Holschuh had no direct part in writing the circular and did not read

27  it prior to distribution, the district court expressly found that much of the information contained

28  therein was directly traceable to his conversations with Mr. Stanley."  *Id*. at 134.  Here, similarly, it

1   was Berry's statements and conduct that made KLA's 1999 proxy statement false, and she is

2   therefore primarily liable for the misrepresentations contained in the filings.

3            **2.       Defendant Is Primarily Liable for Misleading Filings She Signed**

4            Defendant does not dispute that she participated in the preparation, and signed (at least part

5   of), three registration statements filed on Form S-8 by KLA, six registration statements filed on Form

6   S-8 by Juniper and four proxy statements announcing Juniper's annual meeting of shareholders.  *See*

7   Motion at 5-6.  And, in defendant's bright line world where a signature is the beginning and ending

8   of the inquiry, her primary liability for the misrepresentations and omissions included in these filings

9   should not be in dispute.  Indeed, Berry is primarily liable for each of these false filings both because

10  she signed them and because she was substantially and intricately involved in their preparation.

11  *Howard v. Everex*, 228 F.3d at 1061-62.

12           Defendant protests against her liability for the misrepresentations in KLA's January 30, 1998

13  and August 7, 1998 Forms S-8 based on her erroneous assertion that the "*earliest* backdated options

14  grant the SEC pleads involved an August 31, 1998 grant date."  Motion at 12 (emphasis in original).

15           Berry's assertion contradicts her own acknowledgement that the FAC alleges Berry

16  backdated grants from "July 31, 1997 through . . . June 15, 1999."  Motion at 10, n.9 (citing FAC, ¶

17  32).  Her entire argument, attacking the allegations concerning two of the three KLA Forms S-8, thus

18  appears premised on a simple mistake.[5]

19           Desperate to stay on the "non-signing" side of the bright line she imagines, defendant

20  disingenuously claims that "Ms. Berry did not *sign* Juniper's proxy statements," but rather signed

21  attached "*meeting notices*."  Motion at 12 (emphasis in original).  In fact, the proxy statements she

22  attaches as exhibits (F-I at 2) contain her signature.  It is the only signature to the entire filing.  Just

23  below Berry's signature, Exhibit F reads:  "This notice of meeting and proxy statement and

24  accompanying proxy card are being distributed on or about April 13, 2000."  Far from supporting her

25  theory that the signature solely regards the date of the annual meeting, the document itself suggests a

26

27  _____

    [5]     The January 30, 1998 registration statement specifically incorporates by reference "Registrant's
    Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 1997" (item 3(c), page 2),
28  which the FAC, ¶ 38, alleges was false.

corporate officer placed her imprimatur on an important communication to shareholders. Even if defendant were to ultimately find evidence to support her strained theory of a limited signature, it is not appropriate at this stage to assume she will, since all inferences must be drawn in favor of the FAC and the facts must be construed in the light most favorable to the Commission. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d at 340; *Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d at 1504.[6]

Finally, it bears mentioning that even for the numerous periodic filings on Forms 10-K that Juniper filed without Berry's actual signature, the company announced that Berry had the power to sign on behalf of each of the signing officers (the CEO, and the CFO), as well as each of the directors.[7] Accordingly, there are more than sufficient facts alleged in the FAC to support Berry's primary liability for the misrepresentations and omissions of fact contained in Juniper's, and KLA's, public filings.

## B.    The FAC Alleges the Same Well-Pled Bases for Scheme Liability

Defendant devotes a substantial portion of her brief to relitigating the question of scheme liability, although the Court's May 7, 2008 Order puts this issue to rest. "As alleged, Ms. Berry falsified stock option grants at both KLA and Juniper to avoid properly accounting for compensation charges. The overall scheme was deceptive, and Ms. Berry's alleged contribution was fraudulent. Accordingly, the SEC's first claim for securities fraud does adequately allege a 'scheme' theory of liability." Order at 17.

---

[6] Furthermore, since defendant refused to answer questions regarding her role in preparing and singing any of the filings, or any of their subparts, the Court should infer that if she did testify, her testimony would support the Commission's allegations. *See SEC v. Trabulse*, 526 F. Supp. 2d at 1007, n.4 (denying motion to dismiss SEC complaint for lack of particularity, finding that the "Court is entitled to make an adverse inference" from defendant's invocation of his Fifth Amendment privilege during Commission investigative testimony).

