NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | No. C07-04431 RMW (HRL) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL** |
| v. | |
| LISA C. BERRY, | **[Re: Docket No. 150]** |
| Defendant. | |

Defendant Lisa Berry ("Berry") moves for an order compelling nonparty Audit Committee of the Board of Directors of Juniper Networks, Inc. ("Juniper") (the "Audit Committee") to produce notes and memoranda from Audit Committee interviews of ten Juniper witnesses and from any meetings between the Audit Committee and the government at which those witnesses were discussed. Docket No. 150 ("MTC"). For the reasons described below, the Court GRANTS IN PART and DENIES IN PART Berry's motion.

## BACKGROUND

The Securities and Exchange Commission ("SEC") filed this civil enforcement action in relation to alleged improper stock option backdating at Juniper. Berry was General Counsel of Juniper from June 1999 to January 2004, and the SEC alleges that she oversaw Juniper's stock option granting process.

Following reports in May 2006 that Juniper may have backdated stock options and receiving a subpoena from the United States Attorney's Office for the Eastern District of New York, Juniper's Board of Directors formed an Audit Committee to formally investigate Juniper's historical stock option pricing. The Audit Committee retained Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") to act as its independent counsel in the investigation. The Audit Committee, through Pillsbury attorneys, interviewed 35 current and former directors, officers, employees, and agents of Juniper, among them the following ten "key" witness: (1) Rob Atherton; (2) Blythe Bruntz; (3) Mary Cole; (4) Marcel Gani; (5) Steven Haley; (6) Scott Kriens; (7) Ken Levy; (8) Ken Miller; (9) Linda Neyer; and (10) Brienne Taloff Fisher (collectively, the "Key Witnesses"). The Pillsbury attorneys drafted interview memoranda based on their notes of these interviews.

During the second half of 2006 and 2007, the Pillsbury attorneys met with attorneys for the United States Attorney's Office for the Northern District of California ("USAO") and the SEC (collectively, "the government") in relation to the Audit Committee investigation. All of these discussions were conducted pursuant to confidentiality agreements between the Audit Committee and USAO and the SEC. In some instances, the Pillsbury attorneys provided proffers of certain facts learned through the witness interviews; however, they did not read the memoranda to the government, nor did they give their notes of these meetings or their notes or memoranda of the witness interviews to the government.[1]

Around the same time as the Audit Committee's investigation, Juniper's outside auditor, Ernst & Young ("E&Y"), requested that Pillsbury and its forensic accountant share with it information about the investigation since it was auditing Juniper's financial statements. Using the final interview memoranda to refresh their recollections, the Pillsbury attorneys orally shared with E&Y certain facts provided by witnesses in the course of the investigation. The Pillsbury attorneys did not give their notes or memoranda of their meetings with the government or their notes or memoranda of the witness interviews to E&Y.

---

[1] They did, though, provide the government with copies of the interview binders they used during the witnesses' interviews; these binders, which contain documents relevant to the witness being interviewed, were already produced to Berry by the SEC. Indeed, Juniper represents that Berry has received every document that either it or the Audit Committee ever produced the government.

2

The SEC filed the instant action against Berry in August 2007. A related class action had already been filed against Juniper in July 2006, and eight of the ten Key Witnesses were deposed in relation to that litigation in the fall of 2009. Berry's counsel attended these depositions.

In January 2008, Berry served a document subpoena on the Audit Committee for it to produce any notes and/or memoranda of the Pillsbury attorneys' interviews of the ten Key Witnesses and any notes and/or memoranda of any meetings between the Pillsbury attorneys and the government at which the Key Witnesses were discussed. The Audit Committee refused to do so on the ground that the material sought was protected by the attorney work product doctrine.[2]

Berry now moves for an order compelling the material sought. The Audit Committee opposes Berry's motion (Docket No. 146 ("Opp'n")), and oral argument was heard on February 22, 2011.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." FED. R. CIV. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. However, the broad scope of permissible discovery is limited by, among other things, the attorney work product doctrine. See FED. R. CIV. P. 26(b)(3).

"The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects 'from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation.'" In re Grand Jury Subpoena, 357 F.3d 900, 906 (9th Cir. 2004) (quoting Admiral Ins. Co. v. U.S. Dist. Court, 881 F.2d 1486, 1494 (9th Cir. 1989)). Nevertheless, the protection afforded by the doctrine is qualified and may be overcome if the party seeking disclosure shows that the materials are otherwise discoverable under Fed. R. Civ. P. 26(b)(1) and that "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P. 26(b)(3)(A)(i), (ii).