[7] The signature page to the 1999 Form 10-K (Ex. 1 to SEC Req. for Judicial Notice) thus states:

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Lisa C. Berry and Marcel Gani, and each of them individually, as his attorney-in-fact, each with full power of substitution, for him in any and all capacities to sign any and all amendments to this Report on Form 10-K, and to file the same with, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that said attorney-in-fact, or his or her substitute, may do or cause to be done by virtue hereof.

1    Without even acknowledging that this question was settled in the Court's Order, defendant

2    proceeds to revisit the prior ruling.  However, the Local Rules provide a process for requesting that

3    the Court reconsider an interlocutory ruling.  Rule 7-9 requires that the party seeking reconsideration

4    to first obtain leave of Court before filing such a motion.  Indeed, the rule provides for sanctions for

5    repeating arguments already made.  LR 7-9(c).  Defendant simply ignores this process.

6    Furthermore, even if she had sought leave, defendant's request would have failed, as she

7    offers nothing new for the Court's consideration.  The only "new" law to which she cites, *Stoneridge*

8    *Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S.Ct. 761 (2008), was decided on January

9    15, 2008, approximately one month prior to the hearing on defendant's original motion to dismiss,

10   and nearly four months prior to the Court's May 7, 2008 Order.[8]  She therefore should have raised

11   any such arguments about the case prior to the Court's ruling.  Defendant's further suggestion that the

12   FAC has somehow injected "new facts" upon which scheme liability is premised is simply spurious.

13   As discussed above, the new allegations in the FAC were specifically added to address the Court's

14   Order permitting the Commission to amend, in order to allege with particularity the defendant's role

15   in "finalizing" false filings and to describe the conduct she engaged in that establishes her substantial

16   participation and intricate involvement in the making of material misrepresentations or omissions.  It

17   is simply beyond argument that, if the Commission's complaint satisfied the requirements for scheme

18   liability *before* adding such additional facts, it must continue to satisfy the legal threshold *after* the

19   addition of facts related to false statements and omissions.  Accordingly, defendant offers the Court

20   no reason to revisit this question.[9]

21   _____

22   [8]  Far from signaling the demise of scheme liability in Commission enforcement matters, the Court
     in *Stoneridge* took pains to make clear that if the conclusion of the court below were read to suggest

23   that "there must be a specific oral or written statement before there could be liability under § 10(b) or
     Rule 10b-5, it would be erroneous."  *Id*. at 769.  Instead, the Court squared the ruling below by

24   interpreting it to mean that "the court was stating only that any deceptive statement or act respondents
     made was not actionable because it did not have the requisite proximate relations to the investors'

25   harm."  *Id*.  The Court's opinion proceeds to address the "reliance" prong of private securities claims,
     which does not apply to Commission enforcement actions.  *SEC v. Trabulse*, 526 F. Supp.2d 1001,

26   1006 (N.D. Cal. 2007) (citing *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363 (9th Cir. 1993)).

27   [9]  Although she asserts that scheme liability is simply inconsistent with options backdating, Berry
     never addresses the decisions – including those discussed in the Commission's opposition to her

28   original motion – that find otherwise.  *See, e.g., In re CNET Networks, Inc. Deriv. Litig.*, No. C-06-
     03817 WHA (N.D. Cal. Apr. 11, 2007) (Alsup, J.), 2007 WL 1089690 at *9 ("intentionally

**Footnote continued on next page**

**C.    The FAC Adequately and Appropriately Alleges Berry's Liability for Aiding and Abetting Misrepresentations and Omissions in Proxy Statements**

In the Order, the Court noted that the Commission had not fully specified "how" proxy statements filed with the Commission which described compensation to executives, including stock options grants, were false. Order at 16. The Court found a disconnect between allegations that appeared to be focused on options grants to employees and allegations that disclosures about executive stock options were false. The FAC addresses this apparent disconnect by making clear that, although executive stock option grants followed a somewhat different process for approval, Berry nevertheless backdated those options at times. In particular, the FAC alleges with respect to grants made at KLA, "despite the fact that the Stock Option Committee did not have authority to grant stock options to officers, with Berry's assistance the Committee priced certain officer and executive option grants with the benefit of hindsight, and such grants were later approved by KLA's board of directors." FAC, ¶ 24. Moreover, the FAC describes precisely how Berry made a particular, backdated grant to officers and executives (including herself) in October 1998, and backdated the grants to August 31, 1998. *Id.*, ¶¶ 28-29. Moreover, as the FAC further specifies that KLA stated in its proxy statements concerning compensation to executives through stock options that "the exercise price of the options was the fair market value of the company's common stock as of the date of the grant," which was false due to Berry's backdating. *Id.*, ¶ 20. The FAC similarly alleges that, while at Juniper, Berry repeatedly backdated grants for executives and officers, and that the proxy statements nevertheless asserted that "options are granted at fair market value on the date of grant." *Id.*, ¶¶ 50-52, 61-63.