---

[2] The Court notes that any attorney work product protection belongs to the Pillsbury attorneys, not the Audit Committee. However, since no party has taken issue with this issue, the Court will proceed to decide the motion before it as if Pillsbury had objected on this ground.

3

"[C]ourts are in accord that the attorney work-product privilege is not absolute and may be waived, for example, when an attorney attempts to use the work product as testimony or evidence, or reveals it to an adversary to gain an advantage in litigation." United States v. Reyes, 239 F.R.D. 591, 598 (N.D. Cal. 2006) (citing United States v. Nobles, 422 U.S. 225, 239-40 (1974)). However, determination as to whether there has been a waiver "requires a court to balance competing interests: 'the need for discovery' with 'the right of an attorney to retain the benefits of his own research.'" SNK Corp. of America v. Atlus Dream Entertainment Co., Ltd., 188 F.R.D. 566, 571 (N.D. Cal. 1999) (quoting Handguards, Inc. v. Johnson & Johnson, 413 F. Supp. 926, 932 (N.D. Cal. 1976)). Additionally, the determination whether there has been any waiver is rooted in principles of fairness. SNK Corp., 188 F.R.D. at 571 ("Like with waiver of the attorney-client privilege . . . fairness principles should be applied in considering whether work product immunity has been waived.").

## DISCUSSION

The Audit Committee challenges Berry's motion on the ground that the materials she seeks are protected as attorney work product.[3] Berry contends that the materials (A) are not protectable as attorney work product, and (B) even if they are, the Audit Committee waived such protection, and (C) even if the Audit Committee did not waive protection, her need for the materials is substantial enough to allow her access to them.

A. Are the Materials Protectable as Attorney Work Product?

Berry initially argues that, because facts contained within an attorney's notes or memoranda are not protected as work product, the Pillsbury attorneys' notes and memoranda of the interviews are not protectable as attorney work product. Docket No. 155 ("Reply") at 8-9 (citing United States v. Deloitte LLP, 610 F.3d 129, 139 (D.C. Cir. 2010) (remanding case and instructing district court to assess whether a memorandum was entirely work product or whether a redacted version could be

---

[3] As Berry correctly notes, any attorney-client privilege was waived when the Audit Committee communicated with the Government and E&Y about these issues. See U.S. v. Ruehle, 583 F.3d 600, 609, 612 (9th Cir. 2009). The Audit Committee does not appear to challenge this point and it did not address it in its opposition. However, "[w]hile voluntary disclosure waives the attorney-client privilege, it does not necessarily waive work-product protection." United States v. Deloitte LLP, 610 F.3d 129, 139 (D.C. Cir. 2010) (citing United States v. Am. Tel. & Tel. Co., 642 F.2d 1285, 1299 (D.C. Cir. 1980)).

4

disclosed because, while the memorandum did contain an attorney's thoughts and analyses, other analyses by non-attorneys "may not be so intertwined with the legal analysis as to warrant protection"); Xerox Corporation v. International Business Machines Corporation, 64 F.R.D. 367, 381 (S.D.N.Y. 1974) (attorney work product doctrine does not protect non-privileged facts)).[4] But while it is hornbook law that underlying non-protectable facts cannot be clothed with the protections of the attorney work product doctrine, see EDNA SELAN EPSTEIN, 2 THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE at 1123-1126 (5th ed. 2007), it is also quite clear that an attorney's notes or memoranda of an interview are often considered to be "classic attorney work product." See SEC v. Roberts, 254 F.R.D. 371, 375, 383 (N.D. Cal. 2008) (Patel, J.); SEC v. Schroeder, No. C07-03798 JW (HRL), 2009 WL 1125579 (N.D. Cal. Apr. 27, 2009) (Lloyd, J.) (finding that attorney notes and draft memoranda of witness interviews "fall within the ambit of the work product doctrine" where the attorneys submitted declarations supporting their contention that they were not "mere scriveners"); Reyes, 239 F.R.D. at 602, 602 n.2 (Breyer, J.).[5] Thus, the Court finds that the notes and memoranda at issue are protectable as attorney work product.

B. Were the Protections of the Attorney Work Product Doctrine Waived?

Berry next argues that, even if the materials are protected as attorney work product, the Audit Committee waived this protection when it disclosed the substance of the interviews to the government and to E&Y.

1. Waiver Due to Disclosure to the Government

Berry first contends that the Audit Committee waived this protection when it provided to the government proffers of certain facts learned through the witness interviews.