Although the FAC alleges Berry's primary liability for the misrepresentations contained in the proxy statements, defendant seeks to resurrect her claim by now asserting that the FAC does not adequately allege her aiding and abetting liability. Rather than truly address the additional allegations, however, defendant again rehashes her rejected arguments regarding aiding and abetting

---

employing hindsight to adjust the grant date to an advantageously low price, or "backdating," is fraud"); *In re UnitedHealth Group PSLRA Litig.*, (D. Minn. June 4, 2007), Slip op., 2007 WL 1621456 at *2 (finding "a claim has been stated," after likening the alleged backdating scheme to the ruse in *The Sting* (Universal Pictures 1973)).

1    liability.  Contrary to defendant's assertions here (made with respect to all of the public filings in her

2    original motion), the FAC does plead predicate violations of the securities laws by both KLA and

3    Juniper in issuing false proxies in violation of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a),

4    and Rule 14a-9, 17 C.F.R. § 240.14a-9.  Defendant's argument seems premised on a theory that in the

5    very same paragraphs where the false disclosures are alleged in the FAC, the Commission must

6    repeat the allegations about how executive and officer stock options were backdated.  There is no

7    basis for her theory, and the cases she cites again lend her no support.  *Cf.* Order at 18 (discussing

8    citation to *SEC v. Druffner*, 353 F. Supp.2d 141 (D. Mass. 2005) and *SEC v. Gann*, 2006 WL 616005

9    (N.D. Tex. 2006)).

10         **D.**     **Application of the Doctrine of Equitable Tolling to the Facts Pled in the FAC Renders All of Defendant's Unlawful Conduct Subject to Civil Penalties**

11

12         In its Order, the Court concluded that the only request for relief subject to the time bar in

13    Section 2462 is the civil penalty request, as applied to conduct occurring more than five years before

14    the complaint was filed.  Order at 11. Recognizing that the Ninth Circuit has held that such a time bar

15    may be subject to equitable tolling, the Court granted the Commission leave to amend the complaint

16    to allege that the statute was tolled by defendant's fraudulent concealment.  *Id*. at 11-12 (citing *FEC

17    v. Williams*, 104 F.3d 237, 241 (9th Cir. 1996)). [10]

18         As set forth above, the FAC alleges Berry's conduct resulting in the concealment of the

19    operative facts; that the Commission did not discover those facts within the five-year period, and that

20    the Commission acted with diligence before discovering defendant's backdating.  *E.g.*, FAC, ¶¶ 43-

21    45, 74-76.  In addition to her self-concealing actions during the course of years to hide the true grant

22    dates, and thus the in-the-money value of the stock options granted, the FAC describes how Berry

23    subsequently refused to answer any questions when asked by the persons investigating the

24    companies' historical stock options practices on behalf of both Juniper and KLA.  *Id*., ¶¶ 45, 76.  She

25

26    ––––––––––––––––––

27    [10]   To establish equitable tolling of the statute of limitations the Commission must ultimately show: (1) wrongful concealment of defendant's actions; (2) failure to discover the operative facts that are the basis of the action within the limitations period; and (3) the Commission's due diligence.

28    *Williams*, 104 F.3d at 240.

1    similarly refused to respond to questions about her practices when they were posed by the

2    Commission's staff during its investigations.  *Id*.

3        Nevertheless, within approximately one year of each company's announcement that it would

4    be reviewing its historical practices regarding stock options, the Commission instituted the instant

5    action.  Prior to the revelations in May 2005, the Commission did not have a basis to question the

6    accuracy of either company's representations about its historical stock options practices, which were

7    reported as having been completed consistent with GAAP.

8        As a matter of law, and practicality, it is not the Commission's place to second-guess the

9    representations made in publicly-filed statements of public companies, absent evidence suggesting

10   the unreliability of those statements.  Thus, the Commission does not send examiners into public

11   companies to periodically examine their books and records, as is the case under certain regulatory

12   regimes.  *Cf*. Investment Company Act, Section 31(b), 15 U.S.C. § 80a-30(b) ("Examination of

13   Records").  Instead, Congress long ago put in place a process by which public companies were

14   required to periodically report their financial results, and make other disclosures, in publicly-

15   available filings; as an additional means of providing for the accuracy of those filings, public

16   companies are required to subject their financial statements to annual audits and quarterly reviews.