---

[4] Berry also cites an order in the Juniper class action litigation in which the court ruled that certain notes and memoranda of witness interviews are not protectable as attorney work product. In re Juniper Networks, Inc. Sec. Litig., Nos. C06-04327 JW (PVT), C08-00246 JW (PVT), 2009 WL 4644534, at *2-3 (N.D. Cal. Dec. 9, 2009). The Court has considered this decision, but disagrees with its outcome and with Berry's claim that it applies here.

[5] Here, Pillsbury associate attorney Robert Nolan submitted a declaration in which he states, with respect to the attorney notes and memoranda of the witness interviews, that the attorneys selected the subjects and questions of the interviews, that the memoranda are not verbatim or even substantially verbatim records of the interviews, and that the memoranda reflect the attorneys' thoughts processes in selecting and summarizing portions of the interviews based on the attorneys' understanding and judgment of which facts and comments were important. Docket No. 148 ("Nolan Decl.") ¶ 3.

5

In support of its waiver theory, Berry relies heavily on Judge Breyer's opinion in <u>United States v. Reyes</u>, 239 F.R.D. 591 (N.D. Cal. 2006), which features nearly identical facts to those present here (although <u>Reyes</u> was a criminal matter). In that case, the law firms of Morrison & Foerster ("MoFo") and Wilson Sonsini Goodrich & Rosati ("WSGR"), each as separate counsel for Brocade Communication Systems, Inc.'s ("Brocade") Audit Committee ("Brocade's Audit Committee"), interviewed Brocade employees as part of an internal stock options backdating investigation. <u>Id</u>. at 596. Pursuant to confidentiality agreements, MoFo and WSGR provided the government with "oral briefings" of their interviews and WSGR provided a PowerPoint presentation of its findings. <u>Id</u>.

Thereafter, Brocade's former Chief Executive Officer, Gregory Reyes ("Reyes"), was indicted in relation to the alleged improper stock option backdating. <u>Id</u>. at 596-97. Reyes moved to compel MoFo and WSGR to produce their interview notes and memoranda and any notes or reports of their meetings with the government. <u>Id</u>. at 599.

As the Audit Committee does here, MoFo and WSGR argued that their confidentiality agreements with the government allowed them to provide the government with the substance of their investigation without waving work product protection. <u>Id</u>. at 604. Judge Breyer found this position to be without merit:

> Nor do the putative confidentiality agreements executed by MoFo or [WSGR] preserve the work-product privilege. Different judges have reached different conclusions, on remarkably similar facts, about whether a confidentiality agreement between disclosing and receiving parties may rescue or resuscitate an otherwise relinquished work-product privilege. <u>Compare</u> <u>In re McKesson HBOC, Inc., Sec. Litig.</u>, 2005 WL 934331 (N.D. Cal. Mar. 31, 2005) (Whyte, J.), <u>with</u> <u>United States v. Bergonzi</u>, 216 F.R.D. 487 (N.D.Cal. 2003) (Jenkins, J.). Nonetheless, for the reasons set forth above — namely, the opportunistic use of privileged work product and its disclosure to an adversary — the confidentiality agreements do not save the day for MoFo and [WSGR]. Also, the agreements executed in this case are little more than fig leafs. They grant the SEC and DOJ permission to share the disclosed information "in furtherance of the [agencies'] discharge of [their] duties and responsibilities." With this capacious clause, the law firms essentially leave the agencies to manage the disclosed information as they see fit. When, after sharing it with others, privilege-holders retain so little power over their confidential work product, it is not proper to credit their subsequent efforts to protect it. <u>See</u> <u>In re Qwest Commc'ns Int'l, Inc.</u>, 450 F.3d 1179, 1194 (10th Cir. 2006) (rejecting the argument that a confidentiality agreement with government regulators preserved any privileges where "[t]he agreements [did] little to restrict the agencies' use of the materials they received"); <u>In re Chrysler Motors Corp. Overnight Evaluation Program Litig.</u>, 860 F.2d 844, 847 (8th Cir. 1988) (rejecting the idea that a promise among contracting parties to keep information confidential in the future when the privilege-holder had intentionally

6

disclosed the information in the formation of such a contract). Finally, unlike the case on which MoFo and [WSGR] rely most heavily, in this case the party without the work product faces the unfairness of "defend[ing] against the privilege holder's claim without access to pertinent privileged materials that might refute the claim." In re McKesson, 2005 WL 934331, at *10 (quoting John Doe Co. v. United States, 350 F.3d 299, 304 (2d Cir. 2003)).