17   That the securities acts permit the Commission to "in its discretion, make such investigations at it

18   deems necessary to determine whether any person has violated" the securities laws (*e.g.*, 15 U.S.C. §

19   78u(a)), does not mean that the Commission must continually investigate all filings by all public

20   companies to determine whether there might be any violations of the law in order to exercise

21   "diligence."  Defendant's argument that the Commission was not "diligent" in investigating Berry's

22   fraud because in 2003 and again in 2004 the Commission filed cases alleging fraud related to stock

23   options at two other public companies is simply specious.[11]

24

25   _____

26   [11]  Defendant's argument would imply that the Commission should also investigate all public
     companies, at all times, for a host of potential violations, including in addition to stock options
27   backdating, revenue recognition or other accounting fraud, manipulation, and every other type of
     fraud ever previously the subject of a Commission action.
28

1    Furthermore, defendant misconstrues the law that applies in this Circuit, and elsewhere, in

2    suggesting that Berry's scheme in this case to conceal for years her granting of in-the-money options

3    does not amount to fraudulent concealment for equitable tolling purposes. "Where a plaintiff has

4    been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on

5    his part, the bar of the statute does not run until the fraud is discovered." *Williams*, 104 F.3d at 240

6    (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). As the Ninth Circuit has further stated:

7    "If a reasonable plaintiff would not have known of the existence of a possible claim within the

8    limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit

9    until the plaintiff can gather what information he needs." *Santa Maria v. Pacific Bell*, 202 F.3d.

10    1170, 1178 (9th Cir. 2000).

11    As set forth in the very case defendant cites, "self-concealing" conduct underlying fraud

12    claims may establish the equitable tolling of the statute. "For a fraud to be self-concealing, the

13    defendant must have engaged in 'some misleading, deceptive or otherwise contrived action or

14    scheme, in the course of committing the wrong, that [was] designed to mask the cause of action.'"

15    *SEC v. Jones*, 476 F. Supp.2d 374, 382 (S.D.N.Y. 2007) (quoting *Hobson v. Wilson*, 737 F.2d 1, 34

16    (D.C. Cir. 1984)). *See also State of New York v. Hendrickson Brothers, Inc.*, 840 F.2d 1065, 1083-84

17    (2d Cir. 1988) (finding bid-rigging allegations were "self-concealing" and acted to toll the statute).

18    By taking issue with the Commission's allegations of concealment, defendant asks the Court

19    to ignore the FAC's well-pled allegations. Motion at 21 (asserting that the FAC is "illogical" and,

20    contrary to the FAC, arguing that her scheme was "out-in-the-open"). While her device is

21    inappropriate whenever considering a motion to dismiss, it is particularly problematic when assessing

22    allegations of the equitable tolling of the statute of limitations at the pleading stage. *See SEC v.*

23    *Alexander*, 2007 WL 2816195, at *15 (E.D.N.Y. Sept. 26, 2007) (slip op) (applicability of equitable

24    tolling of fraud claims in options backdating case too difficult to analyze in the context of motion to

25    strike an affirmative defense). Moreover, in making her arguments, defendant disregards the

26    allegations that she concealed the facts from the CFO and the SEC reporting manager, who relied

27    upon her to ensure the accuracy of disclosures in Forms 10-K and 10-Q concerning Juniper's stock

28    options (FAC, ¶¶ 67, 70); from Juniper's auditors (*Id*.); and from KLA's outside auditors and the

1  Audit Committee of KLA's board of directors (*Id*., ¶ 44).  She similarly disregards her later

2  unwillingness to answer questions when asked by two investigating committees representing the two

3  companies, and by the Commission's staff during two investigations.  Accordingly, defendant's

4  invitation to ignore the Commission's allegations should be rejected, and her request to limit the

5  scope of conduct upon which penalties may be assessed should be denied.

6  **V.      CONCLUSION**

7        For the above reasons, the defendant's motion to dismiss should be denied in its entirety.

8

9

10  DATED:          July 25, 2008                    Respectfully Submitted,

11

12                                                  /s/ Susan F. LaMarca
                                                    Susan F. LaMarca

13                                                  Attorneys for Plaintiff
                                                    SECURITIES AND EXCHANGE COMMISSION

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28