Id. Judge Breyer thus found that Brocade's Audit Committee counsel gave up their work product protection when they shared the substance of their work product with the government, despite the existence of certain confidentiality agreements. Id. at 604. Most courts similarly hold that such confidentiality agreements do not prevent waiver. See In re Qwest Commc'ns Int'l Inc., 450 F.3d 1179, 1194 (10th Cir. 2006); In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 303 (6th Cir. 2002); Westinghouse Elec. Corp. v. Rep. of the Philippines, 951 F.2d 1414, 1430 (3d Cir. 1991); In re Chrysler Motors Corp. Overnight Evaluation Program Litig., 860 F.2d 844, 847 (8th Cir. 1988). But see In re Steinhardt Partners, L.P., 9 F.3d 230, 236 (2d Cir. 1993) (noting in dicta that a confidentiality agreement might prevent waiver in some instances).

      Here, the confidentiality agreements that the Audit Committee entered into with the two government agencies are the same "fig leaves" described by Judge Breyer — they both allow the USAO and the SEC to share the disclosed information as "required by law" or "in furtherance of the [agencies'] discharge of [their] duties and responsibilities." Nolan Decl., Exs. A, B.[6]

      As it must, the Audit Committee hangs its hat on Judge Whyte's decision in In re McKesson HBOC, Inc. Sec. Litig., No. 99-cv-20743, 2005 WL 934331 (N.D. Cal. Mar. 31, 2005). In that case, the board of directors of McKesson HBOC, Inc. ("McKesson") formed an audit committee to investigate certain issues related to revenue recognition. Id. at *1. The audit committee engaged the law firm of Skadden, Arps, Meagher & Flom ("Skadden") to conduct the investigation, and whereby

---

[6] The agreement with the United States Attorney's Office for the Northern District of California states that "[t]he USAO will maintain the confidentiality of the [copies of materials and oral briefings] pursuant to this agreement and will not disclose them to any third party, except to the extent that the USAO determines in its sole discretion that disclosure is otherwise required by law or would be in furtherance of the USAO's discharge of its duties and responsibilities." Nolan Decl., Ex. B at 1. The agreement with the SEC contains a similar provision: "The Staff [of the SEC] will maintain the confidentiality of the [copies of materials and oral briefings] pursuant to this agreement and will not disclose them to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the [SEC's] discharge of its duties and responsibilities." Id., Ex. A at 1.

7

1  its attorneys conducted numerous witness interviews. Id. Pursuant to confidentiality agreements, the
2  audit committee agreed to provide the government with copies of the investigation report and other
3  materials. Id. These agreements, like the ones in Reyes and in this case, allowed the government to
4  disclose the report and materials in furtherance of their duties and responsibilities. Id. at *2.

5        Later, the plaintiffs in a related securities class action sought the report and materials that the
6  audit committee, through the Skadden attorneys, provided to the government. Id. at *1. In granting
7  Skadden's motion for a protective order, while Judge Whyte acknowledged that most courts found
8  that waiver had occurred in these circumstances, he found it persuasive to distinguish "between
9  disclosure to a private entity (resulting in waiver) and disclosure to a government entity pursuant to
10 a confidentiality agreement (maintaining work product protection) . . . [because] the presence of a
11 confidentiality agreement ensures, to the extent possible under the law, that disclosure of the
12 protected materials will not reach adverse parties." Id. at *9. He determined that the confidentiality
13 agreements were not "fig leaves" because "the extent of the re-disclosure is not broader than
14 required to make voluntary disclosure by McKesson useful to the government" and "[t]he re-
15 disclosure provisions are logical preconditions for the government's agreeing to treat the materials
16 as privileged and confidential." Id. at *10.

17       This Court finds the reasoning of Reyes more persuasive. First, the confidentiality
18 agreements place all of power with the government and essentially leave the Audit Committee with
19 none. While the re-disclosure provisions indeed may be logical preconditions for the government to
20 enter into such an agreement, this does not cure the fact that they basically allow the government,
21 which is in an adversarial position to Juniper, to decide if it wants to disclose the information or not.
22 Second, the Court agrees with Judge Breyer (and with Judge Jenkins in Bergonzi) that if a party
23 "lower[s] the shield of protection to foster an amicable relationship with the government," it should
24 not then be able to "raise it against parties injured by [its] disclosures." Reyes, 239 F.R.D. at 603.
25 See also id. at 604; Bergonzi, 216 F.R.D. at 497 ("It is unherently unfair to permit an entity to
26 choose to disclose materials to one outsider while withholding them from another on grounds of
27 privilege."). Third, it is questionable whether distinguishing between disclosure to a private party
28 and disclosure to the government promotes cooperation from a corporate target, as several cases

cited by Judge Breyer suggest that such entities behave the same either way. See Reyes, 239 F.R.D. at 603 (citations omitted).

Thus, the Court finds that the Audit Committee waived work production protection as to substance of any of the material sought that was disclosed to the government. In this regard, the Audit Committee states that only five of the Key Witnesses' statements were discussed with the government at all. Reply at 12-13. Specifically, the Audit Committee states that the Pillsbury attorneys did not discuss with the government the interviews of Bruntz, Cole, Haley, Levy, or Neyer. Id. at 12 n.6 (citing Nolan Decl. ¶ 7). This means that the interviews of Atherton, Gani, Miller, Kriens, and Taloff Fisher were discussed with the government, and so the Audit Committee waived work product protection as to those five Key Witnesses.

But the waiver with respect to these five Key Witnesses does not mean that Berry should get the Pillsbury attorneys' underlying notes and draft interview memoranda. Presumably, the attorneys used the final interview memoranda to refresh their recollections when discussing the five Key Witnesses with the government. And as this Court explained in Schroeder:

> This court concludes that Skadden's internal notes and drafts need not be produced. "Most courts have held . . . that simply because a final product is disclosed to the public (or a third person), an underlying privilege attaching to drafts of the final product is not destroyed." In re Air Crash Disaster at Sioux City, Iowa, 133 F.R.D. 515, 518 (N.D.Ill. 1990) (concluding that draft reports prepared in connection with an accident investigation did not lose work product immunity by virtue of the fact that the final report was made public); see also In re Linerboard Antitrust Litig., 237 F.R.D. 373, 388-390 (E.D. Pa. 2006) (concluding that production of a "White paper" report did not effect a subject matter waiver as to an attorney's opinion work product or commingled fact and opinion work product).

Schroeder, 2009 WL 1125579, at *7 (rejecting the defendant's argument that production of final interview memoranda did not effect a broad waiver as to the entire subject matter of the disclosed material).

Accordingly, since the Audit Committee waived attorney work product protection with respect to their interviews of Bruntz, Cole, Haley, Levy, or Neyer, the Audit Committee must turn over the final interview memoranda for these five Key Witnesses to Berry.

2. Waiver Due to Disclosure to E&Y

9

Berry also argues that the Audit Committee waived the protections of the work product doctrine over the interview notes and memoranda when it shared the substance of those interviews with E&Y. MTC at 15-17 (citing Middlesex Retirement Sys. v. Quest Software, Inc., No. 06-6863 DOC (RNB), slip op., at 10-11 (C.D. Cal. July 8, 2009); Medinol, Ltd. v. Boston Scientific Corp., 214 F.R.D. 113, 116 (S.D.N.Y. 2002); Diasonics Sec. Litig., No. C83-4584, 1986 WL 53402, at *1 (N.D. Cal. June 15, 1986)). This Court has already dealt with this issue before, and its decision applies equally here. In Schroeder, this Court explained:

> Courts are split over the question whether disclosure to an independent auditor waives protection. Some courts find a waiver on the ground that the auditor acts as a "public watchdog" with interests that are not necessarily aligned with those of the company being audited. See, e.g., Medinol, Ltd. v. Boston Scientific Corp., 214 F.R.D. 113, 116 (S.D.N.Y. 2002) (concluding that work product protection as to the special litigation committee's materials was waived when the information was disclosed to an outside auditor); Diasonics Securities Litig., No. C83-4584, 1986 WL 53402 (N.D. Cal., June 15, 1986) (concluding that the work product protection did not apply to documents disclosed to an auditor acting as a public accountant rather than as a consultant). Cf. Samuels v. Mitchell, 155 F.R.D. 195, 200-201 (N.D. Cal. 1994) (finding no waiver where documents were disclosed to an auditor that acted as a consultant rather than as a public accountant).
>
> Nevertheless, under the circumstances presented here, this court finds that the better view, recently followed by another court in this district in a different stock option backdating case, is that espoused by Merrill Lynch & Co. v. Allegheny Energy, Inc., 229 F.R.D. 441 (S.D.N.Y. 2004). That court concluded that disclosures to outside auditors do not have the "tangible adversarial relationship" requisite for waiver. Id. at 447. The court reasoned:
>
>> [A]ny tension between an auditor and a corporation that arises from an auditor's need to scrutinize and investigate a corporation's records and book-keeping practices simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine. Nor should it be. A business and its auditor can and should be aligned insofar as they both seek to prevent, detect, and root out corporate fraud. Indeed, this is precisely the type of limited alliance that courts should encourage. For example, here Merrill Lynch complied with Deloitte & Touche's request for copies of the internal investigation reports so that the auditors could further assess Merrill Lynch's internal controls, both to inform its audit work and to notify the corporation if there was a deficiency.
>
> Id. at 448. As noted by the court in Roberts, this view "furthers the strong public policy of encouraging critical self-policing by corporations. Indeed, sanctioning a broad waiver here would have a chilling effect on the corporation's efforts to root out and prevent corporate fraud and disclose the results as necessary to its auditors." 254 F.R.D. at 381-82.

Schroeder, 2009 WL 1125579, at *9.

10

Berry's attempts to distinguish this Court's decision in Schroeder fail. For example, she says that at the time the Audit Committee shared the substance of its witness interviews with E&Y, Juniper and E&Y were potential adversaries in the Juniper class action. But the court in Roberts persuasively rebutted such an argument when it explained that an auditor and an investigative committee of a corporate client have aligned, not adversarial, interests because an auditor's fiduciary duty to its client requires it to advise its client to restate its financial statements upon discovery of wrongdoing. Roberts, 254 F.R.D. at 382. Berry also says that the Audit Committee's disclosure also increased the risk that the substance of the interviews would reach its adversaries, as E&Y sent a large production of documents, which included many protected ones, to the SEC. But this production was an obvious mistake, evidenced by the government's notification to the Audit Committee of the mistake and agreement not to review the protected documents. Docket No. 147 ("Hasson") Decl. ¶ 15.

As such, the Court finds that the Audit Committee did not waive work product protection by sharing the substance of its witness interviews with E&Y.

C. Can Berry Nevertheless Gain Access to the Requested Materials?

Berry contends that, even if the materials are protectable as work product and the Audit Committee did not waive this protection, she should still gain access to them because they are "fact work product" and she has a substantial need for them and she cannot otherwise obtain their substantial equivalent.

Berry correctly states that under Rule 26, "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial" unless "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P. 26(b)(3). So, "[i]f the relevant work product contains only non-privileged facts and a party satisfies the substantial need and undue hardship elements, a court may order discovery of the relevant materials, known as fact work product." In re HealthSouth Corp. Sec. Litig., 250 F.R.D. 8, 10 (D.D.C. 2008); see also Roberts, 254 F.R.D. at 374-75 (recognizing same standard, although not using the "fact work product" terminology).

1   However, courts must further protect against the disclosure of "opinion work product" —
2   that is, "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or
3   other representative concerning the litigation." FED. R. CIV. P. 26(b)(3)(B). "Under Ninth Circuit
4   law, such opinion work product is discoverable only if it is '*at issue* in the case and the need for the
5   material is compelling.'" Roberts, 254 F.R.D. at 375 (quoting Holmgren v. State Farm Mut. Auto.
6   Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992)).

   1.  The Interview Notes and Memoranda

8   Berry argues that an attorney's interview notes and memoranda are "routinely classified" as
9   fact work product, and that many courts, including this one, have applied the "substantial need"
10  standard to similar materials. MTC at 9 (citing In re HealthSouth, 250 F.R.D at 11-13; In re IPO
11  Sec. Litig., 249 F.R.D. 457, 465 & n.64 (S.D.N.Y. 2008)); Reply at 2 (citing In re Sealed Case, 124
12  F.3d 230, 235-36 (D.C. Cir. 1997), rev'd on other grounds, 523 U.S. 399; Schroeder, 2009 WL
13  1125579, at *7; Xerox, 64 F.R.D. at 381-82).

14  The cases Berry cites, however, are distinguishable. In In re HealthSouth, the court found
15  that the witness interview memoranda were fact work product because the attorneys "neither crafted
16  nor asked the questions and because the memoranda contain complete summaries of the interviews,
17  indicating [that the attorneys] did not carefully week the material in any manner that would reveal
18  attorney mental processes . . . ." In re HealthSouth, 250 F.R.D. at 12. Instead, the attorneys took
19  nearly verbatim notes while FBI agents conducted the interviews. Id. at 13. Similarly, in In re IPO
20  Sec. Litig., the court determined that the witness interview memoranda were fact work product
21  because the attorneys stated that while the memoranda "were not intended to be verbatim recitals of
22  the interviewees' statements, [they were nevertheless] factual summaries of those statements as
23  memorialized by outside counsel." In re IPO Sec. Litig., 249 F.R.D. at 465 & n.64. In addition, the
24  District of Columbia Circuit in In re Sealed Case also surmised that an attorney's interview notes
25  might be fact work product in the context of a preliminary interview where "one would expect him
26  to have tried to encourage a fairly wide-ranging discourse from the client, so as to be sure that any
27  nascent focus on the lawyer's part did not inhibit the client's disclosures." In re Sealed Case, 124
28  F.3d at 236. The appellate court then remanded the case back to the district court to reexamine the

12

1  notes in light of this observation. Id. at 237. And while the district court in Xerox suggested that if
2  non-protected facts cannot be distilled from protected information, the entire contents should be
3  produced, the court did not provide any specific citation for this proposition (aside from apparently
4  deriving it from the "basic thrust of Hickman [v. Taylor] and its progeny").

5  Moreover, Berry misreads this Court's previous decision in Schroeder. In Schroeder, the
6  defendant argued that the attorneys' witness interview notes and draft memoranda were fact work
7  product and subject to the lower standard. In discussing this argument, the Court found that the
8  attorneys' declarations stating that they were not "mere scriveners" suggested that the materials
9  were, "at the very least, commingled fact and opinion work product." Schroeder, 2009 WL
10 1125579, at *7. In any case, it did not matter, because the Court then went on to state that the
11 defendant had not met even the lower fact work product standard for gaining access to the materials.
12 Id.

13 The Audit Committee counters with authority of its own where courts concluded that witness
14 interview notes and memoranda are opinion work product and thus subject to the higher standard.
15 Opp'n at 8 (citing Hickman v. Taylor, 329 U.S. 495, 509-510 (1947) (denying the plaintiffs' request
16 for an attorneys' witness interview notes and memoranda as "an attempt, without purported
17 necessity or justification, to secure written statements, private memoranda and personal
18 recollections prepared or formed by an adverse party's counsel in the course of his legal duties");
19 Upjohn Co. v. United States, 449 U.S. 383, 399 (1981) ("Forcing an attorney to disclose notes and
20 memoranda of witness' oral statements is particularly disfavored because it tends to reveal the
21 attorney's mental processes.")). See also Roberts, 254 F.R.D. at 375 ("There is no dispute that the
22 interview notes in question here are classic attorney work product — they comprise handwritten
23 notes that include the attorney's mental impressions, conclusions and opinions."); O'Connor v.
24 Boeing North America, 216 F.R.D. 640, 643 (C.D. Cal. 2003) (citing cases stating that an attorney's
25 witness interview notes and memoranda are opinion work product).

26 Based on its review of the applicable authority, the Court believes that the Pillsbury
27 attorneys' witness interview notes and memoranda in this case are opinion work product and thus
28 are subject to the higher standard. Indeed, one of the Pillsbury attorneys stated in a declaration that

13

1 the attorneys selected the subjects and questions of the interviews, that the memoranda are not
2 verbatim or even substantially verbatim records of the interviews, and that the memoranda reflect
3 the attorneys' thought processes in selecting and summarizing portions of the interviews based on
4 the attorneys' understanding and judgment of which facts and comments were important. Nolan
5 Decl. ¶ 3.

6 Accordingly, the interview notes and memoranda of the five Key Witnesses not discussed
7 with the government (i.e., not those witnesses for whose memoranda protection was waived) are
8 only discoverable only if they are "'*at issue* in the case and the need for the material is
9 compelling.'" Roberts, 254 F.R.D. at 375 (quoting Holmgren, 976 F.2d at 577). Here, the interview
10 notes and memoranda are not "at issue"; rather, they simply contain information that Berry wants to
11 see. Since Berry does not meet this higher standard, her motion to compel is denied as to the
12 Pillsbury attorneys' notes and memoranda of the interviews of Bruntz, Cole, Haley, Levy, and
13 Neyer.

14        2.   <u>The Notes and Memoranda of the Meetings with the Government</u>

15 However, the lower standard applies with respect to the notes and memoranda of the
16 Pillsbury attorneys' meetings with the government. As Berry points out, in such meetings, it would
17 be the government who would be asking the questions and the Pillsbury attorneys who would be
18 providing factual answers to those questions. Reply at 2-3. In this situation, the Audit Committee's
19 argument that these materials are opinion work product fails because the Pillsbury attorneys' mental
20 impressions and theories likely would not have been a part of them. Indeed, the Pillsbury attorney
21 who submitted a declaration providing facts to support the Audit Committee's contention that the
22 witness interview notes and memoranda are opinion work product did not include any such facts
23 with respect to the notes and memoranda of the meetings with the government. See Nolan Decl. ¶¶
24 5-10. This omission leads the Court to believe that the notes and memoranda of the meetings with
25 the government contain mostly factual recitations and thus are fact work product that would be
26 subject to the lower, "substantial need" standard.

27 Does Berry meet this standard? She says she has a substantial need for this information
28 because many of the events at issue in the case took place over ten years ago and the Key witnesses

14

have begun to forget material facts (as demonstrated in their late 2010 depositions in the Juniper class action). MTC at 10; Reply at 3-4. And she also says that she cannot, without undue hardship, obtain their substantial equivalent by other means because new depositions under this circumstance are poor substitutes when the witnesses cannot remember such old events. MTC at 11-12.

The Court believes Berry's arguments are moot. As noted above, the Court will grant her motion to compel as to the final interview memoranda for Atherton, Gani, Miller, Kriens, and Taloff Fisher — who are the only Key Witnesses discussed with the government — and these memoranda are a sufficient substitute for the Pillsbury attorneys' notes and memoranda of their meetings with the government as to those witnesses. After all, any information about those five Key Witnesses contained in the meeting notes and memoranda would already be contained in those witnesses' interview memoranda. Since this is the case, Berry cannot show a substantial need for the meeting notes and memoranda. Thus, the Court will deny her motion as to these materials.

## CONCLUSION

Based on the above, the Court GRANTS IN PART and DENIES IN PART Berry's motion to compel. Specifically, the Court:

1. grants Berry's motion to compel the final interview memoranda for Atherton, Gani, Miller, Kriens, and Taloff Fisher, but denies her motion to compel any notes or draft memoranda as to these witnesses;

2. denies Berry's motion to compel any notes or memoranda of the interviews of Bruntz, Cole, Haley, Levy, or Neyer; and

3. denies Berry's motion to compel any notes or memoranda of the Audit Committee's meetings with the government.

**IT IS SO ORDERED.**

Dated: March 7, 2011

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

15

**C07-04431 RMW (HRL)** N**otice will be electronically mailed to:**

| | |
|---|---|
| Amy M. Ross | aross@orrick.com |
| Benjamin Cunningham Geiger | bgeiger@orrick.com |
| Edward W. Swanson | eswanson@swansonmcnamara.com |
| Elena Ro | roe@sec.gov |
| James A. Meyers | jmeyers@orrick.com |
| James Neil Kramer | jkramer@orrick.com |
| Jeffrey Bruce Coopersmith | jeff.coopersmith@dlapiper.com, bradley.meissner@dlapiper.com, evelyn.dacuag@dlapiper.com |
| Jeremy Emerson Pendrey | pendreyj@sec.gov |
| Joni L. Ostler | jostler@wsgr.com, pbaird@wsgr.com |
| Judith L. Anderson | andersonju@sec.gov, huangw@sec.gov, johnstonj@sec.gov |
| Katherine Collinge Lubin | klubin@orrick.com |
| Marc J. Fagel | fagelm@sec.gov |
| Mark Philip Fickes | fickesm@sec.gov |
| Matthew Austen Tolve | mtolve@orrick.com |
| Matthew Eric Sloan | Matthew.Sloan@skadden.com, eaviad@skadden.com, jlyons@skadden.com, mtroost@skadden.com |
| Michael David Torpey | mtorpey@orrick.com |
| Nancy E. Harris | nharris@orrick.com, vsweet@orrick.com |
| Randall Scott Luskey | rluskey@orrick.com, gpackard@orrick.com |
| Rebecca Felice Lubens | jcopoulos@orrick.com, klubin@orrick.com, nharris@orrick.com, rlubens@orrick.com, sjaffer@orrick.com |
| Robert John Nolan | robert.nolan@pillsburylaw.com, docket@pillsburylaw.com |
| Steven Andrew Hong | shong@orrick.com |
| Susan F. LaMarca | lamarcas@sec.gov, huangw@sec.gov, johnstonj@sec.gov |
| Thomas R. Green | thomas.green@usdoj.gov, daniel.charlier-smith@usdoj.gov, lily.c.ho-vuong@usdoj.gov |

**Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.**